UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-CV-23983

MSP RECOVERY CLAIMS, SERIES LLC,  a
Delaware entity,

       Plaintiff,

vs.

DAIRYLAND INSURANCE COMPANY,
a Foreign Profit Corporation,

       Defendant.

_____/

## <u>NOTICE OF REMOVAL</u>

Defendant, *Dairyland Insurance Company* ("Defendant"), hereby removes to this Court the state court action *MSP Recovery Claims, Series LLC v. Dairyland Insurance Company*, Case No. 2017-019585-CA-01, filed in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.  This Court has jurisdiction over said action on the basis of: (i) the Class Action Fairness Act ("CAFA"), 18 U.S.C. §1332(d), (ii) traditional diversity jurisdiction, and (iii) federal question jurisdiction.

**BACKGROUND**

1.      On October 2, 2017, Plaintiff served Defendant with the Complaint in this action. In compliance with 28 U.S.C. § 1446(b), this Notice of Removal is filed within thirty days after service of said Complaint.

2.      Plaintiff's Complaint is expressly based on alleged rights under the federal MSP laws, the Medicare Secondary Payer statute ("MSP Act"), 42 U.S.C. § 1395y, and related federal regulations.

3.      The primary basis alleged for Plaintiff's Complaint, appearing in its very first paragraph, is that "Defendant failed to fulfill its statutory-mandated duty under the Medicare Secondary Payer ('MSP') laws to reimburse Medicare Advantage Organizations ('MAOs') for medical treatment and expenses paid by Plaintiff and the putative Class Members . . . on behalf of Medicare beneficiaries who entered into a settlement with Defendant."  (Compl., ¶ 1.)

4.      According to Plaintiff, under "the MSP laws, MAOs are, by law, secondary payers for any medical expenses that are also covered by the terms and conditions of a primary policy," and Defendant's no-fault automobile insurance policies provide for primary coverage for medical bills incurred as the result of an auto accident.  (Compl., ¶¶ 3, 4.)

5.      Plaintiff claims to be the assignee of "numerous MAOs" that paid Medicare benefits on behalf of Defendant's insureds, referred to in the Complaint as Medicare beneficiaries, who were allegedly insureds under Defendant's no-fault policies.   (Compl., ¶ ¶ 5, 9.)  Plaintiff has alleged that Defendant was primarily responsible for the payment of these insureds' Medicare expenses.  *Id*.

6.      The putative class allegedly consists of entities that:

> contracted directly with CMS and/or its assignee pursuant to Medicare Part C including, but not limited to, MAOs, and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by CMS and HHS, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant; and

2

have made payment(s) of benefits, services and/or supplies whereby the MAO, as a secondary payer, has the direct right and responsibility to collect for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee and the Florida no-fault law (section 627.736(4), Florida Statutes), was/is financially responsible to a Medicare beneficiary; and

have not been reimbursed by Defendant pursuant to the recognized Current Procedure Terminology codes based on the fee-for-service by the primary payer, as delineated by Section 627.736, Florida Statutes, for medical services and/or supplies for their damages.

(*Id.*, ¶ 27.)

7.    Plaintiff asserts three causes of action:  Count I "Breach of Contract for Failure to Pay PIP Benefits"; Count II "Breach of Contract for Failure to Pay PIP Benefits [Conventional Subrogation]"; and Count III "Breach of Contract for Failure to Pay PIP Benefits [or in the Alternative, Equitable Subrogation]."  (Compl., ¶¶ 52-67.)

## I.    THE COURT HAS JURISDICTION UNDER CAFA.

8.    This Court has jurisdiction over this action under CAFA, because this is a putative class action with more than 100 putative class members that are seeking to recover in excess of $5,000,000 in the aggregate, and there is minimal diversity.

9.    CAFA reflects Congress' intent to have federal courts adjudicate substantial class action suits brought against out-of-state defendants, such as this case.  When CAFA was passed, it expanded federal jurisdiction over class actions by amending 28 U.S.C. § 1332 to confer upon federal courts original jurisdiction over cases where (a) the putative class contains at least 100 class members, (b) any member of the putative class is a citizen of a State different from that of any defendant; and (c) the amount in controversy exceeds $5,000,000 in the aggregate for the entire class, exclusive of interest and costs.  28 U.S.C. § 1332(d).

10.     This suit satisfies all of the requirements for federal jurisdiction under CAFA in that:  (1) the putative class exceeds 100; (2) members of the proposed class have a different citizenship from Defendant; (3) the amount in controversy exceeds $5,000,000; and (4) the exceptions to CAFA jurisdiction do not apply.  *See* 28 U.S.C. § 1332(d); s*ee also Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118, 1121-23 (11th Cir. 2010) (setting forth CAFA requirements).

**1.     The Putative Class Size Exceeds 100.**

11.     CAFA requires that the proposed class consist of at least 100 persons.  28 U.S.C. § 1332(d)(5).  That requirement is satisfied here.

12.     Although Plaintiff alleges that the class is comprised of between 25 and 50 entities or their assignees, those figures are demonstrably wrong.  (Compl., ¶ 26.)  A CMS chart published in September 2017, entitled "Details for title: MA Contract Service Area," sets forth MA contract service areas by state and shows the number of Florida entities potentially in the class alleged by Plaintiff is more than 100.  *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/MA-Contract-Service-Area-by-State-County-Items/MA-Contract-Service-Area-2017-09.html?DLPage=1&DLEntries=10&DLSort=1&DLSortDir=descending.  Indeed, the number of MA entities with Florida services areas, omitting duplicate entities, is 106.

13.     The CMS data, alone, shows there are plausibly over 100 class members.  This is sufficient to support removal.  *See, e.g., Dart Cherokee Basin Operating Co., LLC v. Owens,* 135 S. Ct. 547, 550 (2014) ("removal notice need only plausibly allege, not detail proof of, the amount in controversy."); *Dudley v. Eli Lilly & Co.,* 778 F.3d 909, 912 (11th Cir. 2014) ("all that is required is a short and plain statement of the grounds for removal, including a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.") (citations and

internal quotation omitted); *Powell v. Huntington Nat. Bank,* No. 2:13-CV-32179, 2014 WL 4809729, *6 (S.D.W. Va. Sept. 26, 2014), *certificate of appealability granted in part on other grounds,* 2015 WL 1980491 (S.D.W. Va. May 01, 2015), *app. dismissed* (Jan 28, 2016 ) ("Defendant plausibly alleges that the putative class exceeds 100 members.").

14.     Moreover, Plaintiff does not limit the proposed class to Florida MAOs.  To the contrary, Plaintiff's class definition also plainly includes out-of-state MAOs.  *See* Compl., ¶ 27. Here, Plaintiff has defined the putative class to consist of entities that:

> contracted directly with CMS and/or its assignee pursuant to Medicare Part C including, but not limited to, MAOs, and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by CMS and HHS . . . . [Compl., ¶ 27.]

15.     Plaintiff has further expanded his class to include all non-Florida MAOs where the

> MAO, as a secondary payer, has the direct right and responsibility to collect for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee and the Florida no-fault law . . . was/is financially responsible to a Medicare beneficiary. [*Id.*]

16.     Thus, Plaintiff's class definition is not limited to Florida MAOs, but also encompasses MAOs nationwide, so long as they paid for treatment to patients entitled to Florida PIP benefits.  According to the CMS nationwide directory of MAOs, available on its webpage "Details for title: MA Plan Directory," as of September, 2017 there were approximately 673 MAOs nationwide that potentially fit within Plaintiff's class definition.[1]  Even assuming,

---

[1] *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports /MCRAdvPartDEnrolData/MA-Plan-Directory-Items/MA-Plan-Directory.html?DLPage=1&DL Entries=10&DLSort=1&DLSortDir=descending.

*arguendo*, that only a fraction of these entities were ultimately included in Plaintiff's class, the minimum class number requirement under CAFA would be satisfied.

17.    Additionally, non-Florida MAOs are plausibly class members because under federal regulations such MAOs are required to pay for emergency and urgently needed services, even where the enrollee's accident occurred outside of the MA organization or service area. Specifically, 42 C.F.R. § 422.113 provides, in pertinent part:   "(2) *MA organization financial responsibility.*  The MA organization is financially responsible for emergency and urgently needed services— (i) **Regardless of whether the services are obtained within or outside the MA organization**."   42 C.F.R. § 422.113(b)(2) (bold emphasis added).  Section 422.113 further provides:

> (ii) *Emergency services* means covered inpatient and outpatient services that are—
>
> > (A) Furnished by a provider qualified to furnish emergency services; and
> >
> > (B) Needed to evaluate or stabilize an emergency medical condition.
>
> (iii) *Urgently needed services* means covered services that are not emergency services as defined in this section, **provided when an enrollee is temporarily absent from the MA plan's service (or, if applicable, continuation) area** (or provided when the enrollee is in the service or continuation area but the organization's provider network is temporarily unavailable or inaccessible) when the services are medically necessary and immediately required—
>
> > (A) As a result of an unforeseen illness, injury, or condition; and
> >
> > (B) It was not reasonable given the circumstances to obtain the services through the organization offering the MA plan.

42 C.F.R. § 422.113(b)(1) (bold emphasis added).    Therefore, non-Florida MAOs would be required to pay for emergency or urgently needed services received by its enrollees in Florida.

18.     Separately, under Florida's PIP laws, there are also a number of non-emergency situations where a person receiving payment from a non-Florida MAO would be entitled to Florida PIP benefits.  For example, Section 627.733, Florida Statutes, provides for PIP coverage for non-residents with vehicles present in the state for more than 90 days:

> (2) Every nonresident owner or registrant of a motor vehicle which, whether operated or not, has been physically present within this state for more than 90 days during the preceding 365 days shall thereafter maintain security as defined by subsection (3) in effect continuously throughout the period such motor vehicle remains within this state.

Fla. Stat. § 627.733 (2017).  Under this statute, a person with an out-of-state MAO who owns a motor vehicle located in Florida, which is a common scenario for seasonal residents in Florida, could potentially recover Florida PIP benefits under their Florida PIP coverage even though they reside in another state and have a non-Florida MAO.

19.     Based on the significant number of seasonal and temporary residents in Florida, it is evident that a high number of people with non-Florida MAOs are impacted by section 627.733, Florida Statutes.  A survey of Florida households each month between September 2000 and December 2003 (p. 439) demonstrated that, of 20,218 survey respondents, there were 139 temporary residents between ages 65-74, and 97 temporary residents age 75 or older (*see* Table 2, p. 442).  Consistently, a Bureau of Economic and Business Research study shows a high incidence of seasonal residency over 65 years of age in Florida.  *See* S. Smith and M. House, Bureau of Economic and Business Research, *Temporary Migration:  a case study of Florida,* Population Research and Policy Review 26:437–454 (published online July 11, 2017), https://www.bebr.ufl.edu/sites/default/files/Research%20Reports/PRPR%202007%20(Temp%20Migr).pdf.  Data from these surveys further establishes there are plausibly over 100 out-of-state

MAOs with exposure in Florida for Medicare enrollees who might also be eligible for Florida

PIP benefits.

      20.     In addition, Florida PIP laws contemplate various scenarios where a person,

though not a Florida PIP policyholder, would nonetheless be entitled to Florida PIP benefits.

Specifically, Fla. Stat. § 627.736 provides:

> (1) Required benefits.--An insurance policy complying with the
> security requirements of s. 627.733 must provide personal injury
> protection to the named insured, relatives residing in the same
> household, *persons operating the insured motor vehicle,
> passengers in the motor vehicle, and other persons struck by the
> motor vehicle* and suffering bodily injury while not an occupant of
> a self-propelled vehicle, subject to subsection (2) and paragraph
> (4)(e), to a limit of $10,000 in medical and disability benefits and
> $5,000 in death benefits resulting from bodily injury, sickness,
> disease, or death arising out of the ownership, maintenance, or use
> of a motor vehicle as follows:

Fla. Stat.  § 627.736 (emphasis added).  Based on this statute, permissive users, passengers, and

persons struck by the insured's vehicle, which could include out-of-state individuals with non-

Florida MAOs who have no Florida PIP policy, could also recover up to $10,000 in PIP benefits.

      21.     Moreover, the above figures and data refer only to MAOs, and do not include

purported assignees of MAOs, such as Plaintiff, who are also alleged to be in the class.  For

example, there are at least four MSP Recovery entities of which Defendant is aware that have

filed these types of lawsuits as purported assignees of MAOs, including MSP Recovery, LLC,

MSP Claims 1, LLC, MAO-MSO Recovery II, and Plaintiff.  If the number of MAOs that are

potentially in the class each assigned just one claim for reimbursement for one medical

transaction to an entity such as Plaintiff, yet retained the right to pursue such claims as to other

medical transactions, that would double the number of MAOs that were plausibly within the

class -- *i.e.,* the MAOs themselves and their assignees.  This further demonstrates that there are

over 100 potential class members in this case.  Indeed, in a recent hearing in one of this Plaintiff's counsel's numerous other substantively similar cases, the same attorney, John Ruiz, argued that notice of a substantively similar class should be sent to far more than 100 individuals and entities.  *See MSPA Claims 1, LLC v. IDS Prop. Cas. Ins Co.*, No. 15-27940-CA-21 (Cir. Ct. 11th Jud. Cir., Miami-Dade County, June 23, 2017) (**Exhibit A**), at pp. 28:2-29:2; 33:4-10) (indicating that in addition to MAOs, the notice would have to be sent to 120,000 potential assignees).

22.     In sum, Plaintiff's putative class encompasses more than 100 members.

**2.     There is Minimal Diversity Sufficient to Establish CAFA Jurisdiction.**

23.     The second CAFA requirement is minimal diversity, which requires that at least one putative class member must be a citizen of a state different from one defendant.  28 U.S.C. § 1332(d)(2).  Under CAFA, a limited liability company is a citizen of the state where it has its principal place of business as well as the state under whose laws it is organized.  28 U.S.C. § 1332(d)(10).  Plaintiff alleges it is a Delaware entity with its principal place of business in Florida, so it is a citizen of those states.  (Compl., ¶ 9.)

24.     Here, Plaintiff purports to represent a class that includes Florida MAOs. ( Compl., ¶¶ 26, 27.).  Additionally, Defendant is alleged to be a foreign insurance company (Compl., Caption), and is in fact incorporated under the laws of Wisconsin with its principal place of business in Wisconsin and is a citizen of that State for diversity purposes.  28 U.S.C. § 1332(c)(1).   Thus, there is clearly minimal diversity here as at least one class member is a citizen of Florida and Defendant is a citizen of Wisconsin, so this prerequisite to CAFA jurisdiction is also met.  28 U.S.C. § 1332(d)(2).

### 3.   The CAFA Amount in Controversy Requirement of $5,000,000 is Satisfied.

25.     CAFA requires that the amount in controversy exceed $5,000,000 for the entire

putative class in the aggregate, exclusive of interest and costs.  28 U.S.C. § 1332(d)(2).

26.     As the removing party, Defendant bears the burden of establishing the CAFA

amount in controversy requirement is met by a preponderance of the evidence, meaning it must

show it is "more likely than not" that the amount in controversy exceeds the jurisdictional

requirement.  *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 768 (11th Cir. 2010).  To meet

its burden, a removing party may provide "specific factual allegations establishing jurisdiction

and can support them (if challenged by the plaintiff or the court) with evidence combined with

reasonable deductions, reasonable inferences, or other reasonable extrapolations . . . .  [A]

removing defendant is not required to prove the amount in controversy beyond all doubt or to

banish all uncertainty about it."  *Id.* at 754.  *See also Dudley,* 778 F.3d at 913 ("A removing

defendant is not required to prove the amount in controversy beyond all doubt or to banish all

uncertainty about it. . . .  Moreover, at the jurisdictional stage, the pertinent question is what is in

controversy in the case, not how much the plaintiffs are ultimately likely to recover. . . .  The

amount in controversy is not proof of the amount the plaintiff will recover.  Rather, it is an

estimate of the amount that will be put at issue in the course of the litigation.") (citations and

internal quotations omitted). [2]

---

[2] Defendant makes no concession about the *actual* exposure if a class were to be certified, and if
Plaintiff were to win a classwide judgment on liability.  However, the standard for "amount in
controversy" examines potential exposure *based on the allegations of the Complaint*, and thus
removal is well-supported here.  Defendant disputes material information in the Complaint, and
has so informed Plaintiff's counsel, but Plaintiff's counsel has declined to voluntarily dismiss,
thereby underscoring that the Complaint allegations provide the appropriate measure for the
amount in controversy here.

27.     In meeting its burden on removal, a removing defendant need not submit detailed evidence with its removal notice, but needs only to show plausibly that removal jurisdiction exists.  *Dart,* 135 S. Ct. at 554.  *See also Dudley,* 778 F.3d at 912 (same).   Similarly, a removing defendant may meet its burden based on reasonable extrapolations derived from the complaint allegations.  In *Perret v. Wyndham Vacation Resorts, Inc.*, No. 11–CV–61904, 2012 WL 592171 (S.D. Fla. Feb. 22, 2012), the plaintiffs alleged the defendants' time-share sale transactions were misleading and deceptive and that the management costs assessed by the defendants were excessive and unreasonable.  After the defendants removed the case under CAFA, the plaintiffs sought remand on the ground that the amount in controversy requirement had not been met.  The court rejected the plaintiffs' argument, stating:  "The amount in controversy can be facially apparent from the pleading itself, even when the complaint does not claim a specific amount of damages."  *Id.,* *2 (citing *Roe v. Michelin North America, Inc.,* 613 F.3d 1058, 1061 (11th Cir. 2010)).  The court held:

> In this case, the amount in controversy is facially apparent from the
> Amended Complaint.  Paragraph 10 of the Amended Complaint
> states, in part, "[t]he amount of *each individual* claim in
> controversy exceeds $15,000.00, exclusive of interest and costs."
> (emphasis added).   The Amended Complaint further states, at
> paragraph 26, "Plaintiffs are informed and believe that potentially
> thousands of Floridians and non-Floridians have purchased
> timeshare vacations from Wyndham."  Thus, $15,000 in damages
> per individual claim times 1000, or more, individual class
> members is $15,000,000 in damages, well over the $5,000,000
> threshold for CAFA jurisdiction.

*Id.,* *2.

28.     In *Argentine v. Bank of Am. Corp.,* No. 8:15-CV-957-T-26MAP, 2015 WL 3793868, *2 (M.D. Fla. June 18, 2015), the court found the following extrapolations supported removal:

> Plaintiff alleged in the complaint that his personal damages, which were typical of all class members, equaled $64.00, the difference between redemption for a credit of one cent per dollar ($160.00 for 16,000 points) and six-tenths cent per dollar ($96.00 awarded for 16,000 points).  Defendants assert that Plaintiff's allegation that his claim is typical of each member of the class, together with the injunctive relief as alleged, permits them to extrapolate the $64.00 for the almost 150,000 Florida cardholders for a total that exceeds the $5 million requisite.

*Id.* (footnotes omitted).  The court in *Argentine* determined that the "amount in controversy advocated by the Defendants in this case, based on the complaint, notice of removal, and other evidence provided at the time of removal, [was] not too speculative so that reasonable deductions and inferences dictate an accurate estimation of over $5 million dollars."  *Id.*, *3.

29.   In *Lee-Bolton v. Koppers Inc.*, 848 F. Supp. 2d 1342, 1354 (N.D. Fla. 2011), the plaintiff landowners in an area bordering a wood treatment facility brought a state-court class action against the defendants, alleging defendants' activities in connection with the wood treatment facility caused the contamination of surrounding properties.  The defendants removed the case to federal court under CAFA, and the plaintiffs moved to remand, arguing, among other things, that the amount in controversy requirement was not met.  The court explained that the "question is not how much the plaintiff[s] will ultimately recover in the case, but instead 'the pertinent question is what is *in controversy* in the case.'"  *Id.* (quoting *Pretka*, 608 F.3d at 751) (emphasis in original).  The court found that, "[w]hile Plaintiffs have included claims for five common-law causes of action in addition to their claims for violation of the WQAA and for injunctive and equitable relief, in its simplest form this case is really about the damage that has occurred to the class members' properties as a result of the purported discharge of chemical pollutants from the Koppers Site."  *Id.* at 1355.  Based on the property records submitted by the defendants, the court found that, based on an average assessed value of approximately $88,000

12

per property, with 87 parcels at issue, the amount in controversy was $7,722,100 in the aggregate for all putative class members.  *Id.*

30.     Here too, based upon Plaintiff's Complaint allegations and theories (which Defendant disputes, but which control for removal purposes), the $5,000,000 CAFA amount in controversy requirement is satisfied.

31.     As Plaintiff alleges in its Complaint, each PIP claim represents a potential recovery of up to $10,000 in PIP benefits.  (Compl., ¶ 8.)  Accordingly, if there were just 501 instances where an MAO class member paid benefits on behalf of an enrollee who was entitled to recover PIP benefits, that would put the amount in controversy over $5 million.

32.     In fact, there are potentially more than 500 such instances based on Plaintiff's theory, as shown by state court actions brought by Plaintiff's counsel, *MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins.*, No. 2015-1946-CA 06 (Cir. Ct. 11th Jud. Cir., Miami-Dade County, Feb. 2, 2017) (**Exhibit B**); and *MSPA Claims 1, LLC v. IDS Prop. Cas Ins Co.*, No. 15-27940-CA-21 (Cir. Ct. 11th Jud. Cir., Miami-Dade County, Apr. 20, 2017) (**Exhibit C**), where the courts (Defendant submits improperly) granted class certification.  In *Ocean*, the court found "each Class Member MAO has hundreds of instances in which Defendant failed to provide primary payment in violation of the Medicare Secondary payer laws and section 627.736, Florida Statutes[.]"   Exhibit B, p. 42.  The court further stated:  "Plaintiff ultimately offered evidence of over 3,300 instances whereby Defendant's Medicare eligible enrollees were involved in Florida automobile accidents."  *Id.,* p. 43.  Similarly, in *IDS,* the court stated each of the Florida MAOs in the putative class insured "thousands" of Medicare beneficiaries, and that "each class member MAO may have hundreds of instances in which Defendant has potentially failed to provide primary payment[.]"  Exhibit C, p. 25.

33.     Moreover, as discussed above, there are well over 600 MAOs nationwide, and there are also numerous MSP entity assignees.  As was also shown above, any MAO or assignee nationwide could well have paid expenses for several enrollees who are residents of another state where the MAO is located but suffered injury and was treated in Florida and was also eligible for Florida PIP benefits.

34.     As Plaintiff's counsel has purported to show in the *Ocean* and *IDS*, even if only 6 putative class members had one hundred instances where Defendant was supposedly liable, which is far lower than the "hundreds" found by the *Ocean* and *IDS* courts, it would equate to $6,000,000 in controversy (600 X $10,000 = $6,000,000).  The test for CAFA's Amount in Controversy requirement is not what the plaintiff and putative class ultimately *will* recover, but what they potentially *could* recover.  *See, e.g., South Florida Wellness, Inc. v. Allstate Ins. Co*., 745 F.3d 1312, 1318 (11th Cir. 2014) ("Although members of the putative class might not ultimately recover the full $68,176,817.69, that possibility does not shut the door on federal jurisdiction.  As we have said before, the pertinent question [at the jurisdictional stage] is what is *in controversy* in the case, not how much the plaintiffs are ultimately likely to recover.") (citation and internal quotation omitted) (emphasis Court's); *Raskas v. Johnson & Johnson,* 719 F.3d 884, 888 (8th Cir. 2013) (CAFA's amount in controversy requirement was met "[e]ven if it is highly improbable that the Plaintiffs will recover the amounts Defendants have put into controversy[.]").  Accordingly, each class member potentially could recover $10,000 for each claim at issue.  Similarly, if just 105 class members had only 5 claims at issue -- again, a plausible figure given Plaintiff's allegations, it would result in $5,250,000 being in controversy  (105 X 5 X $10,000 = $5,250,000).  *See Stavrakis v. Underwriters at Lloyd's London,* No. 8:16-CV-2343-T-17JSS, 2016 WL 9211676, *2 (M.D. Fla. Dec. 20, 2016) ("When, as here, damages are not specified in

the state-court complaint, the defendant seeking removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.") (quoting *Case v. Cincinnati Ins. Co.*, No. 8:16-CV-2250-T-30JSS, 2016 WL 4771628, *2 (M.D. Fla. Sept. 14, 2016)).

35.     Here, because there are potentially over 600 putative class members, each of which potentially has dozens of claims at issue, the potential amount in controversy is far greater than the $5 million threshold.   Thus, the CAFA amount in controversy requirement is satisfied.

### 4.     None of the CAFA Exceptions Applies.

36.     Plaintiff bears the burden of establishing any applicable exceptions to CAFA jurisdiction.  *See, e.g., In re Brican Am. LLC Equip. Lease Litig.,* No. 10-MD-02183-PAS, 2011 WL 13115472, *3 (S.D. Fla. Mar. 11, 2011).  CAFA provides two mandatory exceptions and one discretionary exception to the application of federal jurisdiction.  28 U.S.C. § 1332(d)(3)-(4). None of these exceptions applies here.  Each CAFA exception requires, as a starting point, an in-state defendant.  28 U.S.C. § 1332(d)(3)-(4) (requiring either "significant relief" to be sought from an in-state defendant (local controversy exception), or requiring the "primary defendant" to be an in-state one ("home state" and discretionary exceptions).  Here, the only named Defendant is not a citizen of Florida.

### II.     ALTERNATIVELY, THE COURT HAS JURISDICTION UNDER TRADITIONAL DIVERSITY PRINCIPLES.

37.     This Court also has jurisdiction under traditional diversity principles pursuant to 28 U.S.C. §§ 1332 and 1367.

38.     There is complete diversity of citizenship between Plaintiff and Defendant. Plaintiff is alleged to be a Delaware LLC with its principal place of business in Miami, Florida.

(Compl., ¶ 9.)  Defendant is alleged to be and is a foreign corporation, and is in fact incorporated in Wisconsin with its principal place of business in Wisconsin.

39.     The general rule is that a party seeking to establish diversity must list the citizenships of all members of an LLC to establish that diversity exists.  *See, e.g., Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) ("a limited liability company is a citizen of any state of which a member of the company is a citizen. . . .  To sufficiently allege the citizenships of these unincorporated business entities, a party must list the citizenships of all the members of the limited liability company and all the partners of the limited partnership.  Because Comcast failed to do so, it failed to carry its burden of establishing diversity of citizenship."); *Trutie v. Republic Nat. Distrib. Co*., 718 F. Supp. 2d 1350, 1351 (S.D. Fla. 2010) (when determining citizenship, a limited liability company is a citizen of any state of which a member of the company is a citizen) (citation and internal quotation omitted).

40.     However, this rule is relaxed where, as here, a party is unable to determine the citizenship of LLC members through reasonable investigation.  *See, e.g., Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 110 (3d Cir. 2015) ("a plaintiff need not affirmatively allege the citizenship of each member of a defendant LLC if it is unable to do so after a reasonable investigation.  If the plaintiff is able to allege in good faith that the LLC's members are not citizens of its state of citizenship, its complaint will survive a facial challenge"; further indicating that Nebraska insurer alleged complete diversity in good faith, as required to survive attack to diversity subject matter jurisdiction, where information provided by insurer indicated that LLC defendants had connections to New York and Delaware, counsel for insurer conducted a reasonable inquiry to determine membership of LLC defendants but found nothing of value, and counsel for insurer did not find any connection between LLC defendants and Nebraska; although

it was possible that LLCs had at least one member domiciled in Nebraska, that scenario was not so overwhelmingly likely that insurer's allegation to the contrary could be considered frivolous) (footnote omitted); *Carolina Cas. Ins. Co. v. Team Equip., Inc.,* 741 F.3d 1082, 1087 (9th Cir. 2014) ("Carolina explained in its motion for reconsideration that it had made efforts to determine the citizenship of the two LLCs and four of the eight individual defendants but it was unable to do so from publicly available information.  The business filings that Carolina submitted to the district court show that information necessary to determining the citizenship of the LLCs could not be determined from the public filings of those companies.  Furthermore, Carolina reported that it was not able to allege the citizenship of some of the individual defendants based on their residency, as there was no information about their residency in the underlying complaints. . . . Carolina made a showing that at least some of the information necessary to establish the diversity of the parties' citizenship was within the defendants' control and argued that it should have been excused from the general requirement that it must plead diversity affirmatively and on knowledge. . . .  We conclude that in this situation it was sufficient for Carolina to allege simply that the defendants were diverse to it.  Relatedly, we hold that Carolina should have been permitted to plead its allegations on the basis of information and belief."); *Bissell v. Graveley Bros. Roofing Corp.,* No. CV 15-04677, 2016 WL 3405455, *7 (E.D. Pa. June 21, 2016) ("Plaintiff conducted a reasonable investigation into the identities of the members of GFP and Girard Commons, LLC and their citizenship; however Plaintiff's search was fruitless.  Therefore, this Court finds that Plaintiff has alleged complete diversity in good faith, which is sufficient to survive a facial attack.").

41.     In addition, courts have allowed limited discovery related to the citizenship of LLC's, including where the plaintiff's prior lawsuits indicate diversity of citizenship exists.  *See,*

*e.g., CSDVRS, LLC v. Purple Commc'ns, Inc.,* No. 8:13-CV-1811-T-30AEP, 2013 WL 4763948,

*1 (M.D. Fla. Sept. 4, 2013) ("In its Amended Notice of Removal, Purple alleged that CSDVRS

is a limited liability company with seven members and that the seven members are not citizens of

Delaware or California.  The Plaintiff previously filed a similar complaint against the same

parties in federal court based on diversity of citizenship, which it voluntarily dismissed. . . .

Although CSDVRS has voluntarily proffered affidavits regarding the citizenship of several of its

member companies, Purple has contested the sufficiency of the affidavits and therefore

jurisdiction is in dispute. . . .  Further, evidence of the dispute as to diversity of citizenship exists

due to the Plaintiff's prior allegations of complete diversity between the same parties in its prior

complaint.  The Court concludes that the Defendant is entitled to jurisdictional discovery limited

to the issue of diversity of citizenship between the Plaintiff and Defendants.") (citation omitted).

42.     Here, the Plaintiff, MSP Recovery Claims, Series LLC, is alleged to be a

Delaware entity.  However, the Delaware Secretary of State website lists only minimal

information regarding MSP Recovery Claims, Series LLC -- e.g., name, entity type, and

formation date.  *See* https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx.  And

Defendant has not, after reasonable investigation, been able to locate any information definitively

identifying the members of MSP Recovery Claims, Series LLC.

43.     However, there exists no basis to believe that any of Plaintiff's LLC members is a

citizen of Wisconsin -- the state of which Defendant is a citizen.  For example, an interrogatory

response from one of the similar plaintiffs in one of the many similar cases brought by Plaintiff's

counsel, *MSPA Claims 1, LLC v. Allstate Property and Casualty Insurance Company*, No. 17-cv-

20782-DPG (S.D. Fla.), states that family members of Plaintiff's Florida counsel (John H. Ruiz,

Jr., John Ruiz's son, and Diane Lista, Frank C. Quesada's daughter), all of which Defendant

reasonably believes are Florida citizens, have an ownership interest in MSP Recovery Services,
LLC, which is identified as the parent company of the plaintiff in that case, MSPA Claims 1,
LLC.  (*See MSPA Claims 1* Plaintiff's Interrogatory Responses, attached hereto as Exhibit D,
Interrogatory Resp.  No. 16.)  The Florida Department of State's website lists MSP Recovery
Services, LLC as a Florida entity with a Florida address identical to that of Plaintiff and
Plaintiff's counsel here.  (*See* Compl., ¶ 9.)  *See also*

http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype
=EntityName&directionType=Initial&searchNameOrder=MSPRECOVERYSERVICES%20L15
0000278910&aggregateId=flal-l15000027891-ab6d9723-c961-4d8c-ba98-23f5a148a6fd&search
Term=MSP%20Recovery%20Services&listNameOrder=MSPRECOVERYSERVICES%20L150
000278910.  Additionally, a March 6, 2015 "LC Amendment" for MSP Recovery Services, LLC,
appearing on the same website, lists the same Florida address for John H. Ruiz., Jr.  *Id.*

44.     Similarly, the Florida Department of State's website identifies MSPA Claims 1,
LLC with the same Florida address as that of MSP Recovery Services, LLC, Plaintiff's counsel,
and Plaintiff's counsel's son.  *See* http://search.sunbiz.org/Inquiry/CorporationSearch/Search
ResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=MSPACLAI
MS1%20L150000267300&aggregateId=flal-l15000026730-b572c747-548e-4d9b-ba65-379f9fe
4c4f3&searchTerm=MSPA%20claims%201&listNameOrder=MSPACLAIMS1%20L150000267
300.  The February 12, 2015 Articles of Organization for MSPA Claims 1, LLC, appearing on
the same website, identifies  MSP Recovery Services, LLC as the "person" authorized to manage
MSPA Claims 1, LLC, and again lists the same Florida address.  *Id.*

45.     Based on the foregoing information, Defendant reasonably believes that the
members of Plaintiff's LLC are citizens of Florida, and has absolutely no reason to believe they

are citizens of Wisconsin, which is Defendant's state of citizenship. This is sufficient, as in the above cases, to satisfy the complete diversity requirement.

46. At a minimum, if there is any question on this issue, the Court should allow limited jurisdictional discovery -- *i.e.,* a single interrogatory to resolve the question of Plaintiff's LLC membership. *See, e.g., CSDVRS*, 2013 WL 4763948, *1 (allowing such jurisdictional discovery).

47. In addition, Plaintiff's individual claim meets Section 1332(a)'s $75,000 amount-in-controversy requirement and, therefore, this Court has supplemental jurisdiction over the entire putative class under 28 U.S.C. § 1367. *See Exxon Mobil Corp. v. Allapattah Services, Inc*., 545 U.S. 546, 549 (2005) (where one of the named plaintiffs in the alleged class action satisfies the amount-in-controversy requirement, 28 U.S.C. § 1367 authorizes supplemental jurisdiction over the claims of the other plaintiffs); *Armatrout v. Wal-Mart Stores, Inc.,* No. 807-CV-1113-T-30TBM, 2008 WL 680209, *1 n. 1 (M.D. Fla. Mar. 7, 2008) ("Federal courts may exercise supplemental jurisdiction over the claims of class members whose claims are for less than $75,000, provided that 'at least one named plaintiff in the action satisfies the amount-in-controversy requirement.'") (quoting *Exxon*); *Dowell v. Debt Relief Am., L.P.,* No. 2:07 CV 27(JCH), 2007 WL 1876478, *2 (E.D. Mo. June 27, 2007) ("The supplemental jurisdiction statute, 28 U.S.C. § 1367 . . .  also allows a district court to exercise jurisdiction over a class action even if the $5,000,000 amount is not satisfied as long as the other elements of diversity jurisdiction are present and at least one named plaintiff satisfies the $75,000 amount in controversy requirement[.]").

48.     As one court explained, a removing defendant must establish the amount in controversy requirement by a preponderance of the evidence, but need assert only a plausible allegation that the threshold has been met:

> When, as here, damages are not specified in the state-court complaint, the defendant seeking removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." (quoting *Dart Cherokee Basin Op. Co. v. Owens*, 135 S. Ct. 547, 554 (2014)). If, however, a plaintiff contests the defendant's allegation, the defendant must prove, by a preponderance of the evidence, that the amount in controversy exceeds the jurisdictional threshold. *Id.* "A removing defendant is not required to prove the amount in controversy beyond all doubt or to banish all uncertainty about it." *Id.*

*Stavrakis,* 2016 WL 9211676, *2 (quoting *Case v. Cincinnati Ins. Co.*, No. 8:16-CV-2250-T-30JSS, 2016 WL 4771628, *2 (M.D. Fla. Sept. 14, 2016)).

49.     A removing defendant may establish the amount in controversy requirement based on estimates premised on the plaintiff's alleged damages. For example, in *Wineberger v. RaceTrac Petroleum, Inc.,* 672 F. App'x 914, 917 (11th Cir. 2016), the Court explained:

> After reviewing comparable FCRA cases, RaceTrac's evidence and calculations, and Ms. Wineberger's lack of mitigating evidence suggesting alternative calculations, the district court estimated $43,289 in back pay, $12,670 in front pay, non-economic damages in the $5000–$30,000 range, $10,000 in attorney's fees, and $10,000 in punitive damages. D.E. 13 at 6–8. Although she claimed that damages would not exceed $65,000, Ms. Wineberger did not factor in attorney's fees or specify the type of damages that her calculations included. Thus, the district court concluded that she had not properly stipulated to an amount less than $75,000. *See id.* at 5 n.2.
>
> On appeal, Ms. Wineberger challenges the district court's calculations by claiming that our decision in *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1213 (11th Cir. 2007), precluded the district court from "speculating" as to her damages. But *Lowery* dealt with CAFA-related removal issues that are not relevant or instructive here. *See id.* (analyzing the "scope of evidence on

> which a removing defendant may rely" under the removal provision, *see* 28 U.S.C. § 1453(b), of the Class Action Fairness Act). Moreover, Ms. Wineberger fails to account for other binding decisions that expressly allow a district court to make reasonable deductions and inferences and to rely on judicial experience.

*Id.* (citations omitted).

50.     Similarly, in *Angrignon v. KLI, Inc.*, No. 08-81218-CIV, 2009 WL 506954, *3 (S.D. Fla. Feb. 27, 2009), the court stated a "complaint that presents a combination of facts and theories of recovery that may support a claim in excess of $75,000 can support removal." (citation omitted). The court held "[b]ased on the unchallenged factual allegation that a life was lost, the Court has engaged in a common sense evaluation of the types of damages that Plaintiff is seeking and concludes Defendant has established by a preponderance of the evidence that the amount in controversy is in excess of $75,000." *Id., *4.

51.     In *Mullaney v. Endogastric Sols., Inc.*, No. 11-62056-CIV, 2011 WL 4975904, *2 (S.D. Fla. Oct. 19, 2011), the defendant defeated a remand motion in reliance on plaintiff's complaint allegations and estimates of plaintiff's potential damages based on settlements and jury verdicts in similar products liability cases. The court found the defendant demonstrated "that it is more likely than not that the amount in controversy exceeds the $75,000 threshold." *Id.* (footnote omitted). *See also Jones v. Novartis Pharm. Co.*, 952 F. Supp. 2d 1277, 1284 (N.D. Ala. 2013) (stating it "'defies logic and common sense' that Ms. Jones would be seeking $75,000 or less 'given [her] allegations of three major surgeries, painful ongoing physical therapy, continuing pain and suffering, both physical and mental, permanent injuries and disabilities, and future medical bills, as well as punitive damages against a major corporation (and up to 30 fictional defendants).' Given this 'reasonable deduction,' the court finds that 'judicial experience

and common sense' dictate that Ms. Jones's allegations 'facially establish the jurisdictionally required amount in controversy.'") (citations omitted).

52.     Here, although Plaintiff does not set forth a specific amount of damages, it has alleged sufficient facts and financial information upon which to make a reasonable calculation of damages, showing that there is in fact more than $75,000 in controversy despite Plaintiff's boilerplate and conclusory allegation to the contrary.

53.     Plaintiff alleges "[n]umerous Medicare beneficiaries . . . were enrolled in Medicare Advantage plains administered by MAOs [which] have assigned their recovery rights to Plaintiff.  (Compl.,¶ 15.)  Plaintiff further alleges it is the assignee of "numerous MAOs," and that the individual recovery for each claim is potentially $10,000.  (Compl.,¶¶ 8, 9.)  "Numerous" is defined as "consisting of great numbers of units or individuals."  *See* https://www.merriam-webster.com/dictionary/numerous.  Courts have referred to "numerous" as meaning at least 8 or 10.  *See, e.g., Perry v. Schack,* No. 09-21771-CIV, 2009 WL 2369211, *1 (S.D. Fla. July 31, 2009) ("The incarcerated pro se plaintiff in this case is a multiple filer, having filed the following *numerous* cases in this District, *at least nine* cases in the Northern District of Florida, five cases in the Middle District of Florida and several cases in the United States Court of Appeals for the Eleventh Circuit.") (emphasis added); *Lowe v. Consol. Freightways of Delaware, Inc.,* 177 F.3d 640, 641 (7th Cir. 1999) (referring to "numerous" as "at least 8 or 10."); *United States v. T.C.A., Inc.,* No. C-95-1627-JLQ, 1997 WL 542683, *1 (N.D. Cal. Aug. 25, 1997), as amended (Sept. 2, 1997) ("The court has already found that the Defendants violated the Fair Debt Collections Act on  *numerous (more than 10)* occasions.") (emphasis added); *Birkett v. United States,* No. 90 CR 1063 (SJ), 2009 WL 10655836, *1 (E.D.N.Y. June 1, 2009) ("All told, the Posse was responsible for *numerous* assaults and murders (*at least ten*).") (emphasis added).

54.     Here, if even only eight claims asserted by Plaintiff as an assignee had a value of $10,000, the amount in controversy for Plaintiff alone would be $80,000.  That is not mere speculation, but instead is based on Plaintiff's express allegation that it is pursuing "numerous" claims individually and that each of those claims is potentially worth $10,000.

55.     Moreover, the standard for assessing the amount in controversy is not what a plaintiff *will* recover, but instead what it plausibly *could* recover based on the amount put at issue by the complaint.  *See, .e.g., Scott v. Cricket Commc'ns, LLC,* 865 F.3d 189, 196 (4th Cir. 2017) ("The key inquiry in determining whether the amount-in-controversy requirement is met is not what the plaintiff will actually recover but an estimate of the amount that will be put at issue in the course of the litigation.") (citation and internal quotation omitted); *Schiller v. David's Bridal, Inc.*, No. 10-cv-00616 AWI SKO, 2010 WL 2793650, *8 (E.D. Cal. July 14, 2010) ("[T]he question is not how much Plaintiff or the class will ultimately recover; the amount in controversy is calculated based upon the amount put into controversy by the complaint. . . .") (citation omitted).  *See also Katz v. Apple Inc.,* No. 6:10-CV-1778-ORL, 2011 WL 1103513, *2 (M.D. Fla. Mar. 24, 2011) ("even if that (potential) $86,000 back pay award is subject to a deduction, for jurisdictional purposes, this is still an $86,000 case.  When determining the amount in controversy for jurisdictional purposes ... courts cannot look past the complaint to the merits of a defense that has not yet been established.") (citation and internal quotation omitted).  Here, Plaintiff could, in connection with just 8 of the "numerous" claims it is pursuing as an alleged assignee, recover $10,000 for each claim, which, again, puts the amount in controversy over $75,000 for Plaintiff's individual claim alone. [3]

---

[3] As noted above, Defendant makes no concession about the *actual* exposure if Plaintiff were to prevail on its claims.  Again, however, the standard for "amount in controversy" examines

56.     Plaintiff's allegation that its aggregate claims do not exceed $75,000 (Compl., ¶ 8) does not change this result.  Notably, Plaintiff does *not* allege that it will reject damages in excess of $75,000, so it has not categorically disclaimed such damages.

57.     Yet, it has been specifically held that a failure to categorically disclaim damages in excess of $75,000 means the amount in controversy for diversity purposes can still be above $75,000.  *See, e.g., Green v. Wal-Mart Stores E., L.P.,* No. 2:14-CV-01684-WMA, 2014 WL 6792043, *1 (N.D. Ala. Dec. 2, 2014) ("plaintiffs ... who want to pursue claims against diverse parties in a state court seeking unspecified damages of various kinds, such as punitive damages and emotional distress, must in their complaint formally and expressly disclaim any entitlement to more than $74,999.99, and categorically state that plaintiff will never accept more.") (citation and internal quotation omitted); *Geodesic Consulting, LLC v. BBVA USA Bancshares, Inc.,* No. 2:15-CV-1225-WMA, 2015 WL 4985474, *2 (N.D. Ala. Aug. 20, 2015) ("Because Geodesic has not disclaimed entitlement to any amount over $74,999.99, its motion to remand (Doc. 4) is DENIED."); *Kancewick v. Howard,* No. 08 C 229, 2008 WL 4542970, *2 (N.D. Ill. Apr. 3, 2008) (noting "[a]t first glance, Kancewick's complaint does not seem to place over $75,000 in controversy because it includes a statement that judgment is sought in 'an amount not to exceed $50,000.00," stating these "kinds of statements have no legal effect"; further stating "Kancewick's request for judgment in an amount not to exceed $50,000 therefore did not bind her and did not prevent removal of this case.  In addition, Kancewick did not stipulate to damages not exceeding $75,000."); *Finnegan v. Wendy's Int'l, Inc.,* No. 2:08-CV-185, 2008 WL

---

potential exposure *based on the allegations of the Complaint*, hence removal is well-supported here, particularly given Plaintiff's failure to accept Defendant's representations inconsistent with the material allegations of Plaintiff's Complaint and voluntarily dismiss the Complaint based thereon.

2078068, *2 (S.D. Ohio May 13, 2008) (same principle; "In his complaint and in his motion to remand, plaintiff does not specifically disclaim any right to recover over $75,000 in damages.").

58.     Moreover, the Eleventh Circuit has indicated that a plaintiff's assertion that its damages will not exceed a certain amount, without specifying the types of damages or factoring in items such as attorneys' fees, is insufficient to stipulate to an amount less than $75,000. *Wineberger*, 672 F. App'x at 917 (affirming denial of motion to remand; noting:  "Although she claimed that damages would not exceed $65,000, Ms. Wineberger did not factor in attorney's fees or specify the type of damages that her calculations included.  Thus, the district court concluded that she had not properly stipulated to an amount less than $75,000.").

59.     Here, Plaintiff alleges only that its claims do not exceed $75,000, but does not stipulate it will not seek damages in excess of that amount or disclaim entitlement to any amount over $74,999.99.  Nor does Plaintiff factor attorneys' fees into the less than $75,000 in "claims" to which it refers, even though Plaintiff's Complaint expressly seeks attorneys' fees (Compl., p. 16 "Wherefore" clause),[4] or specify the type of damages included in this calculation.  As in *Wineberger,* then, Plaintiff has not effectively alleged or established an amount in controversy less than $75,000 for its individual claim.

60.     Because the $75,000 amount in controversy requirement is satisfied, this case is validly removed under traditional diversity jurisdiction principles.  In addition, as noted, because Plaintiff's individual claim satisfies the amount-in-controversy requirement, the Court has supplemental jurisdiction over the claims of the putative class members.  *See Allapattah*, 545

---

[4] Although Defendant adamantly disputes that attorneys' fees are available in this case, they are alleged by Plaintiff, and therefore are properly considered as part of the amount in controversy. *See, e.g., E.S.Y., Inc. v. Scottsdale Ins. Co.,* 217 F. Supp. 3d 1356, 1362 (S.D. Fla. 2015) (where,

U.S. at 549 (where one of the named plaintiffs in the alleged class action satisfies the amount-in-controversy requirement, 28 U.S.C. § 1367 authorizes supplemental jurisdiction over the other class members' claims).

**III.    FEDERAL QUESTION JURISDICTION ALSO EXISTS HERE.**

61.    This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1441(a) and (b), as there is a federal question under the MSP Act and the federal regulations on which Plaintiff relies.

62.    In determining whether a complaint arises under federal law and therefore poses a federal question, the court applies the well-pleaded complaint rule.  Here, as discussed above, from the very first paragraph of Plaintiff's Complaint, it is clear that Plaintiff's case hinges on federal law, and will require the finder of fact to interpret, analyze and apply federal law. Paragraph 1 of the Complaint alleges "Defendant ***failed to fulfill its statutorily-mandated duty under the Medicare Secondary Payer . . . laws*** to reimburse [MAO's] for  medical treatment and expenses paid by Plaintiff and the putative Class Members . . . on behalf of Medicare beneficiaries.  (Compl., ¶ 1 (emphasis added).)   In addition, Plaintiff alleges that a question supposedly common to the putative class is whether, as Plaintiff's counsel have advocated in a similar lawsuit, federal law applies here and preempts state law and any state law PIP defenses Defendant might have to Plaintiff's and the putative class' alleged right to reimbursement under federal Medicare law.  (Compl., ¶ 33.)  This case, therefore, centers on federal law, and federal question jurisdiction plainly exists here.

---

as here, attorneys' fees "are sought pursuant to statute, the Court may properly consider them in the amount-in-controversy inquiry.").

63.     A defendant may remove an action to a federal district court if that court has

original jurisdiction over the action.  28 U.S.C. § 1441(a).  District Courts have original

jurisdiction over all "'civil actions arising under the Constitution, laws, or treaties of the United

States.'  28 U.S.C. § 1331. * * *  The test ordinarily applied for determining whether a claim

arises under federal law is whether a federal question appears on the face of the plaintiff's well-

pleaded complaint."  *Herman v. Hartford Life & Acc. Ins. Co.*, No. 10-61661-CIV, 2011 WL

1458050, *2 (S.D. Fla. Apr. 15, 2011) (citations omitted).  *See also Dunlap v. G&L Holding

Grp., Inc.*, 381 F.3d 1285, 1290 (11th Cir. 2004) (whether a claim "arises under" federal law "is

governed by the 'well-pleaded complaint rule,'" which provides that federal jurisdiction exists

when a federal question is presented on the face of a plaintiff's complaint).

64.     Thus, "the plaintiff [is] the master of the claim; he or she may avoid federal

jurisdiction by exclusive reliance on state law, even where a federal claim is also available. . . .

However, even when a plaintiff has pled only state-law causes of action, he may not avoid

federal jurisdiction if either (1) his state-law claims raise substantial questions of federal law or

(2) federal law completely preempts his state-law claims."  *Dunlap,* 381 F.3d at 1290 (citations

and internal quotation omitted).  For a state-law claim to raise substantial questions of federal

law, "[federal] law must be an essential element of [plaintiff's] claim[, and] the federal right or

immunity that forms the basis of the claim must be such that the claim will be supported if the

federal law is given one construction or effect and defeated if it is given another."  *Id.* (further

stating "the state-law claim must "really and substantially involve[] a dispute or controversy

respecting the validity, construction or effect of [federal] law.") (citations omitted).  *See also*

*Marcus v. AT&T Corp.,* 138 F.3d 46, 55 (2d Cir. 1998) ("The artful-pleading doctrine  * * *

prevents a plaintiff from avoiding removal by framing in terms of state law a complaint the real

nature of [which] is federal, regardless of plaintiff's characterization, or by omitting to plead necessary federal questions in a complaint") (citation and internal quotation omitted); *Vaughn v. Kelly*, No. 06 C 6427, 2007 WL 804694, *1 (N.D. Ill. Mar. 13, 2007) (denying remand where defendant removed on ground that claims arose under federal law despite their state law labels, based on federal question jurisdiction); *In re Carter*, 618 F.2d 1093, 1101 (5th Cir. 1980) ("the removal court should inspect the complaint carefully to determine whether a federal claim is necessarily presented, even if the plaintiff has couched his pleading exclusively in terms of state law. . . . The reviewing court looks to the substance of the complaint, not the labels used in it.") (citation omitted); *Drawhorn v. Qwest Commc'ns Int'l, Inc.,* 121 F. Supp. 2d 554, 559-60 (E.D. Tex. 2000) (in finding federal question existed, stating "district courts should inspect the complaint carefully to determine whether a federal claim is necessarily presented, even if the plaintiff has couched his pleading exclusively in terms of state law. . . . This process of looking beyond the face of plaintiff's complaints to determine whether a federal question has been raised is called the 'artful pleading' doctrine," which is an exception to the 'well-pleaded complaint' rule and it applies when a state law claim involves a substantial federal issue." (citations and internal quotations omitted)); *Harding Hosp. v. Sovchen,* 868 F. Supp. 1074, 1078 (S.D. Ind. 1994) ("the removability issue turn[s] on the substance of the dispute rather than on accidents of labeling, the conclusory characterization of the proceeding for some other purpose, or the plaintiff's litigation strategy.").

65.    Federal courts have original jurisdiction over MSP Act claims under 28 U.S.C. § 1331, and, since Plaintiff's Complaint requires an interpretation, analysis and application of the MSP Act in order to resolve this matter, this case is removable under 28 U.S.C. § 1441(a) and (b)

based on federal question jurisdiction.  *See, e.g., Brown v. U.S. Steel Corp.,* No. 10cv10–780, 2010 WL 4388075, *1 (W.D. Pa. Oct 29, 2010), *aff'd,* 62 Fed. Appx. 152 (3d Cir. 2011).

66.     In *Brown,* the court found that in the "amended complaint, the plaintiff asserted that the defendants violated the MSP by refusing to repay Medicare for its payments made on his behalf during a period when the defendants were primarily obligated to pay his medical bills by virtue of his enrollment in their employer group health plan[.]"  2010 WL 4388075, *1.  The court concluded that since the plaintiff had "initiated this suit under 42 U.S.C. § 1395y(b)(3)(A)," the "Court's federal question jurisdiction is invoked."  *Id.  See also In re Avandia Mktg.,* 685 F.3d 353, 357 (3d Cir. 2012) (where plaintiff asserted a private cause of action under the MSP Act, finding the "District Court had subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because interpretation of the federal Medicare Act presents a federal question."); *Doctors Med. Ctr. of Modesto, Inc. v. Kaiser Found. Health Plan, Inc.,* 989 F. Supp. 2d 1009, 1011 (E.D. Cal. 2013) (in ruling on dismissal motion, referring to Kaiser as a "Medicare Advantage" plan, and stating "Kaiser removed the action to this court based on federal question jurisdiction under the Medicare Act"); *Kinsey v. American Underwriters Life Ins. Co.,* No. 03-0627, 2008 WL 2812966, *3 (W.D. La. June 24, 2008) ("The United States's claim arises under the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b).  Therefore, there is federal question jurisdiction."); *Gusmano v. Allstate Ins. Co.,* No. 13-13208, 2013 WL 6133136, *1 (E.D. Mich. Nov. 21, 2013) (plaintiff filed an amended complaint asserting claim under the "Medicare Secondary Payor Act" (Count II); stating case was removed "based upon federal question jurisdiction over Count II.").

67.     Notably, similar plaintiff organizations to the Plaintiff here have recently filed substantively similar lawsuits in federal court based on federal question jurisdiction.  *See, e.g.,*

*MAO-MSO Recovery II, et al v. Farmers Ins. Exch.* No. 17cv02522-CAS (C.D. Cal.); *MAO-MSO Recovery II, et al v. USAA Cas. Ins. Co.,* No. 17cv21289 (S.D. Fla.); *MAO-MSO Recovery II, LLC v. Allstate Ins. Co.,* No. 17cv1340 (N.D. Ill.); *MAO-MSO Recovery II, et al v. The Progressive Corp, et al.,* No. 17cv00390-CAB (N.D. Ohio).

68.     Here, a federal question is presented on the face of Plaintiff's Complaint.  Plaintiff seeks reimbursement of sums that Plaintiff claims its assignors allegedly paid for medical care and treatment on behalf of Medicare Advantage Plan enrollees for which Plaintiff argues Defendant was responsible as a primary payer.  The Complaint thus clearly asserts claims under the MSP Act.  Indeed, as noted, Plaintiff's overarching Complaint allegation of wrongdoing is that "Defendant failed to fulfill its *statutory-mandated duty under the Medicare Secondary Payer ('MSP') laws* to reimburse Medicare Advantage Organizations ('MAOs') for medical treatment and expenses paid by Plaintiff and the putative Class Members . . . on behalf of Medicare beneficiaries who entered into a settlement with Defendant."  (Compl., ¶ 1 (emphasis added).)  In other words, in order to recover here, Plaintiff must demonstrate that Defendant did not comply with the federal Medicare laws, which Defendant certainly contests.  That, in turn, means that federal law will have to be applied in order for this case to be decided.  Plaintiff further alleges that under "the *MSP laws, MAOs are, by law, secondary payers* for any medical expenses that are also covered by the terms and conditions of a primary policy," and that Defendant's no-fault automobile insurance policies provide for primary coverage for medical bills incurred as the result of an auto accident.  (Compl., ¶¶ 3, 4 (emphasis added).)

69.     In addition, Plaintiff alleges it has been "assigned *all legal rights of recovery and reimbursement* for health care services and Medicare benefits provided by health care

organizations *that administer Medicare benefits for enrollees under Medicare Part C*[.]"
(Compl., ¶ 10 (emphasis added).)

70.    Plaintiff's class definition also turns on the right to recovery under the MSP laws,
referring to entities who "contracted directly with CMS and/or its assignee pursuant to Medicare
Part C, including but not limited to, MAOs and other similar entities, to provide Medicare
benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services,
treatment, and/or supplies as required and regulated by CMS and HHS, all of which pertain to the
same medical services and/or supplies that were the primary obligation of the Defendant."
(Compl., ¶ 27.)  Plaintiff further alleges "Each Class Member, including Plaintiff, possess the
same rights to obtain *recovery of its payments under the MSP law*."  (Compl., ¶ 30 (emphasis
added).)

71.    In its questions purportedly common to the putative class, Plaintiff alleges
"federal law preempts state law and/or any defenses Defendant might raise, which might conflict
with the statutory and regulatory provisions that renders CMS and MAOs not responsible for
payment of medical services and/or supplies, where a primary payer, like Defendant, exists[.]"
(Compl., ¶ 33(e).)  So, Plaintiff's pleading concedes that in order for Plaintiff to recover here the
Court will have to agree with Plaintiff's interpretation of the federal Medicare laws.  Again, on its
face, this indicates the federal Medicare laws will have to be applied in order for this case to be
resolved.  And where, "a federal cause of action completely preempts a state cause of action any
complaint that comes within the scope of the federal cause of action necessarily 'arises under'
federal law." *Dunlap,* 381 F.3d at 1290 (citations omitted).

72.    Even Plaintiff's causes of action, while ostensibly labeled "breach of contract,"
turn on federal Medicare laws.  For example, Count I, while labeled "Breach of Contract for

Failure to Pay PIP Benefits," alleges "MAOs are subrogated [to] the right to recover primary payment from Defendant for the Defendant's breach of contract with their insured, *pursuant to the MSP provisions. . . . Under the MSP provisions*, Plaintiff is permitted to subrogate the enrollee's/insured's right of action against Defendant."  (Compl., ¶ 52 (emphasis added).)  Count II, while labeled "Breach of Contract for Failure to Pay PIP Benefits [Conventional Subrogation]," alleges Plaintiff and the putative class members have subrogation and reimbursement rights granted to MAOs pursuant to their "Evidence of Coverage."  (Compl., ¶ 59.)  The Evidence of Coverage is a Medicare form that provides details regarding what an MAO plan covers, *see* https://www.medicare.gov/forms-help-and-resources/mail-about-medicare/evidence-of-coverage-.html, and the reimbursement rights to which the Complaint refers are the rights of an MAO under the MSP laws.

73.     Plaintiff's claims therefore "really and substantially involve[] a dispute or controversy respecting the validity, construction or effect of [federal] law."  *Dunlap,* 381 F.3d at 1290.

74.     Judge Scola's remand order in *MSP Recovery v. Allstate Prop. Cas. Ins. Ins. Co;* No. CV 16cv20443, 2016 WL 4370078 (S.D. Fla. June 30, 2016), another case brought by Plaintiff's counsel, is instructive.  There, the court remanded the case because it determined the trier of fact would not need to "apply or decide any federal issues to resolve MSPA's asserted state-law claims."  *Id.*, *5.  Here, in stark contrast, it is evident that federal law will, in fact, have to be applied and decided in order for the case to be resolved.  Accordingly, under the standard applied by Judge Scola, federal question removal is appropriate here.

75.     Moreover, unlike in *MSP Recovery v. Allstate,* or any of the other cases where related entities to this Plaintiff have secured remand orders, Plaintiff here expressly alleges, in

the very first paragraph of the Complaint, that "Defendant *failed to fulfill its statutorily-mandated duty under the Medicare Secondary Payer . . . laws* to reimburse [MAO's] for medical treatment and expenses paid by Plaintiff and the putative Class Members . . . on behalf of Medicare beneficiaries.  (Compl., ¶ 1 (emphasis added).)  That is the crux of Plaintiff's liability theory -- *i.e.,* that Defendant is liable not because it breached the terms of its insurance contracts, but because it failed to fulfill the requirements of the federal MSP laws.  Thus, Plaintiff's Complaint, on its face, turns not on Defendant's purported failure to fulfill its contractual obligations, but instead on its alleged failure to fulfill statutory duties mandated by the federal MSP laws.  Federal Medicare law is therefore not merely a "context" for Plaintiff's claims, but instead must be interpreted, analyzed and applied to resolve Defendant's liability to Plaintiff and the putative class.  Put simply, Plaintiff's allegations that this case turns on Defendant's failure to fulfill its statutorily mandated duty under the federal MSP laws, and that federal law preempts state law and/or any defenses Defendant might raise (Compl., ¶¶ 1, 33), demonstrate that, to prevail, Plaintiff must show that its interpretation of the interplay between federal Medicare laws and state PIP laws, rather than the Defendant's contrary interpretation, is correct..  And that, in turn, means federal law will have to be interpreted, analyzed, and applied in order for the case to be resolved.

76.     By couching its Complaint in terms of state law causes of action, Plaintiff is attempting to do precisely what the *Vaughn* court rejected in concluding that the plaintiffs' "contract" claims presented a federal question.  *Vaughn,* 2007 WL 804694, *2 (a plaintiff "may not prevent the defendant from removing his case by framing his claims under state law and omitting federal questions that are essential to his recovery.").  The plaintiff in *Vaughn* argued he was claiming a right to compensation under contract and fraud theories, as opposed to claiming

any sort of right in a copyrighted work, and therefore that any discussion of the Copyright Act was beside the point.  The court rejected that argument, stating the "court disagrees, as the issue is whether Vaughn is seeking relief which ostensibly arises under state law but in fact necessarily implicates the Copyright Act."  *Id.*  Here too, as set forth above, Plaintiff's ostensible state court causes of action necessarily implicate the federal MSP laws.

77.     In sum, each of Plaintiff's claims is premised on the allegations that Plaintiff's purported right of reimbursement arises under federal law.  Accordingly, the Complaint undeniably presents a federal question and this Court has federal question jurisdiction.

78.     Even assuming, *arguendo*, that the Court were to construe some of Plaintiff's claims as 'state law' claims, then supplemental jurisdiction would apply to them, as all Plaintiff's claims arise from Defendant's alleged failure to pay benefits allegedly owed by Defendant for bills which the MAO was allegedly required to pay.  Accordingly, all claims are "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy."  *See*  28 U.S.C.A. § 1367 ("a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. . . ."); *Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1563 (11th Cir. 1994) (district court had jurisdiction over both state and federal claims where the "state law claims against Patterson and Bates are certainly part of the same case or controversy as the COBRA claims."); *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006) (same principle; stating "the RCRA

and CWA claims are the 'substantial federal claims,' and they arise out of a common nucleus of operative fact as the state claims.").

79.     Pursuant to 28 U.S.C. §1446(a), attached as **Exhibit E** is a copy of all the state court pleadings and process in this matter.  Attached as **Exhibit F** is a copy of Defendant's Notice of Filing of Notice of Removal in the state court that will be filed contemporaneously with the instant Notice of Removal.  Defendant has, therefore, satisfied all the requirements for removal under 28 U.S.C. § 1446 and all other applicable rules.

## CONCLUSION

For all the foregoing reasons, Defendant, Dairyland Insurance Company, respectfully requests this Court to assume full jurisdiction over the cause herein, as provided by law.

Respectfully submitted,

GUNSTER
*Counsel for Dairyland Insurance Company*
600 Brickell Avenue
Suite 3500
Miami, Florida  33131
Telephone:  305-376-6000
Facsimile:  305-376-6010

By: /s/ Angel A. Cortiñas
      Angel A. Cortiñas: FBN: 797529
      Jonathan H Kaskel, FBN: 52718

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2017, the foregoing was filed using the Court's CM/ECF system and served via transmission of Notices of Electronic Filing generated by CM/ECF to all counsel by the Court's CM/ECF system.

By: /s/ Jonathan  H Kaskel

**John H. Ruiz, Esquire**
**Frank C. Quesada, Esquire**
MSP RECOVERY
5000 SW 75th Ave Ste 400
Miami, Florida 33155
serve@msprecovery.com
fquesada@msprecovery.com
jruiz@msprecovery.com
*Counsel for MSP Recovery Claims, Series LLC*

**EXHIBIT**

**A**

1      IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
2           IN AND FOR MIAMI-DADE COUNTY, FLORIDA

3                          CASE NO.: 2015-27940-CA 01

4

5   MSPA CLAIMS 1, LLC, a Florida limited

6   liability company,

7           Plaintiff,

8   vs.

9   IDS PROPERTY CASUALTY

10  INSURANCE COMPANY, a Florida profit

11  Corporation,

12          Defendant.

13  _____/

14

15              TRANSCRIPT OF PROCEEDINGS

16                     BEFORE

17        THE HONORABLE ANTONIO ARZOLA

18

19              Dade County Courthouse

20              73 West Flagler Street

21              Miami, Florida 33130

22

23              June 23rd, 2017

24            1:30 p.m. - 3:35 p.m.

25

Page 2

```
1  APPEARANCES:
2
3  For the Plaintiff:
4          JOHN H. RUIZ, ESQUIRE
5          REYNALDO MARTINEZ, ESQUIRE
6          FRANK QUESADA, ESQUIRE
7          MSP Recovery Law Firm
8          5000 Southwest 75th Ave, Suite 400
9          Miami, Florida 33155
10         305-614-2222
11         jruiz@msprecovery.com
12         rmartinez@msprecovery.com
13         fquesada@msprecovery.com
14
15 For the Defendant:
16         ROBIN SYMONS, ESQUIRE
17         Gordon & Rees, Scully, Mansukhani
18         100 Southeast 2nd Street, Suite 3900
19         Miami, Florida 33131
20         305-428-5300
21         rsymons@gordonrees.com
22
23
24
25
```

Page 3

1  THEREUPON:
2      THE COURT:  All right. We're on record in the
3  matter of MSPA versus IDS, and appearances for the
4  record for the plaintiff?
5      MR. RUIZ:  Your Honor, may I please The Court,
6  and good afternoon. John H. Ruiz on behalf of MSPA
7  Claims 1.
8      MR. MARTINEZ:  Reynaldo Martinez also on
9  behalf of the plaintiff, Your Honor.
10     MR. QUESADA:  And Frank Quesada.
11     THE COURT:  All right. On behalf of the
12  defendants.
13     MS. SYMONS:  Good afternoon, Your Honor. Your
14  Honor, Robin Symons on behalf of IDS Property
15  Casualty.
16     THE COURT:  Okay. We're here on I think two
17  different motions. The first one is a Motion for
18  Entry of Stay followed by the defense. The
19  plaintiff has also filed a Motion to Approve a
20  Proposed Notice of Class Action.
21     MR. RUIZ:  I'll start, Your Honor.
22     THE COURT:  I think it most sense to start
23  with the Request for Stay.
24     MS. SYMONS:  Yes, Your Honor. Would you like
25  us to stay where we are at counsel table or

Page 4

1  approach?
2      THE COURT:  That's fine.
3      MS. SYMONS:  Okay. Thank you.
4      THE COURT:  If you have a lot of materials
5  it's going to be easier for you.
6      MS. SYMONS:  Yes, Your Honor. Although, I
7  haven't seen Mr. Ruiz's PowerPoint so when we get
8  to that point if I would have permission to --
9      THE COURT:  Absolutely.
10     MS. SYMONS:  So I could see it. Thank you,
11  Your Honor. Thank you for your time this afternoon.
12  You're setting a special set on a Friday afternoon,
13  especially on a nice day.
14     THE COURT:  You're really thanking me for
15  that?
16     MS. SYMONS:  Yes, Your Honor. I am because,
17  you know, we had it on motion calendar, and you
18  were correctly perceived --
19     THE COURT:  People dislike when judge do that.
20     MS. SYMONS:  That's a good point, Your Honor,
21  but certainly in my heart I'm wearing casual
22  clothes, but there's still some part of the
23  afternoon that we can potentially salvage, and I
24  think these issues are important for both our
25  clients. So sincerely thank you because you can

Page 5

1  also be doing something else this afternoon, and we
2  appreciate you're taking the issues.
3      THE COURT:  No, problem, no problem.
4      MS. SYMONS:  To heart. One of which is when we
5  appeared before you on motion calendar on this
6  motion, and you agreed to defer to a special set
7  was that now that you have granted the plaintiff's
8  Motion for Class Certification, things are little
9  different in the case, and even though there was a
10  history of a stay it was not successful before that
11  things might be a little bit different now, and I'd
12  like to explain briefly to Your Honor why that is
13  true, and they are, and you should grant a stay
14  pursuant to Florida Civil Rule of Procedure 9.103C
15  and 9.310.
16     I always have to look down because I get the
17  cites correct, and as you know, Your Honor, the
18  criteria for a stay pending appeal is whether there
19  are three criteria really that have to be
20  fulfilled.
21     One is whether there is this substantial,
22  debatable question. I think in a case like this
23  that's very closely one of first impression or one
24  of several -- cases of first impression. The other
25  being the Ocean Harbor case that your colleague

Page 6

1  has.
2      I don't think there can seriously be any doubt
3  that there's a substantially debatable question
4  about the -- in the case. Certainly they were
5  sufficiently complex that while we tried the
6  hearing for class certification September, the
7  issues were sufficiently complex that some months
8  past before an order was entered, and when it was
9  it was 57 pages long.
10      The order in the other case is over 100 pages
11  long. Setting aside the joke about not having time
12  to write, you know, a short brief or a short order,
13  I think that's at least an indirect indication or
14  an informal indication that yes, we have
15  substantially debatable issues in this case.
16      They're also evident by some of the issues
17  that have been raised in the proposed notice to the
18  class, but because we are arguing this motion first
19  I'll save those arguments for later, but clearly
20  whether MSPA act can be used in the way the
21  plaintiff wishes it to be used, whether Plaintiff
22  in Plaintiff's capacity as an assignee is the
23  appropriate plaintiff or class representative,
24  that's a substantial issue, and whether there is a
25  conflict that prevents otherwise admittedly

Page 7

1  competent and expert counsel from representing the
2  plaintiff in this particular case, those are all
3  substantial issues that will have to be looked at
4  by the appellate court.
5      Not least of which is Plaintiff itself is an
6  entity that was formed for the purpose of this
7  litigation and is owned by Mr. Ruiz's son, who is a
8  very successful baseball player at UM, and started
9  in I think all but one game this season .
10      So there are certain substantially debatable
11  questions with regard to the ultimate issues in
12  this case, and with regard to the class
13  certification order that was entered by The Court.
14      There's -- it's always awkward to argue
15  likelihood success on the merits, and likelihood of
16  harm, but most particularly likelihood of success
17  on the merits because that requires the person
18  seeking the stay to, to explain why The Court may
19  not have been correct in granting the motion in the
20  first place, and I'm sure that counsel for the
21  plaintiff will say that we are just rearguing
22  issues that you've already decided, or that we're
23  complaining that you ruled against us, and I don't
24  wish to do that, Your Honor, but what I will say is
25  that the issues that you considered and that you

Page 8

1  tried for three or four days in your courtroom were
2  highly contested.
3      They were new issues that are coming before
4  the courts for the very first time, and that at
5  minimum there's a high likelihood that the
6  appellate is either not be familiar with them and
7  will be confronted with issues that have never come
8  before them.
9      So whether the defendant will prevail on that
10  certainly is something we won't know until the
11  third rules, but this is not a divorce case. This
12  is not a simple slip and fall case where we can say
13  you made this mistake or you made that mistake,
14  Your Honor. This is a very complicated case in
15  which there are essentially three court issues.
16      Whether Plaintiff has standing, and within
17  that whether this particular set of attorneys and
18  this particular Plaintiff organizations are the
19  right ones to represent a class, even if they have
20  otherwise articulated a good legal theory, and then
21  there are issues -- the classic issues under Rule
22  1.220 with regard to commonality, numerosity,
23  predominance, etcetera, which we don't think that
24  the plaintiffs really satisfied and will be the
25  subject of the appeal.

Page 9

1      Typicality is another issue, Your Honor, which
2  has raised its ugly head yet again with regard to
3  the potential notice to the class that Plaintiff's
4  counsel wishes to make, and it illuminates one of
5  the issues that we have, and why we think that the
6  class should not be certified aside from the issue
7  of individual claims being analyzed on an
8  individual basis, which is something you heard a
9  lot about, but as I understand it Plaintiff's
10  counsel now wishes to expand the notice to include
11  entities -- unnamed entities in an unnumbered
12  amount and an unidentified number of other entities
13  that are not MAOs that the plaintiff is going to
14  argue to you are included within the definition of
15  class that, you know, it was in the order that you
16  signed, but is the language that Plaintiff's
17  counsel, you know, proposed to you.
18      Which we think undercut completely numerosity,
19  typicality, and commonality because they are not in
20  MAOs. This additional group of entities that the
21  plaintiff wishes you to approve a notice to.
22      MR. RUIZ: Judge --
23      MS. SYMONS: I'm dangling participles, but --
24      MR. RUIZ: Judge --
25      MS. SYMONS: If I might finish before --

1    MR. RUIZ:  Judge, respectfully, she's getting
2  into my motion as opposed to arguing her motion. So
3  I believe --
4    THE COURT:  She's making a link to it, so it's
5  not -- she's not just bringing it up to bring it
6  up. She's bringing it to what she's arguing as an
7  issue --
8    MS. SYMONS:  That's exactly right, Your Honor
9  --
10    THE COURT:  Makes this more complex --
11    MS. SYMONS:  And for that reason, and the
12  reason that I'm bringing it up now is because I
13  think it might, if Your Honor is so inclined, be
14  best to hear both arguments before your rule on
15  either motion because I think because of the way
16  the notice has been prepared one varies on the
17  other, even though it's completely appropriate to
18  hear the Motion for Stay first, but you might want
19  to wait to rule on it until the other motion has
20  been heard for this very reason.
21    That the, that the proposed notice, and
22  Mr. Ruiz and I were on the phone until after 10:00
23  last night trying to work it out so that it
24  wouldn't be contested, so there's been, you know, a
25  good faith effort to resolve, but the expanded

1  nature of the notice that the plaintiff wishes to
2  send to the class bears on the Motion to Stay.
3    Otherwise, he would be absolutely right, and I
4  shouldn't be talking about it if that's the reason
5  that I brought it up.
6    Your Honor, the other element for a stay as
7  you know, and of course, this is all clearly within
8  your discretion is whether there would be the
9  likelihood of harm. Here the likelihood of harm
10  criterion has more to do with the waste of judicial
11  resources, and the waste of the resources of the
12  parties than any actual harm to any one person.
13    The MAOs that are listed are 37 corporations.
14  They are, as you have granted the motion for class
15  certification represented by a single purpose
16  entity that is completely under the control and was
17  formed by plaintiff's counsel.
18    So the idea of harm is a bit of a construct
19  because there's really no one to be harmed here.
20  There's a potential archain legal remedy that the
21  plaintiff is pursing, but the class representative
22  who would be the likely primary beneficiary of any
23  class settlement or any results if the case were to
24  be tried is not an injured party.
25    It's an entity that was set up for the purpose

1  of bringing this lawsuit that has an assignment
2  from a failed AMO whose founders I think are in
3  prison. So it's not the typical situation where
4  somebody, an actual person, is likely to be harmed
5  by delay, but what is likely to happen is that
6  we're going to be back before you in motion
7  practice, even though we have a very cordial,
8  professional relationship, and we always try to
9  work with each other to resolve things, but there
10  will be --
11    Because it's such an interesting and
12  complicated case and involves an act that is
13  somewhat impenetrable to read I think we will back
14  before you in motions. The discovery will be
15  intensive and expensive, particularly if Plaintiff
16  is allowed to send the notice that he wishes to
17  send that includes first tier entities and second
18  tier entities and other entities that I don't even
19  understand at this point, but if he is allowed to,
20  or I shouldn't see he and personalize it.
21    If Plaintiff is allowed to proceed with
22  discovery at this stage of the case, it's going to
23  be expensive. It's going to be active. It's going
24  to require time and energy from The Court, all of
25  which could be avoided if all of that is postponed

1  pending the outcome of the appeal, and to the
2  extent that it has any relevance is that my
3  understanding is that there is an informal status
4  in the Ocean Harbor case.
5    There is no activity that would prompt a
6  Motion to Stay in that case, but in any event I
7  thought you might, you know, wonder what was going
8  on there.
9    THE COURT:  Ocean's Harbor, what -- it's
10  Louise Qualanz (phonetic) case?
11    MS. SYMONS:  Yes, Your Honor. That's Judge
12  Louise --
13    THE COURT:  What did you say, there's what?
14    MS. SYMONS:  There hasn't been any attempt to
15  engage in discovery such that a Motion for Stay is
16  pending. There is no Motion to Stay pending as I
17  understand it, or at least there's not one set for
18  hearing.
19    MR. RUIZ:  I'm sorry, but she's talking about
20  things that she has zero knowledge about.
21    MS. SYMONS:  I can look at the docket.
22    MR. RUIZ:  And I think that shouldn't be
23  presented to The Court as a basis for her argument
24  because she's unfortunately wrong for her position,
25  so I think we should move with the facts of this

Page 14

1  case and the procedure and substance of law of this
2  case.
3     MS. SYMONS:  Your Honor, this case was filed
4  on December 2nd of 2015, and Plaintiff didn't move
5  for class certification until April 27th of 2016.
6  Plaintiff hasn't been in -- there's no compelling
7  reason, there's no personal injury for a -- or any
8  sort of compelling reason that would prevent a stay
9  or that would cause, you know, set forth any sort
10  of harm for a stay.
11     What would it would do would be to allow these
12  very interesting and new and novel issues for which
13  I commend Plaintiff for coming up with, truly, and
14  I don't have any sense of irony at all. I mean
15  that, and I told him that in his office, but these
16  are new and novel issues, and none of them are
17  going to be litigated without intensive expense,
18  extensive time, and extensive reliance on the
19  resources of The Court to resolve issues that were
20  not even to resolve.
21     Either because there isn't prior case law or
22  precedent to assist us or guide us, or because we
23  just genuinely disagree on the scope and the
24  process because of the lack of prior cases.
25     This would be really the first case in which

Page 15

1  -- unless I'm badly mistaken, at least down here.
2  This case would be in a league in terms of
3  discovery. So for those reasons, Your Honor, we
4  respectfully request that you enter a stay of all
5  proceedings pending the outcome of the appeal, and
6  if, for any reason, the Court is uncomfortable
7  staying the entire case, we will then ask that you
8  consider a partial stay if Plaintiff --
9     Which I don't think Plaintiff will agree to,
10  but I did discuss that issue with him yesterday to
11  see if there would be any way we could reach an
12  agreement.
13     THE COURT:  What would that encompass?
14     MS. SYMONS:  Well, Your Honor, it would either
15  be a total for stay for a limited period of time
16  that would maybe not, you know, be tied to the end
17  of the appeal, or it would be for certain things
18  and not others.
19     In other words, you might allow them to issue
20  a Notice to the Class, you might approve the notice
21  in some form, or you might instruct us to go
22  outside and figure it out and come back to the
23  motion calendar with a form that we both agree on,
24  or ask us to submit two forms, you know, by
25  Tuesday, in which case you can just decide which

Page 16

1  one you approve.
2     You could approve the notice and then stay
3  everything else, and so at least that way that
4  issue would be off the table. I'm trying to present
5  some of the -- practical options, but I -- what
6  would be most efficient, Your Honor, would be if
7  you stayed all proceedings pending the outcome of
8  the appeal and what IDS is asking you to do. Thank
9  you for your time.
10     MR RUIZ:  Your Honor, good afternoon again.
11  Johnny H. Ruiz on behalf of MSPA Claims 1, and may
12  I please The Court. Judge, we have to understand
13  first of all that it is the defendant's burden to
14  overcome , to be able to get this Court to grant a
15  stay.
16     Now one of the elements was to be persistent,
17  perhaps they would have scored some points, but
18  persistency is not one of the elements because this
19  is not the third time, this is the fourth time that
20  they asked either this Court or the Third District
21  Court of Appeals to stay these proceedings.
22     You denied her stay on March the 3rd, 2016.
23  Then you denied a second stay on April 11th, 2016.
24  Then they appealed it to the Third District Court
25  of Appeals, and the Third District Court of Appeals

Page 17

1  denied the writ of searcherary.
2     This is the fourth time that this same
3  defendant is asking you to stay this case, which by
4  the way the only reason why there is no discovery
5  provided we have propounded discovery. They object
6  to absolutely everything. What is somewhat curious
7  to me, and you recall this was almost like a four
8  day trial, that they did nothing but the night of,
9  the moment when they were going to put their
10  witness, they miraculously reviewed 64 files that
11  they say they couldn't do before.
12     So it's delay, delay, delay, so they say that
13  necessity is the mother of invention, well that
14  night they invented how to review all these cases.
15  Now, Judge, even if you felt sympathetic for them,
16  even if you thought that, oh, poor IDS, they have
17  to meet their burden. They have a procedural and a
18  substantive burden to meet, and simply stated they
19  have not met it.
20     Substantial likelihood of success. I heard
21  opposing counsel talk about debatable case. It's a
22  not go case. That's sounds great. Everything's
23  debatable, but where does she show you that they
24  have a substantial likelihood of success. So when
25  we came here, Judge, what would we have to prove?

1    We had to prove beyond a -- not beyond -- a
2  preponderance of the evidence that we were entitled
3  to certification. That burden now for them is much
4  higher because this court has already ruled that
5  this case should be certified.
6    Judge, you didn't do it in a vacuum. You
7  didn't do it during motion calendar. You did after
8  hearing the evidence, listening to an argument. I
9  felt it was a pretty intense hearing. I thought you
10  asked very good pinpointed questions. We laid it
11  out, and you reviewed the entire case, and it was
12  Your Honor's discretion to either certify the case
13  or deny certification.
14    There is a Rule of Procedure. It's 1.540 or
15  1.530, neither of which may apply that this
16  defendant failed to adhere to also to try to come
17  back and say, Judge, you know, you made a mistake.
18  You didn't have the right facts. Judge, you
19  misapplied the law. They didn't ask you for any of
20  that.
21    So what they're asking you to do, Judge, at
22  this point in time, in my opinion it's
23  counterintuitive. You have already found in favor
24  of the plaintiff. She can disagree with who the
25  plaintiff is. That's what all the insurance

1  companies, oh my God.
2    All of a sudden because there's an assignee,
3  it doesn't change the dynamics of what we're
4  dealing with. We are dealing with an insurance
5  company who takes premiums from people and doesn't
6  pay their debts. I don't care how you slice it.
7  That is what this case is about, and it doesn't
8  deal with one plaintiff, Judge.
9    This is a certified case, okay, and as a
10  result of that, Judge, I think it's important for
11  this Court to understand that because it's a con
12  certification, we're going to get into that, it is
13  incumbent upon The Court to make sure that notice
14  is sent because what we're dealing with is now this
15  Court has essentially expended this case from a
16  case that had one plaintiff to every entity that
17  falls within the class definition due process,
18  notice, and an opportunity to be heard.
19    This is exactly what the notice is for. Why
20  would we stop people form being able to come before
21  Your Honor and either agree with the plaintiff,
22  disagree with the plaintiff, maybe want to file
23  some briefs with the Third District Court of
24  Appeals. It is absolutely illogical not to send a
25  notice.

1    Now not only have they not provided you with
2  case law or factual circumstances to prove that
3  they have a substantial likelihood of success, but
4  they fail miserably because as a matter of law when
5  you have an adequate remedy of law, Your Honor, you
6  cannot seek any injunction.
7    They're asking this Court to stay, and their
8  argument is that they're going to have to pay
9  money. Well we all know, Judge, and you know, that
10  money damages is not a basis for a stay. So they
11  have failed to meet their burden. Simply stated
12  they have not carried their burden.
13    We could have sat here and done absolutely
14  nothing, and with what Ms. Robin's argued you
15  legally cannot grant a stay because there's no
16  basis for it. Now I understand at the end of the
17  day Judge, you're the judge.
18    You can grant a stay, but I am communicating
19  to you as a lawyer that procedurally and
20  substantively it would be incorrect and improper
21  for this Court to grant a stay.
22    Now, let's move forward because I think with
23  The Court's permission I wanted to look at the
24  notice, okay, and I want The Court to understand
25  because a lot of statements have been made about

1  HMOS and MSOs, but we have actually broken it down,
2  and I believe, Judge, that we went through this a
3  little bit when we had the Motion for
4  Certification, and the reason why that becomes
5  important is because companies contract, and if you
6  can take me to the slide on the hierarchy,
7  companies contract with the federal government, the
8  CMS, okay, so I'm outlining that. Medicare
9  Advantage --
10    THE COURT: Can I have a copy of that?
11    MR. RUIZ: Yes.
12    MS. SYMONS: I have not been provided with it,
13  and I haven't seen it, Your Honor, and I can barely
14  see it presently without getting too --
15    MR. RUIZ: Well, I think it's the lighting. I
16  don't know.
17    MS. SYMONS: Maybe, but that's -- I don't have
18  anyway to see it.
19    MR. RUIZ: There you go. So Judge, what we're
20  trying -- what we wanted you to understand and
21  explain to you is we use Cigna as an example. Cigna
22  is an HMO. They contract directly with the Center
23  for Medicare and Medicaid Services. Essentially
24  that contract is whereby Cigna takes the risk of a
25  person that is a Medicare beneficiary and

Page 22

1  essentially enters into a contract with the
2  government whereby Cigna accepts a monthly premium,
3  typically between 12 and 13, 1,400 dollars.
4      In exchange for that Cigna takes the entire
5  risk of that beneficiary irrespective of what
6  happens to that beneficiary medically. Any medical
7  necessity that falls under Medicare payments, that
8  is a responsibility that Cigna takes.
9      Cigna further may contract with what's called
10 an independent practice association, an MSO, which
11 is a Management Services Organization, a
12 coordinated care plan, skilled nursing facilities,
13 or other assignees.
14     What this means, Judge, is essentially that
15 the risk that's taken by Cigna can be contractually
16 transferred to another entity by law. They're
17 called MSOs IPAs. When you certified this class
18 action you certified MAOs and assignees. I'll be
19 more than happy to show you exactly what we
20 certified, and it's only logical because the risk
21 of loss, the payment, ultimate loss is born by
22 these first tier entities in many occasions.
23     So the logical sequence of what needs to
24 happen is not only that Cigna got notice, but
25 everyone who has suffered a loss gets noticed. Why

Page 23

1  is notice important? Notice doesn't mean that they
2  get paid. It just means that they have notice that
3  if they have a claim they should submit it.
4      It only means that if they have a claim they
5  understand that there's a lawsuit whereby they may
6  potentially be able to receive the money. So the
7  notice, again, is just notice for an opportunity to
8  be heard. We, as litigants and the parties have had
9  an opportunity to be heard. No one has won. We've
10 only gotten certified as a class. That's all that's
11 transpired.
12     This is only logical. It's already in the
13 moving papers. The Court has already certified the
14 issue. I'd be more than happy to explain in more
15 detail if The Court has some other concern.
16     THE COURT:  Well how does the existence of
17 first tier entities or downstream entities play
18 into the, the traditional class action requires of
19 typicality, commonality as counsel has indicated?
20     MR. RUIZ:  It's the same, Judge. Nothing has
21 changed. This is what happened. Functionally Cigna
22 pays all the bills. They actually write all the
23 checks. So let me give you an example that you may
24 understand a little bit better simply because
25 they're here locally, and I'm using Leon Medical

Page 24

1  Centers that everyone knows.
2      So Leon Medical Center originally owned the
3  HMO and owned the medical centers. Leon Medical
4  Center sold the HMO to Cigna. They actually sold it
5  to Health String (phonetic) which then sold it to
6  Cigna, but Leon Medical Centers kept the medical
7  centers that provide the actual care to the
8  patient.
9      So understand that these insurance companies
10 are payors whereby the providers of care provide
11 care, but when they enter into agreements with
12 these entities they take on full risk. It's almost
13 like an indemnification agreement pretty much.
14     So what happens, Judge, is Cigna pays the
15 bill, right, physically writes a check, but in the
16 agreement these first tier entities ultimately bear
17 the risk because they have a fund called a service
18 fund. So let's assume that one of these entities is
19 supposed get 500,000 a month for care and treatment
20 of patients.
21     If Cigna pays, let's say 100,000 dollars for
22 somebody that's in the hospital they'll give it a
23 reconciliation to the down tier entity. Now in
24 terms of how it affects numerosity, typicality,
25 commonality, and adequacy of representation, it

Page 25

1  doesn't affect it at all.
2      They're all -- their interests are aligned.
3  It's the same dollar who's entitled to it? That's
4  why notice is important because whereby I could
5  have owned my car today, and I sold it to somebody
6  tomorrow, and there's some compensation that's
7  being given because of a defect with the car, if I
8  don't own it anymore, and that payment flows with
9  the title, then both people should get notice.
10     So I think that that's something that we can
11 look at hopefully. I don't know if you have anymore
12 questions regarding that because I'd be more than
13 happy to explain.
14     THE COURT:  Proceed.
15     MR. RUIZ:  Okay. Now, so we understand now the
16 sequence and hierarchy of these entities of how
17 they formulate it. So what we essentially did,
18 Judge, is prepared a notice, a notice to the
19 members of the class that complies with Rule 1.220.
20     We essentially went one by one, and this is
21 what we did to make it easier for The Court, we
22 went into the class action rule, which states that
23 notice shall, this doesn't day say may. It doesn't
24 say whatever we wanted. It says shall inform each
25 member of the class that nay member of the class

1  who files a statement with a court by specifically
2  dating the notice asking to be excluded shall be
3  excluded.
4      So the first thing is notice, right, and then
5  the next thing that we did is to say listen, if you
6  don't want to be in this case you can opt out. So
7  once you get the notice if you don't like the case,
8  you don't like what's happening within the case,
9  you want to handle a case on your own, all you have
10 to do is say Your Honor, Judge Arzola, we want out.
11 We don't want to be in this case, okay.
12     So that's pretty straight forward. It's
13 fundamentally sound, and it complies with the
14 requirement of the room. Now can you go back. You
15 can do nothing. If you do nothing it tells you
16 exactly what happens. If you do nothing you stay
17 with class counsel, who's going to represent your
18 interest in the prosecution of this case.
19     Now, Judge, I will tell you that in the 90s
20 when our firm certified a lot of these cases --
21 certified and got affirmed on appeal the notices
22 are within 95 percent the same of what we did, and
23 we obviously had to tailor it to the facts and law
24 that we're dealing with here.
25     As an officer of The Court I will tell Your

1  Honor that I would not mislead you. I think in a
2  class action one of the things that you have to
3  look at is what the lawyers do because a lot of the
4  work should be done by the lawyers and not by The
5  Court, but ultimately you're the gatekeeper. You
6  keep out whatever you feel is misrepresented, is
7  not appropriate.
8      We have done our best job we feel to make sure
9  that the people that receive these notices
10 understand. Now I want to take this just one step
11 further so that you understand. Opposing counsel
12 indicates that MSPA Claims 1 owns some of the FHCP
13 claim, but the reality is that we as Plaintiff's
14 lawyers represent the owners of a substantial
15 amount of these cases.
16     In fact, it expands almost the entire United
17 States, 23 states and almost 90 percent of Puerto
18 Rico. Not that those are in here, but they're all
19 the same entities. They're all the Cignas and the
20 Anthems and the Uniteds and the down tier entities
21 that are involved in that.
22     So already as it is we understand the data
23 that they have. We understand what they should do,
24 and I think we've learned a lot from that so I want
25 to share that with you so that you understand that

1  we believe that we have a pretty --
2      THE COURT:  Just out of curiosity from, from
3  what we've dealt with throughout to this case to
4  the present date is I believe it was 37, 38 or
5  something MAOs, how many of those first tiers or
6  downstream entities exist?
7      MR. RUIZ:  It could be -- we know that there
8  are 120,000 about NPI providers in the State of
9  Florida. An NPI provider is someone that's allowed
10 to provide services to a Medicare beneficiary. How
11 many of those become assignees because your
12 certification is an MAO or an assignee.
13     So unless we have the contracts from the
14 Center for Medicare and Medicaid Services and
15 Cigna, but as you can understand for example a
16 company like Humana uses MCCI in 53 locations
17 throughout the United States to service about
18 180,000 other patients. You know, some of these
19 MAOs have two million, three million, four million
20 people, they need multiple down tier entities to
21 service these lives.
22     So to give you an exact number I would not be
23 able to tell you how many of those fall within
24 this, but I can tell you that the notice would be
25 about 120,000 to providers around the State of

1  Florida or that participate within the structure.
2  Plus, the 37 MAOs.
3      Now, if Your Honor believes that it is more
4  prudent to tailor the notice so that it goes to the
5  MAO, and the MAO has to send it, I just feel
6  uncomfortable with that because we may have a
7  situation where we pay an MAO, and then a provider
8  comes back or an IP and takes a position that hold
9  on a second, you just extinguished a claim through
10 an MAO that the money belongs to me.
11     So this is almost like an interpleader action
12 where we want everybody to be in the same place so
13 that anyone that wants to voice their concern,
14 state their position, make their claim, is before
15 this court, and we believe that's the most prudent
16 course of action, right.
17     Now, let me take you through the other
18 necessary elements of the class action rule. So can
19 also elect to be part of this lawsuit, but not be
20 represented by class counsel. So someone can come
21 in, Your Honor, and intervene and take the position
22 that look, you know, we like the lawsuit, but we
23 don't want the MSP Recovery Law Firm, we don't like
24 Mr. Quesada. We don't like Mr. Ruiz. We don't think
25 they're going to do a good job, and that's

1 understandable.
2    People in this country have a right to choose
3 their lawyers. Because of the certification process
4 we believe that we presented the necessary elements
5 of adequacy of representation and Your Honor agreed
6 that at least from what you saw and the experience
7 of the lawyers and you indicated that we would be
8 adequate representatives as lawyers for this class.
9    So I've taken you through, and I'm going to
10 continue moving through the rule that we are
11 required to make sure that those notices are there.
12 So what we want to show you  now is we want to show
13 you the specific language in the notice, specific
14 language that links to the order, right.
15    The order on certification, specifically you
16 certified a class. We're going to show you how we
17 tied your order, which here's the order, said --
18 contracts -- and/or its assignee. That's exactly
19 what -- pursuant to part C.
20    So contracted with CMS, that's Cigna and/or
21 its assignee. If I assign my risk to one of these
22 down tier entities that's why we're sending them
23 notice. So I wanted to show that to you so that you
24 understood that it's there already. Can you go to
25 the next slide?

1    So these entities are provided subcontractor
2 first year entities, so now these assignees like we
3 indicated can take the form of multitude of
4 different types of services.
5    Judge, so that you understand, an MAO can have
6 a contract with let's say a diagnostic center. An
7 MAO can have a contract with a hospital. An MAO can
8 have a contract with an orthopedic surgeon, a
9 neurologist. It's endless. That's the reason why we
10 set it up this way. What are the next -- sign on
11 the notice. So here are the people that are
12 receiving it. You want to see?
13    THE COURT: Proceed.
14    MR. RUIZ: Okay. So let me go to the notice
15 because then we're going to talk about
16 distribution. So --
17    THE COURT: By the way, first thing you're
18 taking off is that photograph. There's no need for
19 my mug to be on there.
20    MR. RUIZ: Okay.
21    THE COURT: I don't think it's a bad picture,
22 but I don't see a need for it to be there. I have a
23 copy of this.
24    MR. RUIZ: Okay. So Judge in the notice
25 itself, stop there, we break down the content of

1 the notice. So it tells you about the purpose. It
2 talks about the litigation. Who are the members of
3 the class. Your option as a class member, what you
4 can do. We have the 37 companies that are the
5 Medicare Advantage organizations, and then we
6 specifically break it down, and here's what we do.
7    So we provide to the class members, okay, a
8 full list of known assignee first tier entities,
9 okay, downstream entities. This is found on page
10 three of the notice. So if you look at page three
11 of the notice it tells you here that if somebody
12 wants to look at this Your Honor, that he just
13 click on and link to this, and that is the list
14 that I explained to you. I believe it's about
15 120,000, and they'll be able to find themselves.
16    Now what we did is that when someone enters
17 their name we have on the backend of the system put
18 the legal name of the entities that would be
19 recognized by the government, by the United States
20 Government Center for Medicare and Medicaid
21 Services as an MPI provider.
22    So if somebody comes in and puts, you know, we
23 own XYZ clinic, and they don't have an MPI number
24 we know right off the bat you can't be a class
25 member. So this has been strategically formulated.

1 This isn't a one day event. This has been a
2 multiple year project in the making because the
3 backup end of it is very important.
4    So let me explain that to you again just to
5 make sure. There's about 120,000 potential
6 assignees that have provided services to
7 individuals that have been involved in car
8 accidents for which IDS was the insurance company,
9 and IDS has claims that they've paid for those
10 individuals.
11    THE COURT: Let me ask you one question.
12    MR. RUIZ: Yes.
13    THE COURT: This -- obviously technology is a
14 beautiful thing. You can actually link right to by
15 clicking on that.
16    MR. RUIZ: Correct.
17    THE COURT: That link, right, but if you were
18 to send it by mail there's nothing you can link to.
19 You just -- they would have to actually type that
20 into a search box to get there.
21    MR. RUIZ: Correct.
22    THE COURT: Just for my personal experience,
23 I'm sure you guys all get -- at some point get some
24 type of notice of in the mail from some class
25 notices, the little thing that you rip on the side

1 and whatever it could be. Something against AT&T.
2     MR. RUIZ:  Right.
3     THE COURT:  Or some big corporation, but you
4 open and you look at it, and you determine whether
5 something interests you or not. E-mails, I mean, I
6 personally getting a ton of junk mail, how is this
7 distinguished from, from something that somebody
8 would open, which I guess we'll never know, but --
9 or to junk mail. Is it by virtue of what it's
10 called or what it says in the subject line?
11     MR. RUIZ:  Okay. So that's a related question
12 because it actually catapults us into distribution.
13     THE COURT:  The reason I'm asking --
14     MR. RUIZ:  No, it's a good question.
15     THE COURT:  The whole purpose of notice is you
16 want them to be noticed.
17     MR. RUIZ:  Yes, absolutely.
18     THE COURT:  You don't want them to just go to
19 junk mail, and then you never find out you had an
20 opportunity to opt out.
21     MR. RUIZ:  So our system will track who opened
22 the e-mail, who discarded the e-mail, and gives us
23 a synopsis of everyone who received it, and what
24 that does for us it that it tells us who we may
25 have to communicate with, maybe a phone call, but

1 because we have it backed up with a number of other
2 functions being newspapers, the daily business
3 review, social media, prey publications.
4     We know that because of that if it doesn't get
5 to them through the e-mail it will get to them
6 through some other form. In addition to that, in
7 addition to that, we also have, and we have all the
8 circulation of each newspaper so that we know where
9 we're going and who it is that reads all of this.
10     In addition because you're very correct, the
11 most important thing, and that's the reason why
12 notice is important because if you don't get
13 notice, you can't -- you don't have due process.
14 You don't know what you're dealing with.
15     So the systems that we have will tell us,
16 Judge, if we sent out 120,000 e-mails, which actual
17 providers opened it, and what the functionality
18 was. How many pages they went through to go through
19 the notice, and we can give you that report. So
20 would know --
21     THE COURT:  That's pretty scary.
22     MR. RUIZ:  The way it's technology. So in the
23 old days.
24     THE COURT:  This is not just like a read
25 receipt thing? This is like something else?

1     MR. RUIZ:  Well, if you open up an e-mail, and
2 you go from page to page to page we can tell you
3 when opened it up if you stopped just at the first
4 page. If you read the two pages, what you did
5 within the system. So that tells you afterwards
6 you're going to get a full report of what exactly
7 transpired. So that's very good, and in the 90s and
8 the early 2000s when I did the class actions we
9 used to mail them, and we would get an opt out. It
10 was, you know, handwritten and signed, and we had
11 to trace all that. So technology, obviously, is
12 much better.
13     THE COURT:  Have you ever heard of something
14 like that?
15     MS. SYMONS:  Yes, Your Honor. I have, but it's
16 a little creepy just to think about. I hope I don't
17 get one of those, but I'd also like to have an
18 opportunity to respond. I don't know if you have
19 another hearing after this.
20     THE COURT:  No, I don't want you guys to think
21 that I'm going to be here all night with you.
22     MR. RUIZ:  So --
23     MS. SYMONS:  I'll try not to take it
24 personally.
25     THE COURT:  You will get an opportunity.

1     MS. SYMONS:  Thank you, Your Honor.
2     MR. RUIZ:  So Judge, whatever it is, look, I
3 think ultimately as a judge in this case when you
4 see the tools that we have to provide reports to
5 you so that you understand there's nothing that
6 should happen in this case that you would say to
7 yourself, what did you guys do? I mean, I don't
8 know what happens.
9     So I'd rather you take the time and stop, stop
10 us, and tell hey, how does this work? How does that
11 work? We'd be more than happy to explain that to
12 you.
13     So as we go through -- I want to go back again
14 because the first level, and in class actions the
15 preferred method of transmission would be something
16 that we know people get. So if I had my choice,
17 Judge, I would send a text message.
18     People read text messages more than they read
19 e-mails. So you generally don't -- it's start to
20 change a little bit, and I get called every five
21 minutes to sell me an insurance policy. I don't
22 know the number, and they start texting you with
23 different things, but if I had to provide you with
24 my opinion in terms of junk mail, e-mails, that
25 comes first.

1   You know, it used it be faxes they would sent
2   you, but now I find that text messaging people
3   respond to more than the e-mails. You have the
4   phone on you, and they say that by the year 2025 we
5   won't even have computers. Everything's on our
6   phone. You live by your phone.
7   So what this basically does is it gives us the
8   best first level approach that we think exists in
9   the marketplace. So I'd rather do this than send a
10  letter because I don't know -- at least in my house
11  I don't always get to see the mail. There's a lot
12  of bulk mail, and that people generally read a lot
13  less.
14  Now it takes a lot more to open it up, read
15  it. So I think that's an even more antiquated
16  process, and we know by experience --
17  THE COURT: Did Ruiz just call me antiquated?
18  MS. SYMONS:  He was looking at me, Your Honor.
19  MR. RUIZ:  So here's what happened.
20  THE COURT:  I want to say that I opened the
21  mail --
22  MS. SYMONS:  By the way, we're not contending
23  that he shouldn't make electronic notice somehow.
24  I'm not sure why this is being argued.
25  MR. RUIZ:  No, no the judge has a legitimate

1   question. So, Judge, the other thing that we know,
2   and I'm just giving you my experience. When you
3   send out first class mail, okay, for a class
4   action, the response is generally between nine and
5   11 percent.
6   So you're using what the system's called
7   constant contact in a lot of cases. There's a
8   system that you can put, you know, some of this
9   information. We use multiple systems. You put the
10  information into the system, and it will tell you
11  because that system when people receive e-mails
12  they know that it isn't junk mail because they
13  clean it up. They have their own formula to clean
14  it up.
15  So what I'm getting at basically is that this
16  the preferred method of sending out notice as it
17  pertains. Now here's what the other thing we do
18  Judge. In addition to this we will send a certified
19  letter to the CEO of each of these Medicare
20  Advantage organizations, the head honchos.
21  So they will get the information, and even
22  assuming -- and they do control all of the data. So
23  they have their own internal contracts between
24  them. So if an MAO makes a claim and receives
25  money, and later on let's say that some provider

1   comes and takes a position that hey, I never got
2   notice entitled to the money we can always go back
3   and take the position that the MAO with whatever
4   they collect, assuming they collect anything, if we
5   prevail on this case, the MAO by collecting the
6   money has to indemnify a down tier provider, and
7   these are multi billion dollar companies.
8   So we can create mechanisms in the system to
9   protect what we would be concerned about, which is
10  somebody trying to collect twice on the same claim,
11  and I think this is the ultimate goal is by sending
12  this notice to make sure people don't collect twice
13  on the same claim, okay.
14  We keep moving down. We talk about the
15  litigation, so this is, you know, what the case is
16  about. We allege. We don't say that we've won. This
17  is exactly -- this is being taken from the action
18  notice -- I'm sorry, the actual certification
19  order.
20  So we haven't change anything, and be more
21  than happy if you want to look at it even further
22  we will even run a word to word comparison so that
23  you understand what we have.
24  So we explain what the litigation is, you
25  know, how it works as an MAO FHEP, advanced

1   Medicare payments on behalf of the enrolling
2   because that was the MAO that we discussed, okay,
3   and then we talk about what a downstream entity is.
4   These are definitions taken from cases, and
5   then we continue moving on. Then we talk about the
6   class members, okay. Those are the members of the
7   class that Your Honor certified, exactly per the
8   definition that you certified.
9   Now, we went through this, Judge. What are you
10  options, do nothing, hire another lawyer, or opt
11  out?
12  THE COURT:  All right. Hold on, hold on.
13  MR. RUIZ:  Yes.
14  THE COURT:  That paragraph all the way at the
15  top of page three that says a full list of known
16  assignees, first year entities, etcetera, can be
17  found at, and then there's that link.
18  MR. RUIZ  Yes.
19  THE COURT:  Wouldn't that answer the question
20  that I had before is how many first tier -- I mean,
21  when you hit that link what pops up? Show me.
22  MR. RUIZ:  Is it live? We can't put it live
23  because until you don't approve it we put it live
24  we'll be violating, you know, the order so we have
25  it behind --

Page 42

1    THE COURT:  From wherever you have it.
2    MS. SYMONS:  We want to talk about notice, you
3 know. It's so hidden I can't have it that he wants
4 you to approve it with, you know --
5    MR. RUIZ:  It's not notice. I'm saying that we
6 can't put it live on our website. You understand --
7    THE COURT:  He's saying he has it. He just has
8 it in a different location.
9    MR. RUIZ:  Right.
10    MS. SYMONS:  Yes, Your Honor, I understand,
11 but my point is that one thing we agree about is
12 notice and due process, and right now, even
13 standing here we don't know who he's talking about,
14 but there's 129,900 of the,, you know.
15    THE COURT:  I'm trying to find out.
16    MR. RUIZ:  Okay. While he looks for that
17 because he's going to click to the link, but you
18 know what if you go to the section that you put in
19 the name it has them all in there. So what happens
20 -- we'll show you that in a moment, but when you
21 click on here, okay, you can either get the full
22 list or go to the section where they fill out.
23    Okay. It's a little hard to look at, but
24 Judge, look. When you put in -- okay. When you put
25 in the type of entity, and you click on here where

Page 43

1 it said MSO, HMO, whatever. Then it gives you
2 another section where you put in your name. If it
3 doesn't find your name it means you're not
4 registered in the State of Florida under an MPI, so
5 you can't collect, simple.
6    He's going to -- throw that up again. So you
7 see you're either a Medicare Advantage
8 Organization. You're an MSO, you're an IPA. You're
9 a physician. You're going to be one of these. Now,
10 these here are also referenced within all of them
11 motions and memos that we filed in this case.
12    So there's nothing new. I just want you to
13 understand. We haven't inserted anything new at
14 all. When you go to an MSO, and you click the name
15 of the entity it has within it everything already
16 noted. So if you put in a name that's not found
17 there that means you can't be a class member, so
18 that's the way that the system works.
19    It's almost like assume now that you put the
20 name John Ruiz and the list of judges in the 11th
21 Circuit. It's going to say Ruiz is not a judge.
22 You're not going to find him, but if they put in
23 Arzola it's going to pop up because you're one of
24 the judges.
25    So this system recognizes what's buried behind

Page 44

1 -- the data that's buried behind. Keep moving. It
2 allows you to put in a lawyer's bar number. If you
3 want to represent the person so we we've gone
4 through this, you know, in pretty great detail. It
5 tells you here if you're opting out as an MAO, MSO,
6 IPA, you got to sign this so it's very detailed.
7    I mean, I'd be more than happy to work with
8 opposing counsel, so I think the more important
9 part of it, Judge, is what is your position
10 ultimately on the notice, and what you would want
11 to make sure it includes because otherwise the
12 reality is we could probably -- it took us in
13 reality probably weeks thinking of the whole --
14    We create this in process maps. So what I want
15 to take you through is the experience. So just
16 quickly through the experience of --
17    THE COURT:  Just one thing that --  I mean,
18 I've written all over this thing. I have some
19 comments and so forth, but my biggest question, I
20 guess, is how does someone that's reading, whether
21 it be the CEO of Cigna or some other entity, first
22 tier entity, how are they going to know whether
23 this applies to them? What are they being told? If
24 you did X, Y and Z, you may have. If you ever this
25 or paid that.

Page 45

1    MR. RUIZ:  Yes.
2    THE COURT:  All right. That area, where do you
3 have that area?
4    MR. RUIZ:  Okay. Let's go to the notice. It's
5 what the litigation is about, okay. So what the
6 litigation is about, the litigation. Okay, so it
7 tells that is an assignee there was an allegation
8 that claims arise from injury sustained by an
9 enrollee while traveling in an automobile asserted
10 and -- this complaint that somebody suffered
11 injuries, and it wasn't paid by the defendant, and
12 we tell you that the defendant isn't our insured,
13 and as an MAO FHP Advanced Payments on behalf of
14 this honoree accordingly Plaintiff seeks damages
15 for those people.
16    Now if you look at the very -- it says to, the
17 first page, to Florida Medicare Advantage
18 Organization and/or their assignees including but
19 not limited to MSOs, IPAs, and skilled -- paid for
20 medical care and treatment of enrollees who were
21 injured in automobile accidents.
22    So the first page right here bold it tells you
23 hey, this notice is being sent to you in case you
24 paid for medical bills or are responsible for
25 medical bills for people that were involved in

1  automobile accidents that were insured by IDS.
2      Now functionally I think your question is a
3  very logical question, which a lot of people have
4  this question, which is okay. Now we're sending
5  notice to 120,000 providers and all of these MAOs.
6  How do those MAOs know that they have a claim,
7  right? So here's where this part comes in.
8      So the defendant, although they claim to have
9  run these searches, all they have to do Judge is
10  give us the names of everyone that they've paid a
11  claim on behalf of for the class period, and we put
12  those names behind.
13      We create an API, which is basically a pinging
14  system between the payors, or the people that have
15  the data for the patients, and all you do is you
16  match them. So you match, you know, Chris Miranda
17  was paid -- claim per paid on behalf of Chris
18  Miranda for an auto accident that he had.
19      Hey, by the way, Chris Miranda is a member of
20  Cigna, the same name. Now let's find out if the
21  claims that Cigna paid are related to our car
22  accident. That's when we talked about the ICD9s,
23  the ICD10s, the CPT codes, the external causes of
24  injury. I mean, it was a while back, but if you
25  recall that's the reason we told you could prove

1  this with class wide proof because once the
2  defendant gives us the names of those people, and
3  by the way Judge, here's what they're going to
4  have, too.
5      They're going to have the ICD codes, meaning
6  nines or tens, CPT codes, they're going to have
7  everything that they've paid or haven't paid. Our
8  system and the system that we would utilize for
9  purposes of determining who has a right to claim or
10  not would do exactly the same. It would say IDS, if
11  this person had an accident, and they went to the
12  hospital, but Cigna paid for his hospital bill
13  instead of IDS that's what this case is about.
14      So at that point in time Your Honor would make
15  a determination whether or not under the law, under
16  this certification, a primary payor is responsible
17  to pay the bills of a secondary payor, and our
18  position obviously is that they are.
19      So you start to see how this all comes
20  together. It sounds a lot more complicated. It is
21  very complicated technically, but we believe that
22  we can show The Court, and we did so, you know, at
23  some level, during the certification that we have
24  the capabilities of doing this.
25      Now, the biggest issue that we have right now

1  they just haven't given us the names of the people
2  that they've paid. They've claimed that they've
3  done it. They've done it, or they still haven't
4  given it to us, and that's real reason why they
5  want to stay because the next hurdle is Your Honor
6  telling them I want to see who you've paid on
7  behalf.
8      Because when somebody gets notice that they're
9  a potential member of this class and they have a
10  bill that they should be reimbursed for, that's the
11  whole purpose of this class action to get IDS to
12  pay for their responsibility.
13      So the notice carefully irons out all of those
14  details. We believe, Judge, whole heartedly, and I
15  tell you as an officer of The Court you know that I
16  try to be totally up front all the time with
17  everything that we're doing, we believe that we
18  have touched upon every possible issue that could
19  service and arise, and it's not just because of
20  this case, but because we deal with these health
21  claims all the time, and they want to understand
22  how it is that this system was developed.
23      So you're talking to a team that developed the
24  system. So we understand how the system works. We
25  didn't buy this off a shelf. This is a proprietary

1  system that frankly doesn't exist anywhere else
2  right now in the United States. That's why you see
3  what you see.
4      Now the notice goes along, and to take a step
5  back for a moment for the stay that they're asking
6  you for, the stay would make zero sense because
7  essentially we've certified a case. The certified
8  case is a case that's supposed to be known by
9  people that may have claims, but the defendant is
10  telling you we don't want anybody -- we want to
11  keep it. We want to sweep it under the rug because
12  we may just have a chance of getting this reversed
13  on appeal. So, Judge, we don't want you to do
14  anything.
15      So I think there is a very logical segue way
16  between them don't grant a stay. Let me give notice to
17  people. Now I understand you may be not 100 percent
18  comfortable with the notice, Judge. We'll come
19  back. We'll tweak whatever you want us to tweak.
20  We're more than happy to do that. We'll work with
21  opposing counsel, but the protocol has to be give
22  notice to the people that are already in this case.
23      You know, an appeal probably will take eight
24  to ten months, if not 12. It could very well be
25  because these are somewhat novel issues, but --

1  their being novel issues doesn't mean that she has
2  a substantial likelihood of success.
3      As a matter of fact, if you look at the all
4  the law it goes contrary to everything that she
5  said. You know, we were fortunate enough to be
6  involved in the Humana versus Western Heritage
7  appeal as an amicus. That case, you know, we
8  prevailed it, and we won our own case, MSPA versus
9  All State, and then Judge Samantha Ruiz Cohen two
10  weeks before or three weeks before certified --
11  sorry, heard a -- or tried a certification and on
12  February 2nd she too certified a case.
13      So everything's really against them that Your
14  Honor, Judge Samantha Ruiz Cohen, the Third
15  District Court of Appeals in the case of Humana
16  versus Real solidified these cases. These are
17  Medicare payments, and they have no defense. We
18  filed our Motion for Summary judgment.
19      Now let me end with this, Judge, because I
20  think, in all fairness to opposing counsel, she
21  should have an opportunity to rebut what we've been
22  arguing, but let's go to Rule 9.310, which his the
23  appellate rule, and one of the things that they
24  didn't raise in their motion, but I'm going to
25  raise to you as an officer of The Court because I

1  think overlooked that perhaps is what is your power
2  to do something on this case being that there's an
3  appeal, and you know, when you get a final judgment
4  you're entitled to appeal that final judgment, but
5  this is an interrogatory order.
6      Now there's a series of interrogatory orders
7  as Your Honor well knows that you have an automatic
8  right to an appeal. So there's a very carved out
9  provision, and a certification -- granting our
10  certification or denial is one of those, but I want
11  you to know, Judge, that you're in your right. You
12  have the power to do this.
13      It says in the absence of a stsy, okay, which
14  is this is what she's arguing. She's got to
15  prevail. She's got to prove -- substantialize her
16  success, even if she did, Judge, you buy the
17  argument where is the irreparable injury. There
18  cannot be as a matter of law.
19      Everything she's arguing is the -- money, and
20  money is not an irreparable injury, maybe to some,
21  but I tell you what, I can't get the money back.
22  That by law doesn't qualify. During the pendency
23  and review of a non-final order, which is what you
24  entered, the lower tribunal may proceed with all
25  matters including notice, of course, including

1  trial or final hearing, except that the lower
2  tribunal may not render a final order disposing of
3  the case.
4      Sot he reason why I bring this to your
5  attention is because while our lawyers were
6  preparing all of this, I had this notion of hold on
7  a second. Let him make sure that Judge Arzola has
8  the power to send the notice out, and when we
9  checked, and we researched it, and we looked at the
10  law, we were correct that you had the power.
11      I want to leave you with case law because
12  opposing counsel hasn't shown you case law. So let
13  me show the case law that tells you that should be
14  doing this. US Supreme Court, I have an itchy
15  finger here today.
16      MS. SYMONS:  Do you have a copy for me,
17  counsel?
18      MR. RUIZ:  Yes. US Supreme Court holds that in
19  a class action the resolution of absent individual
20  cause of action is the taking of property that
21  triggers due process protections, including the
22  right to notice, okay.
23      Within the limits of practice notice must be
24  such as a -- to reach the -- that was the question
25  you asked. You asked that question. Well, how do

1  you make sure? I don't want to, you know, send an
2  e-mail that nobody looks at.
3      Now go to the other case. Even pending an
4  e-mail notice to class members should be given
5  properly after certification order is issued. The
6  manual for complex litigation, and we cite to a
7  case. So what I want to leave you with, Judge, is
8  number one, we feel that there is zero basis for a
9  stay, zero, but even if you were inclined to stay
10  something the notice should not be one of those
11  portions of what you stay, and discovery shouldn't
12  be either because really, if you look at it, you
13  know, and I think even Judges. Well, she's saying
14  discovery.
15      THE COURT:  You said that a minimum that I
16  shouldn't stay notice, and then you said nor
17  discovery, and I'm what else is there?
18      MR. RUIZ:  Summary judgment. It could be a
19  summary judgment because --
20      THE COURT:  But the rule itself says you can't
21  do that.
22      MR. RUIZ:  Well, you can't dispose of the
23  whole case, but if came to you with a summary
24  judgment as to liability only you're not disposing
25  the whole case.

Page 54

1      THE COURT: True.
2      MR. RUIZ: Okay. So look I'm trying to look at
3  this practically, and here's the reality, and I
4  think, Judge, and I'm not sure how it is lately,
5  but I think you as judges have to report every six
6  months or old cases -- you have to report to the
7  State how you move your cases. So what do you want
8  to do?
9      You want to have a case on your docket because
10  opposing counsel tells you that she wants to stay
11  the case. I have to report it?
12      THE COURT: No, no, no, just so that you guys
13  know, what we have to report is a pending, a
14  pending ruling. So for instance in this case I have
15  to report a few different times something that's
16  pending. I don't know if it's 120 days or something
17  like that, but pending case doesn't -- not that I'm
18  aware of has to be --
19      MR. RUIZ: What, you have case files, you have
20  how many cases you have. I mean, you have to
21  monitor it.  I mean, at the end of the day, look,
22  one of the beautiful things of this country is that
23  believe it or not even though our litigation moves
24  slowly it moves much quicker than anywhere else,
25  and we obviously don't want to make this case, you

Page 55

1  know, trump on those averages. So what the
2  suggestion is, Judge, is this really --
3      Look, you know, as lawyers we argue rules and
4  procedures, but from a practical perspective it
5  makes zero sense because all we're doing is just
6  going to aggravate the process more if you don't
7  move the case along.
8      You know, I found that as a plaintiff's lawyer
9  wonderful things happen when the defense has to
10  start defending and moving things along. You either
11  win, lose, or you go to mediation, the case is
12  over. That's why, so Judge, thank you for your
13  time, and respectfully we ask that The Court deny
14  the Motion to Stay, approve the Notice for Class
15  Certification with whatever changes you want, and
16  that we discuss after that talking about how we can
17  better further discovery.
18      MS. SYMONS: Thank you, Your Honor. The one
19  thing, or the one thing for today that I can agree
20  with my esteemed counsel on the other side is that
21  notice and due process are very important.
22      I looked at a couple of the notices of class
23  certification in other cases just to make sure that
24  I wasn't too far a field of being too creative, and
25  generally speaking they include very simple things

Page 56

1  like the number of members of the class or number
2  of known members.
3      We can't even do that today because it just
4  went from 37 to 196,000 or something like that. I'm
5  not exactly sure what the number -- 119,000, and
6  even under questioning counsel couldn't tell you
7  how many members are in this expanded class, for
8  which we really have had no notice, and the reason
9  I say that, Your Honor, I went back to the amended
10  complaint, which is the operative pleading in the
11  case.
12      And it attaches an exhibit, which is the
13  redacted version of the assignment, which is a
14  contended issue, and then Exhibit B to the
15  complaint I have a copy here, although I'm sure you
16  have it electronically as well, contains a list of
17  the 37 MAOs, and then within the complain it
18  mentions the MAOs and then it says something like
19  you know, similarly situated or as assignees.
20      The whole focus for the three or four days
21  that we were before you is on the 37 MAOs that were
22  listed on Exhibit B to the amended complaint, and
23  whether that was sufficient for numerosity because
24  it was under 50, and Mr. Ruiz argued that issue
25  very vehemently.

Page 57

1      What he's done today really is testified as an
2  expert witness about things that were not in
3  evidence and were not in the pleadings, including
4  the flow chart, the references to Cigna, and the
5  new references to downstream providers and the
6  other category of entities that were mentioned and
7  that have been put into the proposed notice.
8      What the order -- now the amended complaint
9  started off talking about in paragraph one, and I
10  won't go into great detail, Your Honor, but it's
11  important because I want you to know how we got
12  here.
13      One the first page of the amended complaint it
14  says that the plaintiff sues to enforce FHCPs and
15  other MAOs collectively the class right of
16  recovery. Now, it's a longer document, but that's
17  the first paragraph, and that's the essence of what
18  you thought you were certifying, and that we were
19  defending and what was referred to on Exhibit B,
20  which has the list of MAOs.
21      Now if there's a lone assignee out there,
22  that's a legal issue that could -- anyone that has
23  an assignment from an MAO in theory might be able
24  to bring a claim at set point, but the class of
25  people that plaintiff brought this case for as

1  illustrated in paragraph one of the amended
2  complaint is those 37 MAOs, and that's really what
3  is why the defendant is surprised and would be
4  unfairly prejudiced and has not had any due process
5  in regard to this other 119,000 unknown,
6  unidentified, unspecified potential class members.
7      You couldn't even put a number into a notice
8  with the information that had been provided by
9  Plaintiff's counsel.
10     Also, in the Motion to Approve the Class
11  Notice there's a reference to similar entities,
12  which are then referred to as first tier entities
13  and downstream entities with some case law cites
14  and some CFR citations. None of which were in the
15  complaint, and none of which were in your order as
16  -- for that purpose.
17     There's no evidence before The Court, and
18  there isn't any in the record with regard to first
19  tier entities. It's not defined, neither are
20  downstream entities. They're not defined.
21     THE COURT:  I'm thinking out loud. I tend to
22  speak my mind, so I don't know if it will make
23  sense or not. Given the possibility that there are
24  so many first tier or downstream entities, isn't
25  notice to the MAOs itself sufficient, meaning the

1  MAOs have some type of contractual agreement with
2  each of these entities that are beneath it.
3      MS. SYMONS:  That's exactly right, Your Honor,
4  and that's why if the MAOs get notice then that
5  takes care of all the people underneath it. If not,
6  then that's another issue for another MAO, but
7  based upon the way the case was presented to you,
8  and based upon the pleadings, Your Honor.
9      THE COURT:  I mean, I'm looking at my order,
10  right, in the -- in the order of the judge, page 55
11  where it says The Court certifies the class defined
12  to include entities that, then it says contracted
13  directly with CMS.
14     MS. SYMONS:  And/or its assignee, and it
15  doesn't specify further, but in the motion --
16     THE COURT:  But CMS's assignee is either the
17  MAO or arguably one of these other entities. I
18  mean, that's what they're saying.
19     MS. SYMONS:  That's what they're saying, Your
20  Honor, but this is the first time they've said
21  that, and there's been no --
22     THE COURT:  See, this is the thing, and I'll
23  -- I know you're responding to what he's saying,
24  but I have to ask Mr. Ruiz in the numerosity of
25  this analysis there was an issue potentially,

1  right, in that your number fell within kind of a --
2  I don't want to say a grey area, but it was --
3  there's some cases that said you needed to have
4  maybe 45 or 50, but then other cases would say
5  there's really no rock solid rule, but if in fact
6  the number was so high, why rely on the 37 at that
7  point?
8      MR. RUIZ:  Well, Judge, because number one, we
9  felt that 37 was enough, and it was, and the size
10  or the number of the members is not necessarily
11  indicative of the size of the class. You have to
12  understand that even though you're dealing with an
13  MAO those MAOs under them have hundreds of
14  thousands if not millions of people that are
15  insured by them, and ultimately these rights really
16  surface from a Medicare beneficiary who is injured
17  and payments are paid.
18     I want to take you just to clear the issue up
19  for you because in our complaint the class was as
20  follows, contracted director with CMS and/or its
21  assignee pursuant to Medicare Part C including but
22  not limited to MAOs and other similarly situated --
23     THE COURT:  Where are you reading from?
24     MR. RUIZ:  From the complaint, page ten of the
25  complaint. And other similarly situated entities to

1  provide Medicare benefits through a Medicare
2  Advantage Plan to Medicare beneficiaries for
3  medical services, treatments, and/or supplies as
4  required and regulated by CMS and HHS.
5      MS. SYMONS:  Your Honor, respectfully, not one
6  of those has been identified to me. Not one of
7  those was mentioned at the hearing.
8      MR. RUIZ:  But Judge --
9      MS. SYMONS:  We have it, and even in their
10  motion they couldn't identify them. They refer to
11  them as reasonably identifiable downstream
12  entities. There is not a single one of those that
13  is in evidence before you, and my clients had no
14  notice and no opportunity to be heard, and that was
15  respectfully not the basis of your order when you
16  granted class certification.
17     What was emphasized to you was 37 MAOs. That
18  was what the case was tried about, and it's
19  improper for Plaintiff to try to expand this case
20  now and amplify the class to the point that today
21  we still don't even know who these people are
22  because he's got a computer program that will
23  reveal all.
24     That's not how we do things, Your Honor. That
25  doesn't comply with the rules of procedure for

1  notice to the class. It doesn't even begin to be,
2  you know, due process, or adequate notice to us.
3  Certainly, it's a surprise, and apparently it's a
4  secret because as I stand here now we still don't
5  have any idea who even one of these entities is
6  much less 119,600 and some odd, which is apparently
7  what the number is.
8      And frankly, Your Honor, if he knows that
9  number then he knows who they are, or who he thinks
10 they are, and he should be letting us know that,
11 and we shouldn't be arguing this now because that's
12 a big issue, and that should have been brought up
13 before we got here today, Your Honor in all
14 respect, but because of that --
15     MR. RUIZ:  May I clarify something g--
16     MS. SYMONS:  Because of that.
17     THE COURT:  Let her finish.
18     MS. SYMONS:  Because of that, Your Honor, that
19 is why it would be appropriate at this point to
20 enter a stay of proceedings with whatever
21 limitations that you wanted to have on it
22 alternatively or canonically -- I can't even say
23 that word right, but I'll spell it for you later,
24 instruct us to come up with notice that strips out
25 those due process and notice issues because as you

1  correctly pointed out, even if you took what
2  Mr. Ruiz said to be true, and you set aside the
3  fact that it was basically expert testimony, if the
4  MAOs get notice, then the funnel of entities --
5      THE COURT:  Wait, what I need to understand,
6  and not necessarily today because I'm not going to
7  rule on this particular issue today.
8      MS. SYMONS:  Yes, Your Honor.
9      THE COURT:  What I need to understand is the
10 -- in order to decide whether or not they go in or
11 not is -- I need to understand the contractual
12 framework that is -- I'll use the Cigna example
13 that Mr. Ruiz used.
14     I need to understand that contractual
15 structure from Cigna down to, and these for the
16 record are hypotheticals because they're the ones
17 in the frame, what you call that thing --
18     MS. SYMONS:  I don't know, Your Honor, because
19 I didn't have it, and I still don't have it.
20     THE COURT:  What do you call this thing?
21     MR. RUIZ:  Power Point.
22     THE COURT:  Shows you what I know about
23 computers.
24     MS. SYMONS:  Your Honor, I don't have a copy
25 of what you're looking at just so you know.

1      THE COURT:  It was just that page.
2      MS. SYMONS:  Oh, that I do have.
3      THE COURT:  Do we have to make one for you?
4      MS. SYMONS:  No, I have that. I thought you
5  were looking at the --
6      THE COURT:  But the contractual framework that
7  is in this example, Cigna down to Health Springs
8  down to Leon Medical Center, so how does that work?
9  For instance, if Cigna were to get reimbursed on a
10 particular claim, do they on their own bring it
11 down the chain to Health Springs, who then brings
12 it down to Leon, or if Leon gets money do they
13 bring it up to Health Springs and then up to Cigna.
14 I need to understand how all that works, you know.
15     MR. SYMONS:  Yes, Your Honor, and if Plaintiff
16 wanted to make that part of the case he should have
17 presented that to you. There is no evidence in the
18 record for the Motion for Class Certification on
19 the issues that you just described, and there is no
20 basis for you to -- well, unless you expand, you
21 know, the order, but based upon the order thaw was
22 entered there's nothing in the record, and whatever
23 Mr. Ruiz tells you about how it works, even as an
24 officer of The Court and the designer of this
25 program is nothing but argument.

1      THE COURT:  Let me ask you a question, is
2  there a distinction between -- I know there is, but
3  in this particular case, can there be a distinction
4  made between class discovery and other type of
5  discovery?
6      MS. SYMONS:  That's it. Let me give that a
7  moments thought. Before I forget it I wanted to
8  bring up one other issue, Your Honor, which well,
9  maybe I should try to answer your question first.
10     THE COURT:  I guess what comes to my mind is
11 for instance the difference between class discovery
12 and -- just summary or merit discovery or summary
13 judgment type discovery. Is there -- can be there a
14 fine line drawn there, or does there come a point
15 where that discovery is just inextricably
16 intertwined?
17     MS. SYMONS:  I think it's intertwined. I think
18 it is very intertwined. One of the issues that will
19 be somewhat complicated is that each -- the way
20 that this insurance company evaluates claims
21 similar to others is on an individual claim basis.
22     So we'll have to get very deeply into the
23 leads on individual claim analysis, and one of the
24 issues around commonality, which is another reason
25 why it's not appropriate to add this 119,000

1  unknown entities is because there may be other
2  additional contractual issues as those assignments
3  drop down or as claims are processed through the
4  system.
5      They don't remain whole. You know, it's not as
6  though necessarily. I mean, it could be that one
7  does, but one cannot assume that a claim is
8  fungible and passes through a system, and that no
9  matter how many entities touch it it remains in the
10  same condition with all the same conditions and
11  limitations to it.
12      I don't think there's any evidence one way or
13  the other on that in the record, but just on a
14  practical basis one cannot assume that all of the
15  claims remain whole, in tact, and have no
16  additional issues as they go through that system.
17  There may be many other reasons why they --
18      For example, a claim could be paid later, you
19  know, in the sequence between when it goes from one
20  MAO to the next downstream provider. There might
21  have been an intervening payment. There's all kinds
22  -- there's 150 million different, you know,
23  scenarios, but that impacts commonality among other
24  things.
25      In fairness, we could probably, if you wanted

1  to have another hearing, we could probably phase
2  discovery in an efficient way, but I don't think
3  there's a way to bifurcate the issues such that
4  there'd be much economy in trying to do it based on
5  class discovery and non-class discovery. I'm not
6  sure how counsel feels about that. I'm sure you
7  have an opinion.
8      MR. RUIZ:  Do you want me to respond to the
9  discovery issue?
10      THE COURT:  The question that I posed.
11      MR. RUIZ:  Okay. So the merit discovery would
12  be merit discovery as it pertains to the one
13  Medicare beneficiary that was the one that we
14  showed The Court during the class certification.
15  Now I don't think we get very far by just looking
16  at that claim.
17      I mean, we already know the facts of that
18  claim. We know that IDS didn't pay it. So we are
19  prepared to move forward with summary judgment on
20  that one, the class representatives claim. So to
21  answer your question directly, I think the logical
22  thing that we should do is to conduct class
23  discovery because that's what's really going get
24  Your Honor to understand the dynamics of how this
25  works.

1      Understand, Judge, that and quite frankly I
2  don't know why they're arguing against sending
3  notice to a person that could potentially make a
4  claim against IDS. Again, if you don't give them
5  notice they're not bound by res judicata. They're
6  not bound by this case, and so that you understand
7  the dynamics of what they're asking for.
8      I don't want to be blamed later on, you say
9  hey, Ruiz brought a class action, 37 MAOs got paid
10  and now IDS is getting sued by 50,00 providers. It
11  is the same money. Providers, under the MSP law
12  have a right to sue themselves because they have an
13  injury in fact.
14      I'm trying to prevent a big disaster quite
15  frankly, so I'm not really sure why we're not
16  wanting to --
17      THE COURT:  It's your only issue?
18      MR. RUIZ:  Yes.
19      THE COURT:  In the example, it's your example.
20      MR. RUIZ:  Yes.
21      THE COURT:  All right. Let's create patient A.
22      MR. RUIZ:  Okay.
23      THE COURT:  And they are covered by Cigna.
24      MR. RUIZ:  Yes.
25      THE COURT:  Okay. They don't go to Cigna, to a

1  medical center.
2      MR. RUIZ:  Correct.
3      THE COURT:  To a medical center that says
4  Cigna on the front door.
5      MR. RUIZ:  That's correct.
6      THE COURT:  They go to one that says Health
7  Springs.
8      MR. RUIZ:  Correct.
9      THE COURT:  Is that possible? Is that
10  physically possible or --
11      MR. RUIZ:  Well, Health Springs, an HMO as
12  well. So let's use Leon as an example.
13      THE COURT:  Okay. So that would mean that
14  there's a form somewhere where Cigna tells Health
15  Springs who then tells Leon that you guys are going
16  to cover patient A under our contract.
17      MR. RUIZ:  So I think I can break it down for
18  you, and --
19      THE COURT:  This is what I'm trying to
20  understand.
21      MR. RUIZ:  Yes, okay. So let me explain to
22  you. So let's assume this issue's patient A. I was
23  using Chris Miranda. Chris Miranda goes and seeks
24  medical attention because he had a car accident.
25  Cigna, for certain providers that it does not have

1  a contract with, has to pay fee for service.
2      Assuming lawyer, to give you the example, has
3  a contract to provide for 10,000 dollars a month
4  all the legal services that he or she has to have
5  versus billing her out.
6      So you're going to have the dynamics of in the
7  same patient having different providers, some of
8  which bill Cigna and they get paid for that
9  service. Others that are capitated. It doesn't
10  matter how many people come in, you're stuck with
11  the bill because you took full risk.
12      So to answer that question, understand that
13  under these 120,000, you're just getting notice to
14  them telling them hey, if you were one of those
15  assignees that has a contract with Cigna that you
16  took the risk of loss, and that you're owed the
17  money, let us know now.
18      THE COURT:  Okay. But go back to the Miranda
19  example.
20      MR. RUIZ:  Yes. So Miranda can go to either a
21  capitated provider or a provider that bills Cigna
22  directly. If the provider bills Cigna directly, and
23  we send notice to Cigna, Cigna's entitled to that
24  money because a provider got paid a fee for
25  service.

1      If we send notice to Cigna, but the IPA took
2  and absorbed the risk of loss, you know, Miranda
3  could have incurred 300,000 dollars in the
4  hospital. That is the responsibility of the IPA
5  that took the responsibility. That's the
6  indemnification.
7      So if you equate it to insurance law, the IPAs
8  that are the MAOs, IPAs, they take the risk of
9  loss, they essentially get -- this is the way it
10  works more less. They get 85 percent of the
11  premium, but they take 100 percent of the loss.
12      So whatever happens to the patient that they
13  take 100 percent of the loss for, they're on the
14  hook. Even if the person goes to the hospital, if
15  they took that risk they're on the hook for it, so
16  in that case, if Miranda has 300,000 dollars in
17  hospital expenses and other providers, they got to
18  pay the whole thing.
19      What I'm trying to prevent, Judge, is giving
20  notice to everybody so that if that exists we can
21  figure that out afterwards because look, this is --
22  the money that's owed is one time. I don't want him
23  to have to pay twice. They shouldn't pay twice for
24  the same claim unless we got to the double damages,
25  but this is not a double damage case yet.

1      So they should only pay once. What I'm trying
2  to prevent is it's the same money. Miranda that
3  goes to the hospital and is owed 300 -- it's the
4  same amount of money. We're not changing the amount
5  of money. We're not adding to the case. We're not
6  doing anything other than making sure that we
7  identify the individuals or entities that are going
8  to make claim on that money, and to me, the most
9  rational way that you do that is you put everybody
10  on notice, and it almost acts like an interpleader.
11      When these notices go out, people are going to
12  make claims through the system we create, and that
13  what we know exactly what your question is. One of
14  the questions we're going to ask is do you have a
15  full risk contract with an HMO. If they say yes,
16  show it to me because if they show it to us that
17  means Cigna's not entitled to it, and they're
18  entitled to it.
19      Now I understand the reason why defendant
20  doesn't want that. The more people you give notice
21  to the more people that are going to say hey, we're
22  owed money. That's logical, but that doesn't serve
23  the function of the lawsuit, which is to make sure
24  that all claims that should be paid get paid if in
25  fact we win.

1      THE COURT:  Okay. But let's deal with Miranda
2  again. He's in the accident.
3      MR. RUIZ:  Yes.
4      THE COURT:  He goes -- how does he get to
5  Leon, all right?
6      MR. RUIZ:  He's assigned Leon before he
7  starts. That's his center.
8      THE COURT:  Cigna tells him that?
9      MR. RUIZ:  Yes, before --
10      THE COURT:  Because Leon has a contract with
11  Cigna that predates the accident.
12      MR. RUIZ:  Correct.
13      THE COURT:  Has nothing to do with his
14  accident.
15      MR. RUIZ:  Correct.
16      THE COURT:  Right?
17      MR. RUIZ:  Correct.
18      THE COURT:  And the agreement is -- says
19  something about, you know, you will be sending us
20  customers or patients --
21      MR. RUIZ:  Correct.
22      THE COURT:  Throughout the course of any given
23  month.
24      MR. RUIZ:  So in other words, when you sign up
25  on an HMO they assign to what they call a PCP,

1  which is a primary care physician. In the case of
2  Miranda his primary case physician would have been
3  the Leon Medical Centers.
4      However, they may not be fit to provide all of
5  the necessary services. If God forbid, somebody
6  gets into an accident they'd have to be rushed
7  because they get airlifted. They don't end up at
8  Leon Medical Center. They end up at Jackson. Leon
9  took on the risk that if one of their members ends
10  up in Jackson they got to foot the bill.
11     So in the case of Miranda, if Miranda or
12  somebody gets injured and goes to a hospital and
13  incurs a bill, even though the services were not at
14  their PCP, which is the pre-determined location, so
15  understand, people get injured. There's an
16  emergency phase, and then the emergency's done and
17  over with it.
18     During the emergency phase these medical
19  centers aren't equipped because they're not trauma
20  centers. Once that emergency subsides, then you go
21  to your normal doctor, and that's I think -- that
22  will give you a good feeling for how this process
23  works.
24     So again, there's a lot of interplay, but what
25  we think make the most sense is to give notice to

1  everyone, and our notice, Judge, says it as a
2  footnote. It says what a first year entity is.
3  First year entity means any part that answers into
4  a written arrangement acceptable to CMS. So keep in
5  mind that CMS approves these as first year
6  entities.
7      With an MAO organization or applicant to
8  provide administrative services or healthcare
9  services for a Medicare eligible person. So these
10  are -- and it's cited by 42CFR422.2. So these
11  aren't just coming from everywhere.
12     Look, I guess the fundamental difference
13  between a defendant and a plaintiff's lawyer and/or
14  frankly with no disrespect to anybody, there's a
15  lot of people that don't -- that think that when
16  you have a class action you're supposed to know
17  everybody that's in the class, and that's not the
18  way that it works because if he we did then people
19  wouldn't get notices to find out if they're in the
20  class or not, right? So --
21     MS. SYMONS:  Your Honor, the -- the order that
22  you entered was limited to MAOs and other similar
23  entities, and the motion that is before you is
24  asking you to include within that entities that
25  were not described. That are described in the

1  motion, but not defined as downstream entities,
2  whatever that means, with a reference to a CFR,
3  which was not a part of your order.
4      Similar entities would be an MAO or a similar
5  entity, and it goes to the core of 1.220 and the
6  criteria of commonality and for that reason alone
7  makes this expanded notice improper.
8      MR. RUIZ:  It's on page eight of the order.
9  Your order signed off on exactly what she's saying
10  you didn't do.
11     MS. SYMONS:  Well, you know, Your Honor, only
12  you know what you intended to do, but what you
13  heard and what was tried before you was a case that
14  related to 37 MAOs. Not MAOS and whoever else we
15  can think of, and I think, Your Honor, you know,
16  there's one other issue. It's not like Plaintiff's
17  counsel is going to personally absorb the cost of
18  the notice and all the other costs --
19     MR. RUIZ:  We are, Judge.
20     MS. SYMONS:  Preliminarily, but --
21     THE COURT:  Commentary --
22     MS. SYMONS:  I know, I would be flattered if I
23  wasn't so exercised over it, Your Honor, but at
24  some point, you know, that Plaintiff's counsel is
25  going to be looking to recover that cost, and it's

1  an unnecessary cost. It's a waste of money because
2  if there are any claims, and he's also leap
3  frogging over proof, you know, just elemental proof
4  of these claims, which has not been determined, and
5  we think is probably going to ultimately be
6  deminimus, but we're not allowed to leapfrog over
7  all of that, and perfect a notice order -- excuse
8  me, a notice to the class that goes far beyond what
9  was tried to you.
10     And far beyond any evidence that's in the
11  case. There are other issues I have with the
12  notice, Your Honor because it presumes that the
13  plaintiff is correct and the plaintiff will
14  recover, and at one point there's language that
15  suggests that the plaintiff is an MAO, which needs
16  to be revised depending on how you decide to rule
17  on it, then we can --
18     THE COURT:  All right. This is what I'm
19  prepared to make some rulings today, so I want you
20  to listen up.
21     MS. SYMONS:  Yes, Your Honor.
22     THE COURT:  We'll see what we do next.
23     MS. SYMONS:  Yes, sir.
24     THE COURT:  I've considered the motion for
25  entry to stay. I've read not only the motion, the

Page 78

1  response. I've listened to your arguments, and what
2  I'm going to do is I'm going to deny in part, grant
3  in part.
4       What I'm -- the only thing I'm going to stay
5  is -- well, this is what I'm going to do, and I'm
6  going to leave it up to you, and I may cause myself
7  problems by doing this, but I trust that you'll
8  have a lot to do while the Third reviews this
9  issues on appeal.
10      I'm not staying class discovery. I'm not
11  staying class notice, okay. However, I am going to
12  stay is the filings of any summary judgment, and
13  the -- I think the grey area that I'm creating is
14  that there may be some discovery sent that is not
15  technically class discovery that I guess the
16  defense will then say this is merit based, and then
17  you either will agree, or you're going to have to
18  bring it to me to decide whether it's class or
19  merit based discovery.
20      This issue -- the notice, I mean, we've
21  pointed out a few little things, but this issue I
22  think that it's an important one. It's a big one.
23  The order that I enter does indicate, and it can be
24  interpreted as including not just the MAOs, but
25  also their assignees, right.

Page 79

1       I'm not too concerned with this issue of the
2  first tier and the downstream entities in terms of
3  my rule, but I am concerned as to how we identify
4  them or don't identify them in this notice, okay.
5  So that issue we're going to have to -- you guys
6  are going to have start talking a little bit more.
7  Maybe educate me more with examples, you know,
8  don't be afraid to say example number one, and then
9  keep using Miranda if you want. I don't care, but
10  just, you know --
11      Some of the stuff is dense. I mean, I hate to
12  say that because this is what you guys are doing
13  all day --
14      MS. SYMONS:  I'm just thought you would say
15  we're dense. May I make a suggestion that we
16  confer. You give us a timetable for -- to confer,
17  and if we're not able to agree that we submit
18  separate notices.
19      THE COURT:  You could do that, but what's
20  going to end up happening is I'm probably going to
21  want to see you guys.
22      MS. SYMONS:  Well, that's fine, too.
23      THE COURT:  That's fine.
24      MS. SYMONS:  That's preferable.
25      THE COURT:  If you want to do it that way. I'm

Page 80

1  just going to throw out a few things that you can
2  just note. Get rid of that picture, please.
3      MS. SYMONS:  Your Honor, I need to just pick
4  up a pen. Is that all right, thanks.
5      THE COURT:  I know what I'd like to see, too,
6  and I don't know if it's in this package that you
7  all submitted. I'd like to see -- I believe
8  Ms. Symons pointed out some examples of other
9  notices, okay.
10      MS. SYMONS:  Yes, Your Honor.
11      THE COURT:  Not just Mr. Ruiz's notices and
12  all his class actions, all right. Just pick some
13  random ones.
14      MS. SYMONS:  I have one here if you'd like to
15  have it.
16      THE COURT:  But just kind of give them to me
17  all together. Just give me one right now, it's
18  going -- it's not going to do much for me right
19  now.
20      MS. SYMONS:  All right.
21      THE COURT:  I've had just about enough of you
22  guys, but you're getting rid of the picture. I, you
23  know, you guys put July 25th, obviously --
24      MR. RUIZ:  Right.
25      THE COURT:  That's presuming that I would be

Page 81

1  signing something today. What is considered
2  reasonable or traditional time in something like
3  this? I mean because presumably this is a month
4  that you gave.
5      MR. RUIZ:  45 days, Judge.
6      MS. SYMONS:  Agreed. Your Honor, there is a
7  Motion for Summary Judgment on file, so could you
8  clarify that it should not be set for hearing. I
9  think there might be a hearing set.
10      THE COURT:  No, you have a court reporter here
11  to the extent there is a Motion for Summary
12  Judgment on file it will not be litigated.
13      MS. SYMONS:  And no discovery relating to the
14  motion I guess? I just want to make sure --
15      THE COURT:  This is what I'm saying. I don't
16  want to get too bogged down on how to put that in
17  black and white. I'm going to -- if there's some
18  discovery, and your opinion is -- your feeling is
19  that it's not class -- I'm going to have sit here
20  unfortunately, but I'm going to have to do it and
21  say, all right. They can proceed with that or they
22  can't. All right, but I think the spirit of my
23  ruling is one that everybody understands.
24      MS. SYMONS:  Yes, sir.
25      THE COURT:  These are little things, guys, but

1 might as well --
2    MR. RUIZ:  Please.
3    THE COURT:  Throw them at you, and then you
4 guys can -- page three, second full paragraph says
5 there's no money available now and no guarantee. I
6 would throw the word that there will be. In the
7 one, two, three, fourth full paragraph anytime -- I
8 definitely don't want anybody with The Court, so
9 anytime you're not going to say not The Court,
10 underline not The Court, maybe even bold it. That
11 sentence, that second sentence in that fourth full
12 paragraph needs to get worked up.
13    I mean, it says class counsel have -- I don't
14 know if it should be class counsel has, and then it
15 doesn't seem to really end. It says class counsel
16 have --
17    MR. RUIZ:  My apology, Your Honor. We're a
18 little lost. Can you tell us where you're at, page.
19    THE COURT:  We'll still on three.
20    MR. RUIZ:  Page three?
21    MS. SYMONS:  Page three, paragraph four.
22    THE COURT:  Page three, paragraph four. Right
23 before the litigation. That sentence that says
24 class counsel have. I don't know if it should be
25 class counsel has, but it established a system for

1 any questions that you may have. All right, but a
2 system to answer, you know -- it needs to get
3 worked up to clarify.
4    In the -- under the litigation, the second
5 paragraph, all the way at the end where it says by
6 defendant. I think -- I know you defined IDS as
7 defendant, but it seemed to me like maybe to say.
8 Either say IDS or say defendant/IDS.
9    All right, go to page four, class members.
10 Right at the end because what you guys did there
11 for class members is you verbatim copied I guess
12 what was in my order on page -- whatever that was
13 56. It would seem to me, I don't know. Maybe I'm
14 wrong. Maybe this is just a suggestion that as I
15 was writing it down that's when you guys pointed it
16 out to me.
17    I think Ruiz pointed out that what I was going
18 to suggest is that you put there something right
19 after you finish that verbatim quote, which should
20 probably be a period after the damages, the word
21 damages, a paragraph that says you may qualify if,
22 all right, and that's where Ruiz pointed out that
23 you have it at the front there.
24    So some type of paragraph that indicates to
25 them because when they read -- half the people are

1 going to read that, maybe 90 percent of them are
2 not going to understand what the heck that means.
3 All right, maybe they do, and they're -- in this
4 dense field, but they may understand it, but they
5 don't. So you may -- something that says you may
6 qualify if you paid and didn't receive or something
7 to that affect, okay.
8    This, I'm not aware of whether or not in the
9 opt out box on page five whether there should be
10 some explanation to them, and this is why I wanted
11 to see some others maybe, but whether there should
12 be some explanation to them that -- I'll just throw
13 my thought out that there is a possibility that
14 their claim could at one point expire if they don't
15 do anything. That -- please note that if you opt
16 out no one's going to bring a claim for you. You
17 have to do it on your own, and if you don't there
18 are laws that may bar you from ever filing these
19 actions.
20    You know, you need to consult with an attorney
21 immediately, something to that affect. Basically
22 some type of statute of limitations reference so
23 that people understand that just because they opted
24 out they're not protected. It may say that to a
25 certain extent, but I think it might need to be a

1 little clear.
2    Okay, the -- about the class representative
3 and class counsel, I don't think the second
4 paragraph is necessary. I think that maybe what you
5 can do after the first paragraph is put a link to
6 the order, and particularly that the pages where I
7 ruled on that issue, okay, or I don't remember if
8 that was a large area, but you may be able to quote
9 my findings in the actual order. I don't remember
10 how big of a paragraph or section that was, but if
11 it's too long it's probably not worth it, but maybe
12 a link.
13    On page six, selfishly again I ask for that
14 please do not contact The Court to be a lot bigger.
15 Those are just some minor thoughts. I think that
16 you guys need to really talk about the -- it looks
17 like really the biggest issue that you're hung up
18 on is this issue about these other entities.
19    Like I said, I don't believe that the
20 existence or the description today or these
21 materials has really an affect on my ruling, but it
22 needs to be hashed out here in a better fashion.
23    Okay. So what I can do is just so that
24 everybody likes timelines in here, maybe give you
25 guys 20 days to try to work it out yourselves and

1  submit to me hopefully one notice. If it's two,
2  it's two, and then I will have to take a look at
3  them, and then probably get my staff to call you to
4  come in to discuss any of the issues.
5       MS. SYMONS:  Yes, Your Honor.
6       THE COURT:  I think it would help me, though,
7  if there are two, if there are two it would help me
8  -- if there are two that means that the defense
9  doesn't agree with the plaintiff's version. If
10  there are two I would like the defense to -- I
11  don't know if it would be like a redline or some
12  fashion for me to understand, you know, break down
13  each portion. Maybe a citation to the page as to
14  what it is that you think should be out, or what
15  you think should be in. I'm sure you guys can get
16  creative when it comes to --
17       MS. SYMONS:  Yes, Your Honor.
18       THE COURT:  Anything else, guys.
19       MR. RUIZ:  No, Judge. I think that works. I
20  think to simplify it for you we'll tweak the
21  notice. We'll send it to opposing counsel, and I
22  think that's a good suggestion if she redlines
23  whatever she disagrees with to the extent that we
24  can't agree ourselves, and then we'll submit that
25  to you.

1       Now the issue of the down tier or downstream
2  providers is it The Court's position that you feel
3  that that is okay to send notice? There's two
4  different issues. One is the content of the notice,
5  and the other one is -- there's really three
6  issues, content --
7       THE COURT:  What I'm saying -- all right,
8  let's go questions. It's fair. I don't know you.
9  Even after sitting here with you guys for over an
10  hour, I'm not 100 percent sure that the answer to
11  that is yes. The only thing I said yes to is that I
12  don't believe it affects in any way my decision on
13  the class action requirements and so forth.
14       What I'm trying to get a better understanding
15  of is I think you need to work on the examples is
16  maybe -- I'm trying to get a better understanding
17  of the workings. How this -- how the money flows.
18  How would -- if Leon makes a claim are they making
19  the same claim as Cigna. You know, is it
20  duplicative? Is it not?
21       I mean, does Cigna stand in the shoes of Leon,
22  or is it the other way around. I mean, I think
23  through examples that's the best way to understand
24  that. I don't know. I think I said that before.
25  Having said that I think it might make sense to --

1       MR. RUIZ:  But an example in the notice?
2       THE COURT:  Well, no, to meet -- give you guys
3  the 20 days and then maybe --
4       MR. RUIZ:  Got it.
5       THE COURT:  Then maybe we meet maybe ten days
6  thereafter and then you guys can then submit the
7  two versions so that I really get an understanding
8  because if you guys just send me a notice in 21
9  days it's going -- I'm still not going to be in a
10  position where I understand what you're trying to
11  tell me here.
12       MS. SYMONS:  Yes, sir. I brought an order in
13  case you granted our motion. I brought a blank, but
14  your ruling is a little more complex than that.
15  Would you like for us to confer and submit it -- an
16  order on the part that you move on today?
17       MR. RUIZ:  I'd rather submit an order, Judge,
18  that's just cleaner, if that's okay with The Court.
19       THE COURT:  That's fine, but it doesn't need
20  to get all crazy, guys. It was a Motion for Stay.
21  It is denied in part, granted in part. You know,
22  it's real simple, the way I laid it out. It's class
23  discovery is -- will proceed. The class notice
24  issues pursuant to rule, whatever the rule number
25  will proceed. Any summary --

1       Then you could talk about the summary
2  judgments. That that I've stayed including any
3  discovery that is potentially considered judgment
4  or merit based. Then the whole issue about that
5  pending summary judgment.
6       MS. SYMONS:  Yes, sir.
7       THE COURT:  And obviously trial is stayed.
8  Since we're going to be thorough, let's throw that
9  in there.
10       MR. RUIZ:  The last question I had was
11  regarding the dissemination of the notice because
12  we talked about the e-mails and the newspapers, and
13  I'm not sure if opposing counsel -- it seemed like
14  she didn't object. I just want to make sure if you
15  want us to brief you more on that, or if it's okay
16  the way we laid it out.
17       THE COURT:  I'm not too concerned about that
18  aspect because it sounds like there is -- there's a
19  -- it sounds like it's been pretty well thought
20  out, and there's this mechanism that you talked
21  about. That whole big brother thing that you talked
22  about, which -- I don't know. I don't even know
23  what we're missing, but that I'm not too concerned
24  about at all.
25       It looks like the notice has a lot of the

Page 90

1  things that I'll be looking for, but we've run into
2  this issue with these entities, and that issue I
3  think I need to understand it better, and he raises
4  a good point, Ms. Symons. Mr. Ruiz does that --
5      I mean, I know he says it in a way that he
6  says he's kind of looking out for you.
7      MS. SYMONS:  That worries me, Your Honor.
8      THE COURT:  That he's looking out for your
9  best interest in making sure that someone is not
10  noticed that should be, and then they can come
11  after you. It's amazing, but I don't know. That's
12  something to think about I think. It's something
13  that -- just something to consider.
14      MS. SYMONS:  Your Honor, I appreciate
15  Mr. Ruiz's concern from ideas, his perspective.
16  This is a known universe of claims because we know
17  how many policies were issued. We know what the
18  limits are. We know what we paid, you know, in that
19  universe of claims.
20      So with respect, you know, I'm not too
21  concerned about meeting Mr. Ruiz's protection,
22  although he certainly is an advocate. I think he
23  does an excellent job.
24      THE COURT:  Here's the question, wouldn't
25  Cigna -- if Cigna is sent Miranda to Leon, wouldn't

Page 91

1  Cigna have all of the --
2      MR. RUIZ:  Data, yes..
3      THE COURT:  Yes, I mean, so --
4      MR. RUIZ:  But the question is not whether
5  they have the information. The question is whether
6  they're entitled to the money or somebody else is.
7  So it's not a matter of who -- they all have the
8  data for their own respective members. The question
9  is who's entitled to it, and we'd rather flush out
10  --
11      THE COURT:  That's why I'm going to need --
12  I'm going to need examples and give me examples.
13  Create a fake case, okay. Create like a scenario A,
14  B, and C, and use actual figures and names so this
15  thing flushes out, and it's understandable.
16      MS. SYMONS:  So we could avoid further
17  surprise, could we ask Plaintiff's counsel to do
18  that, and then provide it to us in time for us to
19  react to it, and then perhaps resolve any --
20      THE COURT:  Whatever Plaintiff's counsel's
21  going to submit to me, they got to submit to you so
22  they're not going to submit it to me the morning of
23  because I'm not going to -- I'm going to be
24  unprepared, so I would hope that you could at least
25  five days before whatever hearing we could set, but

Page 92

1  what I'd like for you to do right now, the order
2  should indicate that you guys will meet within the
3  next 20 days to try to hash out this notice.
4      MR. RUIZ:  In person, Judge, if you could.
5  Could you put in the order. We got to meet in
6  person.
7      THE COURT:  And what I'll try to do is what
8  you guys can do is maybe on Monday call Bill Mary
9  (phonetic), and say look, the judge wants us to
10  meet within 20 days, so we're looking for a date
11  about, you know, I don't know 30 days away, and
12  she'll try to fit you in. Maybe a little bit
13  before, a little after. We'll work it out.
14      MR. RUIZ:  Okay.
15      THE COURT:  All right, guys.
16      MR. RUIZ:  Judge, thank you.
17      MS. SYMONS:  Thank you for your time.
18      (Thereupon, the hearing was concluded.)
19
20
21
22
23
24
25

Page 93

1              CERTIFICATE OF COURT REPORTER
2
3  THE STATE OF FLORIDA:
4                      :ss.
5  COUNTY OF MIAMI-DADE:
6
7      I, MYA ALVENA, a Court Reporter in and
8  for the State of Florida at Large, do hereby certify
9  that I was authorized to and did report the proceedings
10  in the above-styled cause before the Honorable Antonio
11  Arzola, at the time and place set forth; that the
12  foregoing pages, numbered from 1 through 93, inclusive,
13  constitute a true and complete record of my notes.
14      I further certify that I am not an attorney or
15  counsel of any of the parties, nor related to any of
16  the parties, nor financially interested in the action.
17
18      Dated this 27th day of June, 2017
19
20
21              _____
22              Mya Alvena
                Court Reporter
23
24
25

EXHIBIT
B

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO: 2015-1946-CA 06

MSPA Claims 1, LLC, a Florida Limited Liability
Company, as assignee of Florida Healthcare Plus,
on behalf of itself and all other similarly situated
Medicare Advantage Organizations in the State of
Florida,

Plaintiff,                                    **CLASS REPRESENTATION**

v.

Ocean Harbor Casualty Insurance, a Florida profit
corporation,

       Defendant.

_____/

**ORDER GRANTING**
**PLAINTIFF'S, MSPA CLAIMS 1, LLC,**
**MOTION FOR CLASS CERTIFICATION**

**THIS CAUSE** came before the Court on June 2, 2016, and September 12-15, 2016 on

Plaintiff's, MSPA Claims 1, LLC ("Plaintiff" or "Class Representative"), Motion for Class

Certification. The Court, having conducted a full evidentiary hearing, and considered the

pleadings, depositions, discovery, stipulations, affidavits, testimony, applicable legal authorities,

memoranda, evidence presented, and the arguments of counsel, finds as follows:

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff, as the assignee of Florida Healthcare Plus ("FHCP"), a Medicare Advantage Organization ("MAO"), through the claims of R.G.,[1] an enrollee of FHCP, seeks class certification, pursuant to Florida Rule of Civil Procedure 1.220, on behalf of itself, and a class consisting of all Florida MAOs and/or their assignees to whom Defendant, Ocean Harbor Casualty Insurance Company ("Defendant"), failed to provide appropriate reimbursement of its conditional payments provided on behalf of Medicare enrollees. FHCP is a now defunct MAO that was placed into receivership with the Florida Department of Financial Services in December, 2014. . Plaintiff alleges its claims arise from injuries sustained by R.G., while she was traveling in a motor vehicle (hereinafter referred to as "accident"). The claims asserted in Plaintiff's Amended Class Action Complaint are for those services and/or supplies paid by FHCP to treat the injuries suffered by its Enrollee, as a direct result of the accident. In addition to having been an enrollee with FHCP at the time of the accident, Enrollee was also covered by a Florida No-Fault insurance policy issued by Defendant.

On June 2, 2016, the Court held a day-long evidentiary hearing on class certification. At the end of the day, the hearing was continued and was ultimately reset to resume during the week of September 12, 2016. In the interim, this Court addressed numerous motions, held several hearings, and entered the following orders: June 28, 2016 Order Denying Ocean Harbor's Motion to Dismiss for Lack of Subject Matter Jurisdiction; July 7, 2016 Order Overruling Ocean Harbor's Discovery Objection, which is currently stayed pending Ocean Harbor's petition for

---

[1] The MA enrollee (*i.e.*, Defendant's insured) shall only be referred to as "R.G." or "Enrollee." The name of R.G. is known to the Court and the Parties, but is not pled in this Order to protect her privacy.

writ of certiorari in the Third District Court of Appeal[2] and September 7, 2016 Order Resetting

for a Future Date Ocean Harbor's Motion for Leave to Amend to Add Affirmative Defenses.

On September 7, 2016, MSPA filed a reply to Ocean Harbor's response in opposition.

The Court held four more days of an evidentiary hearing from September 12 through 15, 2016.

On September 23, 2016, Ocean Harbor filed a supplemental memorandum on the putative class

representative's standing on class certification, to which the Plaintiff filed a response on

September 28, 2016.  The Parties have also submitted to the Court their Joint Appendix on class

certification, as well as their respective proposed orders on certification.

As such, Plaintiff filed this action on behalf of itself and other similarly situated class

members for: (1) double damages, pursuant to the Medicare Secondary Payer private cause of

action, 42 U.S.C. § 1395y(b)(3)(A) ("MSP Law"); (2) breach of contract under Plaintiff's direct

right of recovery; (3) conventional subrogation; (4) equitable subrogation; and (5) conventional

subrogation arising from third-party beneficiary rights.  [J.A. 000059-000091, Am. Compl.].

Defendant is a no-fault insurer that issues policies of insurance pursuant to Florida's No-

Fault law that provides statutorily required benefits pursuant to sections 627.733 – 627.736,

Florida Statutes and is, otherwise, considered a primary plan pursuant to the Medicare Act.  *See*

42 U.S.C. § 1395y(b)(2)(A) (defining "primary plan" to include no fault insurance); 42 C.F.R. §

411.21 (same); Fla. Stat. § 627.736(4) (indicating "benefits due from a [] [no-fault] insurer under

ss. 627.730-627.7405 are primary").

Plaintiff asserted that Defendant issued No-Fault policies from January 29, 2009 through

the date of certification (the "Class Period"), and collected premiums in the following amounts:

---

[2] Ocean Harbor's petition for writ of certiorari, in *Ocean Harbor Cas. Ins. Co. v. MSPA Claims I*, 3D16-1818 (Fla. 3d DCA), is pending MSPA's response to a rule to show cause and Ocean Harbor's reply thereto.

| | |
|---|---|
| 2009 – $57,254,725 | 2012 – 75,256,995 |
| 2010 – $57,674,148 | 2013 – $73,199,238 |
| 2011 – $50,256,279 | 2014 – $112,986,557 |

[J.A. 005670, Pl.'s Ex. 52, *Annual Report -Florida O.I.R. 2010,* 007099, Pl.'s Ex. 62, *Annual Report – Florida O.I.R. 2011*, 005795, Pl.'s Ex. 53 *Annual Report – Florida O.I.R. 2012*, 006015, Pl.'s Ex. 54, *Annual Report – Florida O.I.R.* 2013, 006171 Pl.'s Ex. 55, *Annual Report - Florida O.I.R.* 2014, 006339, Pl.'s Ex. 56, *Annual Report – Florida O.I.R.* 2015].

Thereby, Plaintiff seeks to enforce its own rights, as well as the reimbursement rights of Florida MAOs and/or its assignees (the "Class") for medical payments made on behalf of its Medicare Part C enrollees, as a result of Defendant's practice and course of conduct in failing to make primary payment, or properly providing appropriate reimbursement. *See Sosa,* 73 So. 3d at 110 (holding "the focus of a court in reviewing a finding of the commonality requirement [needed for class certification under Fla. R. Civ. P. 1.220] is on whether the class members predicated their claims on the same common course of conduct by the defendant and the same legal theory").

As an MAO, FHCP advanced Medicare payments on behalf of R.G. for medical care and treatment for which Defendant was responsible as a primary payer since R.G.'s medical bills arose from the ownership, maintenance, and/or use of a motor vehicle.  § 627.736, Fla. Stat. (2016). Accordingly, Plaintiff seeks damages on behalf of itself and similarly situated Florida MAO's or its assignees, for Defendant's violation of section 627.736 and the MSP Law.

After a careful review of the Record before this Court, there is sufficient evidence to find that Defendant was the legally required primary payer at the time of R.G.'s accident. Particularly, Defendant's liability arises pursuant to Florida's No-Fault Act, section 627.736,

Florida Statute, 42 C.F.R. § 1395y, and Defendant's no-fault insurance policy, which provided coverage to R.G.  [J.A. 003128:21-25, 003129:1-5, Celli Dep. May 31, 2016].  FHCP, the MAO involved in this class action discharged its obligation and paid the medical bills for the treatment(s) and service(s) rendered to R.G., which are related to the accident.  *See* 42 U.S.C. § 1395w-27(f); 42 C.F.R. §§ 422.214 and 422.520.

Defendant admitted it covered R.G. for no-fault benefits at the time of the accident and that the services and/or supplies paid for by FHCP were reasonable, related, and necessary, as it pertained to R.G.'s medical care and treatment.  [J.A. 000145, Def.'s Answers and Objections to Pl.'s First Request for Admissions, p. 4; J.A. 004181, Pl.'s Ex. 24, *Declarations Page for R.G. dated September 26, 2014*; J.A. 003129:15-22, Celli Dep. May 31, 2016].  As the assignee of FHCP, Plaintiff's rights, and those of others similarly situated, arise from the payments made by FHCP as a secondary payer, for which Defendant was primarily responsible and should have itself paid, or properly reimbursed FHCP for its payments. *See* 42 U.S.C. § 1395y(b)(3)(A); 42 U.S.C. § 1395y(b)(2)(B)(ii).  Accordingly, the fundamental issues common to all the claims of all of the MAO's or its assignees is Defendant's failure to provide for primary payment on behalf of its insureds and/or appropriately reimburse FHCP and the Class for its payments on claims covered by Defendant's No-Fault insurance policy.  As alleged by Plaintiff, Plaintiff's assignor and the members of the Class have paid and have not been reimbursed by the Defendant.

Plaintiff seeks class certification pursuant to Rule 1.220(b)(3).  [*See* J.A. 000092, Pl.'s M. for Class Certification; JA 000488, Pl.'s Reply to Def.'s Resp. in Opp'n to Pl.'s M. for Class Certification, ¶ 5].  Following a rigorous analysis, the Court concludes Plaintiff satisfied the class

certification requirements.   Plaintiff's Motion for Class Certification pursuant to Rule 1.220(b)(3) is thereby **GRANTED,** and the Court certifies the following class[3] as:

> entities that contracted directly with the Centers for Medicare and Medicaid Services ("CMS") and/or its assignee pursuant to Medicare Part C, including but not limited to, MAOs and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by HHS and/or CMS as a direct payer of medical services/supplies and/or drugs on behalf of Medicare beneficiaries either for parts A, B and/or D, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant;

> have made payment(s) for medical services, treatment and/or supplies subsequent to January 29, 2009, whereby the MAO, or its assignee, as a secondary payer, has the direct or indirect right and responsibility to obtain reimbursement for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee pursuant to Florida No-Fault law (section 627.736(4), Florida Statute), was/is financially responsible to a Medicare beneficiary for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle; and

> where the Defendant failed to properly pay for medical bills on behalf of its insureds and has otherwise failed to reimburse the MAO's or its assignees for their payment(s) as calculated pursuant to the recognized Current Procedure Terminology ("CPT") codes based on the fee-for-service[4] by the primary payer, as delineated by section 627.736, Florida Statues, for medical services and/or supplies for their damages.[5]

---

[3] The class definition was modified based on the arguments of the Parties, and to demonstrate that Defendant failed to appropriately reimburse Plaintiff.   *See General Tel. Co. of SW v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a [class] certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation."); *see also McNamara v. Felderhof*, 410 F.3d 277, 280 at n.8 (5th Cir. 2005) (holding that "a trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment").

[4] 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 422.108(d); *Bio-Medical Applications of Tenn., Inc. v. Cent. States S.E. & S.E. Areas Health & Welfare Fund*, 656 F.3d 277, 295-96 (6th Cir. 2011); *Humana Inc. v. Medtronic Sofamor Danek USA, Inc.*, 133 F. Supp. 3d 1068, 1078 (W.D. Tenn. 2015).

[5] The Class has not otherwise released their right to reimbursement as secondary payers.

## II. THE MEDICARE ACT AND ITS BACKGROUND

### A.  The Social Security Act

The Medicare Act is found within the Social Security Act under Title XVIII.  The Social Security Act was enacted on August 14,1935.  *See* Soc. Sec. Admin., https://www.ssa.gov/history/1930.html (last visited Oct. 27, 2016).  A few years thereafter, the law added benefits for a retiree's spouse, as well as children and disability benefits.  Id.  It is "the foundation of economic security for millions of Americans—retirees, disabled persons, and families of retired, disabled or deceased workers. About 163 million Americans pay Social Security taxes and 59 million collect monthly benefits. About one family in four receives income from Social Security."  *See* Nat. Academy of Soc. Ins., https://www.nasi.org/learn/socialsecurity/overview (last visited Oct. 27, 2016).  In 1965, Congress amended the Social Security Act to create the Medicare Act under Title XVIII.

### B.  The Medicare Act and The Medicare Part C Program

The Medicare Act functions as a "federally funded health insurance program for the elderly and the disabled."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1993).  The Medicare Act consists of five parts — Part A, B, C, D and E.  Part A and Part B "create, describe, and regulate traditional fee-for-service, government-administered Medicare."  *In re Avandia Mktg. Sales Practices and Products Liability Litigation*, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w).  Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them.  42 U.S.C. §§ 1395w-21-29.  Further, Part D provides for prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x, 1395y.

An enrollee's health coverage with an MAO is strictly construed and regulated by CMS.

Id.   CMS even provides detailed templates for MAOs to use when they create documents,

including   evidence   of   coverage   that   is   provided   to   enrollees.   See   CMS,

https://www.cms.gov/Medicare/Health-

Plans/ManagedCareMarketing/MarketngModelsStandardDocumentsandEducationalMaterial.htm

l (last visited October 27, 2016).   Notably, CMS requires that every evidence of coverage contain

the following language:

> [w]e have the right and responsibility to collect for covered Medicare services for
> which Medicare is not the primary payer. According to CMS regulations at 42
> CFR §§ 422.108 and 423.462, *[insert 2015 plan name]*, as a Medicare Advantage
> Organization,   will   exercise   the   same   rights   of   recovery   that   the   Secretary
> exercises under CMS regulations in subparts B through D of part 411 of 42 CFR
> and the rules established in this section supersede any State laws.

*Id.* at p.141 of the "MA-only HMO (and HMO-POS) templates" attachment; *see also*, [J.A.

000532, FHCP Evidence of Coverage].   As a result, a Medicare Part C enrollee must be provided

certain coverage and protections, as required by CMS that at a minimum must pay for what

Original Medicare would pay.   In essence, Medicare Part C is the functional equivalent of

Original Medicare.   *See* 42 C.F.R. §§ 422.108(f), 422.101; *Honey v. Bayhealth Med. Ctr., Inc.*,

2015 Del. Super. LEXIS 378, at *18 (Del. Super. Ct. July 28, 2015) (holding "an MAO is

squarely within the traditional Medicare system").

Congress has also made certain provisions of the Social Security Act applicable to the

Medicare Act.   *See* 42 U.S.C. § 1395ii.   Particularly, the judicial review provision contained in

42 U.S.C. § 405(g), which is the Social Security Act's "sole avenue for judicial review of all

claims arising under the Medicare Act."   *Heckler v. Ringer*, 466 U.S. 602, 614 (1984); 42 U.S.C.

§ 405(h); *see also*, *e.g.*, *Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 191 (S.D.N.Y. 2012)

(holding that under 42 U.S.C. § 405(h) no findings of fact or decision of the Secretary shall be

reviewed by any person, tribunal, or governmental agency except as herein provided in § 405(g)).

An MAO pays providers directly for the care received by Part C enrollees. See *Honey v. Bayhealth Med. Ctr., Inc.*, 2015 Del. Super, LEXIS 378, at *10 (Del. Super. Ct. July 28, 2015). To the extent that this care exceeds the flat rate received from the government, an MAO assumes the risk and cost. *Id.* In the event that care costs less than the flat rate received, an MAO is permitted to keep the difference as a profit. *Id.*

To be approved to be an MAO, a private insurer must enter a bidding process, meeting certain threshold requirements. *Id.* MAOs must also be licensed in each State in which they operate. *Id.* MAOs must offer an "[evidence] of coverage" annually, approved by CMS to enrollees. *Id.* In providing the basic benefits offered to traditional Medicare enrollees, MAOs must abide by national coverage determinations provided by CMS. *Id.* In addition, all coverage disputes between enrollees, and MAOs must go through the traditional Medicare appeals process. *Id.* at *11. The decisions coming out of the Medicare appeals process are, moreover, binding upon an MAO. *Id.*

The federal government sets the fixed rate at which MAOs will be remunerated. *Id.* at *12. Likewise, the federal government establishes the basic services that each Part C private insurer participant must provide. *Id.* These private health insurers are, further, constrained in their ability to deny coverage, limited to the decisions of federal adjudicators. *Id.* The discretion permitted to these private insurers is *within* this federally created framework – not outside or even alongside it. *Id.* at *12-13. Under Part C, the contract is between the federal government and the insurer. *Id.* at *13.

By way of background, FHCP entered into a contract with CMS to provide Medicare benefits in accordance with the Medicare Part C program to Medicare-eligible enrollees and, in return, received a per capita fee from CMS. *See Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *11 (11th Cir. 2016) ("Under the Medicare Advantage program, a private insurance company, operating as an MAO, administers the provision of Medicare benefits pursuant to a contract with CMS. CMS pays the MAO a fixed fee per enrollee, and the MAO provides at least the same benefits as an enrollee would receive under traditional Medicare."); *see also* 42 U.S.C. §§ 1395w-22(a), 1395w-23.

Therefore, the defining factor of a truly private insurance plan, one between insured and an insurer, is lacking. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *11. *Id.* Of great significance is that these contracts define the rights of insurers vis-à-vis their insureds. *Id.* Among the items contained in such contracts are provisions of services and when such services will be denied. Such basic determinations are out of the administrator's hands in Part C coverage and are instead determined by the other party to the contract – the federal government. *Id.*

In sum, MAOs are more akin to traditional Medicare, rather than a private health insurance plan. *Id.* at *16-17 ("There is no such thing as a [M]edicare Advantage insurance policy."). Medicare Advantage is, instead, a federal program. *Id.* Just as traditional Medicare, MAOs have their recovery rights determined statutorily. *Id.* Specifically, Part C includes a reference to the MSP Law, entitled "Organization as secondary payer," which states as follows:

> Notwithstanding any other provision of law, a Medicare Choice organization[6] may (in the case of the provision of items and services to an individual under a Medicare+Choice plan under circumstances in which payment under this subchapter is made secondary pursuant to section 1395y(b)(2) of this title) charge

---

[6] *i.e.*, an MAO.

or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy described in such section—

(A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or

(B) such individual to the extent that the individual has been paid under such law, plan, or policy for such services.

42 U.S.C. § 1395w-22(a)(4). *See Humana*, 2016 U.S. App. LEXIS 14509 at *12-13. Under this framework, any dispute concerning coverage or reimbursement rights has been construed as arising under the Medicare Act. *See Humana Med. Plan, Inc. v. Reale*, 180 So. 3d 195, 204 (Fla. 3d DCA 2015).

### 1. Payments by Medicare or an MAO are Conclusive Proof that Services Rendered are Reasonable and Necessary.

Section 1395y(a)(1)(A) of the Medicare statute states that, "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which . . . are not ***reasonable and necessary*** for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added). Because this Section contains an express condition of payment – that is, "no payment may be made" – it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." *United States ex. rel. Mikes v. Straus*, 2001 U.S. App. LEXIS 26923, at *30-31 (2d Cir. N.Y. 2001). Hence, payments made by Medicare or an MAO are for services that are reasonable and necessary. *Id.*

As a result of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, the obligations previously imposed on carriers are now undertaken by Medicare Administrative Contractors ("MACs"). *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 § 911(e), 117 Stat. 2066, 2256 (2003). MACs operationalize the Original Medicare fee-for-service option. 42 U.S.C. § 1395kk-1. MACs

handle both Part A and Part B claims from their assigned geographic region.  *See* 42 U.S.C. § 1395h(a); § 1395u(a).  For Medicare beneficiaries who elect to receive benefits under the Medicare Part C option, Part C contractors, which are called "Medicare Advantage organizations" perform the same function that MACs performs on behalf of Medicare enrollees. *See* 42 C.F.R. § 422.2.  Essentially, an MAO's processing of payments is also under the guise of CMS and the Medicare Program. Since MAOs provide the same Part A and Part B benefits as Original Medicare, an MAO must also make payment for "reasonable and necessary" items and services.  42 U.S.C. § 1395w-22(a)(1)(A); 42 C.F.R. § 422.100(c).

MAOs must process and pay or deny claims promptly to comply with the specific requirements established by federal law,[7] federal regulations,[8] and the terms of the MAOs contracts with CMS.  For example, under these requirements 95% of all clean claims submitted by non-participating, *i.e.,* non-contracted, providers must be paid or denied within 30 days of receipt. *See* 42 C.F.R. § 422.520(a)(1).  Further, all other claims submitted by non-participating providers must be paid or denied within sixty (60) days of receipt.  *See* 42 C.F.R. § 422.520(a)(3).  For participating – *i.e.,* contracted – providers, MAOs must comply with the terms of their contracts with those providers.  *See* 42 C.F.R. § 422.520(b)(2).

In sum, MAOs must provide Medicare benefits for "reasonable and necessary" items and services subject to the prompt payment requirements.  Accordingly, once an MAO makes a payment, CMS and the MAO determine whether the payment is for services that are reasonable and necessary.  If a beneficiary or a primary payer seeks to dispute the reasonableness or necessity of the services rendered, a dispute arises under the Medicare Act.

---

[7] *See* 42 U.S.C. § 1395w-27(f).

[8] *See* 42 C.F.R. §§ 422.214 and 422.520.

## 2.     Arising Under the Medicare Act

### i.     Background

When a beneficiary or a primary payer disputes an amount paid by an MAO on behalf of the beneficiary, courts have consistently held that these disputes concern the reimbursement of conditional payments that are claims for benefits that arise under the Medicare Act.  *See Reale*, 180 So. 3d at 204.  Therefore, whenever a beneficiary or primary payer contests a claim for reimbursement, the beneficiary or primary payer must timely exhaust all administrative remedies before it can seek judicial review in Federal Court, which has exclusive jurisdiction over the claim pursuant to 42 U.S.C. § 405(g).  *Id*. at 202.  A claim arises under the Medicare Act if "both the standing and the substantive basis for the presentation" of the claim is the act, or if the claim is "inextricably intertwined" with a claim for benefits.  *See Heckler*, 466 U.S. at 614; *Trostle v. Ctrs. for Medicare and Medicaid Servs.*, 206 U.S. Dist. LEXIS 143101, at *11 (M.D. Penn. Oct. 17, 2016).  Accordingly, once a beneficiary or primary plan contests a reimbursement, the dispute must be administratively exhausted.  *See Reale*, 180 So. 3d at 202.

### ii.     Medicare Administrative Appeal Process

The Code of Federal Regulations explicitly sets out the Medicare administrative process for disputing a Medicare claim.  The organization determination is binding on all parties unless it seeks reconsideration.  42 C.F.R. § 422.576. An MA plan enrollee has appeal rights that may be exercised if he or she is dissatisfied with an "organization determination" made by his or her MAO, in which the enrollee may seek reconsideration of a decision by an MAO.   42 C.F.R. §§ 422.566(b),  422.578, 422.580.   A reconsideration consists  of  a  review  of  an  adverse determination, the evidence and findings upon which it was based, and any other evidence the parties submit or an MAO or CMS obtains.  42 C.F.R. § 422.580.  A request for reconsideration

must be filed within sixty (60) calendar days from the date of the notice of the organization's determination. 42 C.F.R. § 422.582.

If the reconsideration decision is unfavorable to an enrollee, the matter must be reviewed by an independent outside entity that contracts with the Secretary for this purpose. 42 C.F.R. § 422.592. If that outside entity issues an unfavorable decision, the beneficiary may then request a hearing conducted by an Administrative Law Judge ("ALJ"). 42 C.F.R. § 422.600. If the decision of the ALJ is unfavorable, the enrollee may then request that the Medicare Appeals Council ("MAC") review the ALJ's decision. 42 C.F.R. § 422.608. The MAC decision concludes the administrative appeals process. 42 C.F.R. § 422.612. If the enrollee remains dissatisfied, and if the amount in controversy exceeds a certain threshold, the enrollee may seek judicial review of the final agency decision. 42 U.S.C. § 1395w-22(g)(5); 42 C.F.R. § 422.612.

### iii.   Beneficiary or Primary Payer Claims for Reimbursement Disputes Against the MAO Arise under the Medicare Act

The Third District Court of Appeal has held that a beneficiary/primary payer who contested a claim for reimbursement was so "inextricably intertwined" with a claim for benefits that exclusive jurisdiction was limited to the federal court under 42 U.S.C. § 405(g). *See Reale,* 180 So. 3d at 195. In *Reale,* a Medicare enrollee sought declaratory relief in state court challenging the amount of reimbursement that her MAO was entitled to receive. *Id.* at 198. The court went through an extensive analysis of the applicability of the Social Security Act's judicial review provision, and its applicability to claims "arising under" the Medicare Act. *Id.* at 201-205. The court in *Reale* held that where an enrollee seeks to challenge the amounts paid by an MAO for medical treatment provided, the enrollee must first exhaust administrative remedies prior to judicial review from the federal courts. *Id.* at 205.

In *Humana vs. Western Heritage*, the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit"), reviewed an order granting summary judgment in favor of a secondary payer MAO, and held a primary payer was barred from contesting reimbursement for failure to exhaust administrative remedies. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509. As neither the enrollee nor the primary payer contested the amounts paid by the MAO within the administrative remedies period, the primary payer in *Western Heritage* was precluded from challenging the MAO's payments. *Id.* at *24; *see* 42 C.F.R. § 422.576.

In this case, Defendant disputes Plaintiff's right to reimbursement of its conditional payments on a class-wide basis. However, Defendant failed to provide any evidence that it administratively contested any of the amounts paid by any MAO. Moreover, at this point, the time for an administrative appeal has expired and, therefore, Defendant is time-barred from challenging the propriety or amounts paid by the MAOs. Accordingly, all disputes by the Enrollee or primary payer "arise under the Medicare Act," since Defendant failed to follow the statutorily required procedures for contesting any reimbursement claims.

### 3. The Medicare Secondary Payer Law

Initially, Medicare served as the primary payer and paid its beneficiaries' medical costs when other entities, such as insurances provided by private health insurance companies, were responsible for those costs. *See Taransky v. Sec'y of U.S. Dep't of Health & Human Servs.*, 760 F.3d 307, 309 (3d Cir. 2014). In 1980, Congress added the MSP Law provisions to the Medicare Act in order to counteract escalating healthcare costs. *See Bio-Medical Applications of Tenn., Inc. v. Cent. States Southeast & Southwest Areas Health & Welfare Fund*, 656 F.3d 277, 281 (6th Cir. 2011). This means that if a primary plan "has not made or cannot reasonably be expected to make payment," the Secretary may make a conditional payment. 42 U.S.C. § 1395y(b)(2)(B)(i).

Since Medicare remains the secondary payer, the primary plan must reimburse Medicare for the conditional payment.  42 U.S.C. § 1395y(b)(2)(B)(ii).  Though the MSP Law uses the term "primary plan" to describe entities with a primary responsibility to pay, that term covers more than just health insurance plans.  *See MSP Recovery, LLC v. Allstate Ins. Co.*, 2016 U.S. App. LEXIS 15984 (11th Cir. Aug. 30, 2016).  The law defines a "primary plan" as "a group health plan or large group health plan, . . . a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance . . . ."  42 U.S.C. § 1395y(b)(2)(A).  *See Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co.*, 758 F.3d 787, 791 (6th Cir. 2014).

### 4.    The MSP Private Cause of Action - 42 U.S.C. § 1395y(b)(3)(A)

In addition to allowing the government to bring a cause of action for the recovery of double damages anytime a primary payer fails to make required payments, the Medicare Act also provides a private cause of action to non-government entities pursuant to 42 U.S.C. § 1395y(b)(3)(A).  *See In re Avandia Mktg.*, 685 F.3d at 359.  Paragraph (3)(A) states:

> [t]here is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with [the requirements of the MSP Law].

42 U.S.C. § 1395y(b)(3)(A).

An MAO falls within the purview of entities that has standing to sue primary plans under 42 U.S.C. § 1395y(b)(3)(A) and thereby, can "exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter."  42 C.F.R. § 422.108(f); *see Humana*, 2016 U.S. App. LEXIS 14509 at *21; *In re: Avandia Mktg.*, 685 F.3d at 366; *Collins,* 73 F. Supp. 3d at 665.  In this matter, Plaintiff seeks relief under 42 U.S.C. § 1395y(b)(3)(A).

Plaintiff, as the assignee of an MAO, stands in the shoes of an MAO via a string of assignments. Therefore, Plaintiff is within the purview of parties that has standing to sue under 42 U.S.C. § 1395y(b)(3)(A). *See MSP Recovery, LLC v. Progressive Select Ins. Co.*, 96 F. Supp. 3d 1356, 1358 (S.D. Fla. 2015) (holding that as an assignee to an MAO, plaintiff had standing to sue under § 1395y(b)(3)(A)), *vacated on other grounds by MSP Recovery, LLC,* 2016 U.S. App. LEXIS 15984.

Further, the Eleventh Circuit held a plaintiff is entitled to double damages under 42 U.S.C. § 1395y(b)(3)(A) when there is no genuine issue of material fact regarding the: (1) defendant's status as a primary plan; (2) defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages amount. *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *21.

> A primary plan fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraph[] . . . (2)(A), when it fails to honor the underlying statutory or contractual obligation . . . . Paragraph (2)(A) [of the MSP Law] alters the priority among already-obligated entities and contemplates primary plans fulfilling their payment obligation . . . . Paragraph (3)(A), the MSP private cause of action, grants private actors a federal remedy when a primary plan fails to fulfill its payment obligation, thereby undermining the secondary-payer scheme created by paragraph (2)(A).

*Id*. at *6.

### 5.      42 U.S.C. § 1395y(b)(8) Enacted by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA")

On December 29, 2007, the Medicare, Medicaid and SCHIP Extension Act of 2007 ("MMSEA") was signed into law and codified at 42 U.S.C. § 1395y(b)(7) and (8). *See* Pub. L. No. 110-173. The purpose of the MMSEA reporting process is to enable CMS to pay appropriately for Medicare covered items and services furnished to Medicare beneficiaries. *See*

Section 111 NGHP User Guide, Version 5.0, Chapter 1 at *6-1.  Primarily, MMSEA reporting

helps CMS determine primary versus secondary payer responsibility. *Id.*

Under MMSEA, Responsible Reporting Entities ("RREs"), including no-fault insurers

(*e.g.*, Defendant), must report when one of its Medicare beneficiary insureds has been injured in

an automobile accident and is required to submit certain information electronically to CMS.

*See* 42 U.S.C. §§ 1395y(b)(7) and (8); *see also* Section 111 NGHP User Guide, Version 5.0,

Chapter 3 at *3-1.  The new reporting requirements affect all parties involved in a payment of a

settlement, judgment, or award with a Medicare beneficiary after January 1, 2010. *See Seger v.*

*Tank Connection, LLC*, 2010 U.S. Dist. LEXIS 49013, at *12 (D. Neb. Apr. 22, 2010).  When

reporting a case under MMSEA, an RRE must report the Medicare beneficiary's full name,

Medicare Health Insurance Claim Number ("HICN"), gender and date of birth, and complete

address and phone number.  *See* Section 111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1.

Further, RREs must be able to determine whether an injured party is a Medicare

beneficiary and gather the information required for proper Section 111 reporting.  *See* Section

111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1. Anticipating the burden of the new

reporting requirements, CMS developed a "query process" whereby an RRE can determine a

claimant's Medicare status electronically and without authorization, as long as the RRE has

access to the claimant's name, date of birth, gender, Social Security Number, and/or Medicare

Health Insurance Claim Number.  *See Seger*, 2010 U.S. Dist. LEXIS 49013, at *12. This

information must be submitted "after the claim is resolved through a settlement, judgment, award

or other payment, regardless of whether there is a determination or admission of liability.  42

U.S.C. § 1395y(b)(8)(C).

These reporting obligations require no-fault insurers to provide detailed information to CMS regarding any open no-fault claims with an Ongoing[9] Responsibility for Medical Treatment ("ORM") for insureds who are also Medicare beneficiaries. *See Seger*, *LLC*, 2010 U.S. Dist. LEXIS 49013, at *12. The trigger for reporting ORM is: (1) when the RRE has made a determination to assume responsibility for ORM; or (2) it is otherwise required to assume ORM. *See* Section 111 NGHP User Guide, Version 5.0, Chapter 6 at *6.7.

Defendant's compliance or non-compliance with MMSEA provides constructive and/or actual knowledge to Medicare Payers. However, the ultimate issue is whether there has been proper reimbursement by a primary payer. *See W. Heritage Ins. Co.*, 2016 U.S. Dist. LEXIS 14509 at *21 (holding that summary judgment is appropriate when the following are demonstrated: "(1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount"). Once a secondary payer has paid the lien rights become automatic. *See Porter v. Farmers Ins. Co.*, 2012 U.S. Dist. LEXIS 9862 (N.D. Okl. 2012) ("Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim. 42 C.F.R. § 411.21."). MMSEA reporting provides a secondary payer with an opportunity to learn of a primary payer. However, if a secondary payer pays bills that a primary payer should have paid, reimbursement is mandated.

6.      **The Medicare Secondary Payer Act Framework**

There are three paragraphs within the Medicare Act that work together to build the secondary payer framework. The first "alters the priority among already-obligated entities and contemplates primary plans fulfilling their payment obligation." *See* 42 U.S.C. § 1395y(b)(2)(A), *see also Humana*, 2016 U.S. App. LEXIS 14509, at *14. Primarily, Paragraph (2)(A) provides

---

[9] "Ongoing" refers to the RRE's ongoing responsibility to pay for the injured Medicare beneficiary's medical expenses associated with the no-fault claim. *See* Section 111 NGHP User

the circumstances under which Medicare or an MAO may not make a payment, *i.e.,* a primary plan has made or can reasonably be expected to make a payment.

Paragraph (2)(B) provides available options for when a primary plan fails to fulfill its payment obligations.  *Id.* at *14.  Medicare or an MAO has the authority to make a conditional payment if payment has not been made or cannot reasonably be expected to be made by the primary plan.  42 U.S.C. § 1395y(b)(2)(B)(i).  This paragraph also provides for the subrogation "to any right under [the MSP Law] of an individual or any other entity to payment with respect to such item or service under a primary plan."  42 U.S.C. § 1395y(b)(2)(B)(iv).

The final component, Paragraph (3)(A), protects the secondary-payer framework by "grant[ing] private actors a federal remedy when a primary plan fails to fulfill its payment obligation, thereby undermining the secondary-payer scheme created by paragraph (2)(A)." *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *14.  As discussed *supra*, this Paragraph applies equally to Original Medicare and MAOs.  *Id.*

### 7.    *Chevron* Deference and the Code of Federal Regulations

The Secretary's interpretation of a statute which it is charged with administering is entitled to "controlling weight unless [the Secretary's interpretations] are arbitrary, capricious, or manifestly contrary to the statute." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984)).  In fact, the United States Supreme Court has held that federal courts "must uphold the Secretary's judgment as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 826-27 (2013).  Deference is particularly warranted where, as here, the statute governs "a complex and highly technical regulatory program." *Thomas Jefferson Univ.,*

Guide, Version 5.0, Chapter 6 at *6.7.

512 U.S. at 512 (internal citations omitted); *see also, e.g.*, *Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co.*, 758 F.3d 787, 792-93 (6th Cir. 2014) (giving controlling deference to the Secretary's Medicare Secondary Payer regulations in a Medicare Advantage case).

This matter involves the interpretation of the U.S. Code and the following Regulations:

- 42 C.F.R. §§ 422.108(f) and 422.402 address the preemption of State laws and MAOs having the same rights as CMS.

- §§ 422.566, 422.582, 422.564 and 422.111 address the MAO organization determination procedures.

- §§ 411.21, 411.25 and 411.26(a): provide the crucial definitions for primary payers, primary plans, and conditional payments; require notice of primary payment responsibility; and grant subrogation rights to Medicare.

- § 422.108 provides that a primary payer may be billed for full charges, rather than the discounted rates received by CMS and the MAOs.

- §§ 411.20, 411.22, 411.24, and 411.28 address circumstances when CMS/MAOs shall not make payments, the reimbursement obligations of primary payers, required beneficiary cooperation in recovery actions, the recovery of conditional payments and waiver of recovery.

- § 422.520(a) requires MAOs to pay 95 percent of "clean claims" within 30 days of receipt.

- §§ 162.1002 adopted ICD codes and CPT codes as the standard medical data code sets.

- §§ 411.32 and 411.33 discuss the basis and amount of Medicare Secondary payments.

- § 411.30 provides that payment by a primary payer is credited to deductibles.

- §§ 411.35 and 411.37 limit the charges to a beneficiary when there is a primary payer and limit the amount of recovery when the primary payment is the result of a judgment or settlement.

These Regulations provide for the rights and responsibilities of CMS and the MAOs, as well as that of the primary payers.

**8.      Medicare's Recovery Rights are Automatic.**

A Medicare lien is automatic, all-encompassing, and superior to all other interests. *See Pallay v. Nationwide Ins. Co.*, 165 Ohio App. 3d 242 (7th Dist. 2005) ("federal law gives Medicare very powerful subrogation rights, often referred to as a Medicare lien . . . this right of subrogation is superior to any other right, interest, judgment, or claim."); *Porter v. Farmers Ins. Co.*, 2012 U.S. Dist. LEXIS 9862 (N.D. Okl. 2012) ("Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim. 42 C.F.R. § 411.21.").  Pursuant to 42 C.F.R. § 411.24(f)(1), "CMS may recover without regard to any claims filing requirements that the insurance program or plan imposes on the beneficiary or other claimant such as a time limit for filing a claim or a time limit for notifying the plan or program about the need for or receipt of services." *Id.*  Further,

> where the secondary payer does not know of a primary payer's obligation to pay for medical expenses and the statutory language 'cannot reasonably be expected to make payment.' In other words, if a MAO is unaware of a primary payer, the MAO would not "reasonably expect" a primary plan to provide payment.

*Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653, 669 (E.D. La. 2014). Accordingly, Medicare or an MAO may conditionally pay for the medical bills of an injured person, subject to Medicare's or an MAO's right to obtain reimbursement of those payments. *See* 42 U.S.C. §§ 1395y(b)(2)(B)(i), 1395y(b)(3)(A).  Moreover, once Medicare or an MAO pays as a secondary payer, there is no law that would penalize Medicare or an MAO, even if it paid in error, since the payment was supposed to be made by the primary payer.

**9.      State Laws are Preempted Pursuant to 42 C.F.R. § 422.108(f).**

To the extent that Florida's No-Fault Laws may be applicable to determine a reimbursement right, state laws are preempted by the broad, express preemption clause in Part C of the Medicare Act:

(3) Relation to State laws

The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

42 U.S.C. § 1395w-26(b)(3); *see also* 42 C.F.R. § 422.402; *Potts*, 897 F. Supp. 2d at 195 (finding New York anti-subrogation law preempted by 42 U.S.C. § 1395w- 27 26(b)(3)); *cf. Smith v. Travelers Indem. Co.*, 763 F. Supp. 554 (M.D. Fla. 1989) (finding that an older version of Florida's collateral source statute, section 627.7372, Florida Statute (1987), was preempted by § 1395y(b)(1) of the Medicare Act).

When federal law contains an express preemption clause, a court's task is to "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Reale*, 180 So. 3d at 208 (citing *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1977 (2011); *Potts*, 897 F. Supp. 2d at 195 (*citing CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993)). "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *Reale*, 180 So. 3d at 209 (*quoting English v. Gen. Elec. Co.*, 496 U.S. 72 (U.S. 1990)). This is the case here. Part C's preemption provision is clear and unambiguous: the standards established under Part C supersede any state law or regulation with very few exceptions, none of which apply here. *See Reale*, 180 So. 3d at 204.

In *Potts*, the court explained that "[f]or the purposes of the preemption provision, a standard is a statutory provision or a regulation promulgated under the [Medicare Act] and published in the Code of Federal Regulations." *Potts*, 897 F. Supp. 2d at 195 (*quoting New York City Health & Hosps. Corp. v. WellCare of New York, Inc*., 801 F. Supp. 2d 126, 140 (S.D.N.Y. 2011)). "Here, the federal statute contains extensive provisions with respect to reimbursement rights of MA organizations in the secondary payer context." *Potts*, 897 F. Supp. 2d at 196. In

addition, the Part C regulations eliminate all doubt that the standards in Part C govern MAO

reimbursement rights, preempting any state law affecting such rights, where in § 422.108(f) it

states,

> (f) MSP rules and State laws.
> Consistent with § 422.402 concerning the Federal preemption of State law, the rules established under this section supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to MA plans. A State cannot take away an MA organization's right under Federal law and the MSP regulations to bill, or to authorize providers and suppliers to bill, for services for which Medicare is not the primary payer. The MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter.

42 C.F.R. § 422.108(f); *see* § 422.402 ("The standards established under this part supersede any

State law or regulation (other than State licensing laws or State laws relating to plan solvency)

with respect to the MA plans that are offered by MA organizations.").  Defendant does not – and

cannot – argue that any state statute, as applied to MAOs in this case, concerns licensing or plan

solvency.  *See* 42 C.F.R. § 422.402.  On the contrary, any Florida statute that impacts or would

"take away an MA organization's right under Federal law and the MSP regulations" to seek

reimbursement would be preempted.  *Id*.  42 C.F.R. § 422.108(f).  "The plain language of this

regulation suggests that the Medicare Act treats MAOs the same way it treats the Medicare Trust

Fund for purposes of recovery from any primary payer." *In re Avandia Mktg.*, 685 F.3d at 366.

Accordingly, under the plain language of the express preemption provisions of the Medicare Act

and its accompanying regulations, any Florida statute is preempted as it applies to Medicare and

an MAO's reimbursement rights.  *See Id*.  As a result, this Court finds that Defendant's reliance

on state law defenses is inconsistent with an MAO's rights to recover claims for reimbursement

and are therefore, preempted.

### III. Florida's No-Fault Law

The Florida Motor Vehicle No-Fault Law ("Florida's No-Fault Act"), sections 627.730 –
7405, Florida Statutes, was intended to expeditiously provide insurance benefits to the insured
for medical treatment regardless of fault.  *See* Fla. Stat. § 627.731, (2016); *Custer Med. Ctr. V.
United Auto. Ins. Co.*, 62 So. 3d 1086, 1092 (Fla. 2010) (citing *Allstate Ins. Co. v. Kaklamanos*,
843 So. 2d 885, 891 (Fla. 2003)).  The purpose of the no-fault statutory framework is to 'provide
swift and virtually automatic payment."  *Custer*, 62 So. 3d at 1095 (citing *Ivey v. Allstate Ins.
Co.*, 774 So. 2d 679, 683-84 (Fla. 2000)).  The Florida Supreme Court recognized that the PIP
statute is unique in that it abolished "a traditional common-law right by limiting the recovery
available to car accident victims" and in exchange, required PIP insurance that was recoverable
**without regard to fault**.  *Nunez v. Geico Gen. Ins. Co.*, 117 So. 3d 388, 393-394 (Fla. 2013)
(citing *Allstate Ins. Co. v. Holy Cross Hosp., Inc*., 961 So. 2d 328, 332 (Fla. 2007)).  No-fault
insurers are primary payers of any bills for medical services and supplies incurred by its insureds
resulting from the use, maintenance, and/or operation of a motor vehicle.  *See* Fla. Stat. §
627.736(4).

> PAYMENT OF BENEFITS. — Benefits due from an insurer under ss. 627.730-
> 627.7405 are **primary**, except that benefits received under any workers'
> compensation law must be credited against the benefits provided by subsection
> (1) and are due and payable as loss accrues upon receipt of reasonable proof of
> such loss and the amount of expenses and loss incurred which are covered by the
> policy issued under ss. 627.730-627.7405.

*Id.* (emphasis added).

### A.   Breach of Contract Claims

Pursuant to Florida's No-Fault Act, Plaintiff, through its rights as an MAO assignee,
asserts causes of action for breach of contract under its direct right of recovery, conventional

subrogation, equitable subrogation and conventional subrogation arising from third-party beneficiary rights.  [J.A. 000059-000091, Am. Compl.].

Plaintiff has enumerated rights pursuant to law.  One of those rights is a subrogation right pursuant to 42 C.F.R. § 411.26(a).   [J.A. 000059-000091, Am. Compl. at ¶¶ 46, 101]. "(a) *Subrogation.* With respect to services for which Medicare paid, CMS[10] is subrogated to any individual, provider, supplier, physician, private insurer, State agency, attorney, or any other entity entitled to payment by a primary payer."   *Id.*  If the primary payer – or recipient of a payment from the primary payment – fails to reimburse Medicare, despite its obligation to do so, the Act provides Medicare and MAOs with two recovery mechanisms: (1) a **right of subrogation**, to step in and assume the Medicare beneficiary's right for payment of medical bills that should have been paid by the primary payer; and (2) an independent cause of action to sue and assert its own claim against the primary payer and anybody who receives payment from the primary payer, including physicians, attorneys, medical providers, or Medicare beneficiaries themselves.  *See United States v. Stricker*, 524 Fed. Appx. 500, 504 (11th Cir. 2013); s*ee also* 42 U.S.C. §§ 1395y(b)(2)(B)(iv) and 1395y(b)(2)(B)(iii).

Further, CMS's December 5, 2011 Memorandum expresses its intent to permit MAOs the right to pursue state law claims separate and independent from a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).   *See In re Avandia*, 685 F.3d at 366.  CMS's Memorandum clarifies that MAOs can neither be "limited to seeking remedy in [s]tate court" nor be restricted to a private cause of action for double damages.   *Id.*  ("[S]everal MAOs have not been able to take private action to collect for [MSP] services under [f]ederal law because they have been limited to seeking remedy in [s]tate court.").   Here, Plaintiff may pursue its state law claims

---

[10] 42 C.F.R. § 422.108(f) ("The MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP Regulations.").

without restriction to a private cause of action and, inversely, Plaintiff is not restricted to its state law claims to seek reimbursement of medical payments made on Enrollee's behalf. *Id.* Therefore, Plaintiff is permitted to seek reimbursement pursuant to either or both theories, *i.e.* its state law claims as well as its private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

## IV. FINDINGS OF FACT AND COURSE OF THE PROCEEDINGS

### A.   Claims Background of FHCP's Enrollee, R.G.

On or about February 2, 2013, Enrollee was injured while travelling in a motor vehicle (hereinafter referred to as "accident").  [J.A. 000062, Am. Compl., ¶ 9; Pl.'s Ex. 22, *R.G. Police Report dated Feb. 2, 2013*].  The Enrollee received medical services, treatment, and/or supplies for injuries she sustained and, consequently, incurred reasonable expenses for said medical care and treatment.  [J.A. 003129:15-22, Celli Dep. May 31, 2016; J.A.002534:11-20, Celli Testimony Sept. 14, 2016].

Defendant issued a policy of insurance to Enrollee that provided PIP benefits, as well as medical and extended medical expense coverage in compliance with sections 627.730 – 627.7405, Florida Statutes.  [J.A. 002306:3-11, Celli Testimony Sept. 14, 2016].  This policy was in full force and effect at the time of the accident, and provided primary insurance coverage for Enrollee's medical expenses resulting from the accident.  [J.A. 002306:3-11, Celli Testimony Sept. 14, 2016; J.A. 004181, Pl.'s Ex. 24, *Declarations Page for R.G. dated September 26, 2014*].  At the time of the accident, Enrollee was also enrolled in an MA plan administered by FHCP, which provided Medicare benefits to Enrollee.  [J.A. 003296-003305, Pl.'s Ex. 5, *R.G. Demand Letter*].  As described in FHCP's Evidence of Coverage ("EOC"), Enrollee's MA Plan is considered the "secondary plan" in connection with medical expense coverage for the subject accident, and provided FHCP with reimbursement, recovery, and subrogation rights from a

"primary plan", *i.e.*, the Defendant. These rights are further described in the EOC and in the Code of Federal Regulations.  Plaintiff asserts that pursuant to Florida law and the Defendant's no-fault insurance policy, Defendant had a legal obligation to make primary payment for all medical services and/or supplies provided to R.G. as a result of the accident, but that Defendant failed to satisfy that obligation and, otherwise, failed to appropriately reimburse Plaintiff.  [J.A. 000064, Am. Compl. ¶ 19].

The medical services and/or supplies provided to Enrollee and the resulting medical bills charged to FHCP were necessary and reasonable, as they were provided as a result of the medical diagnosis, treatment, conditions, and/or injuries sustained in the accident. [J.A. 001531:1-25, 001532:3-14, Ruiz Testimony, June 2, 2016].  It is undisputed that the medical providers, based on their training, education, experience, and knowledge, determined the medical services and/or supplies provided were reasonable and necessary to diagnose and treat Enrollee. [J.A. 001532:3-20, Ruiz Testimony, June 2, 2016; J.A. 003149:23-25, 003150:1-9, 003151:3-17, Celli Dep., May 31, 2016].  If fact, after it determined that the medical bills and other charges were for medically necessary procedures and/or services, and in accordance with its EOC, FHCP paid the medical bills for the treatment(s) and service(s) provided to Enrollee, as a result of the accident.  [J.A. 001478:5-19, 001502:23-25, 001503:1-9, 001486:23-25, 001487:1-6, 001531:4-25, 001532:1-14, Ruiz Testimony, June 2, 2016; J.A. 000064, Am. Compl. ¶ 18].

The evidence establishes that the medical bills submitted to FHCP for Enrollee's treatment were determined to be "clean claims", meaning that the claims had no defect or impropriety and contained all of the information necessary to determine that the services rendered to Enrollee were medically necessary and the related medical bills were reasonable, and

therefore, required to be paid promptly. *See* 42 C.F.R. § 422.520(a); J.A. 001531:4-25, 001532:1-14, Ruiz Testimony June 2, 2016; J.A. 000074-000075, Am. Compl. ¶ 51].

It is undisputed that prior to initiating this action, Plaintiff's Counsel sent Defendant two letters ("Initial Letters"), dated September 18, 2014, wherein Plaintiff requested: (1) information about R.G.'s accident; and (2) a PIP Payout Sheet[11] or other Explanation of Benefits regarding the accident. [J.A. 001686:8-18, 001689:23-25, 001690:1-2, 001709:2-13, 001713:4-15, 001732:12-25, 001733:1-14, 001734:17-21, 001739:2-14, Ruiz Testimony, Sept. 12, 2016; J.A. 004174-004178, Pl.'s Ex. 23, *R.G. Request for Policy Information*]. In response to the Initial Letters, Defendant sent Plaintiff a letter dated September 26, 2014, which enclosed a copy of the Enrollee's Policy Declarations Page. [J.A. 001707:11-23, Ruiz Testimony Sept. 12, 2016; J.A. 004181, Pl.'s Ex. 24, *Declarations Page for R.G. dated September 26, 2014*].

Plaintiff's Counsel made a second request for a PIP Payout Sheet or other Explanation of Benefits regarding the accident on October 24, 2014. [J.A. 002439:21-25, 002440:1-9, Celli Testimony, Sept. 14, 2016]. In response, Defendant produced a copy of a "PIP Log", which listed benefits paid in connection with the accident. [J.A. 002434:8-23, Celli Testimony Sept. 14, 2016; J.A. 004185-004186, Pl.'s Ex. 26, *R.G. PIP Payout Sheet*].

On January 23, 2015, Plaintiff's Counsel sent Defendant a Demand Letter under 42 U.S.C. § 1395y(b)(3)(A) and section 627.736, Florida Statute, that demanded reimbursement for Enrollee's medical bills in the amount of $29,485.00.[12]   Along with the Demand Letter,

---

[11] The terms "PIP Payout Sheet" and" PIP log" refer to Defendant's "No Fault Payment Register." Under section 627.736(j), Florida Statute, "[a]n insurer shall create and maintain for each insured a log of personal injury protection benefits paid by the insurer on behalf of the insured. If litigation is commenced, the insurer shall provide to the insured a copy of the log within 30 days after receiving a request for the log from the insured."

[12] On May 20, 2016, Plaintiff filed its Notice of Defendant's Non-Compliance with Demand Letter for Reimbursement of Medicare Payments, as Defendant did not respond to Plaintiff's

Defendant also received a Notice of Lien, in which Plaintiff filed a Civil Remedy Notice of Insurer Violations against Defendant.  [J.A. 002439:9-13, Celli Testimony, Sept. 14, 2016; J.A. 003296-003305, Pl.'s Ex. 5, *Demand Pursuant to 42 U.S.C. § 1395y(b)(3)(A) and Florida Statute § 627.736*; J.A. 004188-004189, Pl.'s Ex. 27, *Notice of Lien*].  Thereafter, Defendant sent Plaintiff a second "PIP Log", which listed benefits paid to American Med-Care Centers, City of Greenacres, and MSP Recovery Law Firm, for services that were provided in connection with the accident. [J.A. 004185-004186, Pl.'s Ex. 26, *Letter Dated February, 27, 2015 and enclosed No Fault Payment Register for R.G.*]

On April 20, 2016, Plaintiff transmitted a letter to Defendant reminding it of its reporting obligations to Plaintiff under 42 C.F.R. § 411.25(a).  [J.A. 003292 – 003295, Pl.'s Ex. 4, *General Demand Letter*].  As § 411.25(a) obligates primary payers to notify CMS and MAOs, through 42 C.F.R. § 422.108(f), of any improper payment that the latter has made, Plaintiff alleges that Defendant is required to notify Plaintiff of every instance in which Plaintiff made an improper payment where Defendant should have paid.  42 C.F.R. § 411.25(a).  The record reflects that Defendant did not: (1) produce said information and (2) made no attempt to provide notice of its primary payment obligations.

## B.      Claims Background of FHCP's Enrollees I.S., S.D., and L.B.

In addition to R.G., Plaintiff provided Defendant with notice regarding the claims of three other enrollees I.S., S.D., and L.B., for which it should have provided no-fault benefits under section 627.736, Florida Statute.  These other enrollees were identified by Defendant's Claims

---

requests.  On August 25, 2016, Plaintiff filed its Second Notice of Defendant's Non-Compliance with its Demand Letter for Reimbursement. At the hearing on class certification, Plaintiff's counsel explained that both Defendant and FHCP had the wrong figures for treatment due to the accident as a result of its systems.  The correct amount, as identified by Plaintiff's system, still exceeded the amount that had to be paid by Defendant, which was capped at $10,000.00, without the application of double damages, interest and other penalty charges.

Manager Underwriting Consultant, Joseph Celli ("Celli").  [J.A. 003237:25 – 003238:1-8, Celli Dep. Aug. 24, 2016].   Particularly, Celli references the names and claim numbers of four individuals who were insured by Defendant; R.G., I.S., L.B. and S.D.  *Id*.  The evidence and testimony established that each of these enrollees, at the time of their accidents, were Medicare beneficiaries enrolled in FHCP's MA plan, which provided Medicare benefits to them.  These enrollees were also covered by Defendant's no-fault insurance policy.  [J.A. 003306 – 003309, Pl.'s Ex. 6 *S.D. Demand Letter*, J.A. 003321 – 003330, Pl.'s Ex. 8, *I.S. Demand Letter*, J.A. 003334, Pl.'s Ex. 9, *L.B. Demand Letter*; J.A. 002306:3-11, Celli Testimony Sept. 14, 2016; J.A. 002307:20-25 – 002308:1 Celli Testimony Sept. 14, 2016].  For each of these additional claims, Plaintiff sent demand letters to Defendant on the following dates: (1) for L.B., August 28, 2015; (2) for I.S., January 6, 2015; and (3) for S.D., September 11, 2014.  [J.A. 003306 – 003309, Pl.'s Ex. 6 *S.D. Demand Letter*, J.A. 003321 – 003330, Pl.'s Ex. 8, *I.S. Demand Letter*, J.A. 003334, Pl.'s Ex. 9, *L.B. Demand Letter*].

As in R.G.'s claim, Defendant failed to meet its obligation to make primary payments for all medical services provided, and failed to appropriately reimburse Plaintiff.  As to all four beneficiaries addressed herein:

1. they all were the drivers and owners of vehicles insured by Defendant.  [J.A. 003316 Pl.'s Ex. 7 – *I.S. Police Report*, 004171 Pl.'s Ex. 22 – *R.G. Police Report*, 003341 Pl.'s Ex. 12 – *L.B. MyAbility Report*, 007926 Def.'s Ex. T – *Ocean Harbor's Claim File - S.D.*];

2. each of the enrollees was involved in an automobile accident, which resulted in medical treatment[13];

3. all four enrollees were given the same medical diagnostic code by physicians who provided the medical treatment.  [J.A. 003296 – 003305, Pl.'s Ex. 4, *R.G.*

---

[13] [J.A. 008182, Def.'s Ex. GG – *Ocean Harbor's R.G. Claim File*; J.A. 007409, Def.'s Ex. R – *Ocean Harbor's Claim File – I.S.*; J.A. 007484, Def.'s Ex. S – *Ocean Harbor's Claim File – L.B.*; J.A. 007926, Def.'s Ex. T – *Ocean Harbor's Claim File – S.D.*].

*Demand Letter*, J.A. 003306 – 003309, Pl.'s Ex. 6, *S.D. Demand Letter*, J.A. 003321 – 003330, Pl.'s Ex. 8, *I.S. Demand Letter*, J.A. 003334, Pl.'s Ex. 9, *L.B. Demand Letter*];

4. the medical data consists of billing codes that physicians, pharmacies, hospitals, and other health care providers submit to payers which identify the situation that brought patients to the hospital;

5. all four enrollees had similar diagnostic codes, *e.g.*, E812.0[14] and E849.5[15]; and

6. FHCP made primary payments before Defendant in every instance;[16]

These facts further establish the commonality between R.G.'s claim and the claims of the other enrollees.

As previously indicated, R.G. was involved in an accident on Feb. 2, 2013, wherein FHCP made its first payment on April 2, 2013, and continued to make payments through April 7, 2014. However, Defendant made its first and final payment on February 26, 2015 for $9,355.30. [J.A. 008282, Def.'s Ex. GG – Ocean Harbor's R.G]. Notably, Defendant was legally responsible to exhaust $10,000.00 in medical bills pursuant to section 627.736, Florida Statute, before FHCP made its payments. Defendant failed to meets its obligation. Defendant did not make a payment until February 26, 2015, more than 700 days after Enrollee received her medical treatment.

I.S. was involved in an automobile accident on August 29, 2012. [J.A. 007456-007464, Def.'s Ex. R – *Ocean Harbor's Claim File – I.S.*]. As with R.G., FHCP was the first to pay for the medical treatment provided. However, from October 25, 2012 through March 4, 2013,

---

[14] Code E812.0 encompasses "other motor vehicle traffic accident involving collision with motor vehicle injuring driver of motor vehicle other than motorcycle".

[15] Code E849.5 encompasses "street and highway accidents."

Defendant was legally responsible for making the first payment and failed to do so.  In fact, Defendant did not make a payment until January 26, 2015, 880 days after I.S. received medical treatment.  [J.A. 007481, Def.'s Ex. R – *Ocean Harbor's Claim File – I.S.*].

S.D. was also involved in an automobile accident on June 11, 2012, wherein FHCP was the first to pay for the medical treatment provided.  [J.A. 007926, Def.'s Ex. T – *Ocean Harbor's Claim File – S.D.*].  On August 13, 2012, Defendant made its first and final payment on February 25, 2013.  Defendant was legally responsible for making the first payment and failed to do so. In fact, Defendant denied this claim and did not make any payment. [J.A. 007980, Def.'s Ex. T – *Ocean Harbor's Claim File – S.D.*].

L.B. was involved in an automobile accident on February 04, 2014.  [J.A. 007484, Def.'s Ex. S – *Ocean Harbor's Claim File – L.B.*].  FHCP made payments to L.B.'s medical providers from February 28, 2014 through June 30, 2014.  The first time Defendant made payments to L.B.'s medical providers was on April 8, 2014.  [J.A. 007907, Def.'s Ex. S – *Ocean Harbor's Claim File – L.B.*].

## V. <u>THE LITIGATION</u>

On January 26, 2015, Plaintiff filed its Complaint against Defendant wherein it alleged causes of action for: (1) double damages pursuant to 42 U.S.C. §1395y(b)(3)(A); and (2) damages.  [J.A. 000001-000042, Compl.].  After the filing of the initial lawsuit, on February 25, 2015, Defendant voluntarily paid Plaintiff the sum of $9,355.30, which represented no-fault benefits under the insurance policy, plus $41.39 in interest, and $256.69 in maximum penalty and postage.  [J.A. 002436:19-25, 002437:1-7, Celli Testimony, Sept. 14, 2016].  Thereafter, Defendant sent Plaintiff a copy of its Declarations Page dated February 27, 2016, along with a

---

16 [J.A. 003296, Pl.'s Ex. 5 – *R.G. Demand Letter*; J.A. 003306, Pl.'s Ex. 6 – *S.D. Demand Letter*; J.A. 003321, Pl.'s Ex. 8 – *L.S. Demand Letter*; J.A. 003334, Pl.'s Ex. 9 – *L.B. Demand*

"PIP Log", dated February 27, 2015, that listed benefits paid for medical services provided in connection with the accident, as follows:

    a. <u>American Med-Care Centers</u>
       $267.18, in no-fault benefits, plus $25.66 in interest

    b. <u>City of Greenacres</u>
       $377.52, in no-fault benefits, plus $33.85 in interest

    c. <u>MSP Recovery Law Firm</u>
       $9,355.00, in no-fault benefits, plus $41.39 in interest

[J.A.002436:1-25, 002437:1-25 Celli Testimony Sept. 14, 2016; J.A. 003155:5-14, Celli Dep., May 31, 2016].

Prior to receiving Plaintiff's demand for no-fault benefits, Defendant did not make any payment(s) for Enrollee's medical expenses that were incurred as a result of the accident. [J.A. 002435:1-24, Celli Testimony, Sept. 14, 2016].

On April 18, 2015, Defendant filed its Motion to Dismiss wherein it asserted Plaintiff failed to attach an assignment from FHCP to its Complaint; lacked standing to bring its action; and Plaintiff failed to attach Enrollee's insurance contract. [J.A. 000047-000048]. On December 1, 2015, Plaintiff filed an Amended Class Action Complaint ("Amended Complaint"). [J.A. 000059-000091]. In its Amended Complaint and Motion for Conditional Class Certification, Plaintiff sought to certify a class, wherein the entities directly contracted with CMS and/or its assigns, such as MAOs, HMOs, and other similar entities that made conditional payments as a secondary payer, and where Defendant failed to pay or reimburse the entities resulting in monetary damages. [J.A. 000096-000114]. Subsequent thereto, on January 26, 2016, Plaintiff filed its Motion for Substitution of Party-Plaintiff, where it provided notice that, as of November 6, 2014, MSPA Claims 1, LLC was assigned MSP Recovery's claims and

*Letter*].

causes of action subject to all the rights, title, and interest, in and to, all rights and entitlements. [J.A. 000115-000119].   Two days later, Plaintiff filed its Motion to Correct Scriveners Error to correct the date of assignment previously referred to in the Motion for Substitution of Party-Plaintiff from November 6, 2014 to November 6, 2015.  [J.A. 000120-000127].

On February 5, 2016, following a status conference, the Court entered an Agreed Order wherein it was acknowledged that, among other things, MSP Recovery was substituted by MSPA Claims 1, LLC.   [J.A. 000128-000130].   On February 22, 2016, Defendant filed an Answer to the Amended Class Action Complaint. [J.A. 000131-000132]. In its Answer to the Amended Complaint, Defendant admitted it was a primary payer of any medical bills for services and/or supplies incurred by R.G. that arose from the use, maintenance, and/or operation of a motor vehicle. [J.A. 000131 at ¶ 1].   The Defendant's Answer did not raise any affirmative defenses.  [J.A. 000131-000132].

On May 11, 2016, Defendant filed its Answer and Objections to Plaintiff's Request for Admissions.   [J.A. 000142-000151].   Defendant admitted that it issued an insurance policy to Enrollee, which provided PIP benefits in compliance with sections 627.730 – 627.7405, Florida Statutes. [J.A. 000145, Defendant's Answers and Objections to Plaintiff's First Request for Admissions, p. 4; J.A. 004181, Pl.'s Ex. 24, *Declarations Page for R.G. dated September 26, 2014*].

On June 1, 2016, Defendant filed its Response in Opposition to Plaintiff's Motion for Class Certification.  [J.A. 000206-000247].   In its response, Defendant asserted Plaintiff was not an MAO, lacked subject matter jurisdiction, lacked standing on various grounds, and failed to satisfy the requirements to certify the Class.  [J.A. 000206-000247 at ¶¶ 1, 4].   The hearing for Plaintiff's Motion for Conditional Class Certification was specially set for one day, June 2, 2016.

[J.A. 000183]. However, due to the complexity and length of the proceedings, the class certification hearing did not conclude on June 2, 2016, and the Court specially set the hearing for September 12, 2016.

On June 10, 2016, Defendant filed a Motion to Dismiss the Class Action Complaint for Lack of Subject Matter Jurisdiction, in which it argued Plaintiff's claims were subject to the exclusive jurisdiction of the federal courts.[17]   [J.A. 000248-000256].   Despite Defendant's claims, it did not seek to remove the proceedings.   After hearing arguments from both Parties, Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction was denied.   [J.A. 000323].

On July 25, 2016, Defendant filed a Motion for Leave to File Amended Answer, Affirmative Defenses, and Demand for Jury Trial wherein it sought to add thirty-seven affirmative defenses.  [J.A. 000325-000340].  Plaintiff opposed said relief for untimeliness and waiver based on Defendant's post-suit payment and Defendant's confession of judgment.  [J.A. 000341-000342]. The Court has not ruled on said Motion.

On September 7, 2016, Plaintiff filed its Reply to Defendant's Response in Opposition to Plaintiff's Motion for Class Certification.  [J.A. 000464-000494].  Plaintiff also filed its Motion to Strike Expert Reports and Testimony of Defendant's Witness, Jennifer Jordan, Motion in Limine to Exclude Expert Witness, and Motion to Disgorge Expert Witness Fees.  [J.A. 000523-000531].  Additionally, Plaintiff, on September 11, 2016, filed its Motion to Foreclose Defendant from again raising standing.

The hearing on Plaintiff's Motion for Conditional Class Certification resumed on September 12, 2016 and concluded on September 15, 2016.  Prior to the continuance of the class

---

[17] Defendant's Motion to Dismiss did not raise any argument that Plaintiff lacked standing and/or that Plaintiff was unable to demonstrate Defendant was a primary payer.  [J.A. 000248-000256].

certification hearing, the Parties exchanged information via a Secure File Transfer Protocol ("sFTP") portal.  The sFTP portal allowed for virtual storage of large documents and is only accessible to individuals with proper access credentials.  Further, this portal ensured compliance with the Health Insurance Portability and Accountability Act ("HIPAA") in order to protect the privacy and security of medical records and other personal health information.  The sFTP portal also contained documents entered into evidence at the hearing on Plaintiff's Motion for Conditional Class Certification and summarized traffic crash data compiled and prepared by Plaintiff.

Throughout the class certification hearing, the Court heard sworn testimony from: (a) John H. Ruiz, Plaintiff's witness; (b) Jennifer Jordan, Defendant's expert witness; (c) Victor Pestien, Plaintiff's expert witness; and (d) Joseph Celli, Defendant's witness.

Upon conclusion of the class certification hearing, Defendant filed its Supplemental Memorandum on the Putative Class Representative's Standing on Class Certification, which reasserted Plaintiff allegedly lacked standing.  [J.A. 000754-000766].  Thereafter,  Plaintiff filed its Response to Defendant's Supplemental Memorandum, which asserted: (1) Plaintiff had standing to pursue its claims against Defendant, since Plaintiff suffered an injury in fact that is traceable to Defendant's conduct, and Plaintiff's injury was redressable; (2) Defendant waived the affirmative defense of standing by not raising it in its responsive pleading to the Amended Complaint; (3) the Eleventh Circuit held Plaintiff had standing pursuant to its valid assignment agreements; (4) Plaintiff properly alleged a cause of action for double damages under the MSP Law; (5) Plaintiff was entitled to damages on its breach of contract claims; and (6) the dismissal in *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, was irrelevant to whether this Court could certify the Class.  [J.A. 000767-001167].

## VI. PREREQUISITES FOR CERTIFICATION PURSUANT TO RULE 1.220 AND STANDARD OF REVIEW

When determining whether to certify a class, a trial court should focus on the prerequisites for class certification and not the merits of a cause of action.  *Sosa*, 73 So. 3d at 105.  Accordingly, the Court makes no determination as to the merits of Plaintiff's claims or Defendants defenses.  Instead, it is Plaintiff's burden in seeking class certification to show that the requirements contained in Rule 1.220 have been met.  Rule 1.220(a) states that one or more members of a class may sue or be sued as representative parties on behalf of all, only if:

1) <u>Numerosity</u> – the members of the class are so numerous that separate joinder of each member is impracticable;

2) <u>Commonality</u> – the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class;

3) <u>Typicality</u> – the claim or defense of the representative party is typical of the claim or defense of each member of the class; and

4) <u>Adequacy of Representation</u> – the representative party can fairly and adequately protect and represent the interest of each member of the class.

This Rule is based on Federal Rule of Civil Procedure 23, which has been construed and applied, where appropriate, by Florida courts.  *See Broin v. Phillip Morris Companies*, 641 So.2d 888, 889 n.l (Fla. 3d DCA 1994) (finding that, as Rule 1.220 is patterned after Federal Rule of Civil Procedure 23, federal cases are persuasive authority).

Plaintiff must also satisfy the requirements of Rule 1.220(b)(1)(A), Rule 1.220(b)(2) and/or Rule 1.220(b)(3).  *See* Fla. R. Civ. P. 1.220.  To comply with Rule 1.220(b)(1)(A), Plaintiff must demonstrate that "the prosecution of separate claims or defenses by or against individual members of the class would create a risk of . . . inconsistent or varying adjudications

concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class." *See* Fla. R. Civ. P. 1.220(b)(1)(A).  Rule 1.220(b)(2) requires a showing that Defendant acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Further, Rule 1.220(b)(3) requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods to the fair and efficient adjudication of the controversy.  *See* Fla. R. Civ. P. 1.220(b)(3).

In *Sosa*, the Florida Supreme Court held that the trial court "render an order on class certification as soon as practicable, with that order separately detailing the trial court's factual findings and conclusions of law, and, if proceeding with a class, specifically designating the applicable section of rule 1.220." *Sosa,* 73 So. 3d at 117–18.  "A trial court's findings of fact are presumptively correct unless clearly erroneous."  *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1155-56 (Fla. 2014) (citing *Tobin v. Michigan Mut. Ins. Co.*, 948 So. 2d 692, 696 (Fla. 2006)).  This presumption is due to the fact that the Court must conduct a "rigorous analysis" before determining the facts that justify class certification, which may entail "[evaluating] written arguments for and against class certification…consider[ing] affidavits, deposition testimony, as well as all discovery, documentation, and court filings that constituted the entire case file." *Sosa*, 73 So. 3d at 118.

An order granting certification may be conditional and may be altered or amended before entry of a judgment on the merits of an action.  Fla. R. Civ. P. 1.220(d)(1).  "The certification of a class follows the parameters of the class action rule and the theory upon which the rule is based when the court is faced with a multiplicity of individual actions. The class action rule has a real

and meaningful position in the administration of justice to address the ever-increasing caseload burden placed upon our trial courts." *Sosa*, 73 So. 3d at 103. "To certify a class, a trial court must engage in an analysis with regard to whether the class representative and putative class members meet the requirements for class certification promulgated in Florida Rule of Civil Procedure 1.220." *Id*. at 105. "A trial court should resolve doubts with regard to certification in favor of certification, especially in the early stages of litigation." *Id*. "In undertaking the initial analysis, a trial court may look beyond the pleadings and, without resolving disputed issues, determine how disputed issues might be addressed on a classwide basis." *Id*. at 117.

## VII. FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court finds that Plaintiff has met its burden of demonstrating that the requirements of Rule 1.220 have been met, as delineated below:

### A.    Rule 1.220(a)

#### 1.    Numerosity

##### i.    *Applicable Law*

The law requires a low threshold for numerosity and does not require the identification of every single claim and every single enrollee that is a member of each MAO within the Class Period. *See Connor B. v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011) ("To satisfy [the numerosity] element, [p]laintiffs must overcome a relatively 'low threshold,' which does not impose a precise numerical requirement.").

"[C]lasses as small as 25" satisfy the numerosity requirement. *Estate of Bobinger v. Deltona Corp.*, 563 So. 2d 739, 743 (Fla. 2d DCA 1990); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (holding "generally less than [21] is inadequate, more than [40] adequate, with numbers between varying according to other factors"). Both Florida and federal

courts recognize the "relatively low threshold to meet the numerosity requirement," in which they have held that "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," then "the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).   Essentially, fewer than 100 members may satisfy the numerosity requirement.   *See George v. Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 173 (D. Mass. 2012).

Moreover, where the existence of an ascertainable class has been shown, there is no need to be able to specifically identify the individual members of the class prior to class certification. *See Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (holding that the party seeking certification does not need to establish the precise number of members of the proposed class).   "Rather, class certification is proper if the class representative does not base the projected class size on mere speculation." *Sosa*, 73 So. 3d at 114.

### ii.    *Findings of Fact and Conclusions of Law as to Numerosity*

Plaintiff and the putative class members demonstrated by substantial competent evidence the numerosity requirement, as "the members of the proposed class [are] so numerous as to make joinder impractical." *Sosa*, 73 So. 3d at 114; Fla. R. Civ. P. 1.220(a).   Plaintiff has established that the potential class includes the thirty-seven (37) MAOs administering an MA plan in Florida.   [J.A. 003886-003927, Pl.'s Ex. 19, *Florida Office of Insurance Regulation Managed Care Report – Quarterly Data Summary as of June 30, 2016*, *http://www.floir.com/siteDocuments/HMO2Q2016.pdf*; J.A. 001491:13-24, Ruiz Testimony, June 2, 2016; J.A. 001835:18-21, 001836:10-13, Ruiz Testimony, Sept. 12, 2016; J.A. 000078-79, Am. Compl. ¶65].   Additionally, each of the 37 MAOs insure thousands of Medicare

beneficiaries that are enrolled in their MA plans under Medicare Part C.  [J.A. 001560:17-22, Ruiz Testimony, June 2, 2016].

As set forth in the MSP Law,[18] each Class Member is a secondary payer of medical expenses made on behalf of a Medicare-eligible enrollee, and Defendant is a primary payer for thousands of Medicare Part C beneficiaries enrolled throughout the 37 MAOs.  [*See* J.A. 000078-79, Am. Compl. ¶65; J.A. 001492:1-5, 001493:18-25, Ruiz Testimony June 2, 2016]. Each MAO in the Class has paid claims to medical providers as a result of the injuries sustained from automobile accidents within the Class Period on behalf of a Medicare enrollee, which the Defendant should have paid or otherwise reimbursed the MAO as a secondary payer.  [*See* J.A. 001491:3-25, 001492:1-5, Ruiz Testimony, June 2, 2016].  Consequently, each Class Member MAO has hundreds of instances in which Defendant failed to provide primary payment in violation of the Medicare Secondary payer laws and section 627.736, Florida Statutes, which require for no-fault benefits to be primary, and/or reimburse the MAO when payments have been made by these secondary payers.  *See Sosa*, 73 So. 3d at 114 (finding that the plaintiff had "assuredly satisfie[d] the numerosity requirement" where the plaintiff "asserted a projected class of at least several hundred, if not thousands, of aggrieved class members").

Plaintiff obtained from the Florida Department of Motor Vehicles all automobile crash reports from 2006 through the first quarter of 2016.  [J.A. 003885, Pl.'s Ex. 18 – *Florida Crash Report Data 2006-2016*; J.A. 001836:17-25, 001837:1-12, Ruiz Testimony, Sept. 12, 2016]. Plaintiff funneled this data by searching for every instance where Defendant's enrollees were either the driver or passenger in an automobile accident that occurred between January 2009 through the first quarter of 2016.  From this subset of the data, Plaintiff identified 107 random

---

[18] *See supra* Part II. B. 4-9.

automobile crash reports and ran the information through CMS' MMSEA reporting database. [J.A. 003633 Lopez Depo., Ex. 5; J.A. 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016]. This random sample included Defendant's enrollees that were also the beneficiaries of Humana Insurance Company, Simply Healthcare Plans, Careplus Health Plans, Inc., Healthspring of Florida, Humana Medical Plan, Inc., HealthSun Health Plans, Inc, Coventry Health Plan of Florida, Coventry Summit Health Plan, Florida Healthcare Plus, Inc. [J.A. 003633 Lopez Depo., Ex. 5].[19] For 104 of these 107 selected reports, Defendant neither reported these instances to CMS nor did it know that these beneficiaries were Medicare eligible. [J.A. 001584:10-14 Ruiz Testimony, June 2, 2016, J.A. 002452:19-25, 002453:1-7 Celli Testimony, Sept. 14, 2016]. Although Defendant argued that Plaintiff failed to present evidence that supports the existence of a single actual identifiable claim, Plaintiff presented evidence that Defendant had a practice and course of conduct in failing to report to CMS, failing to identify its enrollees that are also Medicare beneficiaries, and ultimately failing to reimburse Florida MAOs. [J.A. 002326:9-25 Celli Testimony, Sep. 14, 2016; J.A. 003633 Lopez Depo., Ex. 5].

Plaintiff ultimately offered evidence of over 3,300 instances whereby Defendant's Medicare eligible enrollees were involved in Florida automobile accidents. [J.A.001303:5-12, 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony, June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016; J.A. 004191-007213, Pl.'s Exs. 28-63]. In addition, any absent Class Members may be identified from readily available data in the Parties' possession and control. [J.A. 001491:13-24, 1504:21-1505:25, Ruiz Testimony, June 2, 2016]. Collectively, the State of Florida has approximately 40% of all Medicare beneficiaries enrolled

---

[19] Any absent class members may be identified from readily available data in the Parties' possession and control. [J.A. 001491:13-24, 1504:21-1505:25, Ruiz Testimony, June 2, 2016].

in Medicare Part C plans and Miami-Dade County has approximately 60% of its Medicare population enrolled in Part C plans. *See* CMS website, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Dashboard/Medicare-Enrollment/Enrollment%20Dashboard.html (last visited October 24, 2016).  This accounts for millions of Medicare Part C Beneficiaries that are enrollees of one or more of the MAO's in Florida throughout the Class Period.  The MAO's themselves are identified and any Medicare Part C enrollee can be identified by the MAO, as well as each insured with Defendant that had an accident within the claims period where the MAO's paid for medical bills associated with an automobile accident that Defendant was required to pay or reimburse.

Based upon the evidence presented, the Court finds that Plaintiff satisfies the numerosity requirement for certification, and that the joinder of all of these claims would be impracticable.

## 2.   **Commonality**

### *i.   Applicable Law*

The commonality requirement is met when the moving party can show that the claims or defenses present common questions of either law or fact.  *Sosa*, 73 So. 3d at 107-8.  The Florida Supreme Court in *Sosa* analyzed all of the prerequisites and the quantum of proof necessary to meet the requirements for certification of a claim.  *Id.* at 107.

"The primary concern in the consideration of commonality is whether the representative's claim arises from the same practice or course of conduct that gave rise to the remaining claims and whether the claims are based on the same legal theory."  *Id*. at 107.  "The threshold of the commonality requirement is not high. A mere factual difference between class members does not necessarily preclude satisfaction of the commonality requirement. Individualized damage inquiries will also not preclude class certification."  *Id* (internal citations

omitted).  "[T]he commonality prong only requires that resolution of a class action affect all or a

substantial number of the class members, and that the subject of the class action presents a

question of common or general interest."  *Id.*  In fact, the

> commonality requirement is satisfied if the common or general interest of the
> class members is in the object of the action, the result sought, or the general
> question implicated in the action. This core of the commonality requirement is
> satisfied if the questions linking the class members are substantially related to the
> resolution of the litigation, even if the individuals are not identically situated.

*Id.* at 107-8 (internal citations omitted).

### ii.   *Common Question of Law and Fact to Determine Whether a Primary Payer has Failed to Pay or Reimburse*

In *Humana vs. Western Heritage*, the Eleventh Circuit established the necessary elements

for a claim by a secondary payer to recover against the primary payer regarding a claim where

the primary payer failed to reimburse.  *See Humana*, 2016 U.S. App. LEXIS 14509, at *21. The

court stated that a secondary payer was entitled to recover from a primary payer by establishing:

(1) the defendant was a primary payer; (2) the defendant failed to provide for primary payment

or appropriate reimbursement; and (3) damages.  *Id.*

In determining whether a primary payer is required to reimburse a secondary payer for

medical bills paid by a secondary payer for injuries resulting from the use, maintenance or

operation of a motor vehicle, this Court must determine certain questions of law consistent with

the necessary elements as enunciated in *Western Heritage*.   There is no difference for a

secondary payer to recover from a primary payer on a breach of contract claim; the only

significant difference is the imposition of double damages pursuant to the MSP Law.  The MSP

Law private cause of action was legislated to create attorney generals of anyone that had an

injury, so that the Medicare Trust Fund could be preserved and recover money that should not be

paid by a secondary payer.  *See In re Avandia Mktg.*, 685 F.3d at 365 (holding that "when MAOs

spend less on providing coverage for their enrollees, as they will if they recover efficiently from primary payers, the Medicare Trust Fund does achieve cost savings"); s*ee Citizens Ins. Co. of Am. v. United States*, 102 Fed. Cl. 733, 744 (2011) ("Congress enacted the MSPA in order to permit Medicare to recoup its own payments when it is not the primary payer, thereby reducing federal healthcare costs.").

Moreover, the Court's analysis is not limited to common questions of law; it may certify a case if the claim involves common questions of fact.   *See Sosa*, 73 So. 3d at 107-8. Accordingly, the Court finds that the questions of law and fact common to the resolution of all claims as asserted by Plaintiff, as well as the absent class members, include:

A. Did Defendant provide no-fault benefits to individual enrollees during the Class Period as advanced by Plaintiff?

B. How many of these individuals had Medicare Part C benefits through one or more of the MAOs in the State of Florida throughout the Class Period?

C. How many of the individuals with Medicare Part C benefits during the Class Period, were involved in automobile accidents wherein they incurred medical bills as a result of the use, maintenance or operation of a motor vehicle?

D. How many of the individuals that had Medicare Part C and insured by Defendant at the time of their automobile accident had their medical bills paid by the Plaintiff and/or absent class members instead of Defendant?

E. What is the amount of damages that the secondary payers would be entitled to receive as a result of the failure of Defendant to pay for medical bills incurred by the Medicare Part C beneficiaries and paid by the MAO or it's assignee?

F. What is the amount of coverage for no-fault benefits extended for each of the Medicare Part C beneficiaries by Defendant?

G. What was the amount of coverage available to the Medicare Part C enrollee as afforded by Defendant to pay for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle?

H. What were the applicable coverage dates of the policy of insurance providing no-fault benefits to the Medicare Part C enrollee?

I.  Was the Medicare Part C enrollee the driver, passenger, or non-motorist at the time of the accident?

J.  Did the driver, passenger or non-motorist own a vehicle that was required to carry security pursuant to sections 627.733 – 627.736, Florida Statutes?

K.  If the driver, passenger or non-motorist did not own a vehicle which was required to carry security, did they live with a resident relative who owned a vehicle which was required to carry security?

L.  Which vehicle was the driver or passenger occupying, at the time of the accident, if the driver or passenger did not own a vehicle which was required to carry security and did not reside with a relative who owned a vehicle required to carry security?

M.  Which vehicle struck the non-motorist at the time of the accident, if the non-motorist did not own a vehicle which was required to carry security and did not reside with a relative who owned a vehicle required to carry security?

N.  Did the Medicare Part C Enrollee incur medical bills which the primary payer should have paid?

O.  Was the Medicare Part C MAO charged for medical bills which were the responsibility of the primary payer?

P.  Did the Medicare Part C MAO pay for medical bills which were the responsibility of the primary payer?

Q.  Has the primary payer reimbursed the Medicare Part C MAO for medical bills which were the responsibility of the primary payer?

R.  What is the total amount of damages that the primary payer must pay the Medicare Part C MAO as the reimbursement amount?

### iii.  Findings of Fact and Conclusions of Law as to Commonality

As set forth below, Plaintiff's claims arise from the same practice, course of conduct in Defendant's claims processing procedure, and methodology are based on the same legal theory. *See Sosa*, 73 So. 3d at 107 (finding commonality where the plaintiff's claims "arose from the same course of conduct and routine billing practice by [defendant] and were based on the same legal theory").

### a.     Defendant's Common Practice and Course of Conduct

Plaintiff has established by substantial competent evidence that Defendant's common

practice and course of conduct in processing no-fault claims pertaining to any and all of its

claims within the Class Period is the same. Specifically, Defendant processes its no-fault claims

by:

A. maintaining PIP payout sheets that contain identical fields [J.A. 003272, Pl.'s Composite. Ex. 1; J.A. 001686:8-001687:4, 001699:21-25, 001700:1-8, Ruiz Testimony Sept. 12, 2016; J.A.002349:7-20, 002353:15-25, Celli Testimony September 14, 2016], including, but not limited to, the following fields: name of the claimant; date of birth; claim number; date of loss; coverage status; deductible amount; provider number; service dates; billed amount; bill date of receipt; and paid amount [J.A. 001690:3-001694:9, Ruiz Testimony September 12, 2016; J.A.002349:7-25 Celli Testimony September 14, 2016; J.A. 003272, Pl.'s Composite Ex. 1];

B. maintaining the information in its PIP payout sheets in electronic format, both the field titles and data within the fields [J.A. 002353:15-19, Celli Testimony Sept. 14, 2016];

C. maintaining insurance "declarations pages" that contain identical fields and data within the fields, including, but not limited to:  name of the insured; address of the insured; policy period; year, make, and model of the vehicle; vehicle identification number; personal injury protection coverage status; amount of coverage; and deductible amount [J.A. 002354:15-21, 002355:14-25, 002356:1-8, 002357:4-20, 002358:18-24, Celli Testimony Sept. 14, 2016 ;

D. maintaining the information in its "declarations page" in an electronic format, which can be recreated [J.A. 001686:8-25; 001687:1-4, Ruiz Testimony Sept. 12, 2016; J.A. 002359:14-16, Celli Testimony Sept. 14, 2016];

E. maintaining the information in its "explanation of benefits" in an electronic format, which can be recreated [J.A. 002359:17-21, Celli Testimony Sept. 14, 2016];

F. has knowledge of its obligation to report to CMS regarding the Medicare eligibility of its injured insureds [J.A. 003186:24-25, 003187:1, Celli Dep. May 31, 2016; J.A.002535:8-12, Celli Testimony Sept. 14, 2016];

G. sending form letters to its insureds to inquire whether they are Medicare eligible, which are limited to inquiring only about Medicare Part A, Part B, and group health insurance, and not Medicare Part C (*i.e.*, Medicare

Advantage) [J.A. 003287, Pl.'s Ex. 3 – *R.G. Reporting Compliance Letter*; J.A. 002313:9-25, 002314:1-6, 002321:2-6, 002536:6-19, Celli Testimony Sept. 14, 2016.; J.A. 003130:8-13, 23-25, 003131:1-10, Celli Depo May 31, 2016];

H. only reporting to CMS if its insured informs it of its Medicare eligibility [J.A. 001598: 2-23, Ruiz Testimony June 2, 2016; J.A. 003094:14-25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016];

I. using ISO in order to satisfy its Medicare reporting responsibility [J.A. 002326:2-8, 14-25, 002327:1-2, Celli Testimony Sept. 14, 2016.];

J. failing to utilize any specific guidelines for determining whether or not its insureds are Medicare eligible.   [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016]. In fact, Defendant processes claims involving its Medicare eligible insureds no different than the claims involving its non-Medicare eligible insureds. [J.A. 001390:7-21, Celli Testimony June 2, 2016; J.A. 003090:7-19, Celli Dep. May 31, 2016];

K. Joseph Celli, Defendant's claims adjuster, admitted he makes the final determination as to whether medical treatment is reasonable, related, or necessary as a result of the use, maintenance, or operation of a motor vehicle [J.A. 003144: 12-17, Celli Dep. May 31, 2016]. As it pertains to the car accident of R.G., Mr. Celli agreed that all the medical bills that were submitted to the Defendant were reasonable, related and necessary. [J.A. 003129: 15-19, Celli Dep. May 31, 2016];

L. not requiring its insureds to provide social security numbers [J.A. 002345:1-13, Celli Testimony Sept. 14, 2016] or maintaining a guideline or protocol to determine whether an insured of the Defendant, making a PIP claim, was also a Medicare beneficiary.   [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016];

M. not performing paper reviews [J.A. 002342:4, Celli Testimony Sept. 14, 2016];

N. routinely failing to notify CMS about every instance in which it receives a no-fault claim from a Medicare beneficiary.  [J.A. 003094:14-25, Celli Depo May 31, 2016]; and

O. only informing CMS of its insured's Medicare eligibility if it is made aware that its insured is Medicare eligible. [J.A. 003094:25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 001598:2-23, Ruiz Testimony June 2, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016].

   **b.**  ***There is a Common and General Interest as to Both the Law and Facts as it Pertains to the Class Representative and the Absent Class Members Claims***

  Plaintiff demonstrated by substantial competent evidence that the questions of common or general interest apply to all class members, *i.e.*, the right to reimbursement for payments made for Medicare enrollees' medical expenses.  *See W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *21 (finding "the primary plan's failure to make primary payment or to reimburse the MAO causes the MAO an injury in fact.  Therefore, an MAO may avail itself of the MSP private cause of action and/or state law claims when a primary plan fails to make primary payment or to reimburse the MAO's secondary payment."). Defendant is primarily responsible in all instances when there is a Medicare beneficiary that has been involved in a car accident and incurred medical expenses.  [J.A. 002458:22-25, 002459:3-6, 002462:17-23, Celli Testimony Sept. 14, 2016].

   **c.**  ***Similar Interest in Relief Sought and Common Right of Recovery***

  Plaintiff demonstrated by substantial competent evidence that the Class Members have a similar interest in the relief sought and a common right of recovery, *i.e.*, reimbursement for payments made as a result of Defendants' failure to comply with section 627.736, Florida Statutes, and 42 U.S.C. § 1395y(b)(3)(A). [J.A. 001470:16-25, 001471:1-5, Ruiz Testimony June 2, 2016; J.A. 002123:19-25, 002124:1-5, Jordan Testimony, Sept. 13, 2016].

   **d.**  ***Common Issues to All Class Members***

  Defendant's conduct raises common issues of law and fact, affecting all Class Members, mainly the: (1) defendant's status as primary plan; (2) defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages amount.  *W. Heritage Ins. Co.,* 2016 U.S. App. LEXIS 14509 at *21.

### e.      Common Issues of Law as Alleged in the Amended Complaint

The Amended Complaint identifies additional questions of law and fact that are common to Plaintiff's and the Class Members' claims[20], including whether:

A.      the Enrollee received emergency medical services, hospital inpatient services and/or other medical treatment or supplies as a result of the use, maintenance or operation of a motor vehicle that rendered Defendant primarily responsible to satisfy such expenses before Plaintiff and the Class were obligated to make secondary payments on behalf of the enrollee;

B.      pursuant to 42 C.F.R. § 411.25, Defendant was required to provide notice or otherwise inform Plaintiff and the Class that it is a primary payer, and to further provide specifics as to the accident or injury for which it is primarily responsible;

C.      Plaintiff and the Class are authorized to bill Defendant full charges.  *See* 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 422.108(d); *Bio-Medical Applications of Tenn., Inc. v. Cent. States S.E. & S.E. Areas Health & Welfare Fund*, 656 F.3d 277, 295-296 (6th Cir. 2011); *Humana Inc. v. Medtronic Sofamor Danek USA, Inc.*, 133 F. Supp. 3d 1068, 1078 (W.D. Tenn. 2015); and

D.      the evidence established the following relevant factors common to all members of the Class: (i) injuries to their enrollees that arose out of the use, maintenance or operation of a motor vehicle [J.A. 001488:13-25, 001584:1-22, 001598:2-25, 001599:1-4, Ruiz Testimony June 2, 2016; J.A. 003089:21-25, 003090:1, Celli Depo May 31, 2016; J.A. 003272-003283, Pl.'s Composite Ex. 1]; (ii)charges for medical treatments and/or supplies [*Id.*]; (iii) a single statute that, for all material purposes, applies to all claims [J.A. 000078, Am. Compl. ¶ 65; J.A. 002315:23-25, 002316:1-25, 002317:1-10, Celli Testimony Sept. 14, 2016]; and (iv) a single no-fault insurer, Defendant, for all the Medicare enrollees. [J.A. 001421: 11-21, Celli Testimony June 2, 2016; J.A. 003128:21-25, J.A. 003129:1-5, Celli Dep. May 31, 2016].

Accordingly, this Court finds that Plaintiff satisfied the commonality requirement.

**3.** **Typicality**

       *i.*      *Applicable Law*

"The **key inquiry** for a trial court [to] determine[] whether a proposed class satisfies the typicality requirement is whether the class representative possesses **the same legal interest** and has endured **the same legal injury** as the class members." *Sosa*, 73 So. 3d at 114; *Morgan v. Coats*, 33 So. 3d 59, 65 (Fla. 2d DCA 2010). "The test for typicality, like the test for commonality, is not demanding and focuses on the general similarity between the named plaintiff[s]' legal and remedial theories and the theories of those whom they purport to represent." *Morgan*, 33 So. 3d at 65; *see also Clausnitzer v. Fed. Exp. Corp.*, 248 F.R.D. 647, 656 (S.D. Fla. 2008) (holding that "[a]s is the case with commonality, the requirements of typicality are not high."). "Because the test for typicality is not demanding, this Court looks at the requirement in the light most favorable to the [P]laintiff[]." *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 600 (E.D. La. 2002). As held by the Florida Supreme Court,

> *[m]ere factual differences between the class representative's claims and the claims of the class members will not defeat typicality*. Rather, the typicality requirement is satisfied when there is a strong similarity in the legal theories upon which those claims are based and when the claims of the class representative and class members are not antagonistic to one another.

*Sosa*, 73 So. 3d at 114-15 (internal citations omitted) (emphasis added). Further, typicality is not defeated by differing damages among class members and their representatives. *Id.* at 115. Accordingly, the main purpose of the typicality requirement is to aid the court in its duty to protect the absent class members. *Id.* A named plaintiff's claim will be found to be typical if it arises from the same event or conduct giving rise to the claims of absent class members. *See Basco*, 216 F. Supp. 2d at 599 (holding that "[o]ne of the purposes of the typicality requirement

---

[20] *See* J.A. 000080, Am. Compl., ¶ 67.

is to ensure that the representative's interest is "aligned with those of the represented group, and in pursing his own claims, the named plaintiff will also advance the interests of the class members").

### ii. Findings of Fact and Conclusions of Law as to Typicality

Plaintiff and the putative class have similar interests in the relief they seek and their common rights of recovery, *i.e.*, reimbursement for payments made as a result of Defendant's failure to comply with 42 U.S.C. § 1395y(b)(3)(A) and section 627.736, Florida Statutes.  [J.A. 002123:19-25, 002124:1-5, Jordan Testimony Sept. 13, 2016]; *see Sosa*, 73 So. 3d at 114 (holding that the key inquiry in determining whether a class satisfies the typicality requirement is whether the class representative "possesses the same legal interest and [have] endured the same legal injury as the class members"); *see also* Fla. R. Civ. P. 1.220(a)(3).  Thus, Plaintiff's claims are typical of the Class claims, since every single class member has a right to seek reimbursement from Defendant, as it pertains to the Medicare Part C enrollees who had an accident during the claims period and for which the Class Members made payments and have not been reimbursed. *See Sosa,* 73 So. 3d at 114.

Defendant's common practice and course of conduct in processing its no-fault claims gives rise to the claims of Plaintiff and the putative class members.  *See Basco*, 216 F. Supp. 2d at 599 (holding the typicality requirement was met "because the representative plaintiffs ha[d] been affected by the same [] [pattern and] practices that affect[ed] all members of the Class"); *supra* Part VII.A.2., *Commonality*.  It is Plaintiff's theory that its rights, and those of others similarly situated, arise through the payments made by the MAOs as secondary payers, for which Defendant was primarily responsible and should have itself paid, or properly reimbursed MAOs, for their payments.   [J.A. 000081-000082, Am. Compl. ¶ 71; J.A. 001560:13-22, Ruiz

Testimony, June 2, 2016; J.A. 002101:7-11, Ruiz Testimony, Sept. 13, 2016; J.A. 002458:22-25;

002459:3-4; 002460:17-21, Celli Testimony, Sept. 13, 2016; J.A. 002462:18-23, Celli Testimony

Sept. 14, 2016].

As such, Plaintiff's interest is "aligned with those of the represented group, and in

pursing [its] own claims, the [] [P]laintiff will also advance the interests of the class members."

*See Basco*, 216 F. Supp. 2d at 599.  The Court thereby finds that Plaintiff satisfied the typicality

requirement for class certification, as:  (1) Defendant is an insurance company that provides no-

fault coverage to Medicare Part C enrollees [J.A. 000131 at ¶ 1 Defendant's Answer to Amended

Class Action Complaint]; (2) Defendant is a primary payer in the event that a Medicare Part C

enrollee is injured in an automobile accident and incurs medical expenses due to personal

injuries [J.A. 002459:3-6, Celli Testimony Sept. 14, 2016; J.A. 000131 at ¶ 1]; and (3) Plaintiff's

assignor and class members are secondary payers that seek reimbursement from Defendant for

conditional payments made, which should have been paid by Defendant as a primary payer [J.A.

001478:5-19, 001502:23-25, 001503:1-9, 001486:23-25, 001487:1-6, 001531:4-25, 001532:1-

14, Ruiz Testimony, June 2, 2016; J.A. 000064, Am. Compl. ¶ 18].  Further, Defendant also

allegedly violated 42 U.S.C. § 1395y(b)(3)(A) and section 627.736, Florida Statute, by failing to:

    a. determine whether Plaintiff and the Class Members' enrollees were Medicare beneficiaries [J.A. 002311:14-18, 25, 002312:1-22, Celli Testimony Sept. 14, 2016;

    b. pay for Plaintiff and the Class Members' enrollees' medical expenses stemming from an automobile accident [J.A. 002457:16-22, 25, 002458:4];

    c. notify Plaintiff and the Class Members made payments that they should not have pursuant to 42 C.F.R. § 411.25(a) [J.A. 002456:6-25, Celli Testimony Sept. 14, 2016]; and

    d. reimburse Plaintiff and the Class Members for the payment of medical expenses of Medicare Part C enrollees stemming from an automobile accident [J.A. 002460:3-8, Celli Testimony Sept. 14, 2016.

As a result, Plaintiff and the absent class members all have identical rights pertaining to the causes of action that may be pursued to obtain reimbursement from Defendant, as a primary payer.   As asserted in the Amended Complaint, Plaintiff's claim under 42 U.S.C. § 1395y(b)(3)(A), and breach of contract claim for Defendant's failure to pay PIP benefits' claims are typical of the causes of action that would be asserted by every absent class member.   [J.A. 000085-000091, Am. Compl.].   Thereby, the typicality requirement is satisfied.

### 4. <u>Adequacy of Representation – Class Counsel and Class Representative</u>

#### i. *Applicable Law*

"[T]he Constitution's Due Process Clause and the rules of class action procedure both insist that the class be 'adequately' represented."  Newberg on Class Actions § 3:50 (5th ed.); *see also Grosso v. Fid. Nat. Title Ins. Co.*, 983 So. 2d 1165, 1170 (Fla. 3d DCA 2008) (holding that "[b]ecause the certification of a class and settlement of the class representative's claims will ultimately bind absentee class members, there are constitutional due process implications which must be satisfied.")   "A trial court's inquiry concerning whether the adequacy requirement is satisfied contains two prongs. The first prong concerns the qualifications, experience, and ability of class counsel to conduct the litigation. The second prong pertains to whether the class representative's interests are antagonistic to the interests of the class members." *Sosa,* 73 So. 3d at 115 (internal citations omitted). "The relationship between the class and class representatives must be free from conflicts of interest, and the adequacy analysis serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Grosso*, 983 So. 2d at 1173 (internal quotations omitted).   However, "the existence of minor conflicts alone will not defeat a party's claim to class certification; ***the conflict must be a 'fundamental'*** one going to the specific issues in controversy."   *United Wis. Servs. v. Abbott Labs. (In re Terazosin*

*Hydrochloride Antitrust Litig.)*, 220 F.R.D. 672, 688 (S.D. Fla. 2004) (emphasis added).   The

Plaintiff and its counsel in the instant matter have met these legal standards.

### ii.      Findings of Fact and Conclusions of Law as to Adequacy

#### a.      Adequate Class Counsel

##### 1.      Plaintiff's Counsel Possesses Sufficient Experience and Resources to Serve as Class Counsel.

Plaintiff established that John H. Ruiz, Frank C. Quesada, and Gonzalo Dorta have the

experience, resources, and commitment to prosecute this case vigorously to a successful

resolution[21] as they possess:

a.   the requisite knowledge and experience in the MSP Law necessary to prosecute this case by virtue of their representation and active participation in other significant cases [*MSP Recovery, LLC v. Allstate Ins. Co.*, 26 Fla. L. Weekly Fed. C738 (U.S. 11th Cir. August 30, 2016); Brief for MSP Recovery, LLC as Amicus Curiae, *W. Heritage Ins. Co.*, 26 Fla. L. Weekly Fed. C591 (U.S. 11th Cir. August 8, 2016)];

b.   the financial resources necessary to prosecute this case.   [J.A. 001509:12-24 001510:1-5 Ruiz Testimony, June 2, 2016; 001838: 10-15 Ruiz Testimony Sept. 12, 2016]; and

c.   the personnel and staff to litigate this case. [J.A. 001507: 3-25 Ruiz Testimony, June 2, 2016].

In addition, attorney John H. Ruiz has successfully certified a substantial number of no-

fault class action cases that were later affirmed by the Third District Court of Appeal.   [J.A

003284, Pl.'s Ex. 1 *(June 2, 2016 Hearing) Previous Cases Certified by Class Counsel*; J.A.

001449:8-25, 001454:24-25, 001455:1-25, 001530:2-16, Ruiz Testimony, June 2, 2016].   A

substantial number of these cases received final settlement approval from the court finding the

settlements to be fair, reasonable, and adequate to the class members. Moreover, Mr. Ruiz and

Mr. Quesada have substantial experience litigating MSP cases, serving as counsel for multiple

---

[21] [J.A. 001449:8-25, 001452:24-25, 001453:1-17 Ruiz Testimony, June 2, 2016; 004085:4-5, Pl.'s Ex. 20, *Jenifer Jordan Deposition Tr.*].

significant cases decided by the Eleventh Circuit and Third District Court of Appeal.  Finally, Mr. Dorta has extensive trial practice in complex commercial litigation, and he has served as lead trial counsel in various public interest class action claims.  Accordingly, the evidence established that Plaintiff's Counsel is uniquely qualified to effectively represent the proposed class and hence, is adequate counsel to prosecute this class action.

### b. Adequate Class Representative

#### 1. Plaintiff's Interests Are Parallel to The Interests of The Class Members.

By assignment, Plaintiff is the owner of FHCP's and other MAOs' reimbursement claims, and seeks class certification to enforce the reimbursement rights of the Class for medical payments made on behalf of its Medicare enrollees.  [J.A. 003465:6-10 Jorge Lopez Depo. Tr., Aug. 31, 2016; 003540:12-16 Stipulation of Ruiz at Lopez Dep; 001460:21-25, 001461:1-7, 001520:19-25, 001521:1-5 Ruiz Testimony, June 2, 2016 Tr.].  Plaintiff demonstrated that it is "willing and able to take an active role as class representative and advocate on behalf of all class members."  *See Sosa*, 73 So. 3d at 115; *but cf. Weinberger v. Jackson*, 102 F.R.D. 839, 844 (N.D. Cal. 1984) (holding that "[p]ersonal qualifications or motives of the proposed class representative are not determinative of the adequacy of the representative").  For instance, Attorney Jorge A. Lopez, as the corporate representative of Plaintiff, MSPA Claims 1, LLC, testified that MSPA's interests are aligned with and consistent with those of the putative class member MA Organizations. Mr. Lopez also testified that MSPA Claims 1, LLC retained Mr. Ruiz, Frank C. Quesada, MSP Recovery Law Firm, Gonzalo Dorta, and Dorta Law to represent its interests in this action. Mr. Lopez actively cooperates with Plaintiff's Counsel to protect the best interests of the absent class members and their reimbursement claims. [J.A. 001469: 1-17 Ruiz Testimony June 2, 2016; see also Deposition of Jorge Lopez].

Defendant has argued that Mr. Ruiz is too closely related to the Plaintiff, and that Mr. Ruiz has significant financial interests at stake in this litigation. [J.A. 000234 Def.'s Response in Opposition to M. for Class Cert., 001472;1-25 Ruiz Testimony, June 2, 2016]. However, "to question [Plaintiff's] adequacy is to be unrealistic about the role of the class representative in a class action suit …. [T]he class action suit … is in fact entirely managed by class counsel. For 'class action attorneys are the real principals and the class representative/clients their agents' in class action suits." *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013). "It has long been understood that class counsel control class actions, perhaps even selecting the class representatives themselves, thereby reversing, not inscribing, the standard attorney/client relationship. Newberg on Class Actions § 3:52 (5th ed.); *see also New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (holding that "[e]xperience teaches that it is counsel for the class representative, and not the named parties, who direct and manage these actions."). Furthermore, the Southern District of Florida has held that "but for [the] requirement that there be a named class representative", where "proving either Plaintiff's case or that of other class members, [] will [] be established through expert testimony based on [] computer data", "[the] [p]laintiff is basically irrelevant to the case." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 697 (S.D. Fla. 2015). Such is the case here, where as described at length below, Plaintiff has the ability to prove its case and that of the other class members, using computer data and analysis.

Plaintiff also demonstrated that there is no hostility of interests between Plaintiff and the Class Members, as Plaintiff has no objectives that are antagonistic to the claims of the Class Members it seeks to represent and/or claims it will pursue. On the contrary, Plaintiff demonstrated that its interests are parallel to the interests of the Class Members and that it seeks

the same relief for itself as it does for the Class. [J.A. 001470: 16-25, 001471; 1-5 Ruiz

Testimony, June 2, 2016; 003547:16-25, 003548:10 Lopez Dep.].

## 2.      Absence of Any Fundamental or Substantial Conflicts.

Defendant alleged the existence of potential conflicts of interest between Plaintiff and its

counsel, which they contended render Plaintiff an inadequate class representative.  The Court is

unpersuaded by this assertion.

"A named class representative and [its counsel] serve[s] the class in a fiduciary capacity because

class plaintiffs undertake the litigation to protect and benefit the dependent class members they

serve." *Grosso*, 983 So. 2d at 1173.  However, (t)he existence of minor conflicts alone will not

defeat a party's claim to class certification; ***the conflict must be a 'fundamental'*** one going to

the specific issues in controversy."   *In re Terazosin*, 220 F.R.D. at 688 (emphasis added).

As the Southern District of Florida explained, the Defendant has the burden of proving

the existence of a conflict.

> Class certification cannot be defeated merely because Defendants assert
> unsupported allegations of conflict between potential class members. ***When
> Defendants come forward with an alleged conflict, the Court must scrutinize
> the record citations Defendants cite to determine whether such evidence
> establishes the existence of a conflict, or whether it provides a basis for the
> Court to imply that a realistic possibility of antagonism exists***.

*Id. at* (emphasis added).

> A fundamental conflict exists where some party members claim to have been
> harmed by the same conduct that benefitted other members of the class. In such a
> situation, the named representatives cannot 'vigorously prosecute the interests of
> the class through qualified counsel' because their interests are actually or
> potentially antagonistic to, or in conflict with, the interests and objectives of other
> class members.

*Id*. at 688.  Further, "perfect symmetry of interest is not required and not every discrepancy

among the interests of class members renders a putative class action untenable . . . . Put another

way, to forestall class certification *the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole*." *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012) (emphasis added) (rejecting Defendant's contention "that an insurmountable intra-class conflict destroys any hope of adequacy of representation").

Defendant relied on several cases for the proposition that "financial or family ties between the class representative and class counsel may cause substantial conflicts of interest". [*See* J.A. 000231-000232, Defendant's Opposition to Class Cert Mtn.]. "The primary concern in these cases is whether there is a threat the class representative may have an interest in the attorneys' fees the class counsel may ultimately receive." *Werlinger v. Champion Healthcare Corp.*, 598 N.W.2d 820, 828 (N.D. 1999). However, where "[t]here is no evidence in the record, other than the [close] relationship itself, to support a charge of collusion between counsel and the representative", there is no conflict of interest. *See id.* at 828 (explaining that there is no conflict of interest where the only evidence in the record was the familial relationship between the class representative and class counsel, as they were husband and wife). As noted by the Southern District of Florida, "[c]ourts across the country have certified classes where the lead plaintiff was closely related to class counsel — *provided that the class representative demonstrated sufficient economic or decision-making independence from class counsel to mitigate the potential for conflicted interests. Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 700 (S.D. Fla. 2015) (emphasis added).

Although Mr. Ruiz has business and financial relationships with the different entities involved in this litigation, there is no evidence on the record, other than the close relationship itself, to support a charge of collusion between Class counsel and the Class representative. Courts across the country agree that conflicts that are merely speculative or hypothetical will not

affect the adequacy inquiry.  *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 430 (4th

Cir. 2003) (holding that "[t]o defeat the adequacy requirement [], a conflict 'must be more than

merely speculative or hypothetical'"); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296

(E.D.N.Y. 1998); *Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 501-502 (S.D. Fla. 2002)

(citing *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998); *Blackie v.

Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) (noting that "courts have generally declined to

consider conflicts…sufficient to defeat class action status at the outset unless the conflict is

apparent, imminent, and on an issue at the very heart of the suit.") [22].

 Defendant's argument that there is a conflict of interest between Plaintiff's Co-Counsel,

John H. Ruiz, and the putative class was unpersuasive and rebutted by Plaintiff.  The fact that

Mr. Ruiz's son is a member of Plaintiff's parent company, MSP Recovery Services, LLC,[23]  and

owns shares in that company, along with six others, does not, without more, support the

Disqualification of Mr. Ruiz as Co-Class Counsel.  [J.A. 001456:1-25, 001457:1-25, 001458:1-

---

[22]   The Court finds no "apparent, imminent . . . issue at the very heart of the suit" affecting Plaintiff's ability to adequately represent the Class related to Plaintiff's former employee, Walter Lista, as he: (1) does not have a direct financial interest in Plaintiff; (2) is not the Class Representative; and (3) is not involved in this case, as his sole role is that of an I.T. consultant [J.A. 001526:4-17, June 2, 2016; J.A. 001526:18-20, June 2, 2016; J.A. 002043:21-25, 002044:1-25, 002045:1-9, September, 13, 2016; 002521:6-8, Response to Court Question, September 14, 2016; J.A. 001525:23-25, 001526:1-20, June 2, 2016]; *see Sosa*, 73 So. 3d at 115; *Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 505 (S.D. Fla. 2002) ("[s]imply doing business with [a person] is insufficient for [the] Court to judge [a Plaintiff's] moral character or to place blame on [a Plaintiff] for [that person's] violations of [the law].").

[23]  MSP Recovery Services, LLC owns Plaintiff, MSPA Claims 1, LLC. [J.A. 001461:20-25, Ruiz Testimony, June 2, 2016].

24, 001461:20-25, 001462:1-25, 01528:16-23, 001529:1-15 Ruiz Testimony, June 2, 2016].

MSP Recovery Services, LLC's corporate filings show that neither Mr. Ruiz nor Mr. Quesada have a direct financial interest in the Class Representative's parent company, MSP Recovery Services, LLC,. In addition, Plaintiff established that any resolution or settlement in this action would be reached with the participation and approval of Plaintiff's Counsel[24] and counsel for Plaintiff's assignor, FHCP. [J.A. 001463:19-25, 001464:1-4, Ruiz Testimony, June 2, 2016]. Further, Mr. Ruiz testified that Plaintiff and Plaintiff's Counsel entered into a contingency fee agreement whereby Plaintiff's Counsel's entitlement to attorney's fees would be contingent on whether Plaintiff prevails on the merits, which would be sought from Defendant. [J.A. 001832:9-25, 146:5, Ruiz Testimony, September 12, 2016]. Accordingly, Plaintiff "demonstrated sufficient economic or decision-making independence from Class Counsel to mitigate the potential for conflicted interests." *See Alhassid*, 307 F.R.D. at 700.

Ultimately, Defendant's principal argument is that if Plaintiff and Plaintiff's counsel has any familial, business, or otherwise close relationship with each other, and/or any financial interest in the litigation, they cannot be adequate representatives for the putative class. This argument is unpersuasive in light of Plaintiff's evidence to the contrary and is unsupported by the applicable law.

Moreover, "the addition of new and impartial counsel can cure a conflict of interest even where previous counsel continues to be involved in the case." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). "The addition of an impartial attorney ensures that vigorous prosecution of the class claims will continue. Further, this course of action protects the

---

[24] [J.A. 003541:9-15, 003542:3-13, Ruiz Stipulation, August 31, 2016 (Stipulating that a legal services retainer agreement exists between MSP Recovery Law Firm and Plaintiff, MSPA Claims 1, LLC, which: (1) establishes an attorney-client relationship between these two entities; and (2) permits hiring co-counsel)].

Class, which certainly would be prejudiced if compelled to retain new counsel, unfamiliar with the pending litigation." *E. Me. Baptist Church v. Regions Bank*, 2007 U.S. Dist. LEXIS 76430 (E.D. Mo. Oct. 12, 2007) (holding that "there is no per se rule that the continued participation by [conflicted counsel] constitutes inadequate representation under Rule 23, so long as new and impartial counsel can be added to cure the conflict of interest."). In the case at bar, Plaintiff retained Gonzalo R. Dorta to serve as co-counsel in order to avoid any potential conflict of interest between Class Counsel and the Class Members. *See Linney*, 151 F.3d at 1239. Mr. Dorta is the managing partner of Dorta Law, and he is not employed or associated in any manner with MSPA Claims 1, LLC, MSP Recovery Services, LLC, MSP Recovery, LLC or La Ley Recovery, Inc. Clearly, there is no conflict between Mr. Dorta and the class representative.

Finally, Defendant's assertion that the alleged conflicts between Plaintiff's Counsel and Plaintiff will prejudice other class members fails to account for the Court's broad authority over class action settlement terms in the event of a settlement.[25] "To approve a class action settlement, the trial court must find that the agreement [is] fair, reasonable, and adequate." *Grosso*, 983 So. 2d at 1173. When making this determination, the Court must consider several factors, including, but not limited to the: (1) reaction of the class to the settlement; and (2) reasonableness of the settlement in light of the best recovery. *Id.* Further, the Court must also consider the reasonableness of attorneys' fees and costs, as well as the adequacy of notice to the class. *See id.* at 1175-76 (holding that "the reviewing court must require that notice be given to the class of the proposed attorneys' fees as well as the rest of the settlement agreement and

---

[25] The Court acts as a "gatekeeper" to the proper administration of justice in class actions. The legislature endowed courts with a broad range of authority to scrutinize settlements. Hillary A. Sale, *Judges Who Settle*, 89 Wash. U.L. Rev. 377, 390 (2011); *see* Elizabeth Chamblee Burch, *Disaggregating*, 90 Wash. U.L. Rev. 667, 678–79 (2013); *see also* Managing Class Action Litigation: A Pocket Guide for Judges, 2005 WL 5672417.

afford anyone who objects an opportunity to be heard"); *Fung v. Fla. Joint Underwriters Ass'n*, 840 So. 2d 1101, 1102 (Fla. 3d DCA 2003) (holding that "the trial court is allowed to conduct whatever investigation it feels appropriate before approving a class action settlement. Where . . . the court ha[s] a concern that the attorney's fee might be excessive, the court ha[s] the latitude to conduct whatever proceedings it [feels are] appropriate.").

### 4.    *No Conflict Representing Class Member MAOs*

Defendant alleges an existing conflict based on the presumption that, because John Ruiz previously brought suit against certain insurers, the proposed class counsel is inadequate to represent this Class. Defendant requests that the Court take judicial notice of several civil remedy notices filed by Mr. Ruiz against various insurers which may potentially be class members in the instant litigation. Defendant's argument has been rejected by many Florida courts and federal circuit courts throughout the country.

In a securities fraud action by a customer against a brokerage firm, evidence that customer's counsel had represented the brokerage firm in ten prior matters involving securities did not create a conflict of interest substantial enough to disqualify counsel from the case. *See Duncan v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 646 F. 2d 1020, 1028 (5th Cir. Unit B 1981). The Southern District of Florida also held that an attorney's prior representation of a defendant in a patent infringement suit did not preclude representation of plaintiff in the instant suit against defendant for alleged infringement of the same patents. Courts also acknowledge that a finding of inadequacy to every class counsel who may have served in an adversarial role to one or more class members would effectively eliminate class actions entirely. "The strict application of rules on attorney conduct that were designed with simpler litigation in mind might make the class-action device unworkable in many cases, the courts insist that a serious conflict

be shown before they will take remedial or disciplinary action." *Bash v. Firstmark Standard Life Ins. Co.,* 861 F.2d 159, 161 (7th Cir. 1988). Courts have also required that some evidence must be provided to support a defendant's position that a conflict of interest exists between class counsel and class representatives. *See Diakos v. HSS Sys., LLC*, 137 F. Supp. 3d 1300, 1309 (S.D. Fla. 2015) (holding that as to counsel's adequacy, "[a]bsent specific proof to the contrary, the adequacy of class counsel is presumed"). The Third District Court of Appeal has held a party lacks standing to allege a conflict of interest when that party has no privity of contract with the counsel and is not the party which could potentially be prejudiced by the alleged conflict. *See Cont'l Cas. Co. v. Przewoznik,* 55 So. 3d 690, 691 (Fla. 3d DCA 2011).

There is neither legal nor factual support for Defendant's argument that the proposed class counsel in the instant case possesses a potential conflict in representing the Class Members merely because some class members may have been involved in litigation with class counsel. The civil remedy notices Defendant relies on have no relation to the facts or law relevant to this case since they involved group health plans and not the Class Member's Medicare Advantage Plans. Further, MAOs have to contract with CMS. None of the civil remedy notices deal with Medicare benefits, Medicare beneficiaries, or MAOs. Even if the civil remedy notices had been directly related to the recovery of no-fault benefits owed to MAOs, the court in *Duncan* held that past representation in litigation directly related to the lawsuit in question is insufficient to establish a conflict. *See Duncan,* 646 F. 2d at 1028. Moreover, the court in *Bash* recognized that a class action would be reduced to a meaningless procedural device if all attorneys who may have previously represented one of the many potentially thousands of class members were found to be inadequate. *See Bash,* 861 F.2d at 161.

Defendant has presented no credible evidence of a conflict of interest between class counsel and the Class Members.  Furthermore, because there is no privity of contract between Defendant and class counsel and defendant is not the party which could potentially be prejudiced by any alleged conflict, Defendant lacks standing to challenge counsel's adequacy in this manner.

**B.      Rule 1.220(b)(3)**

In addition to meeting the preliminary requirements of Florida Rule of Civil Procedure 1.220(a), Plaintiff must also meet one of the standards under Rule 1.220(b).  Plaintiff's Motion for Class Certification is based on Rule 1.220(b)(3), which requires that questions of law or fact common to the claim of the representative party and the claims of each Class Member predominate over any questions of law or fact affecting only individual members of the Class, and that class representation is superior to other methods for the fair and efficient adjudication of the controversy.

**1.      Predominance**

***i.      Applicable Law***

Plaintiff sought certification pursuant to Rule 1.220(b)(3), which requires that the questions of law or fact common to the claim of the representative party and the claims of each member of the class predominate over any questions of law or fact affecting only individual members of the class, and that class representation is superior to other methods for the fair and efficient adjudication of the controversy.  *See Sosa*, 73 So. 3d at 111, 116. The predominance inquiry focuses on liability, not damages.  *Id*. at 113; *see also Morgan v. Coats*, 33 So. 3d 59, 66 (Fla. 2nd DCA 2010) (holding that predominance is met where "the actual claims [were] based on the same legal theories and [were] based on the same course of conduct by the [Defendant]).

"Florida courts have held that common questions of fact predominate when the defendant acts toward the class members in a similar or common way." *Sosa*, 73 So. 3d at 111. "The methodology employed by a trial court in determining whether class claims predominate over individual claims involves a proof-based inquiry. More specifically, a class representative establishes predominance if he or she demonstrates a reasonable methodology for generalized proof of class-wide impact." *Id.* at 112.

Plaintiff's claims sought to be presented on a class-wide basis are predicated on a single common theory of liability, *i.e.,* violations of section 627.736, Florida Statutes. [J.A. 000079-000080, Am. Compl. ¶¶ 66-67].

In this case, each class member's claim would require proof of the same material and substantive facts. *Sosa*, 73 So. 3d at 112. While each claim will have minor factual differences, "it is not the burden of the class representative to illustrate that all questions of fact or law are common . . . . [r]ather, the class representative must only demonstrate that some questions are common, and that they predominate over individual questions." *Id.* (citations omitted). Further, the predominance inquiry focuses on liability, not damages. Thus, if [Plaintiff was] able to prove the elements of its claims, it would necessarily be able to prove the elements of the claims of each of the other class members. The required proof, as set out in *Western Heritage*, is: "(1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount." *Humana v. W. Heritage*, 2016 U.S. App. LEXIS 14509, at *21 (11th Cir. 2016) ("[W]hen the primary insurer later pays, Medicare's prior payment will normally be a matter of ascertainable fact.") (citing *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003).

### ii.   *Factual Findings and Conclusions of Law as to Predominance*

#### a.   <u>*Defendant's Common Treatment of the Class Members*</u>

The primary focus of this case is the operation of Florida's No-Fault law and Defendant's failure to reimburse the MAOs for payments made pursuant to the MSP cause of action, as well as the state law claims.  Plaintiffs' claims are being pursued on a class-wide basis and are predicated on a single common theory of liability, *i.e.,* the defendant's failure to pay and/or reimburse, which gives rise to the Plaintiff's causes of action sounding in 1395y(b)3, as well as state law causes of action pursuant to section 627.736, Florida Statutes.  [J.A. 000079-000080, Am. Compl. ¶¶ 66-67].

Ultimately, the individual cases arise out of the same nucleus of operative facts, *i.e.*, that Defendant has uniformly failed to: (1) provide primary payment for medical expenses incurred by its insured, *i.e.* the Medicare enrollees; and/or (2) reimburse the secondary payer, the MAO, for payments provided for Medicare enrollees' medical expenses, whereby the Defendant was primarily liable causing liquidated damages.  In none of the cases, neither the beneficiary nor the primary payer contested the amount of reimbursement by exhausting administrative remedies, which are now time barred.  *See* Section VII herein, *infra*.  Each Class Member will have incurred the same type of injury proximately caused by the same Defendant based on the same general factual scenario, a failure to pay or reimburse as a primary payer for medical bills that resulted from an automobile accident during the claims period.

Defendant admittedly uses the same process every time to determine whether it should pay a claim [J.A. 002350:17-25, 002351:1-2, Celli Testimony, Sept. 14, 2016].  Defendant's process is always consistent and amounts to its common course of conduct, which includes, but is not limited to:

a) maintaining PIP payout sheets that contain identical fields, including, but not limited to: name of the claimant; date of birth; claim number; date of loss; coverage status; deductible amount; provider number; service dates; billed amount; bill date of receipt; and paid amount [J.A. 003272, Pl.'s Composite Ex. 1; J.A. 001686:8-001687:4, 001699:21-25, 001700:1-8, Ruiz Testimony Sept. 12, 2016; J.A.002349:7-20, 002353:15-25, Celli Testimony September 14, 2016; J.A. 001690:3-001694:9, Ruiz Testimony September 12, 2016; J.A.002349:7-25 Celli Testimony September 14, 2016; J.A. 003272, Pl.'s Composite Ex. 1];

b) maintaining insurance "declarations pages" that contain identical fields and data within the fields, including, but not limited to:  name of the insured; address of the insured; policy period; year, make, and model of the vehicle; vehicle identification number; personal injury protection coverage status; amount of coverage; and deductible amount [J.A. 002354:15-21, 002355:14-25, 002356:1-8, 002357:4-20, 002358:18-24, Celli Testimony Sept. 14, 2016 ;

c) sending form letters to its insureds to inquire whether they are Medicare eligible, which are limited to inquiring only about Medicare Part A, Part B, and group health insurance, and not Medicare Part C (*i.e.*, Medicare Advantage) [J.A. 003287, Pl.'s Ex. 3 – *R.G. Reporting Compliance Letter*; J.A. 002313:9-25, 002314:1-6, 002321:2-6, 002536:6-19, Celli Testimony Sept. 14, 2016.; J.A. 003130:8-13, 23-25, 003131:1-10, Celli Depo May 31, 2016];

d) only reporting to CMS if its insured informs it of its Medicare eligibility [J.A. 001598: 2-23, Ruiz Testimony June 2, 2016; J.A. 003094:14-25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016];

e) using ISO in order to satisfy its Medicare reporting responsibility [J.A. 002326:2-8, 14-25, 002327:1-2, Celli Testimony Sept. 14, 2016.];

f) failing to utilize any specific guidelines for determining whether or not its insureds are Medicare eligible.   [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016]. In fact, Defendant processes claims involving its Medicare eligible insureds no different than the claims involving its non-Medicare eligible insureds. [J.A. 001390:7-21, Celli Testimony June 2, 2016; J.A. 003090:7-19, Celli Dep. May 31, 2016];

g) not requiring its insureds to provide social security numbers [J.A. 002345:1-13, Celli Testimony Sept. 14, 2016] or maintaining a guideline or protocol to determine whether an insured of the Defendant, making a PIP claim, was also a Medicare beneficiary.  [J.A. 001390:22-25, 001391:1-9, Celli Testimony June 2, 2016];

h) not performing paper reviews [J.A. 002342:4, Celli Testimony Sept. 14, 2016];

i) routinely failing to notify CMS about every instance in which it receives a no-fault claim from a Medicare beneficiary. [J.A. 003094:14-25, Celli Depo May 31, 2016].

j) only informing CMS of its insured's Medicare eligibility if it is made aware that its insured is Medicare eligible. [J.A. 003094:25, 003095:1-3, Celli Dep. May 31, 2016; J.A. 001598:2-23, Ruiz Testimony June 2, 2016; J.A. 002543:11-24, Celli Testimony Sept. 14, 2016].

Accordingly, the Court finds that common issues of law and fact concerning liability and causation involved in the action clearly predominate over issues of individual concern.

**b.    _Reasonable Methodology for Generalized Proof of Class-Wide Impact_**

Using a software system (the "MSP System" or "System") designed and developed by Plaintiff and its counsel, Plaintiff has demonstrated by substantial evidence that it implemented a methodology to capture, compile, synthesize and funnel large amounts of data in order to identify claims class-wide.  [J.A. 001480:13-25, 001481:1, 6-11, 001503:4-22, Ruiz Testimony, June 2, 2016; J.A. 002076:16-24 Celli Testimony, Sept. 13, 2016].  This System captures data from different sources to identify the Class-Member enrollees' medical expenses incurred as a result of an automobile accident and which should have been paid for by Defendant. The System can also identify the amounts owed by using the Defendant's electronic data, the MAO's data, and data acquired from outside sources like the Department of Motor Vehicles, ISO and CMS. [J.A. 001484:13-18, Ruiz Testimony, June 2, 2016; J.A. 002000:15-25, 002001:1-3, Ruiz Testimony, Sept. 13, 2016].  The evidence presented demonstrated that the System captures and manages the following types of data:

a.    CMS reports [J.A. 001481:6-11, Ruiz Testimony, June 2, 2016];

b.    Florida Department of Motor Vehicles automobile crash reports [J.A. 001709:7-

13, Ruiz Testimony, Sept. 12, 2016];

c.     offense incident reports [J.A. 001776:6-12, Ruiz Testimony, Sept. 12, 2016];

d.     ambulance records [J.A. 001481:6-11, Ruiz Testimony, June 2, 2016];

e.     insurance declaration sheets [J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016];

f.     no-fault PIP payout sheets [J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016];

g.     explanation of benefits [J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016]; and

h.     ISO reports [J.A. 001776:6-12, Ruiz Testimony, Sept. 12, 2016].

Plaintiff merges the Defendant's own data with the information available on the MSP System to discover and identify a Medicare eligible person for whom primary medical payments should have been made, along with any information stored as to potential class members. [J.A. 001440:10-24, 001502:23-25, 001503:1-3, 001596:17-25, 001597:1-14, Ruiz Testimony, June 2, 2016].   Although "every health plan has its own nomenclature, so all of the fields are different[,]" the MSP System stores and manages numerous fields of data to differentiate the data received from various MA Plans, such as United, Coventry, and Florida Healthcare Plus to organize the mass amount of information gathered.   [J.A. 001487:18-25, 001488:1-12, Ruiz Testimony, June 2, 2016].

### *1.   Plaintiff's Use of ICD and CPT Codes*

Plaintiff's claims analysis methodology utilizes International Classification of Diseases Codes ("ICD Codes") and Current Procedural Terminology Codes ("CPT Codes") commonly used in the healthcare and automobile insurance industries, [45 C.F.R. § 162.1002; J.A. 002359:22-002360:5, Celli Testimony, Sept. 14, 2016], to identify and obtain any information regarding an enrollees' underlying case, such as the type of injury suffered, the circumstances that caused the injury, whether the listed primary insurance provider made payment, and whether

the insurance carrier was a no-fault provider.  [J.A. 002000:11-23, 002003:10-22, 001596:17-23, Ruiz Testimony, June 2, 2016].

The "International Classification of Diseases" ("ICD") is "the standard diagnostic tool for epidemiology, health management and clinical purposes." [http://www.who.int/classifications/icd/en/  (last  visited  Oct.  24,  2016)].  ICD  codes  are promulgated by the World Health Organization and have been adopted by over 100 countries, and is available in 43 languages.[26]  Use of the ICD codes allows for the standardization of defining and reporting health conditions and diseases.  *Id.* ICD-9 and ICD-10 codes indicate the type of treatment the Enrollee received and, as such, are the same codes commonly used across the nation to decipher the medical services and/or supplies provided to an enrollee as a result of a car accident.  [J.A. 002171:5-25, 002172:1-9, Celli Testimony, Sept. 13, 2016].

Current Procedural Terminology, commonly known as CPT codes, are five digit codes with brief descriptions of more than six thousand medical procedures.[27]  CPT codes pertain to whether an enrollee received lab work or imaging. However, typically the CPT codes related to an automobile accident will be consistent.  [J.A. 002169:16-25, 002170:1-7, Celli Testimony, Sept. 13, 2016].

### 2. Plaintiff's Use of CMS Data

---

[26]  World  Health  Organization  [WHO].  2010a.  History  of  development  of  the  ICD. http://www.who.int/classifications/icd/en/HistoryOfICD.pdf (last visited Oct. 24, 2016).

[27] In 1977, Congress instructed the Health Care Financing Administration ("HCFA") to establish a standardized system to identify physicians' services for Medicare and Medicaid claim forms. HCFA contracted with the American Medical Association to "adopt and use" the CPT codes. HCFA agreed "not to use any other system of procedure nomenclature . . . for reporting physicians' services" and to require use of the CPT in programs administered by HCFA, its agents, and by other agencies whenever possible.  *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 517-18 (9th Cir. 1997) (internal citations omitted).

Plaintiff's claims analysis methodology uses the Ability[28] software system.[29]   Access to this software system allows Plaintiff to determine whether a primary plan[30] is in compliance with reporting requirements pursuant to 42 U.S.C. § 1395y(b)(8) and 42 C.F.R. § 411.25. [J.A. 001540:17-25, 001541:1-18, Ruiz Testimony, Sept. 13, 2016; J.A. 003340-003350, Pl.'s Ex. 12, *L.B. MyAbility Report*; J.A. 003351-003361, Pl.'s Ex. 13, *R.G. MyAbility Report*]*;* J.A. 003362-003372, Pl.'s Ex. 14, *S.D. MyAbility Report*].   These reporting requirements:

> help[] CMS determine when other insurance coverage is primary to Medicare, meaning that it should pay for the items and services first before Medicare considers its payment responsibilities . . . . Upon receipt of this information, CMS checks whether the injured party associated with the claim report is a Medicare beneficiary, and determines if the other insurance is primary to Medicare. CMS then uses this information in the Medicare claims payment process and, if Medicare paid first when it should not have, uses it to seek repayment from the other insurer or the Medicare beneficiary.

[https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html (last visited Oct. 19, 2016)].   A primary payer's failure to comply with these reporting requirements results in the primary provider not being found in the government's records and hence, prevents learning about the existence of an underlying no-fault policy.   However, in this case, Plaintiff's further investigation uncovered the fact that Defendant was Enrollee's PIP insurance carrier.   [J.A. 001494:6-12, Ruiz Testimony, June 2, 2016].

---

[28]   Ability is an authorized health information handler for CMS. CMS website, https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/ESMD/Downloads/2015esMDAnnualProgramReport10-01-2014-09-30-2015_508.pdf (last visited Oct. 27, 2016).

[29]   *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 494-95 (C.D. Cal. 2006) (standard software is a plausible method for class wide proof).

[30]   "An organization that must report under Section 111 is referred to as a responsible reporting entity (RRE) . . . . RREs include . . . no-fault insurers . . . ."   CMS (Dec. 14, 2015), https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-

Upon obtaining said data from CMS, Plaintiff used complex algorithms to place the extracted electronically stored information into separate data fields.  [J.A. 001717:3-19, Ruiz Testimony, June 2, 2016; J.A. 001826:11-20, Ruiz Testimony, Sept. 12, 2016].  The information Plaintiff obtained includes data on whether Defendant reported a claim for a Class Member's enrollee.  [J.A. 001541:11-25, 001542:1-15, 001544:18-22, Ruiz Testimony, June 2, 2016].  Plaintiff then matched the data with other publicly available data, such as, car crash reports, ISO reports, and the MAOs' claims data.  [J.A. 001481:6-11, Ruiz Testimony June 2, 2016, public available data; J.A. 001709:7-13, Ruiz Testimony, Sept. 12, 2016, car crash reports; J.A. 001776:6-12, Ruiz Testimony, Sept. 12, 2016, ISO reports; J.A. 0020000:15-25, 0020001:1-3, Ruiz Testimony, Sept. 13, 2016, MAO claims data].

### 3.  Plaintiff's Use of ISO Data

Insurance Services Office ("ISO"), is a database that stores information about property/casualty insurance risk.[31]  "ISO provides advisory services and information to many insurance companies."[32]  For example, "ISO develops and publishes policy language that many insurance companies use as the basis for their products."[33] Further, No-Fault insurance companies like Defendant use ISO ClaimSearch as its agent for CMS Section 111 reporting.[34] *See Ave T MPC Corp. v. Progressive Ins. Co.*, 851 N.Y.S. 2d 56 at *2 (N.Y.C. Civ. Ct. 2007) (citing to testimony for Progressive that described Progressive's "routine reliance" on

---

Reporting-For-Non-Group-Health-Plans/Overview.html.

[31]  Verisk Analytics, http://www.verisk.com/iso/about-iso/about-iso.html (last visited Oct. 24, 2016).

[32]  Verisk Analytics, http://www.verisk.com/iso/faq/iso-faq/frequently-asked-questions.html (last visited Oct. 24, 2016).

[33]  *Id*.

[34]  Verisk Analytics, ISO as Your Reporting Agent, http://www.verisk.com/iso/faq/iso-

information in ISO. The witness testified that she "fully incorporate[d] said information into her records made in the regular course of [Progressive's] business").

Specifically, Defendant indicated that it used ISO reports to submit information and report and investigate claims.  [J.A. 002309:1-23, 002310:5-9, 002319:1-9, Celli Testimony Sept. 14, 2016].  Defendant entered information about car crashes and their enrollees into ISO. [J.A. 002312:8-9, Celli Testimony Sept. 14, 2016].

Plaintiff's system cross-referenced the information in its possession with common source documents, such as ISO reports, that no-fault insurers and Defendant utilize by common practice and custom to find "any other claim that had been made by the Medicare beneficiary, irrespective of whether it's a slip and fall or a trip and fall, or a car accident so long as that insurance company subscribes to that service."  [J.A. 001492:18-19, 001493:8-20, Ruiz Testimony June 2, 2016].

### 4.   Plaintiff's Use of Crash and Police Report Data

Plaintiff also obtained from the Florida Department of Motor Vehicles all automobile crash reports for every automobile crash that occurred in the State of Florida from 2006 to the present.  [J.A. 001584:23-25, 001585:1-4, 001599:5-13, Ruiz Testimony June 2, 2016; J.A. 001770:2-9, Ruiz Testimony Sept. 12, 2016]. Plaintiff purchased, managed and stored police reports for any enrollee that pertained to the underlying Medicare claim incident. [J.A. 001488:18-25, 001489:1-2, Ruiz Testimony, June 2, 2016; J.A. 001776:6-12, 001770:2-9, Ruiz Testimony, Sept. 12, 2016; J.A. 003314-003320, Pl.'s Ex. 7, *I.S. Police Report*; J.A. 003885. Pl.'s Ex. 18, *State of Florida Crash Report Data*; J.A. 004167-004173, Pl.'s Ex. 22, *R.G. Police Report*].

---

faq/medicare-secondary-payer-reporting-service.html (last visited Oct. 24, 2016).

### 5. *Plaintiff's Use of PIP Related Records*

A PIP payout sheet is a document prepared by an automobile insurance company which lists, among other information, claims against the account, bills that have been paid, and deductible amounts, which would allow a medical provider to monitor available PIP benefits. *See Progressive Am. Ins. Co. v. Rural/Metro Corp.*, 994 So. 2d 1202, 1204 (Fla. 5th DCA 2008). Defendant maintains PIP payout sheets in electronic format for each of its enrollees.  [J.A. 002353:15-19, Celli Testimony Sept. 14, 2016].  Particularly, Defendant's PIP payout sheets contain information related to: claimant, date of birth, claim number, date of loss, coverage clear, deductible, no-show, and provider number. [J.A. 002349:12-17, 002350:8-25, 002351:1-25, 002352:24-25, 002353:1, Celli Testimony, Sept. 14, 2016].  Plaintiff integrated this information into its system to identify whether PIP benefits for an insured had been exhausted and whether the benefits had been paid properly.  [J.A. 001596:14-25, 001597:1-14, Ruiz Testimony, June 2, 2016; J.A. 002211:9-13, Pestien Testimony, Sept. 13, 2016; J.A. 002355:14-25, 002356:1-8, Celli Testimony, Sept. 14, 2016].

Plaintiff's ability to capture data in large volumes, and to simultaneously, categorize, normalize, and utilize the captured data, along with data from outside sources, is a common, reasonable and very effective methodology for generalized proof of class-wide impact for Plaintiff and its potential class members.  [J.A. 001474:23-25, 001475:1-9, Ruiz Testimony, June 2, 2016].

### 6. *Plaintiff's Use of Other Data Sources*

Plaintiff's System also accessed federal, state and county court dockets throughout Florida to identify additional instances in which an enrollee of Defendant or a putative class

member may be involved in a lawsuit related to a recoverable claim.   [J.A. 001494:21-25, 001495:1-6, 001497:4-11, Ruiz Testimony, June 2, 2016].

### 7.  *Class Wide Proof*

Plaintiff demonstrated it can utilize these systems to prove, on a class wide basis, Defendant's liability, as well as the amount owed for liquidated damages for Defendant's failure to pay or reimburse.  [*See* J.A. 002215: 2-14, 002216:13-19, Pestien Testimony, Sept. 13, 2016]. Plaintiff further elicited testimony from Dr. Victor Pestien, who testified that the data available could also be used to establish statistical damage amounts, as well as a methodology to be able to handle this matter class wide.  [J.A. 002217:3-4, Pestien Testimony, Sept. 13, 2016].

### 2.  <u>Superiority</u>

#### i.  *Applicable Law*

Courts consider three factors when deciding whether a class action is the superior method of adjudicating a controversy.  They are: "(1) a class action would provide the class members with the only economically viable remedy; (2) there is a likelihood that the individual claims are large enough to justify the expense of separate litigation; and (3) a class action cause of action is manageable."  *Sosa*, 73 So. 3d at 115.   In *Sosa*, the plaintiff "satisfied rule 1.220(b)(3)'s superiority requirement because a class action is the most manageable and efficient way to resolve the individual claims of each class member."  *Id.* at 116.

#### ii.  *Factual Findings and Conclusions of Law as to Superiority*

##### a.  *Summary*

###### 1.  *Economically Viable Remedy*

Since an MAO's claim may be worth as little as a few hundred dollars, the costs associated with pursuing such a claim, such as the hiring of an attorney and the costs of

purchasing necessary public record data from data vendors and the state and federal governments, would likely exceed the value of the claim and the potential recovery, hence resulting in an MAO's decision to pursue reimbursements on an individual basis very unlikely. [J.A. 001490:1-3, 001833:6-9, 001834:3-14,24-25, 001835:1, 001837:13-25, 001838:1-9, Ruiz Testimony, June 2, 2016]. Here, aggregating thousands of claims provides the Class Members with the benefit of economies of scale where the identification of claims and the pursuit of recovery costs are lower than the recoverable amounts. [J.A. 001837:13-25, 001838:1-9, Ruiz Testimony, June 2, 2016].

### 2. *Justification of Separate Litigation*

As no individual claim exceeds the statutory $10,000.00 maximum no-fault payment amount, there is no individual claim large enough to justify the expense of separate litigation considering standard attorneys fee rates in this jurisdiction and the collection costs set forth *supra*. [Fla. Stat. § 627.736(1); J.A. 001838:1-9, Ruiz Testimony, June 2, 2016].

### 3. *Manageability*

It is the custom and practice of the Parties, the State of Florida and CMS to maintain records in a detailed electronic format. [J.A. 002353:15-19, Celli Testimony, Sept. 14, 2016; J.A. 001590:17-25, 001592:11-15, 001772:11-19, Ruiz Testimony, June 2, 2016; J.A. 2000:15-18, Ruiz Testimony, Sept. 13, 2016]. Based on these practices, Plaintiff's counsel designed and developed its System to store and funnel the records and data, addressed *supra* in Section VII(B)(1)(ii)(a), *supra*, to identify the subject claims. [J.A. 001480:13-25; 001481:1, Ruiz Testimony, June 2, 2016; J.A. 002126:16-24, Celli Testimony, Sept. 13, 2016]. Accordingly, identifying and managing the claims for which the Defendant may be liable for reimbursement is automatic and only limited by the specific parameters delineated by this Court.

As the issues presented will be resolved by the review of data and by examining and interpreting Florida's No-Fault law and the MSP Law, there will be no need for fact-specific individual analysis of intent or causation, and damages will be calculated based upon the total fee-for-service amounts. *See W. Heritage Ins. Co.,* 2016 U.S. App. LEXIS 14509 at *21 ("a plaintiff is entitled to summary judgment in its favor when there is no genuine issue of material fact regarding (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount."); Fla. Stat. § 627.736, *et seq.*

Further, this case will not present manageability problems as compared to non-electronic data driven class actions. There is no need for a fact-specific individual analysis of intent or causation, and damages will be calculated based upon the total fee-for-service amounts associated with the payments made on behalf of an enrollee by an MAO. *See* Fla. Stat. § 627.736, *et seq.*

In this case, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of each Class Member would be impractical. This class action will preserve judicial resources, reduce the overall expense of litigation, streamline legal questions common to the identical legal claims of all Class Members, and result in an expeditious resolution of the claims. Furthermore, a class action will concentrate all the litigation against Defendant (based on primary payer responsibility derived from its no-fault insurance policy) in one forum with no unusual manageability problems. Moreover, Defendant's liability and the nature of the Class Members' damages may be readily proven through common class-wide proofs.

In addition, there are a number of management tools available which the Court may use to address any individualized damage issues that might arise out of a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class. *See Ouellette v. Wal-Mart Stores, Inc.*, 888 So. 2d 90, 91-92 (Fla. 1st DCA 2004).

**C.    Standing Requirements**

**1.    Injury in Fact**

A threshold inquiry in a motion for class certification is whether the class representative has standing to represent the putative class members. *See Sosa*, 73 So. 3d at 116. Particularly, to satisfy the standing requirement for class certification,

> the class representative must illustrate that a case or controversy exists between him or her and the defendant, and that this case or controversy will continue throughout the existence of the litigation. In deciding if a party has alleged a justiciable case or controversy, "the trial court is *not* required to determine the merits of the case." Rather, the trial court must determine if the class representative has alleged sufficient facts to establish a legal issue for the court's resolution.

*Id*. at 116-7. "A case or controversy exists if a party alleges an actual or legal injury." *Id*. at 117. "An actual injury includes an economic injury for which the relief sought will grant redress. That injury must be distinct and palpable, not abstract or hypothetical." *Id*. (internal citations omitted).

The Amended Complaint contains detailed allegations to establish a *prima facie* case that the Plaintiff, as assignee of FHCP's claims reimbursement rights, suffered an actual injury by having paid medical expenses as a result of the injuries suffered by Enrollee from the accident.

[J.A. 000062-000077, Am. Compl., ¶¶ 10-37].   This injury is "distinct and palpable" as FHCP made payments of Medicare benefits on behalf Enrollee, for which FHCP was not primarily liable.   As the Enrollee's no-fault insurer, Defendant was primarily liable for the payment of medical expenses for Enrollee.   *Id*.   Further, FHCP did not receive proper reimbursement from the Defendant for the payments it actually made for Enrollee's medical expenses.   Section 627.736, Florida Statutes, requires that the Defendant make primary payment in this case. Therefore, the injury suffered by Plaintiff is not a hypothetical injury but, instead, is an actual economic injury resulting from Defendant's failure to comply with its primary payer obligations under Florida's No-Fault law and as applied to the facts alleged in the Amended Complaint.   *Id*. A "primary plan's failure to make primary payment or to reimburse the Medicare Advantage Organization causes the MAO an injury in fact."   *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *26.   The injury for which Plaintiff seeks redress was caused by Defendant's conduct, and therefore, a decision in Plaintiff's favor under Counts I - IV would redress this economic injury.

However, Plaintiff must not only demonstrate individual standing, but must also "[possess] the same legal interest and [have] endured the same legal injury as the [putative] class members."   *Sosa*, 73 So. 3d at 114; *see* Fla. R. Civ. P. 1.220(a)(3).   Plaintiff possesses the same legal interest and suffered the same legal injury as the Class Members.   Thus, Plaintiff may serve as class representative since Plaintiff's claims are typical of the Class claims.

Further, the fact that Defendant made a payment after the filing of the lawsuit does not affect the Class Representative's standing to pursue these claims.   The claims as asserted would subject Defendant to double damages, as well as additional no-fault benefits for paying improperly.   *See W. Heritage Ins. Co.*,   2016 U.S. App. LEXIS 14509 at *21 ("[W]hen the

primary insurer later pays, Medicare's prior payment will normally be a matter of ascertainable fact.") (citing *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003).

If a primary plan reimburses an MAO after an MSP Law based lawsuit is filed, it does not absolve the primary plan of liability for double damages under the MSP Law. *See Estate of McDonald v. Indem. Ins. Co. of N. Am.,* 46 F. Supp. 3d 712, 717 (W.D. Ky. 2014) (holding that defendant was still liable for double damages even though it reimbursed plaintiff after the suit was filed); *Hull v. Home Depot United States*, 2016 Mich. Cir. LEXIS at *1 (Mich. Cir. Ct. 2016) ("[o]nly after the instant action was filed [that] [Defendant] finally pa[id] the amounts owed . . . . This course of conduct is not permitted in light of the clear intent and purpose of the MSP."). Moreover, Defendant paid less than its policy limit of $10,000.00 to Plaintiff for reimbursement, and the payments made to other providers other than for reimbursement also creates an issue that the Court must resolve as to Defendant's exhaustion of policy limits. *See Estate of McDonald,* 46 F. Supp. 3d at 717.

## 2.   Plaintiff's Assignments

As FHCP's assignee, Plaintiff has standing to assert the claims raised in its Amended Complaint, to pursue the claims on behalf of the Class and to pursue FHCP's reimbursement claims against Defendant as a no-fault primary payer under section 627.736, Florida Statutes. [J.A. 000075, Am. Compl., ¶¶ 52-54]. As the ultimate assignee of FHCP's rights, Plaintiff is the proper party in interest to prosecute this action.

An assignment is defined as "a transfer or setting over of property, or of some right or interest therein, from one person to another; the term denoting not only the act of transfer, but also the instrument by which it is effected." Black's Law Dictionary (7th ed. 1999). A valid and enforceable assignment requires that the: (1) assignor intended to transfer a present interest in the

subject-matter of the contract; and (2) assignor and assignee mutually assented to the assignment. *See Wingard v. Lansforsakringer AB*, 2013 U.S. Dist. LEXIS 141572, at * 52 (M.D. Ala. 2013). Florida law provides that an assignee's rights vest immediately upon the execution of an assignment, and thereafter the assignor has no further rights. *See Price v. RLI Ins. Co.*, 914 So. 2d 1010, 1013-14 (Fla. 5th DCA 2005).

The April 15, 2014 assignment from FHCP to La Ley Recovery Systems, Inc., (the "FHCP Assignment") and the subsequent assignments are valid. The FHCP Assignment gives La Ley "all of FHCP's rights" "to recover, shift, and/or bill on a fee for service for all medical services," with respect to any of FHCP's members or participants *etc*. Accordingly, the FHCP Assignment is valid, enforceable, and irrevocable. FHCP approved La Ley's assignments of its claims to its affiliates pursuant to the assignment. Specifically, La Ley assigned certain claims to Plaintiff and MSP Recovery, LLC with FHCP's approval. Accordingly, La Ley's assignments are valid.

Moreover, even if the Florida Department of Financial Services, as Receiver for FHCP ("Receiver"), had the power to terminate the vested assignments, the fact that the parties are performing under the terms of the assignments constitutes a waiver. In particular, the Receiver accepted payments in accordance of the assignments, an action that is inconsistent with termination. "Waiver is either an intentional or voluntary relinquishment of a known right, or conduct giving rise to an inference of the relinquishment of a known right." *Air Prod. & Chems., Inc. v. La. Land & Exploration Co.*, 867 F.2d 1376, 1379 (11th Cir. 1989). In view of the Receiver's acceptance of funds under the terms of the assignments, the Receiver waived its prior objections to the assignments, and neither the Receiver nor Defendant can legitimately argue that the contracts have been effectively terminated.

Notably, the Receiver expressly acknowledged and affirmed the FHCP Assignment in a settlement agreement entered into with the Plaintiff and its related entities and approved by the court in *State of Florida ex rel., the Department of Financial Services of the State of Florida v. Florida Healthcare Plus, Inc.*, Case No. 2014 CA 2762 (Leon County) on June 14, 2016 ("Order Approving Settlement").  [J.A. 003373-003374, Pl.'s Ex. 15 *Order Approving Settlement*]

The Settlement Agreement with the Receiver recognized Plaintiff as a valid assignee of FHCP's claims as of April 2014, [J.A. 003375-003445, Pl.'s Ex. 16, *Settlement Agreement*], and affirmed that Plaintiff possessed the right to recover on such claims by virtue of the FHCP Assignment.  Referring to the FHCP Assignment, the Settlement Agreement provides:

> the terms and conditions of the Initial Agreement…shall remain in full force and effect from April 15, 2014…. Receiver hereby agrees that Receiver shall not object to, or seek to terminate for any reason, the Initial Agreement, and expressly acknowledge and agrees that as of the execution of the Initial Agreement, all rights, title, and interest held by FHCP to recoveries, including any rights, title and interest held by FHCP to contractual agreements with FHCP members, related to accidents or incidents recoverable pursuant to the Medicare Secondary Payer Act…and/or any other applicable Federal or State subrogation laws…were and continue to be irrevocably assigned to La Ley.

*Id.*

In addressing the issue of whether Plaintiff has standing to bring its claims against various defendant insurance carriers based on a series of assignment agreements, in a recent opinion issued by the Eleventh Circuit, the FHCP Assignment was found to be valid and the Court held that Plaintiff had standing to bring its lawsuit.  *MSP Recovery, LLC,* 2016 U.S. App. LEXIS 15984 at *12, 14.

Despite Defendant's arguments challenging the validity of the FHCP Assignment, Defendant itself lacks standing to challenge the validity of the assignments because it is not a party to the assignments.  *See Rhodes v. JP Morgan Chase Bank, N.A.*, 2012 U.S. Dist. LEXIS

158988, at *9 (S.D. Fla. Nov. 6, 2012) (standing to challenge validity of assignment requires status as a party to that agreement); *In re Canellas*, 2012 U.S. Dist. LEXIS 33996, at *3 (M.D. Fla. Mar. 14, 2012) (holding that a party who is without privity has no standing to challenge the validity of an assignment agreement); *Altier v. Fannie Mae*, 2013 U.S. Dist. LEXIS 172214, at *9 (N.D. Fla. Nov. 8, 2013).

The Defendant's arguments challenging Plaintiff's standing, by specifically disputing the validity of the assignment agreements, have been carefully considered by this Court. Because an assignee has standing to prosecute a claim for damages[35] and because Defendant has failed to show that the assignments are invalid, the Court rejects Defendant's arguments and finds that Plaintiff has standing. *Sprint Commc'n Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269 (2008).

**VIII. In Addition to Defendant's Failure to Plead Affirmative Defenses, Any Dispute by Defendant as to Claims for Reimbursement Is Barred as a Result of Failing to Exhaust Administrative Remedies and Jurisdictional Limitations.**

**A.      Defendant is Barred from Contesting Reimbursement Amounts.**

Defendant's failure to exhaust administrative remedies via the Medicare appeals process bars Defendant from disputing Plaintiff's entitlement to reimbursement. *See Reale*, 180 So. 3d at 205); *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *24. In the *Reale* and *W. Heritage*, the Florida Third District Court of Appeal and the Eleventh Circuit established that, before a defendant may challenge a plaintiff's right to reimbursement and the amount thereof, defendant must first exhaust administrative remedies. *Id*. Only after the exhaustion of administrative remedies may the Defendant seek judicial review in federal court. *See Reale*, 180 So. 3d at 204

---

[35] A common strategy in defending class and collective actions is "picking off" named plaintiffs through offers for complete relief of their individual claim, thereby eliminating the case or controversy and rending the case "moot" before prospective members join the suit. In a recent decision, *Campbell-Ewald Co. v. Gomez*, No. 14-857, slip op. (2016), the United States Supreme Court ruled that an offer for full relief of a class representative's individual claim in a class action does not moot the case.

(holding that disputes concerning reimbursement of conditional payment must be exhausted through the administrative appeals process before an enrollee invokes judicial review in a federal court). No judicial review is available prior to the exhaustion of administrative remedies, as described herein.

### 1. Defendant Has Not and Can No Longer Exhaust Administrative Remedies.

Defendant is precluded from contesting the amount of Plaintiff's reimbursement claims. Any challenge to Plaintiff's entitlement to reimbursement "arise[s] under the Medicare Act," and Defendant or the Medicare enrollee must first proceed with an administrative appeal prior to judicial review. *See, e.g., W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *24 (holding that a primary plan must exhaust the Medicare administrative appeals process prior to disputing the amount due to an MAO); *Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653 (E.D. La. 2014) (holding that a Medicare Advantage enrollee's state court action seeking a declaration that an MAO was not entitled to reimbursement was a claim arising under the Medicare Act that must be exhausted before any judicial review); *Einhorn v. CarePlus Health Plans, Inc.*, 43 F. Supp. 3d 1329 (S.D. Fla. 2014) (holding that a Medicare Advantage enrollee's Florida Consumer Practices Act claim against an MAO for demanding reimbursement greater than what was due was a claim arising under the Medicare Act that must be brought through the administrative appeals process before it could be taken to federal court); *Cupp v. Johns*, 2014 U.S. Dist. LEXIS 30537 at *6-8 (W.D. Ark. 2014) (holding that a Medicare Advantage enrollee's Arkansas subrogation law action seeking a declaration that an MAO did not have a right to reimbursement arose under the Medicare Act, and the appropriate remedy was to go through the administrative review and appeals process required by the Medicare Act); *Potts*, 897 F. Supp. 2d 185 (holding that Medicare Advantage enrollees' action seeking declaratory judgment regarding

MAO reimbursement rights pursuant to a New York anti-subrogation statute arose under the Medicare Act and was subject to the requirements of § 405(g)); *Phillips*, 953 F. Supp. 2d at 1081 (holding that a Medicare Advantage enrollee's California consumer protection claim against an MAO seeking reimbursement was a disguised claim for benefits and arose under the Medicare Act).

Section 405(g) limits jurisdiction of claims arising under the Medicare Act to the federal courts, but only after exhaustion of administrative remedies:

> [a]ny individual, after any final decision of the [Secretary of Health and Human Services] made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.

*Id.* When read together, 42 U.S.C. §§ 405(h) and 405(g) create an exclusive review process for all claims arising under the Medicare Act, including claims brought in the context of the Medicare Advantage program.

An MAO must establish and maintain appeal[36] procedures that meet the requirements of this subpart for issues that involve organization determinations.  42 C.F.R. §§ 422.564(b), 422.111(b)(8).  When MAOs provide payment for a Medicare enrollee's medical treatment, such payment is an organization determination pursuant to the Code of Federal Regulations.  42

---

[36] *Appeal* means any of the procedures that deal with the review of adverse organization determinations on the health care services the enrollee believes he or she is entitled to receive, including delay in providing, arranging for, or approving the health care services (such that a delay would adversely affect the health of the enrollee), or on any amounts the enrollee must pay for a service, as defined under § 422.566(b). These procedures include reconsiderations by the MA organization, and if necessary, an independent review entity, hearings before ALJs, review by the Medicare Appeals Council (MAC), and judicial review.  42 C.F.R. § 422.561.

C.F.R. § 422.566(b).[37]  An MAO makes an organization determination[38] when it determines: (1) coverage for a Medicare enrollee; and (2) how much the MAO pays. 42 C.F.R. § 422.566(b); [J.A. 000686, FHCP Evidence of Coverage].  Further, an "MAO's refusal to provide or pay for services, in whole or in part" is also considered an organization determination.  42 C.F.R. § 422.566(b)(3); *see Reale,* 180 So. 3d at 205 (Fla. 3d DCA 2015) (holding that an MAO's reimbursement determination is an organization determination under 42 C.F.R § 422.566(b)(3) because it is a "refusal to . . . pay for services" where there is a primary payer).

Pursuant to 42 C.F.R. § 422.582(b), a party has sixty (60) days to contest an organization determination.  If a Medicare enrollee disagrees with the organization determination, it can appeal MAOs decision.  *See* 42 U.S.C. § 1395w-22(g); *see also, W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509 at *24 (holding that a primary plan could not contest the amount due to an MAO, as no party administratively appealed the organization determination).

The Third District Court of Appeal in *Reale* held that the Medicare Act creates an exclusive federal administrative process under which an MA plan enrollee appeals, through CMS, an MAO's denial of benefits or **request for reimbursement**.  *Reale*, 180 So. 3d 195 at 204-05.  The mandatory exhaustion requirement applies to primary plans as well.  *W. Heritage Ins. Co.*, 2016 U.S. App. LEXIS 14509, at *24.  In *W. Heritage*, a primary payer sought to

---

[37]  **(b)** *Actions that are organization determinations.* An organization determination is any determination made by an MA organization with respect to any of the following:
> **(1)** **Payment** for temporarily out of the area renal dialysis services, emergency services, post-stabilization care, or urgently needed services.
> **(2)** **Payment** for any other health services furnished by a provider other than the MA organization that the enrollee believes -
>> **(i)** are covered under Medicare; or
>> **(ii)** if not covered under Medicare, should have been furnished, arranged for, or reimbursed by the MA organization.

[38] In its Evidence of Coverage, FHCP refers to an "organization determination" as a "coverage decision."

contest the amount of reimbursement being claimed by an MAO, Humana. *Id.*  However, the Eleventh Circuit held that a primary plan cannot seek judicial review of its dispute of the reimbursement amounts due to an MAO unless it first exhausted administrative remedies.  *Id.* at *24 ("[t]he amount that [an MAO] may recover is [] fixed," as a result of the primary payer's failure to administratively appeal the reimbursement claim).  Upon exhaustion of the administrative process, the Medicare Act provides for exclusive federal judicial review and expressly preempts state law.  *Reale*, 180 So. 3d 195 at 204-05.

Here, FHCP and the putative class members' request for reimbursement arises from an organization determination under 42 C.F.R § 422.566(b)(2), as they provided "payment for [..] health services furnished by a provider other than the MA organization" where there is a primary payer.  *See Reale*, 180 So. 3d at 205.  Similar to *W. Heritage*, Plaintiff, a secondary payer, seeks reimbursement from Defendant, a primary payer, and Defendant contests the reimbursement amounts.  Defendant failed to contest any organization determination.  As all the claims sought in this matter involve historical data, the sixty (60) days have expired for an enrollee to contest an organization determination. 42 C.F.R. § 422.582(b); *Trostle*, 2016 U.S. Dist. LEXIS 143101, at *16-18 (stating that if an unfavorable decision is not administratively appealed, it becomes binding, and no final decision may be obtained which would allow for federal judicial review). "[E]xceptions do not apply . . . to a statutorily-mandated exhaustion requirement like the one involved in this case." *Cochran v. United States Health Care Fin. Admin.*, 291 F. 3d 775, 780 (11th Cir. 2002).  Therefore, Defendant is foreclosed from disputing the reimbursement amounts, as no party timely appealed the organization determination to FHCP or the other putative class member determinations.  *W. Heritage*, 2016 U.S. App. LEXIS 14509 at *24.

> i. **Even if this Court Accepts Defendant's Purported Affirmative Defense, Defendant's Arguments Continue to be Unavailing.**

Defendant failed to plead any affirmative defenses in its Answer to the Class Action Complaint.  On the eve of resuming the class certification hearing, on September 12, 2016, Defendant moved to amend its Answer to add affirmative defenses.  However, this Court has yet to rule on said amendment, but disallowed the purported defenses for purposes of class certification.  However, even if Defendant's affirmative defenses were considered, Defendant's argument would be unavailing as: (1)  Defendant would still have needed to exhaust the Medicare administrative review process prior to seeking judicial review of its dispute, as set forth *supra*; (2) Plaintiff's rights supersede any state law or regulation with respect to the MA plans that are offered by MAOs (*see* 42 C.F.R. §§ 422.402, 422.108(f)); and (3) Defendant admits that it fails to comply with section 627.736(7), Florida Statutes, to contest reimbursement. This Court already discussed Defendant's failure to exhaust administrative remedies and will now discuss other reasons why Defendant's arguments are futile.

### a.   *Plaintiff's Rights Supersede Florida's No Fault Act's Notice Requirement.*

The Code of Federal Regulations explicitly preempts any state law that takes away an MAOs right to recover conditional payments made for services for which Medicare was not the primary payer.  *See* 42 C.F.R. §§ 422.402, 422.108(f).  Particularly, section 627.736(10)(a), Florida Statutes, requires that as a "condition precedent to filing any action for benefits under this section, written notice of an intent to initiate litigation must be provided to the insurer."  Fla. Stat. § 627.736(10)(a).  The language of this subsection requires precision in a demand letter by its requirement of an "itemized statement specifying each exact amount."  *MRI Assocs. of Am., LLC v. State Farm Fire & Cas. Co.*, 61 So. 3d 462, 465 (Fla. 4th DCA 2011); *see* Fla. Stat. § 627.736(10)(a).  However, this is inapplicable to MAOs seeking reimbursement of its

conditional payments.  The demand letter requirement in Florida's No-Fault Act would "take away an MA organization's right under Federal law and the MSP regulations" to seek reimbursement.  42 C.F.R. § 422.108(f).  Further, the Code of Federal Regulations exempts CMS, and thus MAOs, from any time filing requirements a primary plan imposes on the enrollee.  *See* 42 C.F.R. § 411.24(f)(1).  Accordingly, under the plain language of the express preemption provisions of the Medicare Act and its accompanying regulations, the PIP statute's demand letter requirement is preempted as it applies to Medicare and MAO reimbursement rights.

Even if this Court were to impose the demand letter requirement upon Plaintiff, Plaintiff's Counsel properly sent Defendant a final Demand Letter demanding reimbursement of $29,485.00 for Enrollee's overdue medical bills and on April 20, 2016, notified Defendant of its obligations to reimburse Plaintiff for all identified claims.  [*See* J.A. 003292 Pl.'s Ex. 4 – *General Demand Letter*, 003296 Pl.'s Ex. 5 – *R.G. Demand Letter*].

> **b.      Defendant May Not Withdraw or Deny Payment on the Ground that Medical Treatment is Not Reasonable, Related or Necessary, Without First Obtaining a Medical Report Pursuant to Section 627.736(7), Florida Statutes.**

Section 627.736(7), Florida Statutes, requires that whenever "the mental or physical condition of an injured person covered" by PIP insurance coverage is "material to any claim that has been or may be made for past or future" PIP benefits, such person must "submit to mental or physical examination by a physician or physicians."  § 627.736(7)(a), Fla. Stat. (2016). Further, this subsection expressly states,

> [a]n insurer **may not withdraw payment of a treating physician** without the consent of the injured person covered by the personal injury protection, ***unless the insurer first obtains a valid report by a Florida physician*** licensed under the same chapter as the treating physician whose treatment authorization is sought to be withdrawn, ***stating that treatment was not reasonable, related, or necessary.***

*Id.* (emphasis added). In effect, Defendant is statutorily prohibited from failing to pay for medical bills without this report. *Id.*

Defendant's adjuster, Joseph Celli, testified that even though he requested, but never obtained, a medical report for the claim of R.G., he personally determined that: (1) R.G.'s medical bills were "reasonable, related or necessary", based solely on his review of the medical bills in the claim file and Plaintiff's demand for payment; (2) coverage would be extended; and (3) payment would be made. [J.A. 003129:15-22, 003147:3-10, 003148:14-25, 003149:1-25, 003150:1-9, Celli Dep., May 31, 2016]. For all other claims, Defendant routinely relies on Mr. Celli to determine whether or not the claims are reasonable, related or necessary; and Mr. Celli routinely makes such a determination, irrespective of whether or not he obtains a medical report. [J.A. 003144:7-19, 003145:15-24, 003146:1-9, 003147:11-20, Celli Dep., May 31, 2016].

> **c.      *Defendant's Partial Payment to Plaintiff of R.G.'s Reimbursement does not Affect Plaintiff's Standing to Serve as the Class Representative.***

After the filing of the initial lawsuit on February 25, 2015, Defendant voluntarily paid Plaintiff the sum of $9,355.30, which represented no-fault benefits under the insurance policy, plus $41.39 in interest, and $256.69 in maximum penalty and postage. [J.A. 002436:19-25, 002437:1-7, Celli Testimony, Sept. 14, 2016]. However, the amount paid failed to include double damages and failed to include the total amount available under the policy of $10,000. 00 Additionally, the Defendant failed to acknowledge entitlement and a sum certain to attorneys' fees. Therefore, still in dispute are the following amounts: (a) benefits of $644.70, representing the difference between the $10,000.00 available in no fault benefits minus the $9,355.20; and (b) the double damages related to both the $9,355.30 and the $644.70.

In addition to R.G.'s claim, Plaintiff has identified over 3,300 instances in which Defendant's Medicare eligible enrollees were involved in automobile accidents. [J.A.001303:5-12, 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony, June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016; J.A. 004191-007213, Pl.'s Exs. 28-63]. Out of a random sample of 107 automobile accidents, the Defendant had only registered three (3) with CMS. [J.A. 003633 Lopez Depo., Ex. 5; J.A. 001488:13-25; 001584:1-22; 001598:2-001599:4, Ruiz Testimony June 2, 2016; J.A. 003089:21 – 003090:1, Celli Dep. May 31, 2016]. Of the four (4) files that Defendant chose to produce to Plaintiff, all four (4) were instances that the MAO paid prior to the primary payer. [J.A. 003296, Pl.'s Ex. 5 – *R.G. Demand Letter*; J.A. 003306, Pl.'s Ex. 6 – *S.D. Demand Letter*; J.A. 003321, Pl.'s Ex. 8 – *L.S. Demand Letter*; J.A. 003334, Pl.'s Ex. 9 – *L.B. Demand Letter*].

It is well settled that the payment of a claim following the initiation of an action for recovery, but prior to the issuance of a final judgment, constitutes the functional equivalent of a confession of judgment. *Johnson v. Omega Ins. Co*., 171 So. 3d 117 (Fla. 2016); *see, e.g., Pepper's Steel & Alloys, Inc. v. U.S.*, 850 So. 2d 462, 465 (Fla. 2003). Voluntary payment by a party after suit is filed is the "functional equivalent of a confession of judgment" against that party. *Ivey v.  Allstate,* 774 So. 2d 679 (Fla. 2000); *Avila v.  Latin American Property and Casualty Ins. Co.,* 548 So. 2d 894 (Fla. 3d DCA 1989). However, it is clear that the Defendant has failed to pay the entirety of its liability on the reimbursement rights resulting from the claim of R.G.

Moreover, for the four claims produced by Defendant, on some, the Defendant confessed judgment but has failed to pay double damages, as allowed by law and has failed to pay its policy limits to the Plaintiff. Additionally, Plaintiff has a right to collect attorney's fees pursuant

to section 627.428, Florida Statutes, which Defendant has failed to pay or otherwise agree to pay. As a result, the Plaintiff's claim through R.G. has not been fully resolved or otherwise fully adjudicated and Plaintiff still has standing to serve as the Class Representative.

**B.      The Disallowed Affirmative Defenses**

The certification hearing was specially set four months in advance and in coordination with counsel for both sides. After the certification hearing began, and approximately seven months after Plaintiff filed its Amended Complaint, Defendant sought leave to amend its Answer to include thirty-seven affirmative defenses.   Over this seven month span, Defendant filed several motions and attended various hearings, but did not raise any affirmative defenses. Defendant's Motion for Leave to Amend its Answer neither provides a basis for excusable neglect nor does it address the seemingly obvious prejudice Plaintiff would incur in addressing thirty-seven new defenses raised _after_ the commencement of the certification hearing.  *See Humphrey v. United Way of Texas Gulf Coast*, 2007 WL 2688431 (S.D. Texas 2007) (holding that because the class action had been pending for a similarly significant period of time without these defenses being raised, they were untimely and therefore stricken).

Even if this Court were to allow Defendant to assert its untimely defenses, the Court finds that virtually all of Defendant's proposed defenses are either legally insufficient or immaterial to class certification.[39]

**1.      Defendant's Affirmative Defenses Lack The Requisite Specificity Under The Florida Rules of Civil Procedure.**

Generally,  a  properly  pled affirmative defense includes  ultimate facts  sufficient  to provide notice of the proof the defendant intends to rely upon to defeat a plaintiff's claim. *Zito v. Wash. Fed. Savings & Loan Ass'n of Miami Beach,* 318 So.2d 175, 176 (Fla. 3d DCA 1975).

---

[39] Defendant's Affirmative Defenses 1-10 all allege standing issues which the Court has already

However, Florida Rule of Civil Procedure 1.120(c) requires affirmative defenses, which deny the performance of a condition precedent, to be plead with specificity and particularity.  *See United Bonding Ins. Co. v. Dura-Stress, Inc.*, 243 So.2d 244, 246 (Fla. 2d DCA 1971).  "[C]ertainty is required when pleading defenses, and pleading conclusions of law unsupported by allegations of ultimate fact is legally insufficient."  *Thompson v. Bank of N.Y.*, 862 So. 2d 768, 771 (Fla. 4th DCA 2003). This strict standard required by the Florida Rules of Civil Procedure mandates affirmative defenses must be "proven by very clear and positive evidence."  *Kornaker v. Payor*, 565 So. 2d 899, 900 (Fla. 5th DCA 1990).  Further, when a Defendant fails to deny a condition precedent with specificity, that defense is waived.  *Griffin v. American General Life and Ace. Ins. Co.,* 752 So. 2d 621, n. 1 (Fla. 2d DCA 1999).  The Fourth District Court of Appeal held that the "failure to plead specifically and with particularity appellee's nonperformance of [a] condition precedent as required by rule 1.120(c), Florida Rules of Civil Procedure, constitutes a waiver."  *Davie Westview Developers, Inc. v. Bob-Lin, Inc.,* 533 So.2d 879, 880 (Fla. 4th DCA 1988).

Defendant alleges Plaintiff failed to satisfy various conditions precedent in its purported Affirmative Defenses 11, 16, 17, 18, 19, 25, 26, and 27.  Upon review, the Court finds all aforementioned defenses devoid of the requisite specificity and particularity required by Rule 1.120(c).  For example, Defense 25 states "bills were not submitted in the proper form and/or were not submitted within the required time limit."  This conclusory allegation points to no supporting evidence and fails to specify which bills in particular were untimely and the specific formatting deficiency reflected in the bills. The remainder of Defendant's challenges to conditions precedent reflect similar pleading deficiencies and, as a result, the Court finds that these defenses are legally insufficient.

---

disposed of *supra*.

### 2.       Defendant's Affirmative Defenses are Immaterial For Class Certification.

It is well established that a court may not consider merits issues in ruling on class certification. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). Thus, at the class certification stage, courts "have generally refused to consider the impact of affirmative defenses." *International Woodworkers of Am. v. Chesapeake Bay Plywood* Corp., 659 F.2d 1259, 1270 (4th Cir. 1981). The Eleventh Circuit noted "several federal courts have determined that the appropriate time for a class action defendant to raise affirmative defenses and set-off claims is during the damages phase." *Allapattah Services, Inc. v. Exxon,* 333 F. 3d 1248 (11th Cir. 2003). Moreover, denial of some or all of the elements of a plaintiff's claim is not an affirmative defense. *Gatt v. The Keyes Corp.*, 446 So. 2d 211, 212 (Fla. 3d DCA 1984) (holding that an affirmative defense which "simply denie[s] the facts contained in the . . . complaint and [does] not raise any new matters to defeat the complaint is properly stricken as being legally insufficient").

Affirmative defenses 13, 14, 15, 20, 21, 28, 29, 30, 31 32, and 33 constitute mere denials of the allegations contained in Plaintiff's Amended Complaint and therefore, are insufficient as a matter of law. Moreover, these denials pertain exclusively to the merits of the current litigation and have no bearing on the procedural requirements of class certification. The aforementioned defenses allege Defendant has no duty to reimburse the proposed class under the applicable state and federal statutes, as well as the relevant contractual agreements. Because these issues go to the merits of Plaintiff's claims, they have no bearing on the Court's analysis for class certification. *See Plubell v. Merck & Co.*, 289 S.W.3d 707, 716 (Mo. App. 2009) ("Defenses that go to the merits of the case are not properly considered in class certification.").

Finally, Affirmative Defenses 22, 23, 24, 35, 36 and 37 relate exclusively to damages, which are again irrelevant at the class certification stage. Defendant contends Plaintiff is barred from collecting double damages under the MSP Law and also alleges it is entitled to off-set any damages which may be awarded to Plaintiff. As noted in *Allapattah*, affirmative defenses which pertain primarily to damages rather than liability are immaterial to the issue of class certification. *Allapattah Services, Inc. v. Exxon,* 333 F. 3d 1248 (11th Cir. 2003).

### 3. Section 627.736(10) of the PIP Statute is Preempted by 42 C.F.R. §§ 411, 422 as There are no Claims Filing Requirements on Medicare Secondary Payer Claims.

As addressed in Section II(B)(9), *supra*, CMS may recover reimbursement claims without a claims filing requirement. The Defendant's contention is misplaced, as state statutes inconsistent with the recovery rights are preempted by § 422.108(f), as addressed by the Third District Court of Appeal in *Reale*. *See Reale*, 180 So. 3d 195. Accordingly, there is no requirement that Plaintiff or the Class send a letter prior to filing suit.

Notwithstanding, Plaintiff in this case sent a letter on January 13, 2015, demanding payment, and thereafter, sent another letter on April 20, 2016, demanding that Defendant provide notice of all of its primary payer obligations to which Defendant failed to respond. [J.A. 003296, Pl.'s Ex. 5 – *R.G. Demand Letter*].

### C. <u>42 C.F.R. § 411.53</u>

An MAO can make a conditional payment "if a primary plan...has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations)." 42 U.S.C. § 1395y(2)(B)(i). There is nothing in the statute to support Defendant's assertion that an MAO is limited as to when it can make a

conditional payment.  Pursuant to subparagraph (a), 42 C.F.R. § 411.53(a), which is reprinted as follows:

> (a) A conditional Medicare payment **may** be made in no-fault cases under either of the following circumstances:
>
> > (1) The beneficiary has filed a proper claim for no-fault insurance benefits but the intermediary or carrier determines that the no-fault insurer will not pay promptly for any reason other than the circumstances described in § 411.32(a)(1). This includes cases in which the no-fault insurance carrier has denied the claim.
> >
> > (2) The beneficiary, because of physical or mental incapacity, failed to meet a claim-filing requirement stipulated in the policy.

*Id.* (emphasis added).  The explicit language of the federal regulation is permissive and as such, does not exclusively limit a conditional payment in the enumerated scenarios.  *See Saltzman v. Hadlock*, 112 So. 3d 772, 774 (Fla. 5th DCA 2013) ("[i]t is well-settled that the word 'may' 'denotes a **permissive** term rather than the mandatory connotation of the word 'shall.'").  If this Court were to accept Defendant's position, it would be contradictory to the accepted definition of a "conditional payment."  *See* 42 C.F.R. § 411.21.

Pursuant to the federal regulations, a "conditional payment means a Medicare payment for services for which another payer is responsible, made either on the bases set forth in subparts C through H of this part, or because the intermediary or carrier **did not know that coverage existed**." 42 C.F.R. § 411.21 (emphasis added).  This Court does not interpret any conflict in the situation where the secondary payer does not know of a primary payer's obligation to pay for medical expenses and the statutory language "cannot reasonably be expected to make payment." In other words, if an MAO is unaware of a primary payer, the MAO would not "reasonably expect" a primary plan to provide payment.  *See Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653, 669 (E.D. La. 2014).  Here, FHCP did not know the existence of a primary

payer.   Accordingly, the fact that FHCP did not know of the primary plan when it funded its Medicare enrollees' medical expenses does not undermine the fact that those payments constituted conditional payments.  Thus, the Court finds that FHCP made a conditional payment and satisfies paragraph 42 U.S.C. §§ 1395y(b)(2)(A), 1395y(b)(2)(B)(i).

## IX. CONCLUSION

Based upon the foregoing, the Court concludes that the class action should be certified, and it is hereby,

**ORDERED AND ADJUDGED** that:

1. Plaintiff's Amended Motion for Class Certification is hereby **GRANTED**; and

2. The Court certifies a class defined to include entities that:

   entities that contracted directly with the Centers for Medicare and Medicaid Services ("CMS") and/or its assignee pursuant to Medicare Part C, including but not limited to, MAOs and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by HHS and/or CMS as a direct payer of medical services/supplies and/or drugs on behalf of Medicare beneficiaries either for parts A, B and/or D, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant;

   have made payment(s) for medical services, treatment and/or supplies subsequent to January 29, 2009, whereby the MAO, or its assignee, as a secondary payer, has the direct or indirect right and responsibility to obtain reimbursement for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee pursuant to Florida No-Fault law (section 627.736(4), Florida Statute), was/is financially responsible to a Medicare beneficiary for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle; and

   where the Defendant failed to properly pay for medical bills on behalf of its insureds and has otherwise failed to reimburse the MAO's or its assignees for their payment(s) as calculated pursuant

to the recognized Current Procedure Terminology ("CPT") codes based on the fee-for-service by the primary payer, as delineated by section 627.736, Florida Statues, for medical services and/or supplies for their damages.[40]

Further, Gonzalo Dorta, Esq., John H. Ruiz, Esq., and Frank Quesada, Esq. shall serve as a committee of counsel for the entire above-defined class.

Within 20 days, class counsel shall submit for the court's approval a proposed notice of the pendency of this action. The proposed notice shall inform the Class of the matters set forth in Florida Rule of Civil Procedure 1.220(d)(2).

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 02/02/17.

_____
Samantha Ruiz-Cohen
CIRCUIT COURT JUDGE

**No Further Judicial Action Required on THIS MOTION
CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

*Copies furnished to*:

---

[40] The Class entities have not otherwise released their right to reimbursement as secondary payers.

Case No. 2015-1946-CA 06

Gonzalo Dorta, Esq.
grd@dortalaw.com

Frank Quesada, Esq.
fquesada@msprecovery.com

John H. Ruiz, Esq.
jruiz@msprecovery.com

Shannon McKenna, Esq.
smckenna@conroysimberg.com

Dale Friedman, Esq.
dfriedman@conroysimberg.com

**Page 101 of 101**

EXHIBIT

C

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

Case No. 15-27940-CA-21

MSPA Claims 1, LLC, a Florida Limited Liability
Company, as assignee of Florida Healthcare Plus,
on behalf of itself and all other similarly situated
Medicare Advantage Organizations in the State of
Florida,

Plaintiff,

v.

IDS Property Casualty Insurance Company,

Defendant.
_____/

### ORDER GRANTING PLAINTIFF'S MOTION TO CERTIFY CLASS

**THIS CAUSE** came before the Court on September 26 and 27, 2016, on Plaintiff, MSPA

Claims 1, LLC's ("Plaintiff" or "Class Representative"), Motion to Certify Class. The Court,

having heard argument of counsel, having reviewed the Motion, Defendant's Response in

Opposition to the Motion to Certify Class, and having considered the pleadings, depositions,

discovery, stipulations, affidavits, testimony, applicable legal authorities, memoranda, and having

further heard and considered the evidence presented at the evidentiary hearing, and being

otherwise fully advised, finds as follows[1]:

---

[1] See Sosa v. Safeway Premium Fin. Co., 73 So.3d 91, 118 (Fla. 2011) (holding that for class
certification, a court considers the "entire case file" and "affidavits, deposition testimony,
discovery, [and] documentation....").

## I.  **INTRODUCTION**

Plaintiff, as the assignee of Florida Healthcare Plus ("FHCP"), a Medicare Advantage Organization ("MAO"), through the claims of M.A.,[2] an enrollee of FHCP, seeks class certification, pursuant to Florida Rule of Civil Procedure 1.220, on behalf of itself, and a class consisting of all Florida MAOs and/or their assignees to whom Defendant, IDS Property Casualty Insurance Company ("Defendant"), allegedly failed to provide appropriate reimbursement of its conditional payments provided on behalf of Medicare enrollees. Particularly, Plaintiff alleges its claims arise from injuries sustained by M.A., while she was traveling in a motor vehicle (hereinafter referred to as the "accident").  The claims asserted in Plaintiff's Amended Class Action Complaint are for those services and/or supplies paid by FHCP to treat the injuries suffered by its enrollee, as a direct result of the accident.  In addition to having been an enrollee with FHCP at the time of the accident, enrollee was also covered by a Florida No-Fault insurance policy issued by Defendant.

Plaintiff filed this action on behalf of itself and other similarly situated class members for: (1) breach of contract under Plaintiff's direct right of recovery; (2) conventional subrogation; (3) equitable subrogation; and (4) conventional subrogation arising from third-party beneficiary rights in order to be reimbursed for its payments that should have been paid by the Defendant.

Defendant is a no-fault insurer that issues policies of insurance pursuant to Florida's No-Fault law that provides statutorily required benefits pursuant to sections 627.733 – 627.736, Florida Statutes, and is, otherwise, considered a primary plan pursuant to the Medicare Act.  See 42 U.S.C. § 1395y(b)(2)(A) (defining "primary plan" to include no fault insurance); 42 C.F.R. §

---

[2] The enrollee (*i.e.*, Defendant's insured) shall only be referred to as "M.A." or "enrollee." The name of M.A. is known to the Court and the parties, but is not pled in this Order to protect his or her privacy.

411.21 (same); Fla. Stat. § 627.736(4) (indicating "benefits due from a [] [no-fault] insurer under ss. 627.730-627.7405 are primary").

Thereby, Plaintiff seeks to enforce its own rights, as well as the reimbursement rights of Florida MAOs and/or its assignees (the "class") for medical payments made on behalf of its Medicare Part C enrollees, as a result of Defendant's alleged practice and course of conduct in failing to make primary payment, or properly providing appropriate reimbursement.

As an MAO, FHCP advanced Medicare payments on behalf of M.A. for medical care and treatment for which Plaintiff claims Defendant was responsible as a primary payer since M.A.'s medical bills arose from the ownership, maintenance, and/or operation of a motor vehicle. § 627.736, Fla. Stat. (2016). Accordingly, Plaintiff seeks damages on behalf of itself and similarly situated Florida MAO's or its assignees, for Defendant's violation of Section 627.736. Plaintiff seeks class certification pursuant to Rule 1.220(b)(3).

## II. THE MEDICARE ACT AND ITS BACKGROUND

The Medicare Act is found within the Social Security Act under Title XVIII. The Social Security Act was enacted on August 14, 1935. See Soc. Sec. Admin. https://www.ssa.gov/history/1930.html. The Medicare Act functions as a "federally funded health insurance program for the elderly and the disabled." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 506 (1993). The Medicare Act consists of five parts — Part A, B, C, D and E. Part A and Part B "create, describe, and regulate traditional fee-for-service, government-administered Medicare." In re Avandia Mktg. Sales Practices and Products Liability Litigation, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w). Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them. 42 U.S.C. §§ 1395w-21-29. Further, Part D provides for

prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x, 1395y.

An enrollee's health coverage with an MAO is strictly construed and regulated by the Centers for Medicare and Medicaid Services ("CMS"). CMS provides detailed templates for MAOs to use when they create documents, including an evidence of coverage that is provided to enrollees. See CMS,https://www.cms.gov/Medicare/HealthPlans/ManagedCareMarketing/MarketngModelsSta ndardDocumentsandEducationalMaterial.html. Notably, CMS requires that every evidence of coverage contain the following language:

> [w]e have the right and responsibility to collect for covered Medicare services for which Medicare is not the primary payer. According to CMS regulations at 42 CFR sections 422.108 and 423.462, *[insert 2015 plan name]*, as a Medicare Advantage Organization, will exercise the same rights of recovery that the Secretary exercises under CMS regulations in subparts B through D of part 411 of 42 CFR and the rules established in this section supersede any State laws.

Id. at p.141 of the "MA-only HMO (and HMO-POS) templates" attachment. As a result, a Medicare Part C enrollee must be provided certain coverage and protections, as required by CMS that at a minimum must pay for what original medicare would pay. In essence, Medicare Part C is the functional equivalent of original medicare. See 42 C.F.R. §§ 422.108(f), 422.101; Honey v. Bayhealth Med. Ctr., Inc., No. K13C-05-018, 2015 Del. Super. LEXIS 378, at *18 (Del. Super. Ct. July 28, 2015) (holding "an MAO is squarely within the traditional Medicare system").

Congress has also made certain provisions of the Social Security Act applicable to the Medicare Act. See 42 U.S.C. § 1395ii. Particularly, the judicial review provision contained in 42 U.S.C. § 405(g), which is the Social Security Act's "sole avenue for judicial review of all claims arising under the Medicare Act." Heckler v. Ringer, 466 U.S. 602, 614 (1984); 42 U.S.C. § 405(h); See also, e.g., Potts v. Rawlings Co., LLC, 897 F. Supp. 2d 185, 191 (S.D.N.Y. 2012) (holding

that under 42 U.S.C. § 405(h) no findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided in § 405(g)).

### A. The Medicare Part C Program

Since the 1970s, Medicare beneficiaries have had the option to receive their Medicare benefits through private health plans, mainly Health Maintenance Organizations ("HMOs"), as an alternative to the federally administered traditional Medicare programs. See Kaiser Family Foundation, http://kff.org/medicare/fact-sheet/medicare-advantage/. The Balanced Budget Act of 1997 named Medicare's managed care program "Medicare+Choice" and the Medicare Modernization Act (MMA) of 2003 renamed it "Medicare Advantage." Id; See also Collins v. Wellcare Healthcare Plans, Inc., 73 F. Supp. 3d 653, 659 (E.D. La. 2014). "The congressional goal in creating the Medicare Part C option was to harness the power of private sector competition to stimulate experimentation and innovation to create a more efficient and less expensive Medicare system." See D. Gary Reed, *Medicare Advantage Misconceptions Abound*, 27 Health Law 1, 3 (2014). Congress sought to achieve this goal by implementing a program wherein the government would pay private health insurers a flat rate per enrollee to administer and provide the same basic benefits received under traditional Medicare. See Honey, 2015 Del. Super. LEXIS 378, at *7-17. Pursuant to this framework, an MAO pays providers directly for the care received by Part C enrollees. Id. at *10. To the extent that this care exceeds the flat rate received from the government, an MAO assumes the risk and cost. Id. In the event that care costs less than the flat rate received, an MAO is permitted to keep the difference as a profit. Id.

To be approved to be an MAO, a private insurer must enter a bidding process, meeting certain threshold requirements. See Honey, 2015 Del. Super. LEXIS 378, at *10. MAOs must also be licensed in each State in which they operate. Id. MAOs must offer an "[evidence] of

coverage" annually, approved by CMS to enrollees. Id. In providing the basic benefits offered to traditional Medicare enrollees, MAOs must abide by national coverage determinations provided by CMS. Id. In addition, all coverage disputes between enrollees, and MAOs must go through the traditional Medicare appeals process. Id. at *11. The decisions coming out of the Medicare appeals process are, moreover, binding upon an MAO. Id.

It is the federal government which sets the fixed rate at which MAOs will be remunerated. See Honey, 2015 Del. Super. LEXIS 378, at *12. Likewise, the federal government establishes the basic services that each Part C private insurer participant must provide. Id. These private health insurers are, further, constrained in their ability to deny coverage, limited to the decisions of federally anointed adjudicators. Id. The discretion permitted to these private insurers is *within* this federally created framework – not outside or even alongside it. Id. at *12-13. Under Part C, the contract is between the federal government and the insurer. Id. at *13.

By way of background, FHCP entered into a contract with CMS to provide Medicare benefits in accordance with the Medicare Part C program to Medicare-eligible enrollees and, in return, received a per capita fee from CMS. See Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229, 1235 (11th Cir. 2016) ("Under the Medicare Advantage program, a private insurance company, operating as an MAO, administers the provision of Medicare benefits pursuant to a contract with CMS. CMS pays the MAO a fixed fee per enrollee, and the MAO provides at least the same benefits as an enrollee would receive under traditional Medicare."); See also 42 U.S.C. §§ 1395w-22(a), 1395w-23.

Therefore, the defining factor of a truly private insurance plan, one between insured and an insurer, is lacking. See Honey, 2015 Del. Super. LEXIS 378, at *11. Of great significance is that these contracts define the rights of insurers vis-à-vis their insureds. Id. Among the items

contained in such contracts are provisions of services and when such services will be denied. Such basic determinations are out of the administrator's hands in Part C coverage and are instead determined by the other party to the contract – the federal government. Id.

In sum, MAOs are more akin to traditional Medicare, rather than a private health insurance plan. See Honey, 2015 Del. Super. LEXIS 378, at *16-17 ("There is no such thing as a [M]edicare Advantage insurance policy."). Medicare Advantage is, instead, a federal program. Id. Just as traditional Medicare, MAOs have their recovery rights determined statutorily. Id. Specifically, Part C includes a reference to the Medicare Secondary Payer Law ("MSP Law"), entitled "Organization as secondary payer," which states as follows:

> Notwithstanding any other provision of law, a Medicare+Choice organization[3] may (in the case of the provision of items and services to an individual under a Medicare+Choice plan under circumstances in which payment under this subchapter is made secondary pursuant to section 1395y(b)(2) of this title) charge or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy described in such section—
>
> (A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or
>
> (B) such individual to the extent that the individual has been paid under such law, plan, or policy for such services.

See W. Heritage, 832 F.3d at 1235 (citing to 42 U.S.C. § 1395w-22(a)(4)). Under this framework, any dispute concerning coverage or reimbursement rights has been construed as arising under the Medicare Act. See Humana Med. Plan, Inc. v. Reale, 180 So. 3d 195, 204 (Fla. 3d DCA 2015).

Section 1395y(a)(1)(A) of the Medicare statute states that, "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which . . . are not *reasonable and necessary* for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added). Because this Section contains an express condition of payment

---

[3] *i.e.*, an MAO.

– that is, "no payment may be made" – it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." United States ex. rel. Mikes v. Straus, 2001 U.S. App. LEXIS 26923, at *30-31 (2d Cir. N.Y. 2001). Hence, payments made by Medicare or an MAO are for services that are reasonable and necessary. Id. Essentially, an MAO's processing of payments is also under the guise of CMS and the Medicare Program. Since MAOs provide the same Part A and Part B benefits as original medicare, an MAO must also make payment for "reasonable and necessary" items and services. 42 U.S.C. § 1395w-22(a)(1)(A); 42 C.F.R. § 422.100(c).

MAOs must process and pay or deny claims promptly to comply with the specific requirements established by federal law,[4] federal regulations,[5] and the terms of the MAOs contracts with CMS. Under these requirements, for example, 95% of all clean claims submitted by non-participating, i.e., non-contracted, providers must be paid or denied within 30 days of receipt. See 42 C.F.R. § 422.520(a)(1). Further, all other claims submitted by non-participating providers must be paid or denied within sixty (60) days of receipt. See 42 C.F.R. § 422.520(a)(3). For participating – i.e., contracted – providers, MAOs must comply with the terms of their contracts with those providers. See 42 C.F.R. § 422.520(b)(2).

MAOs must provide Medicare benefits for "reasonable and necessary" items and services subject to the prompt payment requirements. Accordingly, once an MAO makes a payment, CMS and the MAO determine whether the payment is for services that are reasonable and necessary. If a beneficiary or a primary payer seeks to dispute the reasonableness or necessity of the services rendered, a dispute arises under the Medicare Act.

---

[4] See 42 U.S.C. § 1395w-27(f).

[5] See 42 C.F.R. §§ 422.214 and 422.520.

**B.  Arising Under the Medicare Act**

When a beneficiary or a primary payer disputes an amount paid by an MAO on behalf of the beneficiary, courts have consistently held that these disputes concern the reimbursement of conditional payments that are claims for benefits that arise under the Medicare Act.  See Reale, 180 So.3d at 204.   Therefore, whenever a beneficiary or primary payer contests a claim for reimbursement, the beneficiary or primary payer must timely exhaust all administrative remedies before it can seek judicial review in Federal Court, which has exclusive jurisdiction over the claim pursuant to 42 U.S.C. §405(g).  Id. at 202.  A claim arises under the Medicare Act if "both the standing and the substantive basis for the presentation" of the claim is the act, or if the claim is "inextricably intertwined" with a claim for benefits.  See Heckler, 466 U.S. at 614; Trostle v. Ctrs. For Medicare and Medicaid Servs., 206 U.S. Dist. LEXIS 143101, at *11 (M.D. Penn. Oct. 17, 2016).   Accordingly, once a beneficiary or primary plan contests a reimbursement, the dispute must be administratively exhausted.  See Reale, 180 So.3d at 202.

The Code of Federal Regulations explicitly sets out the Medicare administrative process for disputing a Medicare claim.  The organization determination is binding on all parties unless it seeks reconsideration.  42 C.F.R. §422.576.  An MA plan enrollee has appeal rights that may be exercised if he or she is dissatisfied with an "organization determination" made by his or her MAO, in which the enrollee may seek reconsideration of a decision by an MAO.  42 C.F.R. §§422.566(b), 422.578, 422.580.  A reconsideration consists of a review of an adverse determination, the evidence and findings upon which it was based, and any other evidence the parties submit or an MAO or CMS obtains.  42 C.F.R. §422.580.  A request for reconsideration must be filed within sixty (60) calendar days from the date of the notice of the organization's determination.  42 C.F.R. § 422.582.

If the reconsideration decision is unfavorable to an enrollee, the matter must be reviewed by an independent outside entity that contracts with the Secretary for this purpose. 42 C.F.R. § 422.592. If that outside entity issues an unfavorable decision, the beneficiary may then request a hearing conducted by an Administrative Law Judge ("ALJ"). 42 C.F.R. § 422.600. If the decision of the ALJ is unfavorable, the enrollee may then request that the Medicare Appeals Council ("MAC") review the ALJ's decision. 42 C.F.R. § 422.612. If the enrollee remains dissatisfied, and if the amount in controversy exceeds a certain threshold, the enrollee may seek judicial review of the final agency decision. 42 U.S.C. § 135w-22(g)(5); 42 C.F.R. § 422.612.

The Third District Court of Appeal has held that a beneficiary/primary payer who contested a claim for reimbursement was so "inextricably intertwined" with a claim for benefits that exclusive jurisdiction was limited to the federal court under 42 U.S.C. § 405(g). See Reale, 180 So.3d at 195. In Reale, a Medicare enrollee sought declaratory relief in state court challenging the amount of reimbursement that her MAO was entitled to receive. Id. at 198. The court went through an extensive analysis of the applicability of the Social Security Act's judicial review provision, and its applicability to claims "arising under" the Medicare Act. Id. at 201-205. The court in Reale held that where an enrollee seeks to challenge the amounts paid by an MAO for medical treatment provided, the enrollee must first exhaust administrative remedies prior to judicial review from the federal courts. Id. at 205.

In Humana v. Western Heritage, the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit"), reviewed an order granting summary judgment in favor of a secondary payer MAO, and held a primary payer was barred from contesting reimbursement for failure to exhaust administrative remedies. See W. Heritage, 832 F.3d at 1239-1240. As neither the enrollee nor the primary payer contested the amounts paid by the MAO within the

administrative remedies period, the primary payer in <u>Western Heritage</u> was precluded from challenging the MAO's payments. <u>Id.</u> at 1240.

In this case, Defendant disputes Plaintiff's right to reimbursement of its conditional payments on a class-wide basis. However, Defendant has not provided any evidence that it administratively contested any of the amounts paid by any MAO. Moreover, at this point, the time for an administrative appeal has expired and, therefore, it appears that, Defendant may be time-barred from challenging the propriety or amounts paid by the MAOs.

### C.  <u>The Medicare Secondary Payer Law</u>

Initially, Medicare served as the primary payer and paid its beneficiaries' medical costs when other entities, such as insurances provided by private health insurance companies, were responsible for those costs. <u>See</u> <u>Taransky v. Sec'y of U.S. Dep't of Health & Human Servs.</u>, 760 F.3d 307, 309 (3d Cir. 2014). In 1980, Congress added the MSP Law provisions to the Medicare Act in order to counteract escalating healthcare costs. <u>See</u> <u>Bio-Medical Applications of Tenn.</u>, <u>Inc. v. Cent. States S.E. & S.E.  Areas Health & Welfare Fund</u>, 656 F.3d 277, 281 (6th Cir. 2011). This means that if a primary plan "has not made or cannot reasonably be expected to make payment," the Secretary may make a conditional payment. 42 U.S.C. § 1395y(b)(2)(B)(i). Since Medicare remains the secondary payer, the primary plan must reimburse Medicare for the conditional payment. 42 U.S.C. § 1395y(b)(2)(B)(ii). Though the MSP law uses the term "primary plan" to describe entities with a primary responsibility to pay, that term covers more than just health insurance plans. <u>See</u> <u>MSP Recovery, LLC v. Allstate Ins. Co.</u>, 835 F.3d 1351, 1355 (11th Cir. 2016). The law defines a "primary plan" as "a group health plan or large group health plan, . . . a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance . . . ." 42 U.S.C. § 1395y(b)(2)(A); <u>See</u>

Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co., 758 F.3d 787, 791 (6th Cir. 2014).

### D. 42 U.S.C. § 1395y(b)(8) enacted by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA")

On December 29, 2007, the Medicare, Medicaid and SCHIP Extension Act of 2007 ("MMSEA") was signed into law and codified at 42 U.S.C. § 1395y(b)(7) and (8). See Pub. L. No. 110-173. The purpose of the MMSEA reporting process is to enable CMS to pay appropriately for Medicare covered items and services furnished to Medicare beneficiaries. See Section 111 NGHP User Guide, Version 5.0, Chapter 1 at *6-1. Primarily, MMSEA reporting helps CMS determine primary versus secondary payer responsibility. Id.

Under MMSEA, Responsible Reporting Entities ("RREs"), including no-fault insurers (e.g., Defendant), must report when one of its Medicare beneficiary insureds has been injured in an automobile accident and is required to submit certain information electronically to CMS. See 42 U.S.C. §§ 1395y(b)(7) and (8); See also Section 111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1. The new reporting requirements affect all parties involved in a payment of a settlement, judgment, or award with a Medicare beneficiary after January 1, 2010. See Seger v. Tank Connection, LLC, No. 08-cv-75, 2010 U.S. Dist. LEXIS 49013, at *12 (D. Neb. Apr. 22, 2010). When reporting a case under MMSEA, an RRE must report the Medicare beneficiary's full name, Medicare Health Insurance Claim Number ("HICN"), gender and date of birth, and complete address and phone number. See Section 111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1.

Further, RREs must be able to determine whether an injured party is a Medicare beneficiary and gather the information required for proper Section 111 reporting. See Section 111 NGHP User Guide, Version 5.0, Chapter 3 at *3-1. Anticipating the burden of the new reporting requirements, CMS developed a "query process" whereby an RRE can determine a claimant's Medicare status

electronically and without authorization, as long as the RRE has access to the claimant's name, date of birth, gender, Social Security Number, and/or Medicare Health Insurance Claim Number. See Seger, 2010 U.S. Dist. LEXIS 49013, at *12. This information must be submitted "after the claim is resolved through a settlement, judgment, award or other payment, regardless of whether there is a determination or admission of liability. 42 U.S.C. § 1395y(b)(8)(C).

These reporting obligations require no-fault insurers to provide detailed information to CMS regarding any open no-fault claims with an Ongoing[6] Responsibility for Medical Treatment ("ORM") for insureds who are also Medicare beneficiaries. See Seger, LLC, 2010 U.S. Dist. LEXIS 49013, at *12. The trigger for reporting ORM is: (1) when the RRE has made a determination to assume responsibility for ORM; or (2) it is otherwise required to assume ORM. See Section 111 NGHP User Guide, Version 5.0, Chapter 6 at *6.7.

Defendant's compliance or non-compliance with MMSEA provides constructive and/or actual knowledge to Medicare Payers. However, the ultimate issue is whether there has been proper reimbursement by a primary payer. See W. Heritage, 832 F.3d at 1239 (holding that summary judgment is appropriate when the following are demonstrated: "(1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount"). Once a secondary payer has paid, the lien rights become automatic. See Porter v. Farmers Ins. Co., 2012 U.S. Dist. LEXIS 9862 (N.D. Okla. 2012) ("Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim. 42 C.F.R. § 411.21."). MMSEA reporting provides a secondary payer with an opportunity to learn

---

[6] "Ongoing" refers to the RRE's ongoing responsibility to pay for the injured Medicare beneficiary's medical expenses associated with the no-fault claim. See Section 111 NGHP User Guide, Version 5.0, Chapter 6 at *6.7.

of primary payer.  However, if a secondary payer pays bills that a primary payer should have paid, reimbursement is mandated.

### E.  The Medicare Secondary Payer Act Framework

There are three paragraphs within the Medicare Act that work together to build the Secondary Payer framework. The first "alters the priority among already-obligated entities and contemplates primary plans fulfilling their payment obligation." W. Heritage, 832 F.3d at 1237; See 42 U.S.C. § 1395y(b)(2)(A).  Primarily, paragraph (2)(A) provides the circumstances under which Medicare or an MAO may not make a payment, *i.e.,* a primary plan has made or can reasonably be expected to make a payment.

Paragraph (2)(B) provides available options for when a primary plan fails to fulfill its payment obligations.  Id. at 1237.  Medicare or an MAO has the authority to make a conditional payment if payment has not been made or cannot reasonably be expected to be made by the primary plan.  42 U.S.C. § 1395y(b)(2)(B)(i).  This paragraph also provides for the subrogation "to any right under [the MSP Law] of an individual or any other entity to payment with respect to such item or service under a primary plan."  42 U.S.C. § 1395y(b)(2)(B)(iv).

The final component, paragraph (3)(A), protects the secondary-payer framework by "grant[ing] private actors a federal remedy when a primary plan fails to fulfill its payment obligation, thereby undermining the secondary-payer scheme created by paragraph (2)(A)." W. Heritage, 832 F.3d at 1237.  This paragraph applies equally to original medicare and MAOs.

### F.  Medicare's Recovery Rights are Automatic

A Medicare lien is automatic, all-encompassing, and superior to all other interests. See Pallay v. Nationwide Ins. Co., 165 Ohio App. 3d 242 (7th Dist. 2005) ("federal law gives Medicare very powerful subrogation rights, often referred to as a Medicare lien . . . this right of subrogation

is superior to any other right, interest, judgment, or claim."); Porter v. Farmers Ins. Co., 2012 U.S. Dist. LEXIS 9862 (N.D. Okla. 2012) ("Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim. 42 C.F.R. § 411.21."). Pursuant to 42 C.F.R. § 411.24(f)(1), "CMS may recover without regard to any claims filing requirements that the insurance program or plan imposes on the beneficiary or other claimant such as a time limit for filing a claim or a time limit for notifying the plan or program about the need for or receipt of services." Id. Accordingly, Medicare or an MAO may conditionally pay for the medical bills of an injured person, subject to Medicare's or an MAO's right to obtain reimbursement of those payments. See 42 U.S.C. §§ 1395y(b)(2)(B)(i), 1395y(b)(3)(A). Moreover, once Medicare or an MAO pays as a Secondary Payer, there is no law that would penalize Medicare or an MAO, even if it paid in error, since the payment was supposed to be made by the primary payer.

## III.   FLORIDA'S NO-FAULT LAW

The Florida Motor Vehicle No-Fault Law ("Florida's No-Fault Act"), Sections 627.730 -- 7405, Florida Statutes, was intended to expeditiously provide insurance benefits to the insured for medical treatment regardless of fault. See Fla. Stat. § 627.731, (2016); Custer Med. Ctr. V. United Auto. Ins. Co., 62 So. 3d 1086, 1092 (Fla. 2010) (citing Allstate Ins. Co. v. Kaklamanos, 843 So. 2d 885, 891 (Fla. 2003)). The purpose of the no-fault statutory framework is to 'provide swift and virtually automatic payment." Custer, 62 So. 3d at 1095 (citing Ivey v. Allstate Ins. Co., 774 So. 2d 679, 683-84 (Fla. 2000)). The Florida Supreme Court recognized that the PIP statute is unique in that it abolished "a traditional common-law right by limiting the recovery available to car accident victims" and in exchange, required PIP insurance that was recoverable without regard to fault. Nunez v. Geico Gen. Ins. Co., 117 So. 3d 388, 393-394 (Fla. 2013) (citing Allstate Ins. Co. v. Holy Cross Hosp., Inc., 961 So. 2d 328, 332 (Fla. 2007)). No-fault insurers are primary payers

of any bills for medical services and supplies incurred by its insureds resulting from the use, maintenance, and/or operation of a motor vehicle.   Specifically, Section 627.736(4) Florida Statutes provides:

> PAYMENT OF BENEFITS. —— Benefits due from an insurer under ss. 627.730-627.7405 are **primary**, except that benefits received under any workers' compensation law must be credited against the benefits provided by subsection (1) and are due and payable as loss accrues upon receipt of reasonable proof of such loss and the amount of expenses and loss incurred which are covered by the policy issued under ss. 627.730-627.7405.

Pursuant to the Florida's No-Fault Act, Plaintiff, through its rights as an MAO assignee, asserts causes of action for breach of contract under its direct right of recovery, conventional subrogation, equitable subrogation, and conventional subrogation arising from third party beneficiary rights.   Plaintiff has enumerated rights pursuant to law.   One of those rights is a subrogation right pursuant to 42 C.F.R. § 411.26(a): "(a) *Subrogation.* With respect to services for which Medicare paid, CMS[7] is subrogated to any individual, provider, supplier, physician, private insurer, State agency, attorney, or any other entity entitled to payment by a primary payer." Id.  If the primary payer – or recipient of a payment from the primary payment – fails to reimburse Medicare despite its obligation to do so, the Act provides Medicare and MAOs with two recovery mechanisms: (1) the Act grants a **right of subrogation**, to step in and assume the Medicare beneficiary's right for payment of medical bills that should have been paid by the primary payer; and (2) an independent cause of action to sue and assert its own claim against the primary payer and anybody who receives payment from the primary payer, including physicians, attorneys, medical providers, or Medicare beneficiaries themselves.  See United States v. Stricker, 524 Fed. Appx. 500, 504 (11th Cir. 2013); See also 42 U.S.C. §§ 1395y(b)(2)(B)(iv) and 1395y(b)(2)(B)(iii).

---

[7] 42 C.F.R. § 422.108(f) ("The MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP Regulations.").

## IV. **THE LITIGATION**

On or about January 13, 2014, FHCP's enrollee, M.A., was injured while travelling in a motor vehicle (hereinafter referred to as "accident"). The enrollee received medical services, treatment, and/or supplies for injuries she sustained and, consequently, incurred expenses for said medical care and treatment. Defendant issued a policy of insurance to enrollee that provided PIP benefits in compliance with sections 627.730 – 627.7405, Florida Statutes. This policy was in full force and effect at the time of the accident, and provided primary insurance coverage for enrollee's medical expenses resulting from the accident. At the time of the accident, enrollee was also enrolled in an MA plan administered by FHCP, which provided Medicare benefits to enrollee. As described in FHCP's Evidence of Coverage ("EOC"), Enrollee's MA Plan is considered the "secondary plan" in connection with medical expense coverage for the subject accident, and provided FHCP with reimbursement, recovery, and subrogation rights from a "primary plan", *i.e.*, the Defendant. These rights are further described in the EOC and in the Code of Federal Regulations.

Plaintiff asserts that pursuant to Florida law and the Defendant's no-fault insurance policy, Defendant had a legal obligation to make primary payment for all medical services, and/or supplies provided to M.A. as a result of the accident, but that Defendant failed to satisfy that obligation and, otherwise, failed to appropriately reimburse Plaintiff. Plaintiff further asserts that the medical services and/or supplies provided to enrollee and the resulting medical bills charged to FHCP were necessary and reasonable, as they were provided as a result of the medical diagnosis, treatment, conditions, and/or injuries sustained in the accident.

On February 26, 2015, Plaintiff's Counsel sent Defendant a Demand Letter under 42 U.S.C. § 1395y(b)(3)(A) and section 627.736, Florida Statute, that demanded reimbursement for

Enrollee's medical bills in the amount of $87,41.00.[8]  Along with the Demand Letter, Defendant also received a Notice of Lien, in which Plaintiff filed a Civil Remedy Notice of Insurer Violations against Defendant.  On April 20, 2016, Plaintiff transmitted a letter to Defendant reminding it of its reporting obligations to Plaintiff under 42 C.F.R. § 411.25(a).  Section 411.25(a) obligates primary payers to notify CMS and MAOs, through 42 C.F.R. § 422.108(f), of any improper payment that the latter has made.  Plaintiff alleges that Defendant is required to notify Plaintiff of every instance wherein Plaintiff has made an improper payment wherein a Defendant should have paid.  Plaintiff asserts that Defendant, as primary payer, failed to pay or reimburse Plaintiff prior to exhausting its benefits.

On December 2, 2015, Plaintiff filed its Complaint against Defendant wherein it alleged causes of action for: (1) Breach of Contract Under Its Direct Right of Recovery; (2) Conventional Subrogation; (3) Equitable Subrogation; and (4) Conventional Subrogation Arising from Third Party Beneficiary Rights.  On January 19, 2016, Defendant removed the case to federal court. On March 7, 2016, the case was remanded back to state court. The following day, March 8, 2016, Plaintiff filed its Amended Complaint wherein Plaintiff sought to certify a class of more than twenty-five (25) but less than fifty (50) entities, wherein the entities directly contracted with CMS and/or its assigns, such as MAOs, HMOs, and other similar entities that made conditional payments as a secondary payer, and where Defendant failed to pay or reimburse the entities resulting in monetary damages.

On March 22, 2016, Defendant filed a second Notice of Removal which was, again, remanded on April 4, 2016. On April 11, 2016, Defendant filed its Motion to Dismiss wherein it asserted that Plaintiff: (i) lacked standing to bring its action, (ii) its action was preempted by the

---

[8] The letter stated "80% [of $87, 41.00] is due less deductible if applicable."

MSP Act, (iii) the claims were duplicative of a pending case, (iv) the claims were legally deficient, and (v) failed to allege satisfaction of a condition precedent. On June 1, 2016, Defendant's motion was denied by this Court.

On April 27, 2016, Plaintiff filed its Motion to Certify Class. On July 1, 2016, Defendant filed its Answer and Affirmative Defenses. Defendant filed its response in opposition to Plaintiff's Motion to Certify Class on September 22, 2016. The following day, Plaintiff filed its Reply to Defendant's Response in Opposition to Plaintiff's Motion to Certify Class. The hearing on Plaintiff's Motion to Certify Class began on September 26, 2016, and concluded on September 27, 2016.

Prior to the Class Certification hearing, the parties exchanged information via a Secure File Transfer Protocol ("sFTP") portal. The sFTP portal allowed for virtual storage of large documents and is only accessible to individuals with proper access credentials. Further, this portal ensured compliance with HIPAA in order to protect the privacy and security of individuals' medical records and other personal health information. The sFTP portal also contained documents entered into evidence at the hearing on Plaintiff's Motion to Certify Class, and summarized traffic crash data compiled and prepared by the Plaintiff. Throughout the hearing, the Court heard sworn testimony from:

    a.  Natasha Blanco, Plaintiff's witness and Head of the SIU Department;

    b.  Victor Pestien, Plaintiff's expert witness; and

    c.  Jodi Helf, called by the Plaintiff in its case in chief and also Defendant's witness.

Following the hearing, both parties stipulated that all exhibits would be submitted electronically. All exhibits were provided to the Court in DVD-R Form on October 11, 2016.

## V. **PREREQUISITES FOR CERTIFICATION PURSUANT TO RULE 1.220**

When determining whether to certify a class, a trial court must engage in a rigorous analysis to determine whether the class representative and putative class members meet the requirements for class certification promulgated in Rule 1.220 of the Florida Rules of Civil Procedure. Sosa v. Safeway, 73 So.3d 91, 105 (Fla. 2011); Morgan v. Coats, 33 So.3d 59, 63 (Fla. 2d DCA 2010). The trial court must focus on the prerequisites for class certification set forth in Rule 1.220 and not on the merits of the causes of action asserted in the case. Sosa, 73 So.3d at 105. Accordingly, this Court makes no determination as to the merits of Plaintiff's claims or Defendant's defenses. Instead, it is the Plaintiff's burden in seeking class certification to establish that the requirements contained in Rule 1.220 have been met. As set forth in Rule 1.220(a), the four elements that a party must satisfy to obtain class certification are the following:

1) Numerosity – the members of the class are so numerous that separate joinder of each member is impracticable;

2) Commonality – the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class;

3) Typicality – the claim or defense of the representative party is typical of the claim or defense of each member of the class; and

4) Adequacy of Representation – the representative party can fairly and adequately protect and represent the interest of each member of the class.[9]

In addition to complying with the elements of Rule 1.220(a), the Plaintiff must also satisfy one of the three subdivisions of Rule 1.220(b). To comply with Rule 1.220(b)(1)(A), Plaintiff must demonstrate that "the prosecution of separate claims or defenses by or against individual

---

[9] This Rule is based on Federal Rule of Civil Procedure 23, which has been construed and applied, where appropriate, by Florida courts. See Broin v. Phillip Morris Companies, 641 So.2d 888, 889 n.1 (Fla. 3d DCA 1994) (finding that, as Rule 1.220 is patterned after Federal Rule of Civil Procedure 23, federal cases are persuasive authority).

members of the class would create a risk of . . . inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class." See Fla. R. Civ. P. 1.220(b)(1)(A).  Rule 1.220(b)(2) requires a showing that the Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Finally, Rule 1.220(b)(3) requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods to the fair and efficient adjudication of the controversy.  See Fla. R. Civ. P. 1.220(b)(3).

In Sosa, the Florida Supreme Court held that trial courts should "render an order on class certification as soon as practicable, with that order separately detailing the trial court's factual findings and conclusions of law, and, if proceeding with a class, specifically designating the applicable section of rule 1.220(b)." Sosa, 73 So. 3d at 117–18 (citing to Rule 1.220(d)(1)).  "In undertaking the initial analysis, a trial court may look beyond the pleadings and, without resolving disputed issues, determine how disputed issues might be addressed on a classwide basis." Id. at 117.  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. Eisen v. Carlisle, 417 U.S. 156, 178 (1974)(citing to Miller v. Mackey International, 452 F. 2d 424, 427 (5th Cir. 1971)). "A trial court should resolve doubts with regard to certification in favor of certification, especially in the early stages of litigation." Id. at 105; See also Commonwealth Land Title Ins. Co. v. Higgins, 58 So. 3d 280, 282 (Fla. 1st DCA 2011).

## VI.  <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

As set forth below, this Court finds that Plaintiff has met its burden of demonstrating that the requirements of Rule 1.220 have been met.

### A.  <u>Rule 1.220(a)</u>

#### 1. **Numerosity**

The central focus of this element is whether the members of the proposed class are so numerous as to make the separate joinder of each member impracticable. <u>Sosa</u>, 73 So.3d at 114. The law requires a low threshold for numerosity and no specific number and no precise count is needed to sustain the numerosity requirement.  <u>Id.</u>; <u>See</u> <u>Connor B. v. Patrick</u>, 272 F.R.D. 288, 292 (D. Mass. 2011) ("To satisfy [the numerosity] element, [p]laintiffs must overcome a relatively 'low threshold,' which does not impose a precise numerical requirement.").  Notwithstanding this low threshold, "classes as small as 25" satisfy the numerosity requirement.  <u>Estate of Bobinger v.</u> <u>Deltona Corp.</u>, 563 So. 2d 739, 743 (Fla. 2d DCA 1990); <u>Cox v. Am. Cast Iron Pipe Co.</u>, 784 F.2d 1546, 1553 (11th Cir. 1986) (holding "generally less than [21] is inadequate, more than [40] adequate, with numbers between varying according to other factors.").  Both Florida and federal courts recognize the "relatively low threshold to meet the numerosity requirement," in which they have held that "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," then "the first prong of Rule 23(a) has been met." <u>Garcia-Rubiera v. Calderon</u>, 570 F.3d 443, 460 (1st Cir. 2009) (quoting <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001)). Furthermore, "what constitutes numerosity depends on the specific facts of each case." <u>Cheney v.</u> <u>Cyberguard Corp.</u>, 213 F.R.D. 484, 489-90 (S.D. Fla. 2003).[10]

---

[10] <u>See</u> <u>also</u> <u>Evans v. U.S. Pipe & Foundry Co.</u>, 696 F.2d 925, 930 (11th Cir 1983) (noting "that where the numerosity question is a close one, a balance should be struck in favor of a finding of

Moreover, where the existence of an ascertainable class has been shown, there is no need to be able to specifically identify the individual members of the class prior to class certification. See Evans, 696 F.2d at 930 (holding that the party seeking certification does not need to establish the precise number of members of the proposed class). "Rather, class certification is proper if the class representative does not base the projected class size on mere speculation." Sosa, 73 So. 3d at 114.

In the instant case, the proposed class size is not based on mere speculation. The potential class includes the thirty-seven (37) MAOs administering an MA plan in Florida. Specifically, the Amended Complaint identifies these 37 entities believed to be members of the class:

1. Aetna Health Inc. d/b/a Coventry Health Plan of Florida, Inc.
2. AHF MCO of Florida, Inc. d/b/a Positive Healthcare
3. Amerigroup Florida, Inc.
4. AvMed, Inc. d/b/a AvMed Health Plans
5. Behealthy Florida, Inc. d/b/a Florida Blue
6. Better Health, Inc.
7. BlueMedicare Preferred HMO
8. Capital Health Plan, Inc.
9. CarePlus Health Plans, Inc.
10. Cigna Healthcare of Florida, Inc.
11. Eden Health Plans, Inc.
12. Florida Health Care Plans
13. Florida Health Solution HMO Company
14. Florida Healthcare Plus
15. Florida MHS, Inc. d/b/a Magellan Complete Care
16. Florida True Health, Inc.
17. Freedom Health, Inc.
18. Health First Health Plans, Inc.
19. Health Options, Inc. d/b/a Florida Blue HMO
20. HealthSpring of Florida, Inc. d/b/a Leon Medical Centers Health Plans
21. HealthSun Health Plans, Inc.
22. Healthy Palm Beaches, Inc.
23. Humana Health Insurance Company of Florida, Inc.
24. Humana Insurance Company
25. Humana Medical Plan, Inc.
26. Medica HealthCare Plans, Inc.
27. Molina Healthcare of Florida

---

numerosity.")

28. Neighborhood Health Partnership, Inc.
29. Optimum HealthCare, Inc.
30. Preferred Care Partners, Inc.
31. Preferred Medical Plan, Inc.
32. Simply Healthcare Plans, Inc. d/b/a Clear Health Alliance
33. Sunshine State Health Plan, Inc.
34. The Public Health Trust of Dade County d/b/a JMH Health Plan
35. Ultimate Health Plans, Inc.
36. UnitedHealthcare of Florida, Inc., and
37. WellCare of Florida, Inc.

Additionally, each of the 37 MAOs insure thousands of Medicare beneficiaries that are enrolled in their MA plans under Medicare Part C. Each class member is a secondary payer of medical expenses made on behalf of a Medicare-eligible enrollee, and the Defendant is a primary payer for thousands of Medicare Part C beneficiaries enrolled throughout the 37 MAOs. Each MAO in the class has paid claims to medical providers as a result of the injuries sustained from automobile accidents within the class period on behalf of a Medicare enrollee, which the Defendant presumably either should have paid or otherwise reimbursed the MAO as a secondary payer Arguably, each time the Defendant failed to satisfy its primary payer obligation, *i.e.*, by either failing to provide for primary payment or appropriate reimbursement with respect to an enrollee of any plan administered by any class member, a separate claim for relief under Section 627.736, Florida Statutes, arose.

Plaintiff obtained from the Florida Department of Motor Vehicles all automobile crash reports from 2006 through the first quarter of 2016. Plaintiff funneled this data by searching for every instance where Defendant's enrollees were either the driver or passenger in an automobile accident between December 2009 through the first quarter of 2016. From this subset of the data, Plaintiff pulled sixty-four (64) random automobile crash reports and ran the information through CMS' MMSEA reporting database. Forty-four (44) of the sixty-four (64) were reported to ISO. However, for only one (1) of these sixty-four (64) selected reports, was CMS notified that

Defendant was the primary payer. This appears to indicate that of the forty-four (44) cases reported to ISO, Defendant failed to report forty-three (43) of those instances to CMS. It was established at the evidentiary hearing that Defendant utilizes the same common practice and course of conduct in processing all of its no-fault claims. Consequently, it appears that each class member MAO may have hundreds of instances in which Defendant has potentially failed to provide primary payment, in violation of the Medicare Secondary payer laws and section 627.736, Florida Statutes, which require for no-fault benefits to be primary, and/or reimburse the MAO when payments have been made by these secondary payers. See Sosa, 73 So. 3d at 114 (finding that the plaintiff had "assuredly satisfie[d] the numerosity requirement" where the plaintiff "asserted a projected class of at least several hundred, if not thousands, of aggrieved class members").

The potential class of approximately thirty-seven (37) Florida MAOs "is a distinct class described with great certainty." Broin v. Phillip Morris Companies, Inc., 641 So.2d at 889. In addition, any absent class members may be identified from readily available data in the parties' possession and control. Plaintiff has presented evidence that, the State of Florida has approximately 40% of all Medicare beneficiaries enrolled in Medicare Part C plans and Miami-Dade County has approximately 60% of its Medicare population enrolled in Part C plans. See CMS website, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Dashboard/Medicare-Enrollment/Enrollment%20Dashboard.html. This accounts for millions of Medicare Part C Beneficiaries that are enrollees of one or more of the MAO's in Florida. The MAOs themselves are identified and any Medicare Part C enrollee can be identified by the MAO, as well as each insured with Defendant that had an accident within the claims period where the MAO's paid for medical bills associated with an automobile accident that Defendant was required to pay or reimburse.

Certainly, certification of the proposed class would result in expediency and avoid the inconvenience of many individual suits for reimbursement. See Broin, 641 So.2d at 891 ("class treatment will aid judicial efficiency and economy, and is warranted to avoid duplicitous litigation . . . ."). Based on the evidence presented, the Court finds that Plaintiff satisfies the numerosity requirement for certification and has shown that joinder of all of these claims would be impracticable.

## 2. Commonality

The commonality requirement is met when the moving party can show that the claims or defenses present common questions of either law or fact. Sosa, 73 So. 3d at 107-108. "The primary concern in the consideration of commonality is whether the representative's <u>claim arises from the same practice or course of conduct</u> that gave rise to the remaining claims and whether the <u>claims are based on the same legal theory</u>." Id. at 107 (emphasis added). The Plaintiff does not have to present class members with identical claims. Id. at 109. "The threshold of the commonality requirement is not high. A mere factual difference between class members does not necessarily preclude satisfaction of the commonality requirement. Individualized damage inquiries will also not preclude class certification." Id. at 107 (internal citations omitted). "[T]he commonality prong only requires that resolution of a class action affect all or a substantial number of the class members, and that the subject of the class action presents a question of common or general interest." Id. In fact, the

> commonality requirement is satisfied if the common or general interest of the class members is in the object of the action, the result sought, or the general question implicated in the action. This core of the commonality requirement is satisfied if the questions linking the class members are substantially related to the resolution of the litigation, even if the individuals are not identically situated.

Id. at 107-08 (internal citations omitted).

This Court finds that the questions of law and fact common to the resolution of all claims as asserted by the Plaintiff as well as the absent class members, include:

A. Did Defendant provide no-fault benefits to individual enrollees during the class period as advanced by Plaintiff?

B. How many of these individuals had Medicare Part C benefits through one or more of the MAOs in the State of Florida throughout the class period?

C. How many of the individuals with Medicare Part C benefits during the class period, were involved in automobile accidents wherein they incurred medical bills as a result of the use, maintenance or operation of a motor vehicle?

D. How many of the individuals that had Medicare Part C and insured by Defendant at the time of their automobile accident had their medical bills paid by the Plaintiff and/or absent class members instead of Defendant?

E. What is the amount of damages that the secondary payers would be entitled to receive as a result of the failure of Defendant to pay for medical bills incurred by the Medicare Part C beneficiaries and paid by the MAO or its assignee?

F. What is the amount of coverage for no-fault benefits extended for each of the Medicare Part C beneficiaries by Defendant?

G. What was the amount of coverage available to the Medicare Part C enrollee as afforded by Defendant to pay for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle?

H. What were the applicable coverage dates of the policy of insurance providing no-fault benefits to the Medicare Part C enrollee?

I. Was the Medicare Part C enrollee the driver, passenger, or non-motorist at the time of the accident?

J. Did the driver, passenger or non-motorist own a vehicle that was required to carry security pursuant to sections 627.733 – 627.736, Florida Statutes?

K. If the driver, passenger or non-motorist did not own a vehicle which was required to carry security, did they live with a resident relative who owned a vehicle which was required to carry security?

L. Which vehicle was the driver or passenger occupying, at the time of the accident, if the driver or passenger did not own a vehicle which was required to carry security and did not reside with a relative who owned a vehicle required to carry security?

M. Which vehicle struck the non-motorist at the time of the accident, if the non-motorist did not own a vehicle which was required to carry security and did not reside with a relative who owned a vehicle required to carry security?

N. Did the Medicare Part C Enrollee incur medical bills which the primary payer should have paid?

O. Was the Medicare Part C Medicare Advantage Organization charged for medical bills which were the responsibility of the primary payer?

P. Did the Medicare Part C Medicare Advantage Organization pay for medical bills which were the responsibility of the primary payer?

Q. Has the primary payer reimbursed the Medicare Part C Medicare Advantage Organization for medical bills which were the responsibility of the primary payer?

R. What is the total amount of damages that the primary payer must pay the Medicare Part C Medicare Advantage Organization as the reimbursement amount?

S. Whether Defendant, as enrollee's no-fault PIP insurer, is required to reimburse Plaintiff, as the secondary payer, the amounts charged for medical expenses incurred during enrollee's emergency/in-patient medical treatment(s), service(s) and/or any other payment(s) made by Plaintiff, for which Defendant was primarily responsible pursuant to its contractual and statutory obligations?

T. Whether Federal law preempts state law and/or any defenses Defendant might raise, which conflict with the statutory and regulatory provisions that render CMS and MAOs secondarily responsible for payment of medical services and/or supplies, where a primary payer, such as Defendant, exists?

U. Whether the enrollee received emergency medical services, hospital inpatient services and/or other medical treatment or supplies as a result of the use, maintenance or operation of a motor vehicle that rendered Defendant primarily responsible to satisfy such expenses before Plaintiff and the class were obligated to make secondary payments on behalf of the enrollee?

V. Whether pursuant to 42 C.F.R. § 411.25, Defendant was required to provide notice or otherwise inform Plaintiff, and the class, that it is a primary payer, and to further provide specifics as to the accident or injury for which it is primarily responsible?

W. Whether Plaintiff and the class are authorized to bill Defendant full charges?

X.  Whether Plaintiff and the Class are authorized to recover the full charged amount from Defendant, as provided in Section 627.736, Florida Statutes? [11]

a.  **Defendant's Common Practice and Course of Conduct**

As set forth below, Plaintiff's claims arise from the same practice and course of conduct in Defendant's claims processing procedure and methodology and are based on the same legal theory. See Sosa, 73 So. 3d at 107 (finding commonality where the plaintiff's claims "arose from the same course of conduct and routine billing practice by [defendant] and were based on the same legal theory."). Plaintiff has presented evidence that Defendant's common practice and course of conduct in processing no-fault claims pertaining to any and all of its claims within the class period is the same. Specifically, the Defendant processes its no-fault claims by:

1. maintaining PIP payout sheets that contain identical fields, including, but not limited to, the following fields: claim number; last name; first name; payee; stub comments; and amount;

2. maintaining "explanation of benefits" that contain identical fields and data within the fields, including, but not limited to:  claimant name; claim number; date of loss; policy number; state of jurisdiction; and coverage type;

3. maintaining the information in its "explanation of benefits" in an electronic format, which can be recreated;

4. having knowledge of its obligation to report to CMS regarding the Medicare eligibility of its injured insureds;

5. sending form letters to its insureds to inquire whether they are Medicare eligible, which are limited to inquiring only about Medicare Part A, Part B, and group health insurance, and not Medicare Part C (*i.e.*, Medicare Advantage);

6. only reporting to CMS if its insured informs it of its Medicare eligibility;

7. using ISO in an attempt to satisfy its Medicare reporting responsibility;

8. not utilizing any specific guidelines for determining whether or not its insureds are Medicare eligible; in fact, it appears that Defendant processes claims involving its

---

[11] This list is not exhaustive and may include more common questions given that the claims of the Plaintiff and the purported class members arise from the same practice and course of conduct of the Defendant and are based on the same legal theory.

medicare eligible insureds no different than the claims involving its non-medicare eligible insureds;

9. Jodi Helf, Defendant's compliance officer, admits that the determination as to whether medical treatment is reasonable, related, or necessary as a result of the use, maintenance, or operation of a motor vehicle is made by a computer system;

10. not requiring its insureds to provide social security numbers or maintaining a guideline or protocol to determine whether an insured of the Defendant, making a PIP claim, was also a Medicare beneficiary;

11. routinely failing to notify CMS about every instance in which it receives a no-fault claim from a Medicare beneficiary;

12. only informing CMS of its insured's Medicare eligibility if it is made aware that its insured is Medicare eligible;

### b. <u>There is a Common and General Interest as to Both the Law and Facts as it Pertains to the Class Representative and the Absent Class Members Claims</u>

Plaintiff demonstrated by substantial competent evidence that the questions of common or general interest apply to all class members, *i.e.*, the right to reimbursement for payments made for Medicare enrollees' medical expenses. See <u>W. Heritage</u>, 832 F.3d at 1238 (finding "the primary plan's failure to make primary payment or to reimburse the MAO causes the MAO an injury in fact. Therefore, an MAO may, but is not obligated to, avail itself of the MSP private cause of action and/or state law claims when a primary plan fails to make primary payment or to reimburse the MAO's secondary payment."). Defendant is primarily responsible in all instances when there is a Medicare beneficiary that has been involved in a car accident and incurred medical expenses. Plaintiff has also demonstrated by substantial competent evidence that the class members have a similar interest in the relief sought and a common right of recovery, *i.e.*, reimbursement for payments made as a result of Defendants' failure to comply with Section 627.736, Florida Statutes, and 42 U.S.C. § 1395y.

In view of the foregoing, the Court finds that the Plaintiff satisfies the commonality requirement.  See Sosa, 73 So.2d at 110 (finding trial court erred in negating commonality requirement where it focused on the possibility of mere factual differences rather than on whether "the class members predicated their claims or the same common course of conduct by the defendant and the same legal theory.")

### 3. Typicality

"The *key inquiry* for a trial court when it determines whether a proposed class satisfies the typicality requirement is whether the class representative possesses *the same legal interest* and has endured *the same legal injury* as the class members." Sosa, 73 So. 3d at 114 (citing to Morgan v. Coats, 33 So. 3d at 65).  "The test for typicality, like the test for commonality, is not demanding and focuses on the general similarity between the named plaintiff[s]' legal and remedial theories and the theories of those whom they purport to represent."  Morgan, 33 So. 3d at 65; See also Clausnitzer v. Fed. Exp. Corp., 248 F.R.D. 647, 656 (S.D. Fla. 2008) (holding that "[a]s is the case with commonality, the requirements of typicality are not high.").

Mere factual differences between the class representative's claims and the claims of the class members will not defeat typicality. Sosa, 73 So.3d at 114.  Rather, the typicality requirement is satisfied when there is a strong similarity in the legal theories upon which those claims are based and when the claims of the class representative and class members are not antagonistic to one another. Id. at 114-115; See Morgan, 33 So.3d at 65 ("The typicality requirement may be satisfied despite substantial factual differences...when there is a strong similarity of legal theories."). Furthermore, the fact that the extent of damages might vary between the different class members does not bar a finding of typicality. Id.

In the instant case, Plaintiff and the putative class have similar interests in the relief they seek and their common rights of recovery, *i.e.*, reimbursement for payments made as a result of Defendant's alleged failure to comply with Section 627.736, Florida Statutes.  Plaintiff's claims are typical of the class claims since every single class member may have a right to reimbursement from the Defendant as it pertains to every one of its Medicare Part C enrollees who had an accident during the claims period and for which the class members made payments and were not reimbursed.

Defendant's common practice and course of conduct in processing its no-fault claims gives rise to the claims of Plaintiff and the putative class members.  See Basco, 216 F. Supp. 2d 592, 599 (E.D. La. 2002).  (holding the typicality requirement was met "because the representative plaintiffs ha[d] been affected by the same [] [pattern and] practices that affect[ed] all members of the Class").  It is Plaintiff's theory that its rights, and those of others similarly situated, arise through the payments made by the MAOs as secondary payers for which Defendant was primarily responsible and should have itself paid, or properly reimbursed MAOs, for their payments.

As such, it appears that Plaintiff's interest is "aligned with those of the represented group, and in pursing [its] own claims, the [] [P]laintiff will also advance the interests of the class members." See Basco, 216 F. Supp. 2d at 599.  The claims of the Plaintiff and the putative class members are based on the same legal theory that appears to have arisen from the same course of conduct that caused alleged similar injuries to all class members.  Specifically, the Court finds the following similarities in all of the potential claims of the class members:  (1) that Defendant is an insurance company that provides no-fault coverage to Medicare Part C enrollees; (2) that Defendant is a primary payer in the event that a Medicare Part C enrollee is injured in an automobile accident and incurs medical expenses due to personal injuries; (3) that Plaintiff's

assignor and class members are secondary payers that seek reimbursement from Defendant for conditional payments made, for which Defendant may be responsible to pay as a primary payer; and (4) that Defendant may have violated Section 627.736, Florida Statute, by allegedly failing to:

(a) determine whether their insureds were Medicare beneficiaries;
(b) pay for Plaintiff and the class members' enrollees medical expenses stemming from an automobile accident;
(c) notify Plaintiff and the class members when they made payments that they should not have pursuant to 42 CFR 411.25(a); and
(d) reimburse Plaintiff and the class members for the payment of medical expenses of Medicare Part C enrollees stemming from an automobile accident.

Plaintiff and the absent class members all have identical rights pertaining to the causes of action that may be pursued to obtain reimbursement from the Defendant, as a primary payer.  As asserted in the Amended Complaint, Plaintiff's breach of contract claim for Defendant's failure to pay PIP benefits' claims are typical of the causes of action that would be asserted by every absent class member.  As a result, the Court finds that Plaintiff has satisfied the typicality requirement for class certification.

### 4. Adequacy of Representation – Class Counsel and Class Representative

To grant class certification, a trial court must find that the representative party can fairly and adequately protect and represent the interests of each member of the class.: Fla.R.Civ.P. 1.220(a)(4).  "A trial court's inquiry concerning whether the adequacy requirement is satisfied contains two prongs. The first prong concerns the qualifications, experience, and ability of class counsel to conduct the litigation. The second prong pertains to whether the class representative's interests are antagonistic to the interests of the class members." Sosa v. Safeway Premium Fin. Co., 73 So. 3d 91, 115 (Fla. 2011) (internal citations omitted). "The relationship between the class and class representatives must be free from conflicts of interest, and the adequacy analysis serves to uncover conflicts of interest between named parties and the class they seek to represent." Grosso

v. Fid. Nat. Title Ins. Co., 983 So. 2d 1165, 1173 (internal quotations omitted).   However, "the existence of minor conflicts alone will not defeat a party's claim to class certification; the conflict must be a 'fundamental' one going to the specific issues in controversy." United Wis. Servs. v. Abbott Labs. (In re Terazosin Hydrochloride Antitrust Litig.), 220 F.R.D. 672, 688 (S.D. Fla. 2004) (emphasis added).

### a. Plaintiff's Counsel Possess Sufficient Experience and Resources to Serve as Class Counsel

Plaintiff established, and Defendant stipulated, that John H. Ruiz, Frank C. Quesada, and Gonzalo Dorta have the experience, resources, and commitment to prosecute this case vigorously to a successful resolution as they possess:

    a. the requisite knowledge and experience in the MSP law necessary to prosecute this case by virtue of their representation an active participation in other significant cases, and

    b. the financial resources necessary to prosecute this case and the personnel and staff to litigate this case.

In addition, evidence was presented that attorney John H. Ruiz has successfully certified a substantial number of no-fault class action cases that were later affirmed on appeal by the Florida Third District Court of Appeals.  A substantial number of these cases then received final settlement approval as being fair, reasonable and adequate to the class members.  Moreover, Mr. Ruiz and Mr. Quesada have significant experience litigating MSP cases, serving as counsel for multiple cases decided by the 11th Circuit Court of Appeals and Third District Court of Appeals.  Finally, Mr. Dorta has extensive trial practice in complex commercial litigation and has been lead trial counsel in various public interest class action claims.  Accordingly, the evidence established that Plaintiff's counsel is uniquely qualified to effectively represent the proposed class and hence is adequate counsel to prosecute this class action.

### b. Plaintiff's Interests Are Parallel to The Interests of the Class Members

Plaintiff alleges to be the owner of FHCP's and other MAOs' reimbursement claims, and seeks class certification to enforce the reimbursement rights of the Class for medical payments made on behalf of its Medicare enrollees.  Plaintiff demonstrated that it is "willing and able to take an active role as class representative and advocate on behalf of all class members."  See Sosa, 73 So. 3d at 115.  Specifically, Attorney John H. Ruiz, as Class Counsel, represented to this Court that co-counsel Gonzalo Dorta and Frank Quesada are disinterested parties who will look out for the interests of the other class members and if necessary, he invited this Court to appoint someone to oversee the litigation.

Defendant focused much of its argument at the hearing on the interrelationship between Plaintiff and Mr. Ruiz, the implication being that Mr. Ruiz is too closely related to the Plaintiff, which might in turn incentivize Plaintiff to place the interests of Mr. Ruiz above those of the class.  However, "to question [Plaintiff's] adequacy is to be unrealistic about the role of the class representative in a class action suit …. [T]he class action suit … is in fact entirely managed by class counsel. For 'class action attorneys are the real principals and the class representative/clients their agents' in class action suits." Phillips v. Asset Acceptance, LLC, 736 F.3d 1076, 1080 (7th Cir. 2013).  "It has long been understood that class counsel control class actions, perhaps even selecting the class representatives themselves, thereby reversing, not inscribing, the standard attorney/client relationship.  Newberg on Class Actions § 3:52 (5th ed.); See also New Directions Treatment Services v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (holding that "[e]xperience teaches that it is counsel for the class representative, and not the named parties, who direct and manage these actions.")  Furthermore, the Southern District of Florida has held that "but for [the] requirement that there be a named class representative", where "proving either Plaintiff's

case or that of other class members, [] will [] be established through expert testimony based on [] computer data", "[the] [p]laintiff is basically irrelevant to the case." Palm Beach Golf Ctr.-Boca, Inc. v. Sarris, 311 F.R.D. 688, 697 (S.D. Fla. 2015). Such is the case here, where as described below, Plaintiff has the ability to prove its case and that of the other class members, using computer data and analysis.

When asked directly by this Court to pinpoint the exact conflict presented by Ruiz as class counsel, Defendant's counsel was unable to articulate precisely why any familial relationship with the class representative was of import. Plaintiff also demonstrated that there is no hostility of interests between Plaintiff and the class members as Plaintiff has no objectives that are antagonistic to the claims of the class members it seeks to represent and/or claims it will pursue. To the contrary, Plaintiff demonstrated that its interests are parallel to the interests of the class members and that it seeks the same relief for itself as it does for the class.

### c. Absence of Any Fundamental or Substantial Conflicts

Defendants allege that the existence of potential conflicts of interest between Plaintiff and its counsel, render the Plaintiff an inadequate class representative. The Court is unpersuaded by this assertion.

"A named class representative and [its counsel] serve[s] the class in a fiduciary capacity because class plaintiffs undertake the litigation to protect and benefit the dependent class members they serve." Grosso, 983 So. 2d at 1173. Notwithstanding Plaintiff's fiduciary duty, the Southern District of Florida explained that the Defendant has the burden of proving the existence of a conflict, and stated in pertinent part,

> class certification cannot be defeated merely because Defendants assert unsupported allegations of conflict between potential class members. *When Defendants come forward with an alleged conflict, the Court must scrutinize the record citations Defendants cite to determine whether such evidence establishes*

> ***the existence of a conflict, or whether it provides a basis for the Court to imply
> that a realistic possibility of antagonism exists.***

In re Terazosin, 220 F.R.D. at 690 (emphasis added). "[T]he existence of minor conflicts alone
will not defeat a party's claim to class certification; ***the conflict must be a 'fundamental'*** one
going to the specific issues in controversy." Id. at 688 (emphasis added).  A fundamental conflict
exists

> where some party members claim to have been harmed by the same conduct that
> benefitted other members of the class. In such a situation, the named representatives
> cannot 'vigorously prosecute the interests of the class through qualified counsel'
> because their interests are actually or potentially antagonistic to, or in conflict with,
> the interests and objectives of other class members.

Id. at 688.  Further, "perfect symmetry of interest is not required and not every discrepancy among
the interests of class members renders a putative class action untenable.... Put another way, to
forestall class certification ***the intra-class conflict must be so substantial as to overbalance the
common interests of the class members as a whole***." Matamoros v. Starbucks Corp., 699 F.3d
129, 138 (1st Cir. 2012)(emphasis added)(rejecting Defendant's contention "that an
insurmountable intra-class conflict destroys any hope of adequacy of representation.")

Defendant relied on several cases for the proposition that that financial or family ties
between the class representative and class counsel may cause substantial conflicts of interest.  "The
primary concern in these cases is whether there is a threat the class representative may have an
interest in the attorneys' fees the class counsel may ultimately receive." Werlinger v. Champion
Healthcare Corp., 1999 ND 173, ¶ 22, 598 N.W.2d 820, 828.  Where "[t]here is no evidence in the
record, other than the [close] relationship itself, to support a charge of collusion between counsel
and the representative", there is no conflict of interest.  See Id. at 828 (explaining that there is no
conflict of interest where the only evidence in the record was the familial relationship between the
class representative and class counsel, as they were husband and wife). As noted by the Southern

District of Florida, "[c]ourts across the country have certified classes where the lead plaintiff was closely related to class counsel — *provided that the class representative demonstrated sufficient economic or decision-making independence from class counsel to mitigate the potential for conflicted interests.* Alhassid v. Bank of Am., N.A., 307 F.R.D. 684, 700 (S.D. Fla. 2015) (emphasis added).

Although Mr. Ruiz has business and financial relationships with different entities involved in this litigation, there is no evidence on the record, other than these close relationships, to support a charge of collusion between class counsel and the class representative. Conflicts that are merely speculative or hypothetical will not affect the adequacy inquiry. See Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 430 (4th Cir. 2003) (holding that "[t]o defeat the adequacy requirement [], a conflict 'must be more than merely speculative or hypothetical'"); In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998); Newman v. Eagle Bldg. Techs., 209 F.R.D. 499, 501-502 (S.D. Fla. 2002) (citing In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998); Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir. 1975) (noting that "courts have generally declined to consider conflicts…sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit.")

Defendant's assertions that there is a conflict of interest between Plaintiff's co-counsel, John H. Ruiz, and the putative class were unsupported and were rebutted by Plaintiff. The Defendant failed to show the existence of any conflict that would seriously call into question Mr. Ruiz's interest in representing the absent members with the same vigor with which he would represent the class representative. The fact that Mr. Ruiz's son is a member of Plaintiff's parent company, MSP Recovery Services, LLC[12], does not, without more, cause the disqualification of

---

[12] MSP Recovery Services, LLC owns Plaintiff, MSPA Claims 1, LLC.

Mr. Ruiz as co-class counsel.  Corporate filings show that neither Mr. Quesada nor Mr. Ruiz have a direct financial interest in the class representative's parent company, MSP Recovery Services, LLC.  In addition, Plaintiff established that any resolution or settlement in this action would be reached with the participation of Plaintiff's counsel and counsel for Plaintiff's assignor, FHCP.  Further, Mr. Ruiz represented that Plaintiff and Plaintiff's counsel entered into an agreement with Plaintiff whereby, Plaintiff's entitlement to attorney's fees from Defendant would be contingent on whether or not Plaintiff prevails on the merits.  Accordingly, Plaintiff has "demonstrated sufficient economic or decision-making independence from class counsel to mitigate the potential for conflicted interests." See Alhassid, 307 F.R.D. at 700.

Even if there were some conflict, "the addition of new and impartial counsel can cure a conflict of interest even where previous counsel continues to be involved in the case." Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1239 (9th Cir. 1998).  "The addition of an impartial attorney ensures that vigorous prosecution of the class claims will continue.  This course of action protects the class, which certainly would be prejudiced if compelled to retain new counsel, unfamiliar with the pending litigation." E. Me. Baptist Church v. Regions Bank, 2007 U.S. Dist. LEXIS 76430, 2007 WL 3022220 (E.D. Mo. Oct. 12, 2007) (holding that "there is no per se rule that the continued participation by [conflicted counsel] constitutes inadequate representation under Rule 23, so long as new and impartial counsel can be added to cure the conflict of interest.").  In the instant case, Plaintiff has retained Gonzalo R. Dorta to serve as co-counsel in order to avoid any potential conflict of interest between class counsel and the class members. See Linney, 151 F.3d at 1239.  Mr. Dorta is the managing partner of Dorta Law, and is not employed or associated in any manner with MSPA Claims 1, LLC, MSP Recovery Services, LLC, MSP Recovery, LLC or La Ley Recovery, Inc.  Clearly, there is no conflict between Mr. Dorta and the class representative.

Finally, Defendant's assertion that alleged conflicts between Plaintiff's counsel and Plaintiff will prejudice other class members, fails to account for the Court's broad authority over class action settlement terms in the event of a settlement.[13] "To approve a class action settlement, the trial court must find that the agreement was fair, reasonable, and adequate." Grosso, 983 So. 2d at 1173. When making this determination, the Court must consider several factors, including, but not limited to: (1) the reaction of the class to the settlement; and (2) the reasonableness of the settlement in light of the best recovery. Id. Further, the Court must also consider the reasonableness of attorneys' fees and costs and the adequacy of notice to the class. See Id. at 1175-76 (holding that "the reviewing court must require that notice be given to the class of the proposed attorneys' fees as well as the rest of the settlement agreement and afford anyone who objects an opportunity to be heard"); Fung v. Fla. Joint Underwriters Ass'n, 840 So. 2d 1101, 1102 (Fla. 3d DCA 2003) (holding that, "the trial court is allowed to conduct whatever investigation it feels appropriate before approving a class action settlement. Where . . . the court ha[s] a concern that the attorney's fee might be excessive, the court ha[s] the latitude to conduct whatever proceedings it [feels are] appropriate.").

### d. No Conflict Representing Class Members MAOs

Defendant alleges an existing conflict based on the presumption that, because John Ruiz had previously brought suit against certain insurers, the proposed class counsel is inadequate to represent this class. Defendant requests that this Court take judicial notice of several civil remedy notices filed by Mr. Ruiz against various insurers which may potentially be class members in the

---

[13] The court acts as a "gatekeeper" to the proper administration of justice in class actions. The legislature endowed courts with a broad range of authority to scrutinize settlements. Hillary A. Sale, *Judges Who Settle*, 89 Wash. U.L. Rev. 377, 390 (2011); See Elizabeth Chamblee Burch, *Disaggregating*, 90 Wash. U.L. Rev. 667, 678–79 (2013); See also Managing Class Action Litigation: A Pocket Guide for Judges, 2005 WL 5672417.

instant litigation. Defendant's argument has been rejected by many Florida courts and federal circuit courts throughout the country.

Courts also acknowledge that a finding of inadequacy to every class counsel who may have served in an adversarial role to one or more class members would effectively eliminate class actions entirely.  "The strict application of rules on attorney conduct that were designed with simpler litigation in mind might make the class-action device unworkable in many cases, the courts insist that a serious conflict be shown before they will take remedial or disciplinary action." Bash v. Firstmark Standard Life Ins. Co., 861 F.2d 159, 161 (7th Cir. 1988).  Courts have also required that some evidence must be provided to support a Defendant's position that a conflict of interest exists between class counsel and class representatives.  See Diakos v. HSS Sys., LLC, 137 F. Supp. 3d 1300, 1309 (S.D. Fla. 2015) (As to counsel's adequacy, "[a]bsent specific proof to the contrary, the adequacy of class counsel is presumed").  The Third District Court of Appeal has held a party lacks standing to allege a conflict of interest when that party has no privity of contract with the counsel and is not the party which could potentially be prejudiced by the alleged conflict.  See Cont'l Cas. Co. v. Przewoznik, 55 So. 3d 690, 691 (Fla. 3d DCA 2011).

There is no legal or factual support for Defendant's argument that proposed class counsel in the instant case possesses a potential conflict in representing the class members merely because some class members may have been involved in litigation with class counsel.  The civil remedy notices Defendant relies on have no relation to the facts or law relevant to this case since they involved group health plans and not the class member's Medicare Advantage Plans. Further, MAOs have to contract with CMS.  None of the civil remedy notices deal with Medicare benefits, Medicare beneficiaries, or MAOs.  The court in Bash recognized that a class action would be reduced to a meaningless procedural device if all attorneys who may have previously represented

one of the many potentially thousands of class members were found to be inadequate.  See Bash, 861 F.2d at 161.  Defendant has presented no credible evidence of a conflict of interest between class counsel and the class members.

### c. No Presumed Inadequacy of Single Purpose Entities

Defendant's argument that Plaintiff is a single purpose entity, and thus, would be an inadequate class representative is unavailing.  Defendant was unable to point this Court to any case in which a single purpose entity was prohibited from serving as a class representative and/or class counsel.  In fact "[p]roceeding under the [MSPA Claims 1] umbrella has [a] legitimate business purpose: that of 'promot[ing] efficiency and reduc[ing] costs."  BG Litig. Recovery I, LLC v. Barrick Gold Corp., No. 15-civ-8457, 2016 BL 123389, at *9 (S.D. N.Y. Apr. 18, 2016).  The evidence presented demonstrated that by aggregating thousands of claims, the class members obtain the benefits of economies of scale where the identification of claims and pursuit of recovery costs are lower than the recoverable amounts.[14]

### B. Rule 1.220(b)(3)

In addition to meeting the preliminary requirements of Florida Rule of Civil Procedure 1.220(a), Plaintiff must also meet one of the standards under Rule 1.220(b).  Plaintiff's Motion to Certify Class is based on Rule 1.220(b)(3) which requires that the questions of law or fact common to the claim of the representative party and the claims of each class member predominate over any questions of law or fact affecting only individual members of the Class, and that class representation is superior to other methods for the fair and efficient adjudication of the controversy.

---

[14] Plaintiff has also voluntarily dismissed the separate federal action that it previously filed in order to prevent any perceived conflict of interest.

### 1. Predominance

"Florida courts have held that common questions of fact predominate when the defendant acts toward the class members in a similar or common way." Sosa, 73 So. 3d at 111. "The methodology employed by a trial court in determining whether class claims predominate over individual claims involves a proof-based inquiry. More specifically, a class representative establishes predominance if he or she demonstrates a reasonable methodology for generalized proof of class-wide impact." Id. at 112. "A class representative accomplishes this if he or she, by proving his or her own individual case, necessarily proves the cases of the other class members." Id. While claims may have minor factual differences, "it is not the burden of the class representative to illustrate that all questions of fact or law are common . . . . [r]ather, the class representative must only demonstrate that some questions are common, and that they predominate over individual questions." Id. (citations omitted).  Further, the predominance inquiry focuses on liability, not damages. Id. at 113.

Here, as set forth below, Plaintiff's claims sought to be presented on a class-wide basis are predicated on a single common theory of liability, i.e., the Defendant's failure to pay and/or reimburse, which gives rise to the Plaintiff's causes of action sounding in state law claims pursuant to Section 627.736, Florida Statutes.  Each class member's claim would require proof of the same material and substantive facts. Sosa, 73 So. 3d at 112. The actual claims are based on the same legal theories and are based the same course of conduct by the Defendant.  The required proof, as set out in Western Heritage, is: "(1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount." W. Heritage, 832 F.3d at 1239.  Thus, if Plaintiff is able to prove the elements of his

claims, he would necessarily be able to prove the elements of the claims of each of the other class members.

Ultimately, the individual cases arise out of the same nucleus of operative facts; that Defendant has uniformly failed to: (1) provide primary payment for medical expenses incurred by its insured, *i.e.* the Medicare enrollees; and/or (2) reimburse and/or pay the secondary payer, the MAO, for payments provided for Medicare enrollees' medical expenses whereby the Defendant was primarily liable causing liquidated damages.  In none of the cases, neither the beneficiary nor the primary payer have contested the amount of reimbursement by exhausting administrative remedies, which may now be time barred.   Each class member will have incurred the same type of injury proximately caused by the same Defendant based on the same general factual scenario, a failure to pay or reimburse as a primary payer for medical bills that resulted from an auto accident during the claims period.

Defendant admittedly uses the same process every time to determine whether it should pay a claim.  The process that is always consistent and is their common course of conduct includes, but is not limited to:

1. maintaining PIP payout sheets that contain identical fields, including, but not limited to: name of the claimant; date of birth; claim number; date of loss; coverage status; deductible amount; provider number; service dates; billed amount; bill date of receipt; and paid amount.

2. maintaining insurance "explanation of benefits" that contain identical fields and data within the fields, including, but not limited to:  name of the insured; address of the insured; policy period; year, make, and model of the vehicle; vehicle identification number; personal injury protection coverage status; amount of coverage; and deductible amount;

3. sending form letters to its insureds to inquire whether they are Medicare eligible, which are limited to inquiring only about Medicare Part A, Part B, and group health insurance, and not Medicare Part C (*i.e.*, Medicare Advantage);

4. only reporting to CMS if its insured informs it of its Medicare eligibility;

5. using ISO in an attempt to satisfy its Medicare reporting responsibility;

6. not utilizing any specific guidelines for determining whether or not its insureds are Medicare eligible;

7. not requiring its insureds to provide social security numbers or maintaining a guideline or protocol to determine whether an insured of the Defendant, making a PIP claim, was also a Medicare beneficiary;

8. routinely failing to notify CMS about every instance in which it receives a no-fault claim from a Medicare beneficiary.

9. only informing CMS of its insured's Medicare eligibility if it is made aware that its insured is Medicare eligible.

### a. Reasonable Methodology for Generalized Proof of Class-Wide Impact

As noted in Sosa, a class representative establishes predominance if he or she demonstrates a reasonable methodology for generalized proof of class-wide impact. Sosa, 73 So.3d at 112. Using a software system ("MSP System") designed and developed by Plaintiff and its counsel, Plaintiff has demonstrated by substantial evidence that it has implemented a methodology to capture, compile, synthesize and funnel large amounts of data in order to identify claims class-wide. This MSP System captures data from different sources to identify the class-member enrollees' medical expenses incurred as a result of an automobile accident and which should have been paid for by Defendant. The MSP System can also identify the amounts owed by using the Defendant's electronic data, the MAO's data and data acquired from outside sources like the Department of Motor Vehicles, ISO and CMS. Plaintiff merges the Defendant's own data with the information available on the MSP System to discover and identify a Medicare eligible person for whom primary medical payments should have been made along with any information stored as to potential class members.

### b. Plaintiff's Use of ICD and CPT Codes, CMS Data, ISO Data, Crash and Police Report Data, and PIP Related Records

Plaintiff's claims analysis methodology utilizes International Classification of Diseases Codes ("ICD Codes") and Current Procedural Terminology Codes ("CPT Codes") commonly used in the healthcare and automobile insurance industries, to identify and obtain any information regarding an enrollees' underlying case, such as the type of injury suffered, the circumstances that caused the injury, whether the listed primary insurance provider made payment, and whether the insurance carrier was a no-fault provider. Plaintiff's claims analysis methodology also uses the Ability[15] software system.[16] Access to this software system allows Plaintiff to determine whether a primary plan[17] is in compliance with reporting requirements pursuant to 42 U.S.C. § 1395y(b)(8) and 42 C.F.R. § 411.25. These reporting requirements:

> help[] CMS determine when other insurance coverage is primary to Medicare, meaning that it should pay for the items and services first before Medicare considers its payment responsibilities . . . . Upon receipt of this information, CMS checks whether the injured party associated with the claim report is a Medicare beneficiary, and determines if the other insurance is primary to Medicare. CMS then uses this information in the Medicare claims payment process and, if Medicare paid first when it should not have, uses it to seek repayment from the other insurer or the Medicare beneficiary.

https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html. A primary payer's failure to comply

---

[15] Ability is an authorized health information handler for CMS. CMS website, https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/ESMD/Downloads/2015esMDAnnualProgramReport10-01-2014-09-30-2015_508.pdf.

[16] See Negrete v. Allianz Life Ins. Co. of N. Am., 238 F.R.D. 482, 494-95 (C.D. Cal. 2006) (standard software is a plausible method for class wide proof).

[17] "An organization that must report under Section 111 is referred to as a responsible reporting entity (RRE) . . . . RREs include . . . no-fault insurers . . . ." CMS (Dec. 14, 2015), https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html.

with these reporting requirements results in the primary provider not being found in the government's records and hence, prevents learning about the existence of an underlying no-fault policy.  However, in this case, Plaintiff's further investigation uncovered the fact that Defendant was the enrollee's PIP insurance carrier.

Upon obtaining this data from CMS, Plaintiff uses complex algorithms to place the extracted electronically stored information into separate data fields.  The algorithm is a mathematical command given to the software system to recognize certain data fields. See Infection Preventions Techs., LLC v. Lumalier Corp., No. 10-12371, 2012 BL 440126, at *18 (E.D. Mich. Aug. 8, 2012) (defining algorithm as "a mathematical rule or procedure for solving a problem."). The information obtained includes whether the Defendant has reported a claim for a class member's enrollee.  The Plaintiff then matches the data with other sources of publicly available data such as, car crash reports, ISO reports responsibility, and the MAOs' claims data.

Insurance Service Office ("ISO") is a database that stores information about property/casualty insurance risk.  ISO provides advisory services and information to many insurance companies.  Specifically, Defendant indicated that they use ISO reports to submit information and report and investigate claims.  Defendant inputs information about car crashes and their enrollees into ISO.  Plaintiff's system cross-references the information in its possession with common source documents, such as ISO reports, that no-fault insurers and Defendant utilize by common practice and custom, to find any other claim that had been made by the Medicare beneficiary, regardless of whether it is a slip and fall, or a car accident so long as that insurance company subscribes to that service.

Plaintiff has also obtained from the Florida Department of Motor Vehicles all automobile crash reports for every automobile crash in Florida from 2006 to the present.  Plaintiff purchases,

manages and stores police reports for any enrollee that pertain to the underlying Medicare claim incident. Defendant maintains an Explanation of Benefits (EOB) sheet in electronic format for every enrollee. Defendant's EOB sheets contain information related to: claimant, date of birth, claim number, date of loss, coverage clear, deductible, no-show, and provider number. Plaintiff integrates this information into its system to identify whether PIP benefits for an insured have been exhausted and whether the benefits have been paid properly. Plaintiff's System also accesses federal, state and county court dockets throughout Florida to identify additional instances in which an enrollee of Defendant or a putative class member may be involved in a lawsuit related to a recoverable claim.

### c. Class Wide Proof

This Court finds that Plaintiff's ability to capture data in large volumes, and to simultaneously, categorize, normalize, and utilize the captured data, along with data from outside sources, is a common, reasonable and very effective methodology for generalized proof of class-wide impact for Plaintiff and its potential class members. Plaintiff has demonstrated that it can utilize its MSP system to prove, on a class wide basis, the Defendant's liability as well as the amount owed for liquidated damages as a result of the Defendant's alleged failure to pay or reimburse. Plaintiff further elicited testimony from Dr. Victor Pestien, who testified that the data available could also be used to establish statistical damage amounts, as well as a methodology to be able to handle this matter class wide.

### d. Common Questions Predominate

Defendant argues that the predominance requirement cannot be met because the claims of each of the claimants/insureds are highly dependent upon the individual characteristics of each claim and are not susceptible to class-wide proof. This Court disagrees. The mere existence of

some individualized issues does not prevent a finding of predominancy.  Similarly, the simple identification of some common questions of law or fact is not sufficient to satisfy the predominance requirement because the predominance inquiry is far more demanding than the commonality requirement.  Sosa, 175 So.2d at 112.  The key is whether the common questions of law or fact, of which there are many in this case, predominate and pervade over these individual issues.  Id. at 111.

While the Defendant has identified some potential individualized issues, this Court finds that the common questions of law or fact in this case predominate over any individualized issues that may arise.[18]  This is not a case dealing with contract formation issues or dealing with unwritten contracts.  See Celebrity Cruises, Inc. v. Rankin, 175 So.3d 359, 362 (Fla. 3d DCA 2015).  This is also not a typical, run-of-the-mill PIP case.  To the contrary, as demonstrated at the evidentiary hearing, this is a case dealing with (1) claims that all arise from the Defendant's common course of conduct and business practice, as a primary payer, that allegedly resulted in the failure to pay and/or reimburse Plaintiff and the putative class members (i.e., secondary payers) in violation of written contracts and Section 627.736, Florida Statutes, and (2) claims that can be proven on a class-wide basis utilizing the sophisticated and reasonable methodology for generalized proof described in detail above.

### 2. Superiority

Courts consider three factors when deciding whether a class action is the superior method of adjudicating a controversy.  They are: "(1) a class action would provide the class members with the only economically viable remedy; (2) there is a likelihood that the individual claims are large

---

[18] Many of the individualized issues raised by Defendant are centered around defenses that may not legally be available to the Defendant.  See infra Part VII and note 19; See also Sosa v. Safeway, 73 So.3d at 105 ("trial court should resolve doubts with regard to certification in favor of certification, especially in the early stages of litigation.")

enough to justify the expense of separate litigation; and (3) a class action cause of action is manageable." Sosa, 73 So. 3d at 115.  As set forth below, these superiority factors weigh in favor of class certification.

### a. Economically Viable Remedy

Each class member MAO may have hundreds of instances in which Defendant has potentially failed to provide primary payment.  Since an MAO's claim may be worth as little as a few hundred dollars, the costs associated with pursuing such a claim, such as the hiring of an attorney and the costs of purchasing necessary public record data from data vendors and the state and federal governments, would likely exceed the value of the claim and the potential recovery, thereby resulting in an MAO's decision to pursue reimbursements on an individual basis very unlikely.  Here, aggregating potentially thousands of claims provides the class members with the benefit of economies of scale where the identification of claims and pursuit of recovery costs are lower than the recoverable amounts.

### b. Justification of Separate Litigation

As no individual claim exceeds the statutory $10,000 maximum no-fault payment amount, there is no individual claim large enough to justify the expense of separate litigation considering standard attorney fee rates in this jurisdiction and the costs of collection.

### c. Manageability

It is the custom and practice of the parties, the State of Florida and CMS to maintain records in a detailed electronic format.  Based on these practices, Plaintiff's counsel designed and developed its MSP system to store and funnel the records and data to identify the subject claims. Accordingly, identifying and managing the claims for which the Defendant may be liable for

reimbursement is automatic and only limited by the specific parameters that may be delineated by this Court.

In this case, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of each class member would be impractical.   A class action will preserve judicial resources, reduce the overall expense of litigation, streamline legal questions common to the identical legal claims of all class members, and result in an expeditious resolution of claims. Furthermore, a class action will concentrate all the litigation against Defendant (based on primary payer responsibility derived from its no-fault insurance policy) in one forum with no unusual manageability problems.  Defendant's liability and the nature of the class members' damages may also be readily proven through common class-wide proofs.  See Sosa, 73 So.3d at 116 (finding class action would be more manageable and more efficient use of judicial resources where large number of potential class members based their claims on the same course of conduct by defendant).

In addition, there are a number of management tools available which the Court may use to address any individualized damage issues that might arise out of a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.  See Ouellette v. Wal-Mart Stores, Inc., 888 So. 2d 90, 91-92 (Fla. 1st DCA 2004).  Moreover, the Court has a continuing duty to ensure compliance with class action requirements and therefore may decertify a class at any time.  Cole v. CRST, Inc., 317 F.R.D. 141, 144 (E.D. Cal 2016).  "Even after a

certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." General Telephone Co. v. Falcon, 454 U.S. 147, 160 (1982).

In conclusion, this Court finds that class treatment is the most manageable way to resolve the individual claims of each class member.

## C. Standing Requirements

### 1. Injury in Fact

A threshold inquiry in a motion for class certification is whether the class representative has standing to represent the putative class members. Sosa v. Safeway Premium Fin. Co., 73 So. 3d 91, 116 (Fla. 2011). To satisfy the standing requirement for a class action claim,

> the class representative must illustrate that a case or controversy exists between him or her and the defendant, and that this case or controversy will continue throughout the existence of the litigation. In deciding if a party has alleged a justiciable case or controversy, "the trial court is *not* required to determine the merits of the case." Rather, the trial court must determine if the class representative has alleged sufficient facts to establish a legal issue for the court's resolution.

Id. at 116-117 (internal citations omitted). "A case or controversy exists if a party alleges an actual or legal injury." Id. at 117. "An actual injury includes an economic injury for which the relief sought will grant redress. Id. That injury must be distinct and palpable, not abstract or hypothetical." Id.

The Amended Complaint contains detailed allegations to establish a *prima facie* case that the Plaintiff, as assignee of FHCP's claims reimbursement rights, suffered an actual injury by having paid medical expenses as a result of the injuries suffered by the Enrollee in the Accident. This injury is "distinct and palpable" as FHCP made payments of Medicare benefits on behalf of its MA enrollee, Enrollee, for which FHCP was not primarily liable. Plaintiff alleges that as the Enrollee's no-fault insurer, Defendant had primary responsibility and was primarily liable for the

payment of medical expenses for its insured and that FHCP did not receive proper reimbursement for payments it actually made for Enrollee's medical expenses from Defendant.  Therefore, the injury allegedly suffered by the Plaintiff is not a hypothetical injury but rather an actual economic injury resulting from the Defendant's alleged failure to comply with its primary payer obligations under Florida's No-Fault law.  A "primary plan's failure to make primary payment or to reimburse the MAO causes the MAO an injury in fact." W. Heritage, 832 F.3d at 1238. The injury for which Plaintiff seeks redress is alleged to have been caused by Defendant's conduct, and therefore, a decision in Plaintiff's favor under Counts I - IV would redress that economic injury.

However, Plaintiff must not only demonstrate individual standing, but must also "[possess] the same legal interest and [have] endured the same legal injury as the [putative] class members." Sosa, 73 So. 3d at 114; See Fla. R. Civ. P. 1.220(a)(3).  This Court finds that Plaintiff possesses the same legal interest and has endured the same legal injury as the members of the class. Accordingly, Plaintiff may serve as class representative since Plaintiff's claims are typical of the class claims.

### 2.  Plaintiff's Assignments

The Defendant's argument challenging Plaintiff's standing by specifically disputing the validity of the assignment agreements has already been considered by this Court.  The standing issue was previously raised by the Defendant in a Motion to Dismiss.  By Order dated April 11, 2016, this Court denied the Motion to Dismiss.  For purposes of this motion, the Court has once again considered the standing issue as it relates to the assignment of agreements.  The Court finds that Plaintiff has alleged sufficient facts and produced sufficient evidence to establish that it has standing. See also MSP Recovery LLC v. Allstate Ins. Co., 835 F.3d 1351, 1357-1358 (11th Cir. 2016).

## VII. DEFENDANT'S AFFIRMATIVE DEFENSES

It is well established that a court may not consider merits issues in ruling on class certification. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974). Thus, at the class certification stage, courts "have generally refused to consider the impact of affirmative defenses...." International Woodworkers of Am. v. Chesapeake Bay Plywood Corp., 659 F.2d 1259, 1270 (4th Cir. 1981). The Eleventh Circuit Court of Appeals noted that "several federal courts have determined that the appropriate time for a class action defendant to raise affirmative defenses and set-off claims is during the damages phase." Allapattah Services, Inc. v. Exxon, 333 F.3d 1248, 1259 (11th Cir. 2003). Here, the affirmative defenses raised by Defendant are either denials, relate exclusively to damages, or go to the merits of Plaintiff's claims. As a result, these defenses have little to no bearing on the Court's analysis for class certification. See Plubell v. Merck & Co., 289 S.W.3d 707, 716 (Mo. App. 2009) ("defenses that go to the merits of the case ...are not properly considered in class certification."); See also Allapattah Services, Inc. v. Exxon, 333 F.3d at 1261 (affirmative defenses which pertain primarily to damages rather than liability are immaterial to the issue of class certification); See also Sosa v. Safeway, 73 So.3d at 105 (noting that trial courts examining class certification motions are restricted to the "substance of the motion and not the merits of the cause of action or questions of fact for a jury.").[19]

## VIII. CONCLUSION

Based upon the foregoing, the Court concludes that the requirements of Rule 1.220 have been met and that the class action should be certified, and it is hereby,

---

[19] Additionally, some of the Defendant's affirmative defenses may not even be available because (a) Defendant may have failed to exhaust its administrative remedies, (b) the defenses may be prohibited or not supported by relevant statutes, and/or (c) the defenses may be superseded or preempted by federal law.

**ORDERED AND ADJUDGED** that:

i.    Plaintiff's Amended Motion for Class Certification is hereby **GRANTED**; and

ii.   The Court certifies a class defined to include entities that:

contracted directly with the Centers for Medicare and Medicaid Services ("CMS") and/or its assignee pursuant to Medicare Part C, including but not limited to, MAOs and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by HHS and/or CMS as a direct payer of medical services/supplies and/or drugs on behalf of Medicare beneficiaries either for parts A, B and/or D, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant;

have made payment(s) for medical services, treatment and/or supplies subsequent to December 2, 2009, whereby the MAO, or its assignee, as a secondary payer, has the direct or indirect right and responsibility to obtain reimbursement for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee pursuant to Florida No-Fault law (section 627.736(4), Florida Statute), was/is financially responsible to a Medicare beneficiary for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle; and

where the Defendant failed to properly pay for medical bills on behalf of its insureds and has otherwise failed to reimburse the MAO's or its assignees for their payment(s) as calculated pursuant to the recognized Current Procedure Terminology ("CPT") codes based on the fee-for-service by the primary payer, as delineated by section 627.736, Florida Statues, for medical services and/or supplies for their damages.[20]

Further, Gonzalo Dorta, Esq., John H. Ruiz, Esq., and Frank Quesada, Esq. shall serve as a committee of counsel for the entire above-defined class.

---

[20] The Class entities have not otherwise released their right to reimbursement as secondary payers.

Within 20 days, class counsel shall submit for the court's approval a proposed notice of the pendency of this action. The proposed notice shall inform the Class of the matters set forth in Florida Rule of Civil Procedure 1.220(d)(2).

**DONE AND ORDERED** in chambers at Miami-Dade County, Florida on this 20th day of April, 2017.

_____
ANTONIO ARZOLA
Circuit Court Judge

Copies furnished to:

Gonzalo Dorta, Esq.
grd@dortalaw.com

Frank Quesada, Esq.
fquesada@msprecovery.com

John H. Ruiz, Esq.
jruiz@msprecovery.com

Robin Taylor Symons, Esq.
Rsymons@gordonrees.com

Eric Thompson, Esq.
ethompson@gordonrees.com

EXHIBIT

**D**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 17-cv-20782-DPG**

MSPA CLAIMS 1, LLC,

      Plaintiff,

v.

ALLSTATE PROPERTY AND CASUALTY
INSURANCE COMPANY,

      Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

In accordance with to Rule 33 of the Federal Rules of Civil Procedure, MSPA Claims 1, LLC ("MSPA") responds to Defendant's First Set of Interrogatories ("Interrogatories") as follows.

## PRELIMINARY STATEMENT

MSPA provides the following responses and objections to the Interrogatories: (1) MSPA objects to Defendant's overbroad definitions of terms such as "you," "your," and "plaintiff," to the extent they purport to embrace persons and entities that MSPA does not control; (2) MSPA objects to Defendant's Interrogatories to the extent they demand MSPA to disclose information that is privileged by the attorney-client, doctor-patient or work-product privilege; and (3) MSPA objects to Defendant's Interrogatories to the extent that they purport to demand MSPA information that constitutes confidential or proprietary information, or constitutes confidential patient information the production of which would constitute an invasion of privacy or violation of governing law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

1

MSPA has not completed its investigation of this action, has not completed discovery, and has not completed its trial preparation. The responses set forth below are based on MSPA's knowledge, information, and belief at this time. MSPA specifically reserves its right to supplement, amend, or alter these responses, as necessary and as appropriate, and to assert any and all additional specific objections in any such supplemental responses.

## SPECIFIC RESPONSES

### Interrogatory No. 1

Identify all persons with knowledge of any facts relating to any of the allegations of wrongdoing you have made against Defendant in the current version of your Class Action Complaint against Defendant ("Complaint") and describe the knowledge of any such facts possessed by any such individual.

### Response to Interrogatory No. 1

MSPA incorporates in full herein its preliminary statement. MSPA objects to the use of the term "wrongdoing" as vague. To the extent Defendant used this word to mean unlawful conduct, and notwithstanding the foregoing objection, MSPA states that Natasha Blanco and Jorge Lopez of MSP Recovery, LLC, have knowledge of facts relevant to the Complaint's allegations.

### Interrogatory No. 2

Identify each and every expert witness employed, retained or consulted by you in connection with this action, and state whether that expert will be called by you to testify at trial, the subject matter of that expert's testimony, any opinions or conclusions of that expert with respect to this proceeding, the basis for that expert's conclusions or opinions, and the qualifications of that expert.

**Response to Interrogatory No. 2**

MSPA incorporates in full herein its preliminary statement. MSPA has not employed, retained, or consulted with any experts as of the date of this response. MSPA expressly reserves the right to supplement or amend this response as appropriate at a later time.

**Interrogatory No. 3**

Identify and describe each and every element of damages you claim to have suffered as a result of Defendant's supposedly wrongful conduct in this matter.

**Response to Interrogatory No. 3**

MSPA incorporates in full herein its preliminary statement. MSPA objects to the use of the term "wrongful conduct," as vague. To the extent Defendant used this word to mean unlawful conduct, and notwithstanding the foregoing objection, MSPA states that it owns the recovery rights of numerous Medicare Advantage Organizations ("MAOs") to seek recovery of conditional payments made in situations where Defendant was the responsible primary payer. In the Complaint, as a representative example, MSPA alleges Defendant's failure to reimburse MSPA for FHCP's conditional payments made on behalf of FHCP's Enrollee C.R. for medical treatment resulting from an auto accident on June 24, 2013 ("accident–related medical expenses"). This is one among hundreds (if not thousands) of instances of MSPA's damages caused by Defendant's failure to make primary payments for its insureds' accident–related medical expenses, or to reimburse FHCP or MSPA for conditional payments of those expenses. Discovery will reveal the full extent of injury that MSPA and Class Members have suffered from Defendant's failure to comply with its reimbursement obligations.

**Interrogatory No. 4**

For each medical charge, Plaintiff seeks reimbursement from Defendant in

connection with the Enrollee referred to in the Complaint, identify each medical provider that provided services to the Enrollee, the treatment provided, the diagnosis codes (i.e., ICD-9 or ICD-10 codes) and the corresponding billing codes (*i.e.,* CPT codes, HCPCS codes), and the dates the services were provided.

**Response to Interrogatory No. 4**

MSPA incorporates in full herein its preliminary statement. MSPA objects to this interrogatory to as overbroad, harassing and burdensome, as well as demanding confidential information that would constitute an invasion of privacy or violation of governing law, including HIPAA. MSPA also objects to this interrogatory because Defendant long ago lost any colorable ability to dispute any element of C.R.'s accident-related medical expenses. Notwithstanding the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), and subject to the entry of an appropriate confidentiality order, Plaintiff will provide documents from which Defendant can obtain the requested information.

**Interrogatory No. 5**

Identify all payments Plaintiff or FHCP made for the medical services allegedly provided to the Enrollee which are the subject of this lawsuit, including the amounts and dates of the payments, and to whom and by whom the payments were made, and describe the evidence you have showing such payments were made.

**Response to Interrogatory No. 5**

MSPA incorporates in full herein its preliminary statement. Pursuant to Fed. R. Civ. P. 33(d) and subject to the entry of an appropriate confidentiality order, documents from which Defendant can obtain the requested information will be produced in response to Request for Production No. 8.

4

**Interrogatory No. 6**

Identify all medical bills, for any insured of Defendant, which you contend Defendant was obligated to pay as a primary payer and for which you are seeking to recover in this lawsuit, and state the dollar amount you are seeking to recover from Defendant for each such bill.

**Response to Interrogatory No. 6**

MSPA incorporates in full herein its preliminary statement. MSPA reincorporates its responses to Interrogatories Nos. 3 and 5. At this stage of the litigation and discovery process, MSPA cannot confirm the exact number of medical bills and the exact amount of accident-related medical expenses for which Defendant is liable to MSPA as a primary payer.

**Interrogatory No. 7**

Identify all information and documentation supporting your contention that the Enrollee was enrolled in a Medicare Advantage plan managed by FHCP.

**Response to Interrogatory No. 7**

MSPA incorporates in full herein its preliminary statement. MSPA states that claims data from FHCP together with the Evidence of Coverage, and Insurance Services Office, Inc., ("ISO") reports (which will be produced, subject to appropriate confidentiality protections, in response to Request for Production No. 11), support MSPA's contention that the Enrollee was enrolled in a Medicare Advantage plan managed by FHCP.

**Interrogatory No. 8**

Identify any assignments executed by Enrollee for PIP benefits under Enrollee's automobile insurance policy with Defendant for payment of the medical bills at issue in Plaintiff's lawsuit.

5

**Response to Interrogatory No. 8**

MSPA incorporates in full herein its preliminary statement. MSPA objects to this interrogatory to the extent it seeks information that is not relevant to the issues in this action as framed by the pleadings. Notwithstanding the foregoing objection and without waiving it, MSPA states that under the MSP regulations, an "MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter." 42 CFR § 422.108(f). "With respect to services for which Medicare paid, CMS is subrogated to any individual, provider, supplier, physician, private insurer, State agency, attorney, or any other entity entitled to payment by a primary payer." 42 CFR § 411.26; 42 U.S.C. § 1395y(b)(2)(B)(iv). FHCP made a conditional payment for C.R.'s accident-related medical expenses as a result of Allstate's failure to meet its obligations as a primary payer. Therefore, under the MSP Act, FHCP's claim is subrogated to C.R. rights as a matter of law, by operation of law. FHCP was entitled to reimbursement from the primary payer, and assigned that claim to MSPA. Pursuant to Rule 33(d), MSPA also refers Defendant to the assignment produced in connection with MSPA's response to Request No. 12 of Defendant's First Request for Production.

**Interrogatory No. 9**

Identify all documents on which Plaintiff relies for standing to assert the claims in this matter (*e.g.*, contracts, agreements, assignments, etc.).

**Response to Interrogatory No. 9**

MSPA incorporates in full herein its preliminary statement. MSPA objects to this request to the extent that it calls for information that is already in the record. Notwithstanding the foregoing objection MSPA states that it possesses standing by virtue of (1) the April 15, 2014 Agreement between La Ley Recovery Systems, Inc. and FHCP, and (2) the February 20, 2015

Agreement between La Ley Recovery Systems, Inc. and MSPA Claims 1, LLC, as approved by (3) an Order of the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida on June 14, 2016 approving a settlement agreement between the receiver of FHCP and La Ley Recovery Systems, Inc. These documents were attached to the complaint and are readily accessible to Defendant.

**Interrogatory No. 10**

Describe in detail the basis for your contention that the medical expenses for Enrollee's medical treatment which are the subject of this lawsuit were reasonable, medically necessary and related to the Enrollee's automobile accident.

**Response to Interrogatory No. 10**

MSPA incorporates in full herein its preliminary statement. MSPA objects to this interrogatory as seeking information that is not relevant to this action, because Defendant long ago waived any "objection" it ever might have had to the medical necessity of Enrollee's accident-related medical expenses for which FHCP made conditional payments. *See MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins.*, Case No. 2015-1946 CA-01, slip op. at 11-12 (Fla. 11th Cir. Ct. Feb. 2, 2017); *MSPA Claims 1, LLC v. IDS Prop. Cas. Ins. Co.*, Case No. 15-27940- CA-21, slip op. at 7-8 (Fla. 11th Cir. Ct. Apr. 20, 2017). MSPA also objects because this interrogatory demands confidential information that would constitute an invasion of privacy or violation of governing law, including HIPAA. Notwithstanding the foregoing objections and without waiving them, pursuant to Rule 33(d), and subject to an appropriate confidentiality order, MSPA is providing Defendant with relevant claims data from FHCP regarding the Enrollee's accident-related medical expenses in response to Request for Production No. 14.

**Interrogatory No. 11**

Describe in detail the process Plaintiff and/or FHCP undertook when it allegedly paid Enrollee's medical bills which are the subject of this lawsuit, including describing the information and/or documents Plaintiff and/or FHCP had in its possession prior to making the payments for these bills.

**Response to Interrogatory No. 11**

MSPA incorporates in full herein its preliminary statement. MSPA objects to this interrogatory as irrelevant. Plaintiff has a right to recover "all payments" made by FHCP where Defendant failed to make primary payments or failed to make appropriate reimbursement. *U.S. v. Baxter Int'l, Inc.*, 345 F.3d 866, 886 (11th Cir. 2003). *See also* response to Interrogatory No. 10, above. The process FHCP undertook to provide payment has no bearing on the issues or outcome of this case.

**Interrogatory No. 12**

Is it Plaintiff's contention that Plaintiff and the putative class of MAOs are entitled to be reimbursed for the fee-for-service or the full amount charged for the disputed medical bills at issue, and are not limited to recovering the amount they actually allegedly paid for the bills? If so, state the basis for that contention.

**Response to Interrogatory No. 12**

MSPA incorporates in full herein its preliminary statement. MSPA objects to this contention interrogatory as premature. Notwithstanding that objection and pursuant to Rule 33(d), MSPA states that federal law provides the answer and directs Defendant's attention to the following sources: 42 C.F.R. § 411.31; 42 U.S.C. § 1395w-22(4); *Humana Inc. v. Medtronic Sofamor Danek USA, Inc.*, 133 F. Supp. 3d 1068, 1078 (W.D. Tenn. 2015); and *Bio-Medical*

*Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 294-97 (6th Cir. 2011).

**Interrogatory No. 13**

Is it Plaintiff's contention that the court can resolve Plaintiff's alleged entitlement to reimbursement under Defendant's PIP insurance policies without the need to address whether the medical bills at issue are reasonable, necessary and related to the Enrollee's automobile accident, and that Plaintiff need not prove the reasonableness, necessity or relatedness of those bills? If so, state the basis for that contention.

**Response to Interrogatory No. 13**

MSPA incorporates in full herein its preliminary statement. MSPA objects to this contention interrogatory as premature. MSPA further objects to this interrogatory as seeking information that is not relevant to this action, because Defendant long ago waived any "objection" it ever might have had to the medical necessity of Enrollee's accident-related medical expenses for which FHCP made conditional payments. *See MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins.*, Case No. 2015-1946 CA-01, slip op. at 11-12 (Fla. 11th Cir. Ct. Feb. 2, 2017); *MSPA Claims 1, LLC v. IDS Prop. Cas. Ins. Co.*, Case No. 15-27940- CA-21, slip op. at 7-8 (Fla. 11th Cir. Ct. Apr. 20, 2017).

**Interrogatory No. 14**

State the date on which you received the assignment on which you are relying in this lawsuit.

**Response to Interrogatory No. 14**

MSPA incorporates in full herein its preliminary statement. MSPA incorporates herein and refers Defendant to Response to Interrogatory No. 9.

**Interrogatory No. 15**

When did you first make a demand to Allstate for reimbursement with regard to payments for Enrollee's medical treatment and what evidence did you present with that demand?

**Response to Interrogatory No. 15**

MSPA incorporates in full herein its preliminary statement. MSPA submitted a demand letter to Allstate for reimbursement of payments for Enrollee's Accident-related medical expenses on September 12, 2014.

**Interrogatory No. 16**

Identify all ownership and financial interests any of Plaintiff's counsel and/or Plaintiff's counsel's family members have in Plaintiff or any of Plaintiff's affiliates.

**Response to Interrogatory No. 16**

MSPA incorporates in full herein its preliminary statement. Plaintiff's counsel and Plaintiff's counsel's family members do not have any ownership and financial interest in Plaintiff. John H. Ruiz, Jr. – John Ruiz's son – and Diana Lista – Frank C. Quesada's sister – have an ownership interest in MSP Recovery Services, LLC, the parent company of MSPA.

**Interrogatory No. 17**

Identify all individuals and entities which have a financial interest (apart from attorneys' fees) in the outcome of this lawsuit, including, but not limited to, Plaintiff, MSP Recovery LLC, MSP Recovery Law Firm, and John H. Ruiz.

**Response to Interrogatory No. 17**

MSPA objects to the interrogatory to the extent that it seeks information that is not relevant to the issues in this action as framed by the pleadings and, therefore, is not reasonably calculated to lead to discovery that is proportional to the needs of the case. MSPA further objects

because this interrogatory seeks information that is protected by the attorney-client and work product privileges.

**Interrogatory No. 18**

Describe all litigation or governmental proceedings in which you have been a plaintiff (including a named plaintiff in a class action) or a defendant.

**Response to Interrogatory No. 18**

MSPA objects to this interrogatory to the extent that it calls for information that is a matter of public record and is readily accessible to the Defendant. MSPA further objects because gathering this publicly available information would be equally burdensome for MSPA as it would be for Defendant.

**Interrogatory No. 19**

Describe in detail the steps you and/or FHCP took, in connection with the amounts you claim Defendant owes in this matter, to identify the amounts payable by any primary payers.

**Response to Interrogatory No. 19**

MSPA objects to this interrogatory because it is unintelligible as written, in demanding MSPA describe "steps" (whatever that means) taken "to identify the amounts payable by any primary payers" "in connection with the amounts" owed by Defendant as a primary payer. MSPA further objects because this interrogatory demands irrelevant information concerning insurers other than Defendant, as well as information protected by the work-product privilege. Moreover, MSPA objects because Florida and federal law determine what insurers are "primary payers," and all auto insurers doing business in Florida are primary payers, as a matter of law, with regard to medical expenses resulting from auto accidents. Finally, MSPA objects to the extent this interrogatory seeks proprietary, confidential information and trade secrets.

11

**Interrogatory No. 20**

Describe in detail the steps you and/or FHCP took, in connection with the amounts you claim Defendant owes in this matter, to coordinate benefits to Medicare enrollees with the benefits of any primary payers.

**Response to Interrogatory No. 20**

MSPA objects to this interrogatory to the extent it seeks information that is not relevant to the issues in this action as framed by the pleadings, and therefore, is not calculated to lead to discovery that is proportional to the needs of the case. MSPA also objects because at all material times, under 42 U.S.C. § 1395(y)(b)(8), Defendant was (and is) subject to mandatory reporting requirements with regard to its insureds who were Medicare beneficiaries, and was required to electronically report medical information to the Center for Medicare & Medicaid Services to determine who should pay for services provided to Medicare beneficiaries. At all material times, Defendant was required to report to CMS and to coordinate benefits with FHCP and MSPA, not the reverse.

**Interrogatory No. 21**

Is it your contention that Defendant owes money to Plaintiff even if the applicable PIP benefits were exhausted prior to Plaintiff putting Defendant on notice of the disputed amounts? If so, state the basis for that contention.

**Response to Interrogatory No. 21**

MSPA objects to this contention interrogatory as premature. Notwithstanding that objection, MSPA states that at all material times, under 42 U.S.C. § 1395(y)(b)(8), Defendant was (and is) subject to mandatory reporting requirements with regard to its insureds who were Medicare beneficiaries, and was required to electronically report medical information to the Center for Medicare & Medicaid Services to determine who should pay for services provided to

12

Medicare beneficiaries. At all material times, Defendant was required to report to CMS and to coordinate benefits with FHCP and MSPA, and was not permitted to fail to do any of those things and then claim, years later, that "applicable PIP benefits were exhausted" when a demand letter was sent or a lawsuit filed.

**Interrogatory No. 22**

Is it your contention that Defendant somehow waived the ability to challenge the claimed amounts by not administratively appealing FHCP's or any MAO's alleged rights to reimbursement? If so, state the basis for that contention.

**Response to Interrogatory No. 22**

MSPA objects to this contention interrogatory as premature. Subject to and without waiting this objection, Allstate "waived the ability to challenge the claimed amounts" by not administratively appealing FHCP's or any other MAO's alleged rights to reimbursement. In fact, this is the conclusion reached by two courts that have certified two cases alleging virtually identical claims to those alleged herein as class actions. *See MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins.*, Case No. 2015-1946 CA-01, slip op. at 11-12 (Fla. 11th Cir. Ct. Feb. 2, 2017); *MSPA Claims 1, LLC v. IDS Prop. Cas. Ins. Co.*, Case No. 15-27940- CA-21, slip op. at 7-8 (Fla. 11th Cir. Ct. Apr. 20, 2017).

**Interrogatory No. 23**

Is it your contention that once an MAO makes a payment for medical items and services on behalf of its enrollees, the payment is conclusive proof that the items and services were reasonable and necessary? If so, state the basis for that contention.

**Response to Interrogatory No. 23**

MSPA objects to this contention interrogatory as premature. MSPA further objects to this interrogatory as vague and overly broad due to the use of the term "conclusive proof." MSPA

13

also objects to this interrogatory to the extent it calls for the provision of legal research that Defendant can perform as easily as MSPA. As such, MSPA also objects because this interrogatory demands work product. Finally, MSPA objects that this interrogatory seeks information that is not relevant to the issues framed by the pleadings, because Allstate waived the ability to challenge whether any conditional payment was reasonable and necessary.

**Interrogatory No. 24**

If your answer to any of Defendant's Requests to Admit is anything other than an unqualified admission, state the basis for any such failure to unqualifiedly admit a request, and state each fact supporting that response.

**Response to Interrogatory No. 24**

MSPA objects to this interrogatory as vague and overly broad due to the use of the term "unqualified admission." Additionally, MSPA objects to this interrogatory as unreasonably cumulative and duplicative. MSPA's response to each request for admission is supported by its responses to Defendant's First Set of Interrogatories and First Request for Production.


**RIVERO MESTRE LLP**

*Lead Counsel for Plaintiff and the Class*
2525 Ponce de León Blvd., Suite 1000
Miami, Florida 33134
Telephone:  (305) 445-2500
Facsimile:  (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: jmestre@riveromestre.com
E-mail: cwhorton@riveromestre.com
E-mail: knwamah@riveromestre.com
Secondary: npuentes@riveromestre.com

By:      /s/ Andrés Rivero_____
            ANDRES RIVERO
            Florida Bar No. 613819
            JORGE A. MESTRE

14

Florida Bar No. 088145
ALAN H. ROLNICK
Florida Bar No. 715085
CHARLES E. WHORTON
Florida Bar No. 46894
KINGSLEY C. NWAMAH
Florida Bar No. 118364

**MSP Recovery Law Firm**
*Co-Counsel for Plaintiff and the Class*
5000 S.W. 75th Avenue, Suite 400
Miami, Florida 33155
Telephone:  (305) 614-2239
Frank C. Quesada, Esq., Fla. Bar No. 29411
John H. Ruiz, Esq., Fla. Bar No. 928150
E-mail: serve@msprecovery.com
E-mail: fquesada@msprecovery.com
E-mail: jruiz@msprecovery.com

## CERTIFICATE OF SERVICE

I certify that on September 20, 2017, I electronically served this document on all counsel of record by e-mail.

/s/ Andrés Rivero
ANDRÉS RIVERO

Filing # 60258117 E-Filed 08/10/2017 05:26:39 PM

> **EXHIBIT**
> **E**

## FORM 1.997. CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I.    CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>MSP RECOVERY CLAIMS, SERIES LLC</u>
 Plaintiff
       vs.
<u>DAIRYLAND INSURANCE COMPANY</u>
Defendant

---

**II.    TYPE OF CASE**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence – other
  ☐ Business governance
  ☐ Business torts
  ☐ Environmental/Toxic tort
  ☐ Third party indemnification
  ☐ Construction defect
  ☐ Mass tort
  ☐ Negligent security
  ☐ Nursing home negligence
  ☐ Premises liability – commercial
  ☐ Premises liability – residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
  ☐ Commercial foreclosure $0 - $50,000
  ☐ Commercial foreclosure $50,001 - $249,999
  ☐ Commercial foreclosure $250,000 or more
  ☐ Homestead residential foreclosure $0 – 50,000
  ☐ Homestead residential foreclosure $50,001 - $249,999
  ☐ Homestead residential foreclosure $250,000 or more
  ☐ Non-homestead residential foreclosure $0 - $50,000
  ☐ Non-homestead residential foreclosure $50,001 - $249,999

☐ Non-homestead residential foreclosure $250,00 or more
☐ Other real property actions $0 - $50,000
☐ Other real property actions $50,001 - $249,999
☐ Other real property actions $250,000 or more

☐ Professional malpractice
  ☐ Malpractice – business
  ☐ Malpractice – medical
  ☐ Malpractice – other professional
☐ Other
  ☐ Antitrust/Trade Regulation
  ☐ Business Transaction
  ☐ Circuit Civil - Not Applicable
  ☐ Constitutional challenge-statute or ordinance
  ☐ Constitutional challenge-proposed amendment
  ☐ Corporate Trusts
  ☐ Discrimination-employment or other
  ☐ Insurance claims
  ☐ Intellectual property
  ☐ Libel/Slander
  ☐ Shareholder derivative action
  ☐ Securities litigation
  ☐ Trade secrets
  ☐ Trust litigation

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**III.**    **REMEDIES SOUGHT** (check all that apply):
   ☒   Monetary;
   ☐   Non-monetary declaratory or injunctive relief;
   ☐   Punitive

**IV.**    **NUMBER OF CAUSES OF ACTION: (     )**
   (Specify)

   <u>3</u>

**V.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
   ☒   Yes
   ☐   No

**VI.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
   ☐   No
   ☒   Yes – If "yes" list all related cases by name, case number and court:

   <u>MSPA Claims v. Ocean Harbor, 2015-1946-CA-01, Judge Samantha Ruiz- Cohen</u>

**VII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
   ☒   Yes
   ☐   No

---

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature <u>s/ JOHN H RUIZ</u>      FL Bar No.: <u>928150</u>
      Attorney or party                                                          (Bar number, if attorney)

<u>JOHN H RUIZ</u>        <u>08/10/2017</u>
      (Type or print name)                                       Date

Case 1:17-cv-23983-RNS   Document 1   Entered on FLSD Docket 10/31/2017   Page 236 of 263

IN THE CIRCUIT COURT OF THE
ELEVENTH CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.

MSP RECOVERY CLAIMS, SERIES LLC,
a Delaware entity,

       Plaintiff,                    **CLASS REPRESENTATION**

v.

 DAIRYLAND INSURANCE COMPANY a
 Foreign Profit Corporation     ,

       Defendant.

_____/

### PLAINTIFFS' CLASS ACTION COMPLAINT FOR DAMAGES

     Plaintiff, MSP RECOVERY CLAIMS, SERIES LLC, LLC, A DELAWARE ENTITY,

(hereinafter collectively referred to as "Plaintiff"), on behalf of themselves and all others similarly

situated, by and through the undersigned attorneys, bring this action against DAIRYLAND

INSURANCE COMPANY a Foreign Profit Corporation    , (hereinafter referred to as

"Defendant"), and state as follows:

### I.     INTRODUCTION

     1.     Defendant failed to fulfill its statutorily-mandated duty under the Medicare

Secondary Payer ("MSP") laws to reimburse Medicare Advantage Organizations ("MAOs") for

medical treatments or expenses paid by Plaintiff and the putative Class Members ("Class

Members") on behalf of Medicare beneficiaries who entered into a settlement with Defendant.

     2.     Plaintiff assert the rights of MAOs, and their assignees, via assignment of all rights,

title, and interest allowing them to bring these claims.

3.      Under the MSP laws, MAOs are, by law, secondary payers for any medical expenses that are also covered by terms and provisions of an insurance policy. This means Medicare always pays secondary to a primary payer. If another source is responsible for payment of a medical claim(s), i.e., an insurance policy, that source is required to pay for those medical claim(s) up to the policy limit before Medicare is required to pay any accident related claims. And, if Medicare does pay first, by law, those payments are considered "conditional" and the primary payer is required, by law, to reimburse the Medicare coverage provider. Once a payment is made under Medicare Part C on behalf of one of its beneficiaries, the payment is considered an "organizational determination" as it pertains to the payments made for the services rendered.

4.      Defendants offer automobile insurance policies that contain no-fault coverage for any automobile accident-related medical expenses. The policies provide primary coverage for medical bills incurred as a result of an automobile accident and are even required by the Florida Motor Vehicle No-Fault Law.

5.      Plaintiff[1] and the putative class members ("Class Members") paid Medicare benefits on behalf of the Medicare-eligible beneficiaries enrolled under the Medicare Advantage ("MA") program. These Medicare beneficiaries were simultaneously covered by no-fault insurance policies issued by Defendant, which made Defendant the primary payer for the medical bills, services, and items paid by Plaintiff and the Class Members relating to an automobile accident and covered under the terms of the respective policies. MAOs and/or parties who were financially responsible as a result of agreement with the MAOs paid or otherwise incurred losses

---

[1] Plaintiffs assert the rights of MAOs via assignment of all rights, title, and interest allowing them to bring these claims.

for the medical items or treatment even though Defendant was responsible for paying those expenses.

6.     This lawsuit seeks reimbursement for those accident-related medical expenses paid for by the Plaintiff's assignors and all other Florida MAOs or its financially responsible assignees that should have been paid, in the first instance, by Defendants.

7.     As such, Plaintiff filed this action on behalf of themselves and all other similarly situated Class Members for (1) breach of contract under Plaintiff's direct right of recovery, (2) breach of contract via conventional subrogation, and (3) breach of contract via equitable subrogation.

## II.     JURISDICTION, PARTIES, AND VENUE

8.     This is an action for damages, which in the aggregate, exceeds fifteen thousand dollars ($15,000.00).   No individual recovery exceeds ten thousand dollars ($10,000.00), as Florida no-fault insurance policies provide no more than ten thousand dollars ($10,000.00) in coverage pursuant to section 627.736, Florida Statutes.   Accordingly, there is no individual claim in this Class Action whereby the damages will exceed ten thousand dollars ($10,000.00), exclusive of interest, attorneys' fees, and costs.   Moreover, Plaintiff's aggregate claims against Defendant do not exceed seventy-five thousand dollars ($75,000.00).

9.     MSP Recovery Claims, Series LLC is a Delaware entity with its principal place of business located at 5000 S.W. 75th Avenue, Suite 400, Miami, FL 33155. Numerous MAOs have assigned their recovery rights to assert the causes of action alleged in this Complaint to Plaintiff. As part of those assignments, Plaintiff is empowered to recovery reimbursement of Medicare payments made by the MAOs that should have been paid, in the first instance, by Defendant.

10.     Plaintiff has been assigned all legal rights of recovery and reimbursement for health care services and Medicare benefits provided by health care organizations that administer Medicare benefits for enrollees under Medicare Part C; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of conditional payments made by the assignor health plans, including the right to recover claims for health care services billed on a fee-for-service basis.

11.     Defendant is an insurance company that is authorize to conduct business in the State of Florida.

12.     As part of its business, Defendant issues insurance policies in Florida that provide personal injury protection ("PIP") benefits, as well as medical and extended medical expense coverage that must comply with sections 627.730 – 627.7405, Florida Statutes.

13.     Venue is proper, as the cause of action accrued in Miami-Dade County, Florida.  § 47.051, Fla. Stat. (2016).

14.     Plaintiff complied with all conditions precedent prior to the filing of this lawsuit.

### III.     REPRESENTATIVE FACTS

15.     Numerous Medicare beneficiaries ("Medicare Beneficiaries") were enrolled in Medicare Advantage plans administered by MAOs.  Such MAOs have assigned their recovery rights to Plaintiff. These Medicare Beneficiaries were also insured under automobile insurance policies issued by Defendant. These Medicare Beneficiaries' policies with Defendant provided for no fault coverage of reasonable medical expenses relating to injuries resulting in medically necessary services and/or supplies stemming from automobile accidents.

16.     The Medicare Beneficiaries were involved in automobile accidents in Florida. As a direct and proximate result of these automobile accidents, the Medicare Beneficiaries required necessary medical services and/or supplies. The reasonable medical bills for the medical services and/or supplies were required to be paid Defendant. Defendant failed to pay or reimburse the Medicare Beneficiaries' MAOs for the payments made by the MAOs that were required to be paid by Defendant as a result of said automobile accidents.

17.     Defendant was aware of the accidents and assigned claim numbers to said automobile accidents. Defendant reported its responsibility as an RRE to CMS and on other occasions, did not properly report. Nevertheless, Defendant failed to pay and/or provide appropriate reimbursement to the Medicare Beneficiaries' MAOs, Full Risk Payers and/or their assignee(s).

18.     The medical services and/or supplies rendered to the Medicare beneficiaries were charged to the beneficiaries' MAOs. The MAOs, Full Risk Payers and/or their assignee(s) suffered a monetary injury because of Defendant's failures to pay or otherwise reimburse the MAOs, Full Risk Payers and/or their assignee(s).

19.     In addition to reporting the claims to CMS, in some of the claims Defendant reported said automobile accidents to ISO, a national property/casualty claims database. Defendant never notified the Medicare Beneficiaries' MAOs of the automobile insurance companies' primary payer responsibility in accordance with their reporting obligations. To date, these defendants have failed to provide details of their primary payer responsibility to Plaintiffs.

20.     The basis of allegations in paragraphs 17-21 stem from Plaintiff's review of claims data. Plaintiff has identified medical claims whereby Plaintiff's beneficiaries were involved in automobile-related accidents and experienced medical expenses as a result. Of those claims,

Plaintiff has been able to determine that those Medicare beneficiaries possessed automobile insurance policies with Defendant containing no-fault provisions. Thus, there is reasonable evidence of overlapping coverage and evidence that the payments were made by a Medicare Part C payer instead of the primary payer, the Defendant herein. And, based on the nature of the medical treatment and Defendants failure to reimburse Plaintiff's MAOs for those medical expenses, the data supports the good-faith allegation that Defendant's failure to pay for claims as a primary payer is widespread and systematic. In fact, Defendant has a practice and course of conduct to not properly pay and/or of fail to reimburse the secondary payer, such as Plaintiff and the Class Members. Full details of those claims, i.e., specific payments, coverage determinations, etc., are in the Defendants' possession and will be located and assessed through the process of discovery.

21.     The MAOs, Full Risk Payers and/or their assignee(s) suffered a monetary injury because of Defendant's failures to pay or otherwise reimburse the MAOs, Full Risk Payers and/or their assignee(s).

22.     Plaintiff holds, and otherwise owns the right to and interest to, claims that have been processed for items and/or services pertaining to Medicare Beneficiaries for which the Defendant is the primary payer. Defendant has reported some or all of these cases to CMS admitting it has primary payer responsibility. For confidentiality purposes and protection under HIPAA, Defendant can be provided with access to secure sFTP site whereby its own admitted claims can be viewed. Moreover, Defendant has failed to provide notice to Plaintiff and/or Plaintiff's assignor of its primary payment responsibility. Defendant, as to some of these primary payer responsibilities, also reported them to ISO. Despite Defendant being aware of its primary payer responsibility, the Defendant has failed to pay or reimburse the secondary payer.

**IV.     CLASS REPRESENTATION ALLEGATIONS**

23.     Plaintiff brings this suit both individually and, pursuant to Florida Rule of Civil Procedure 1.220(a), on behalf of a Class of similarly situated Florida MAOs or their assignees. Plaintiff seeks certification of the claims and certain issues in this action on behalf of the Class Members. Plaintiff seeks monetary damages against Defendant on behalf of the Class Members.

24.     Florida Rule of Civil Procedure 1.220(a) states that Plaintiff may sue as a representative party on behalf of the Class, if it establishes that:

    a.    the members of the class are so numerous that separate joinder of each member is impracticable;

    b.    the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class;

    c.    the claim or defense of the representative party is typical of the claim or defense of each member of the class; and

    d.    the representative party can fairly and adequately protect and represent the interests of each member of the class.

**A.     Numerosity**

25.     The Class is so numerous that joinder of all members is impracticable.

26.     The Class is, upon information and belief, comprised of more than twenty-five (25) but less than fifty (50) entries or their assignees.

27.     The Class, as set forth herein, consists of entities that:

contracted directly with CMS and/or its assignee pursuant to Medicare Part C including, but not limited to, MAOs, and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required and regulated by CMS and HHS, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant;

have made payment(s) of benefits, services, and/or supplies whereby the MAO, as a secondary payer, has the direct right and responsibility to collect for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee and Florida no-fault law

(section 627.736(4), Florida Statutes), was/is financially responsible to a Medicare beneficiary; and

have not been reimbursed by Defendant pursuant to the recognized Current Procedure Terminology codes based on the fee-for-service by the primary payer, as delineated by section 627.736, Florida Statutes, for medical services and/or supplies for their damages.[2]

**B.     Commonality**

28.     Plaintiff and the Class Members have claims that raise common questions of law and/or fact.

29.     This is an action whereby the Plaintiff and Class Members have claims that are based on the same theory of recovery, *i.e.*, that they are entitled reimbursement from Defendant for payments made as secondary payers on behalf of its Medicare Beneficiaries.

30.     Each Class Member, including Plaintiff, possesses the same rights to obtain recovery of its payments under the MSP law.

31.     Plaintiff's claim arises from the same practice or course of conduct that gave rise to the Class Members' claims.   Specifically, the claims are predicated on Defendant's routine practice of failing to provide primary payment for an Medicare Beneficiaries' medical items and services and failing to appropriately reimburse Plaintiff and Class Members for payments provided on behalf of Medicare Beneficiaries.

32.     The harm suffered by Plaintiff was caused by the same common source, *i.e.*, Defendant's failure to reimburse Plaintiff and the Class Members for its secondary payments for Defendant's medical care and treatment services

33.     Plaintiff's claims raise questions of law and/or fact that are common to the questions

---

[2] The Class entities have not otherwise released their right to reimbursement as secondary payers.

of law and/or fact that will be raised by the Class Claims, including, but not limited to, whether:

    a.  Plaintiff and the Class Members made payment(s) of Medicare benefits for which Defendant, as a no-fault insurance carrier, was responsible as a primary payer;

    b.  Defendant is the primary payer responsible to pay for Medicare Beneficiaries' medical expenses pursuant to its contractual obligations and Florida no-fault law;

    c.  the Medicare Beneficiaries received emergency services and/or hospital inpatient services and/or other medical treatment or supplies as a result of the use, maintenance or operation of a motor vehicle that rendered Defendant primarily responsible to satisfy such expenses, before Plaintiff and the Class were obligated to make secondary payments on behalf of the Medicare Beneficiaries;

    d.  Defendant, as Medicare Beneficiaries' no-fault PIP insurer, is required to reimburse Plaintiff, as the secondary payer, the amount tendered as payment(s) in satisfaction of the medical expenses incurred during Medicare Beneficiaries' emergency/in-patient medical treatment(s), service(s) and/or any other payment(s) tendered by Plaintiff, to which Defendant was primarily responsible to pay pursuant to its contractual and statutory obligations;

    e.  federal law preempts state law and/or any defenses Defendant might raise, which might conflict with the statutory and regulatory provisions that render CMS and MAOs not responsible for payment of medical services and/or supplies, where a primary payer, like Defendant, exists; and

    f.  Plaintiff and Class Members are authorized to recover the full charged amount from Defendant, as provided in section 627.736, Florida Statutes.

34.    The monetary damages caused to Plaintiff, as well as each member of the Class, were directly and proximately caused by the acts of Defendant or by those under Defendant's direction, control, and/or supervision.

**C.    Typicality**

35.    As the assignees of MAOs, Plaintiff's claims relating to Medicare Beneficiaries are typical of the claims of the Class Members that Plaintiff will represent.  All Class Members (including Plaintiff) have been damaged in the same manner. Plaintiff's claims have the same

essential characteristics as those of the proposed Class, and Plaintiff's claims arise from a similar course of conduct and share the same legal theory. Accordingly, Plaintiff as the class representative possess the same interests and suffered the same injury as the other members of the proposed Class, such that there is a sufficient nexus between Plaintiff's claims and those of the proposed Class.

36.     Plaintiff's claims are typical for the Class as Plaintiff, just like all Class Members, is entitled to relief owing to Defendant's failure to reimburse the Class Members (or their assignees), for payments made for the cost of their Medicare Beneficiaries' medical items and services provided.

37.     Plaintiff's claims are typical of the class members' claims because Defendant failed to reimburse Medicare secondary payers for the payments tendered on behalf of the Medicare Beneficiaries in satisfaction of the medical expenses incurred by same.  Plaintiff seeks to recover its owed reimbursement, in other words, the payments that Defendant was primarily obligated to provide pursuant to its no-fault insurance policy and/or section 627.736, Florida Statutes, yet failed to do so.

38.     Plaintiff and the Class Members seek to recover the payments made in situations that Defendant should have made primary payments on behalf of Medicare Beneficiaries and/or failed to appropriately reimburse Plaintiffs and the Class Members of its payment it provided on behalf of the Medicare Beneficiaries.

39.     Plaintiff's claims are predicated on the same statutes, regulations and legal theories. The facts involving Defendant's practices, actions or omissions are similar with respect to Plaintiff and the Class Members and as such, Defendant's legal defenses are the same for all claims.

40.     The facts involving Defendant's practices are similar with respect to Plaintiff and the other Class Members, and Defendant's legal defenses are the same.

**D.    Adequacy of Representation**

41.    Plaintiff and Plaintiff's Counsel can fairly and adequately protect and represent the interests of each member of the Class.

*i.    Adequate Class Counsel*

42.    Plaintiff's Counsel have the experience, resources, and commitment to prosecute this case vigorously to a successful resolution.

43.    To prosecute this case, Plaintiff has retained John H. Ruiz, Frank C. Quesada, and the MSP Recovery Law Firm.   John H. Ruiz has served as lead class counsel for numerous class action cases presiding in both state and federal courts.  In addition to being involved in these types of cases, John H. Ruiz handles other complex litigation matters, including trials.  Specifically, John H. Ruiz and Frank C. Quesada have the experience and financial ability to prosecute this case.  John H. Ruiz has successfully certified numerous no-fault cases affirmed on appeal by the Florida Third District Court of Appeals, a substantial number of which received final settlement approval as being fair, reasonable, and adequate to class members.

*ii.    Adequate Class Representative*

44.    Plaintiff is a member of the Class as defined above. Plaintiff is committed to the active and vigorous prosecution of this action, and has retained competent counsel experienced in litigation of this nature. There is no hostility of interests between Plaintiff and the other members of the Class. Plaintiff anticipates no difficulty in the management of this litigation as a class action. Plaintiff has no claims that are antagonistic to the claims of the Class Members and/or claims it seeks to represent.

**Florida Rule of Civil Procedure 1.220(b)**

45.    This action is maintainable pursuant to Florida Rules of Civil Procedure 1.220

(b)(1)(A) and (b)(3).

**A.      Florida Rule of Civil Procedure 1.220(b)(1)(A)**

46.      The prosecution of separate claims or defenses by or against individual members of the class would create a risk of inconsistent or varying adjudications concerning individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

**B.      Florida Rule of Civil Procedure 1.220(b)(3)**

   **i.      *Predominance***

47.      In this matter, common issues of law and fact concerning liability and causation involved in the action before the court predominate over issues of individual concern.

48.      The individual cases arise out of the same nucleus of operative facts; that Defendant uniformly failed to properly satisfy its obligations in accordance with its policy of insurance and in violation of section 627.736, Florida Statutes, as well as its obligation to reimburse any secondary payers that tendered payment(s) on behalf of the Medicare Beneficiaries.

49.      Plaintiff maintains a reasonable methodology for generalized proof of class-wide impact using a software system ("MSP System") designed and developed by Plaintiff and its counsel.  The MSP System captures, compiles, synthesizes, and funnels large amounts of data in order to identify claims class-wide.

   **ii.      *Superiority***

50.      A class action is superior to other available methods for the fair and efficient adjudication of this litigation because a class action is the most manageable and efficient way to resolve the individual claims of each Class Member.

51.     Specifically, a class action is the superior method of adjudicating Plaintiff and the Class Member's claims as: (1) it will provide Plaintiffs and the Class Members with the only economically viable remedy; (2) the individual claims are not large enough to justify the expense of separate litigation considering standard attorneys fee rates in this jurisdiction and the collection costs; and (3) a class action will concentrate all of the litigation in one forum with no unusual manageability problems, particularly because, in this case, Defendant's liability and the nature of the Class Members' damages may be readily proven through common class-wide proofs.

### V.     CAUSE OF ACTION

### COUNT I
### Breach of Contract for Failure to Pay PIP Benefits

Plaintiff hereby incorporates by reference the allegations of paragraphs one (1) through fifty-one (51) above as if fully set forth herein, and further alleges:

52.     MAOs are subrogated the right to recover primary payment from Defendants for the Defendant's breach of contract with their insured, pursuant to the MSP provisions. Specifically, Defendant was contractually obligated to pay for medical expenses and items arising out of an automobile accident, and Defendant failed to meet that obligation. This obligation was, instead, fulfilled by the Plaintiff and other Class Members. Under the MSP provisions, Plaintiff is permitted to subrogate the enrollee/insured's right of action against Defendant.

53.     Plaintiff complied with any conditions precedent to the institution of this action, to the extent possible.

54.     Defendants failed and/or refused to make complete payments of the no-fault benefits as required by their contractual obligations.

55.     Defendants failed to pay each Medicare Beneficiaries' covered losses, and Defendants had no reasonable proof to establish that they were not responsible for the payment.

56.     Defendants' failure to pay the medical services and/or items damaged Plaintiff and the Class Members as set forth herein. Plaintiff and the Class Members processed and paid for medical expenses and are entitled to recover up to the statutory policy limits for each Medicare Beneficiaries' medical expenses related to the subject automobile accidents, pursuant to their agreements with CMS and the provider of services.

**WHEREFORE**, Plaintiff demands judgment for itself, plus all members of the class, against Defendant for damages, reasonable attorney's fees pursuant to section 627.428, Florida Statutes, court costs, interests, and such other and further relief as this Court deems just and proper.

### COUNT II
### Breach of Contract for Failure to Pay PIP Benefits
### [Conventional Subrogation]

Plaintiff hereby incorporates by reference the allegations of paragraphs one (1) through fifty-one (51) above as if fully set forth herein, and further alleges:

57.     At the time of the Accident, Defendant maintained an insurance contract with the Medicare Beneficiaries.  A copy of this policy is in the exclusive possession of the Defendant.

58.     Plaintiffs made a claim under the insurance policy issued by the Defendant wherein Plaintiff sought PIP benefits for the services provided to Medicare Beneficiaries.  Otherwise, Plaintiff complied with any and all conditions precedent prior to the institution of this action.

59.     Plaintiff's assignors provided these and other benefits to the Medicare Beneficiaries, pursuant to its obligations in the Evidence of Coverage, which specifically grant MAOs broad subrogation and reimbursement rights.

60.     Defendant failed and/or refused to make complete payments of the No-Fault benefits as required by section 627.736, Florida Statutes.

61.     Defendant failed to pay Medicare Beneficiaries' covered losses and Defendant had

no reasonable proof to establish that it was not responsible for the payment.

62.     Defendants' failure to pay the medical services and/or items damaged Plaintiff and the Class Members as set forth herein. Plaintiff and the Class Members processed and paid for medical expenses and are entitled to recover up to the statutory policy limits for each Medicare Beneficiaries' medical expenses related to the subject automobile accidents, pursuant to their agreements with CMS and the provider of services.

**WHEREFORE**, Plaintiff demands judgment for itself, plus all members of the class, against Defendant for damages, reasonable attorney's fees pursuant to section 627.428, Florida Statutes, court costs, interests, and such other and further relief as this Court deems just and proper.

### COUNT III
**Breach of Contract for Failure to Pay PIP Benefits**
**[or in the alternative, Equitable Subrogation]**

Plaintiff hereby incorporates by reference the allegations of paragraphs one (1) through fifty-one (51) above as if fully set forth herein, and further alleges:

63.     Plaintiff made a claim under the insurance policy issued by the Defendant seeking PIP benefits for services provided to the Medicare Beneficiaries.  Plaintiff otherwise complied with all conditions precedent prior to the institution of this action.

64.     FHCP provided full payment for Medicare Beneficiaries' medical expenses even though it was not primarily liable for the medical expenses, as there was a no-fault insurance policy in effect at the time of the Accident issued by the Defendant, which provided primary coverage for the Medicare Beneficiaries' medical expenses. Subrogation would not result in any injustice to the rights of Defendant.

65.     Defendant failed and/or refused to make complete payments of the No-Fault benefits as required by section 627.736, Florida Statutes.

66.    Defendant failed to pay Medicare Beneficiaries' covered losses and Defendant had no reasonable proof to establish that it was not responsible for the payment.

67.    Defendants' failure to pay the medical services and/or items damaged Plaintiff and the Class Members as set forth herein. Plaintiff and the Class Members processed and paid for medical expenses and are entitled to recover up to the statutory policy limits for each Medicare Beneficiaries' medical expenses related to the subject automobile accidents, pursuant to their agreements with CMS and the provider of services.

**WHEREFORE**, Plaintiff demands judgment for itself, plus all members of the class, against Defendant for damages, reasonable attorney's fees pursuant to section 627.428, Florida Statutes, court costs, interests, and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 10, 2017.

Respectfully Submitted,                    **MSP RECOVERY LAW FIRM**
                                           5000 SW 75 Avenue, Suite 400
                                           Miami, Florida 33155
                                           Phone: (305) 614-2222

                                           By: */s/ John H. Ruiz*
                                           John H. Ruiz, Esq., Fla. Bar No. 928150
                                           serve@msprecovery.com

**Page 16 of 16**

Filing # 60795310 E-Filed 08/23/2017 01:22:52 PM

| ■ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.<br>☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|

| DIVISION<br>■CIVIL  ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-019585-CA |
|---|---|---|
| PLAINTIFF(S)<br>MSP RECOVERY CLAIMS, SERIES LLC<br>a Delaware entity | VS.  DEFENDANT(S)<br>DAIRYLAND INSURANCE COMPANY<br>a Foreign Profit Corporation | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): **DAIRYLAND INSURANCE COMPANY**

        **c/o CT Corporation System as RA**
        **301 S. Bedford St. Ste. 1**
        **Madison, WI 53703**

Each defendant is required to serve written defense to the complaint or petition on

Plaintiff's Attorney: **John H. Ruiz, Esq.,**

            **Frank C. Quesada, Esq.**

 whose address is: **MSP Recovery Law Firm,**
           **5000 S.W. 75th Ave, Suite 300,**
           **Miami, Florida 33155**

*CLOCK IN*

within 20 days "**Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br><br>**CLERK of COURTS** | | DATE |
|---|---|---|
| | DEPUTY CLERK | |

# AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

Filing # 60795310 E-Filed 08/25/2017 01:22:52 PM

■ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>■CIVIL    ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-019585-CA |
|---|---|---|
| PLAINTIFF(S)<br>MSP RECOVERY CLAIMS, SERIES LLC<br>a Delaware entity | VS. DEFENDANT(S)<br>DAIRYLAND INSURANCE COMPANY<br>a Foreign Profit Corporation | SERVICE |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): **DAIRYLAND INSURANCE COMPANY**

> **c/o CT Corporation System as RA**
> **301 S. Bedford St. Ste. 1**
> **Madison, WI 53703**

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on

Plaintiff's Attorney: **John H. Ruiz, Esq.,**

> **Frank C. Quesada, Esq.**

whose address is: **MSP Recovery Law Firm,**
> **5000 S.W. 75th Ave, Suite 300,**
> **Miami, Florida 33155**

within 20 days "**Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days.**" after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | DATE |
|---|---|---|
| **HARVEY RUVIN**<br><br>**CLERK of COURTS** | *Conelle Brown* 164659<br><br>DEPUTY CLERK | 8/24/2017 |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

IN THE CIRCUIT COURT OF THE 11
JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE COUNTY, FLORIDA
GENERAL JURISDICTION

**CASE NO.: 2017-019585-CA-01**

MSP RECOVERY CLAIMS, SERIES LLC,
A Delaware entity,

      Plaintiff,

                                    **CLASS REPRESENTATION**

v.

Dairyland Insurance Company,
A Foreign Profit Corporation,

      Defendant(s),

_____/

## NOTICE OF APPEARANCE

**NOTICE IS HEREBY GIVEN** that, Jacinto J. Gonzalez, Esq., hereby enters his

appearance as Co-Counsel for the Plaintiff, MSP RECOVERY CLAIMS, in this case. Copies of

all future pleading and correspondence should be sent to the undersigned counsel at the address

written below.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing Notice of

Appearance was served via eService on MSP Recovery Law Firm, serve@msprecovery.com

                      Stokes & Gonzalez, P.A.
                      7300 N. Kendall Drive, Suite 519
                      Miami, Florida 33156
                      T+ (305) 670-0231\F+ (305) 670-9719

                      By:_____
                      ☐ Jacinto J. Gonzalez, Esq., FL Bar No. 933708
                      Service email: jacinto@stokesgonzalez.com
                                      jackie@stokesgonzalez.com

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

MSP RECOVERY CLAIMS, SERIES LLC,
A Delaware entity,

CASE NO. 2017-019585 CA 01

     Plaintiff,

vs.

DAIRYLAND INSURANCE CO.
A Foreign Profit Corporation,

     Defendants.

_____/

## NOTICE OF APPEARANCE

**COMES NOW**, GONZALO R. DORTA, ESQUIRE of DORTA LAW and herein gives

notice of his appearance as Co-Counsel on behalf of the Plaintiff, MSP RECOVERY CLAIMS

and requests copies of all pleadings, notices, orders and other papers in this cause be henceforth

provided upon the undersigned.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on <u>September 26, 2017</u>, the foregoing was electronically

filed with the Florida Courts E-Filing Portal, which will serve it via electronic mail to counsel of

record.

DORTA LAW
334 Minorca Avenue
Coral Gables, Florida 33134
Telephone:  305-441-2299
Telecopier:  305-441-8849
<u>file@dortalaw.com</u>
<u>grd@dortalaw.com</u>
By:  <u>/s/ Gonzalo R. Dorta</u>
       GONZALO R. DORTA
       Florida Bar No. 650269

Filing # 62703333 E-Filed 10/11/2017 03:12:56 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 17-19585 CA 06

MSP RECOVERY CLAIMS, SERIES LLC,

     Plaintiff,

v.

DAIRYLAND INSURANCE CO.,

     Defendant.

_____/

## NOTICE OF APPEARANCE OF COUNSEL
## AND DESIGNATION OF EMAIL ADDRESSES

Please take notice that Angel A. Cortiñas and Jonathan H Kaskel of Gunster hereby appear as counsel in this action for Defendant Dairyland Insurance Co. and request that all pleadings, notices, correspondence and other papers be served upon them.

Further, counsel designates the following e-mail addresses for service in compliance with Rule 2.516(b)(1)(A), Florida Rules of Judicial Administration:

**Angel A. Cortiñas, Esquire**

Primary: acortinas@gunster.com
Secondary: nsalazar@gunster.com
Secondary: eservice@gunster.com

**Jonathan H Kaskel, Esquire**

Primary: jkaskel@gunster.com
Secondary: nsalazar@gunster.com
Secondary: eservice@gunster.com

Respectfully submitted,

GUNSTER
*Counsel for Dairyland Insurance Co.*
600 Brickell Avenue
Suite 3500
Miami, Florida  33131
Telephone:  305-376-6000
Facsimile:  305-376-6010

By:  /s/ Angel A. Cortiñas

Angel A. Cortiñas: FBN 797529
Jonathan H Kaskel, FBN: 52718

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2017, the foregoing document was electronically filed using the E-filing Portal System, and a copy thereof has been furnished by email on the following Service List.

By:  /s/ Jonathan  H Kaskel

**Gino Moreno, Esquire**
**John H. Ruiz, Esquire**
MSP RECOVERY
5000 SW 75th Ave Ste 400
Miami, Florida 33155
serve@msprecovery.com
gmoreno@msprecovery.com
jruiz@msprecovery.com
*Counsel for MSP Recovery Claims, Series LLC*

**Gonzalo R. Dorta, Esquire**
DORTA LAW
334 Minorca Avenue
Coral Gables, Florida 33134
file@dortalaw.com
grd@dortalaw.com
*Counsel for MSP Recovery Claims, Series LLC*

**Jacinto J. Gonzalez, Esquire**
STOKES & GONZALEZ, P.A.
7300 Kendall Drive, Suite 519
Miami, Florida 33156
jacinto@stokesgonzalez.com
jackie@stokesgonzalez.com
*Counsel for MSP Recovery Claims, Series LLC*

2

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 17-19585 CA 06

MSP RECOVERY CLAIMS, SERIES LLC,

     Plaintiff,

v.

DAIRYLAND INSURANCE CO.,

     Defendant.

_____/

## AGREED ORDER ON EXTENSION OF TIME
## TO RESPOND TO THE COMPLAINT

**THIS CAUSE** came to be heard on the parties' agreement to extend the deadline for

Defendant to respond to the Complaint, and being aware of the parties' agreement and being

otherwise duly advised in the premises, it is hereby **ORDERED and ADJUDGED**, that the

Defendant shall have an extension of time of 30 days, through and including November 22,

2017, to respond to the Complaint.

    DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 10/15/17.

Samantha Ruiz Cohen
CIRCUIT COURT JUDGE

---

**No Further Judicial Action Required on THIS
MOTION
CLERK TO RECLOSE CASE IF POST
JUDGMENT**

---

The parties served with this Order are indicated in the accompanying 11th Circuit email
confirmation which includes all emails provided by the submitter.  The movant shall
IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or

hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Conformed Copies to:

Counsel of Record:

acortinas@gunster.com; jkaskel@gunster.com; nsalazar@gunster.com;
serve@msprecovery.com; gmoreno@msprecovery.com; jruiz@msprecovery.com
grd@dortalaw.com; mrd@dortalaw.com; jdiamond@dortalaw.com; bcabrera@dortalaw.com
jacinto@stokesgonzalez.com; jackie@stokesgonzalez.com



CHIEF FINANCIAL OFFICER
JIMMY PATRONIS
STATE OF FLORIDA

*17-000185637*

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, A DELAWARE ENTITY | **CASE #:** 2017-019585-CA |
| | **COURT:** CIRCUIT COURT |
| PLAINTIFF(S) | **COUNTY:** MIAMI-DADE |
| | **DFS-SOP #:** 17-000185637 |
| VS. | |
| DAIRYLAND INSURANCE COMPANY, A FOREIGN PROFIT CORPORATION | |
| DEFENDANT(S) | |

_____/

SUMMONS 20 DAY CORPORATE SERVICE, CIVIL COVER SHEET, PLAINTIFFS' CLASS ACTION COMPLAINT FOR DAMAGES

## NOTICE OF SERVICE OF PROCESS

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the Chief Financial Officer of the State of Florida. Said process was received in my office by MAIL on Monday, October 2, 2017 and a copy was forwarded by ELECTRONIC DELIVERY on Wednesday, October 4, 2017 to the designated agent for the named entity as shown below.

DAIRYLAND INSURANCE COMPANY
DONNA MOCH
1200 SOUTH PINE ISLAND ROAD
PLANTATION FL 33324

**\*Our office will only serve the initial process(Summons and Complaint) or Subpoena and is not responsible for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court pursuant to Florida Rules of Civil Procedure, Rule #1.080**

Jimmy Patronis
Chief Financial Officer

JOHN H RUIZ, ESQ.
MSP RECOVERY LAW FIRM
SUITE 400
5000 S.W. 75TH AVENUE
MIAMI FL 33155

SSD

Filing # 60795310 E-Filed 08/23/2017 01:22:52 PM

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒CIVIL  ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-019585-CA |
|---|---|---|
| PLAINTIFF(S)<br>MSP RECOVERY CLAIMS, SERIES LLC<br>a Delaware entity | VS. DEFENDANT(S)<br>DAIRYLAND INSURANCE COMPANY<br>a Foreign Profit Corporation | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): **DAIRYLAND INSURANCE COMPANY**

    c/o CT Corporation System as RA
    301 S. Bedford St. Ste. 1
    Madison, WI 53703   *c/o Florida Chief Financial officer as RA*
                      *200 East Gaines Street*
                      *Tallahassee, FL 32399*

Each defendant is required to serve written defense to the complaint or petition on

Plaintiff's Attorney: John H. Ruiz, Esq.,

        Frank C. Quesada, Esq.

whose address is:  MSP Recovery Law Firm,
                5000 S.W. 75ᵗʰ Ave, Suite 300,
                Miami, Florida 33155

within 20 days "Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN<br>CLERK of COURTS | *Gonelle Brown* 164659<br>DEPUTY CLERK | DATE<br>8/24/2017 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

Clerk's web address: www.miami-dadeclerk.com

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 17-19585 CA 06

MSP RECOVERY CLAIMS, SERIES LLC,

     Plaintiff,

v.

DAIRYLAND INSURANCE COMPANY,

     Defendant.

_____/

## <u>NOTICE OF FILING OF NOTICE OF REMOVAL</u>

     Defendant, Dairyland Insurance Company, hereby gives notice that, on October 31, 2017,

a Notice of Removal of this action was filed in the United States District Court for the Southern

District of Florida.  A true and correct copy of the Notice of Removal is attached hereto and

incorporated herein by reference as Exhibit A.

Respectfully submitted,

GUNSTER
*Counsel for Dairyland Insurance Company*
600 Brickell Avenue
Suite 3500
Miami, Florida  33131
Telephone:  305-376-6000
Facsimile:  305-376-6010

By: /s/ Angel A. Cortiñas
     Angel A. Cortiñas: FBN 797529
     Jonathan H Kaskel, FBN: 52718

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2017, the foregoing document was electronically filed using the E-filing Portal System, and a copy thereof has been furnished by email on the following Service List.

By: /s/ Jonathan  H Kaskel

**Gino Moreno, Esquire**
**John H. Ruiz, Esquire**
MSP RECOVERY
5000 SW 75th Ave Ste 400
Miami, Florida 33155
serve@msprecovery.com
gmoreno@msprecovery.com
jruiz@msprecovery.com
*Counsel for MSP Recovery Claims, Series LLC*

**Gonzalo R. Dorta, Esquire**
DORTA LAW
334 Minorca Avenue
Coral Gables, Florida 33134
file@dortalaw.com
grd@dortalaw.com
*Counsel for MSP Recovery Claims, Series LLC*

**Jacinto J. Gonzalez, Esquire**
STOKES & GONZALEZ, P.A.
7300 Kendall Drive, Suite 519
Miami, Florida 33156
jacinto@stokesgonzalez.com
jackie@stokesgonzalez.com
*Counsel for MSP Recovery Claims, Series LLC*

2